# In the United States District Court
# for the Central District of Illinois
# Peoria Division

| | |
|---|---|
| Jane Talkington, | |
| Plaintiff, | Case No. 25-cv-1318 |
| v. | Dist. Judge: |
| Sharla Helton, | Mag. Judge: |
| Defendant | |

**DECLARATORY JUDGMENT COMPLAINT AND JURY DEMAND**

Jane Talkington, by and through counsel Jonathan Phillips and Giselle Ayala of **PHILLIPS & BATHKE, P.C.**, alleges:

## Introduction

1. Plaintiff brings this action to protect herself against a threat of copyright, trade secret, right of publicity, and other litigation, demands to destroy her intellectual property, as well as to confirm her ownership in her own intellectual property. Defendant, essentially, seeks to interfere with Plaintiff's research, publishing, and advocacy concerning botulism. Defendant has threatened Plaintiff, accusing her of infringing on Defendant's copyrights, misappropriating Defendant's trade secrets, violating Defendant's right of publicity and consumer protection laws. Defendant went so far as to claim statutory damages for infringement of a work that did not yet exist. The Court should enter judgment that Plaintiff infringed no copyright, misappropriated no trade secret, and, further, that Plaintiff owns the intellectual property rights in her research efforts.

1

**Jurisdiction and Venue**

2. This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because it involves substantial claims arising under the federal Copyright Act and federal Defend Trade Secrets Act.

3. This Court has personal jurisdiction over the Defendant. As explained below, Defendant's threats are premised, at least in part, on an ongoing research and collaboration effort with Plaintiff located in Illinois. Defendant has, thus, transacted the very sort of business she claims concerns the intellectual property rights in question, and has contacts here in Illinois. Defendant has purposefully availed herself of the privilege of conducting the relevant activities here in Illinois. Additionally, Defendant has claimed ownership of intellectual property owned by Plaintiff here in Illinois and threatened litigation over events transpiring in central Illinois.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 for the same reasons.

**Parties**

5. Plaintiff, Jane Talkington, Ph.D., is an individual residing in Peoria, Illinois.

6. Defendant, Sharla Helton, M.D., is an individual residing in Oklahoma.

**Statement of Facts**

<u>Dr. Helton's background</u>

7. Sharla Helton, is a medical doctor who practiced in the Oklahoma City area.[1]

8. Dr. Helton was an obstetrician and gynecologist that eventually co-founded and was the medical director of Lakeside Hospital.

---

[1] Paragraphs 7-13 are asserted upon information and belief based on the assertions advanced in her suit against Allergan for her illness and its corresponding publicity.

9. In 2006, Dr. Helton received Botox cosmetic injections. And, around that same time, she, unfortunately, contracted botulism.

10. As a result of the botulism, Dr. Helton experienced profound weakness and fatigue. Initially bed-ridden she later could only walk 100 feet before being overcome with muscle fatigue.

11. Dr. Helton further alleged that the Botox injections also lead to toxic peripheral neuropathy, which caused both pain and numbness in her extremities.

12. In the end, these issues caused Dr. Helton to have to give up her medical career.

13. Ultimately, Dr. Helton sued Allergan, Inc., the maker of Botox.

14. After an April 2010 trial, a jury awarded her $15,000,000.

15. Allergan appealed.

16. Appeals upheld the verdict and the judgment stood.

17. There was a significant amount of publicity, including attorney marketing material, about Dr. Helton's case and the factual bases for it.

<u>Research collaboration</u>

18. In 2015, Dr. Helton provided Jane Talkington with hundreds of research publications that she represented to have used to build her legal case against Allergan.

19. At the time, Jane Talkington was a graduate student at Oklahoma State University.

20. Jane Talkington had successfully merged twelve research fields into a single dissertation using a historical methodology called Process Tracing.

21. Upon information and belief, this is why Dr. Helton sought Jane Talkington's services.

22. Dr. Helton had a project that involved three literature fields: biological warfare, public health, and medicine.

23. Dr. Helton secured Jane Talkington's part-time assistance to conduct further research on Botox and botulism.

24. Jane Talkington was paid by the hour by Dr. Helton.

25. Jane Talkington was an independent contractor, not an employee of Dr. Helton.

26. Dr. Helton did not withhold taxes on the pay she provided Jane Talkington.

27. Jane Talkington worked on her personal laptop, not one provided by Dr. Helton, in an office not provided by Dr. Helton.

28. Jane Talkington was not asked to and never signed a non-disclosure or confidentiality agreement concerning the research or her activities.

29. Jane Talkington was not asked to and never signed any document transferring intellectual property rights of any kind to Dr. Helton.

30. Under this independent contractor research arrangement, Jane Talkington and Dr. Helton searched out more articles concerning Botox, botulism, or both. Research covered topics such as migraine, cerebral palsy, pregnancy, lethal dose studies, biological warfare studies, and similar publicly available studies and articles.

31. While over 1,000 research articles were compiled during this collaborative research effort, these were all academic articles accessible through libraries and library databases.

32. During this time, Jane Talkington, at times, tagged and placed keywords on certain journal articles and publications.

33. This initial phase of collaboration occurred between 2015 and 2018.

34. At all times, Dr. Helton explained the research compilation was not just hers, but hers and Jane Talkington's.

35. There was no formal or informal agreement as to ownership beyond that.

36. Jane Talkington, through multiple conversations with Dr. Helton, developed a strategy on which botulism-related topics to publish on first, identifying names of potential journals and co-authors.

37. The expectation was that each would publish in their own botulism-related area of interest using these shared resources with a general desire to raise awareness.

38. In May 2016, Jane Talkington earned her Ph.D. She then enrolled in a program to earn an Interdisciplinary Toxicology certificate.

39. Thereafter, Jane Talkington's access to the software used to store and organize this research, which was a tool provided by Jane Talkington, not Dr. Helton. So, both her and Dr. Helton downloaded a copy of the compilation at that time.

40. No formal or informal, written or oral restrictions were placed on the use of the compilation.

41. No formal or informal, written or oral representations of ownership of the research were made.

42. From 2018 to 2024, Jane Talkington continued her research efforts into botulism and collaboration with Dr. Helton through publicly available resources.

43. During this stage of research collaboration, Jane Talkington was doing most of the research.

44. During this stage of the research collaboration, Dr. Helton was not paying Jane Talkington.

45. In fact, during this time, Jane Talkington became a known botulism academic in her own right.

46. Her research began focusing on early 1900's foodborne botulism, an area of particular interest to Jane Talkington, Ph.D.

47. Jane Talkington, Ph.D. interviewed a Peoria woman who contracted botulism in 1983.

48. She did so because Dr. Helton expressed interest in writing a medical case study about severe myasthenia gravis decades after botulism.

49. Jane Talkington, Ph.D. even prepared a draft manuscript on the topic based on, again, publicly available research materials.

50. Dr. Helton was shown a copy of this manuscript and provided feedback in 2019.

51. Again, there was no non-disclosure agreement, no confidentiality agreement, or any document purporting to establish ownership of intellectual property rights.

52. This collaboration continued during 2022 through present. During this time, Jane Talkington, Ph.D., taught at Bradley University in Peoria, Illinois.

53. Jane Talkington also worked at the Turner School of Entrepreneurship and Innovation at Bradley University.

54. Dr. Helton was well aware she was engaged in a research collaboration with an academic at Bradley University.

55. Dr. Helton even guest lectured in April 2023, on botulism during one of Jane Talkington Ph.D.'s courses, on Bradley University's campus.

56. As recently as 2024, Dr. Helton and Jane Talkington, had discussed purchasing a license for certain software to continue this interstate collaborative research effort.

57. As recently as June 2024, Dr. Helton suggested the formation of a limited liability company with herself, Jane Talkington, Ph.D., and a third party to prepare a book for publication. Ultimately, Dr. Helton decided to proceed on her own.

58. Around that same time, Jane Talkington and Dr. Helton discussed a strategy as to the timing of respective book releases on the subject matter, with the research and publication collaboration becoming a two-pronged approach to raise public awareness.

59. In July 2024, Jane Talkington provided Dr. Helton with a preview of the first several chapters of Talkington's historical botulism book.

60. By December 2024, Dr. Helton declined to provide further feedback or review of Jane Talkington's potential book.

61. Ultimately, Jane Talkington published *Recognizing Botculism* and established a historical botulism museum in a late 1800's home on historic Moss Avenue in Peoria, Illinois.

62. Dr. Helton repeatedly expressed awareness of Jane Talkington's efforts, including during her Illinois-based collaboration efforts.

63. For example, Dr. Helton was supportive of Jane Talkington, Ph.D.'s meeting with Ellen Weiss, an editor for All Things Considered on National Public Radio.

64. Dr. Helton also was aware and supportive of Jane Talkington, Ph.D.'s meeting with a Chicago Tribune reporter about the historical foodborne botulism outbreak in Peoria, Illinois.

65. The reporter came to Bradley University to interview Jane Talkington, Ph.D. in 2023.

66. Dr. Helton encouraged Jane Talkington, Ph.D. to ask the reporter if he would consider writing an investigative reporting piece on botulism from Botox, especially given the number of counterfeit Botox cases reported to the Centers for Disease Control in 2023.

67. In sum, Jane Talkington, Ph.D. and Sharla Helton, M.D. had a productive decade and a half of research, publishing, and awareness collaboration, including efforts and collaboration here, in Illinois. There were no efforts, by either, to divvy up intellectual property rights, maintain any trade secrets (insofar as any could exist), or otherwise transfer any rights that might exist in research collaboration efforts: all from publicly available sources.

Megan McCue

68. At some point, Megan McCue was injured from a botulinum toxin injection as well in July 2024.

69. In fall 2024, Jane Talkington, PhD. and Ms. McCue met by phone in 2024, having met "virtually" through a Facebook group that Jane Talkington, Ph.D. was active in.

70. Dr. Helton blessed and encouraged Jane Talkington, Ph.D.'s contributions to that Facebook group and as part of their collaboration, Jane Talkington, Ph.D. apprised Dr. Helton of novel botulism symptoms reported in the group.

71. Megan McCue published and released a book, *Me Tox Pretty: A Story of Iatrogenic Botulism and the Ugly Side of Cosmetic Injections* in December 2024. It told her story about contracting botulism after a Botox injection.

72. From Jane Talkington, Ph.D's impression, Megan McCue had already conducted a vast amount of research into iatrogenic botulism before Talkington met her.

8

73. Moreover, Ms. McCue had access to resources through the aforementioned Facebook group and was a speech language pathologist familiar with neurology.

74. In January 2025, Ms. McCue asked Jane Talkington, Ph.D. to put her in touch with Dr. Helton.

75. Ms. McCue interviewed, among others, Jane Talkington, Ph.D. and Dr. Helton, for her book *Notox: The Shocking Truth About Cosmetic Injections*, released in January 2025.

76. Upon information and belief, the only portions of this book referencing Dr. Helton are from publicly available information.

77. Then, Megan McCue published another book, *Iatrogenic Botulsim 101: A Guide for Doctors, Nurses & Other Healthcare Providers* in April 2025.

78. While Jane Talkington, Ph.D. was blessed with a dedication for this book, it was published without her input or advance knowledge.

Dr. Helton's escalation

79. Prior to 2025, to the best of Jane Talkington Ph.D.'s knowledge, Dr. Helton has not published any articles in peer-reviewed academic journals or published any books or manuscripts.

80. Apparently, in 2025, Dr. Helton completed a book or manuscript.

81. Dr. Helton applied for and secured a copyright registration, TXU 2-488-289 for that manuscript.

82. The effective date of that registration is May 13, 2025.

83. Less than one month later, Dr. Helton's attorneys sent a letter to Jane Talkington, Ph.D. Ex. 1.

84. In that letter, they refer to the registered manuscript as the Copyrighted Work. This Complaint will do the same.

85. In that letter, they claim that Jane Talkington Ph.D. infringed Dr. Helton's copyright directly or contributorily, in the 2025 Copyrighted Work.

86. The letter threatens statutory damages of up to $150,000 per infringement.

87. The letter claims trade secret protections in a research compilation built, at least in part, by Jane Talkington, Ph.D. over the years.

88. The letter threatens claims under U.S. trade secret law, i.e. the federal Defend Trade Secrets Act, and boldly claims Jane Talkington, Ph.D. "stole" a research compilation.

89. The letter threatens claims about right of publicity violations under Oklahoma law, despite Jane Talkington, Ph.D. being located in Illinois. And, Dr. Helton bases her threatened claims on events transpiring in Peoria, Illinois, *i.e.* appearing on a podcast from Peoria and being interviewed by WCBU, the Peoria, Illinois, Bradley University-located National Public Radio station.

90. The letter demands that Jane Talkington, Ph.D. cease engaging in copyright infringement for the Copyrighted Work.

91. The letter demands that Jane Talkington, Ph.D. cease using a research compilation she developed and owns, at least in part.

92. The letter demands the destruction of a research compilation that Jane Talkington, Ph.D. developed, at least in part.

93. These two demands constitute Dr. Helton reaching into this District to prevent Jane Talkington, Ph.D. from using her own intellectual property to conduct business and even destroying it.

### Count I - Declaratory Judgment of Non-Infringement of Copyright

94. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

95. Jane Talkington, Ph.D. did not copy any of Dr. Helton's Copyrighted Work, which was, according to the application to register the manuscript, completed only in 2025.

96. Jane Talkington, Ph.D. did not contribute to or induce Megan McCue to copy any of Dr. Helton's Copyrighted Work, which was only completed in 2025, in Ms. McCue's books that were released prior to the completion of the "Copyrighted Work."

97. Insofar as Dr. Helton claims there was copyright infringement by sharing other's articles, Dr. Helton does not own copyrights in the same.

98. Insofar as Dr. Helton claims there was copyright infringement based on information and data about botulism, facts are not subject to copyright protection.

99. Insofar as Dr. Helton claims there was some copyright protection for a compilation, then Jane Talkington, Ph.D. has equal copyright interests in such a compilation.

100. In sum, Jane Talkington, Ph.D. did not infringe any copyrights held by Dr. Helton, if any.

101. This Court should declare Jane Talkington, Ph.D. did not infringe any copyrights held by Dr. Helton, if any.

## Count II - Declaratory Judgment of Joint Authorship

102. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

103. Insofar as there is any copyright interest in the so-called "Research Compilation," then Jane Talkington, Ph.D. is a joint author and, therefore, owner of that copyright interest.

104. One cannot infringe something they own.

105. By accusing Jane Talkington, Ph.D. of infringement, Dr. Helton necessarily asserts Jane Talkington, Ph.D. lacks an ownership interest in the "Research Compillation."

106. This Court should declare Jane Talkington, Ph.D. is a joint author of the "Research Compillation."

107. This Court should declare that Jane Talkington, Ph.D. has an equal, undivided copyright interest in the "Research Compillation."

## Count III - Declaratory Judgment of Non-Misappropriation of Trade Secret

108. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

109. There is no trade secret involved here.

110. Dr. Helton took no steps to protect any secrets of any kind.

111. Articles themselves are not trade secrets.

112. Any efforts related to compiling and researching articles were not taken with any expectation of confidentiality.

113. The opposite was true, efforts were acknowledged to be joint and shared.

114. Dr. Helton undertook no efforts to maintain the secrecy of any research, research compilations, or otherwise.

115. Dr. Helton did not undertake reasonable efforts to maintain the secrecy of any research, research compilations, or otherwise.

116. As such, there is no trade secret to misappropriate.

117. As such, Jane Talkington, Ph.D. did not misappropriate any trade secret.

118. This Court should declare that Jane Talkington, Ph.D. did not violate the federal Defend Trade Secrets Act or any state-law analog.

**Count IV- Declaration of Joint Ownership of Trade Secret
In the alternative to Count III**

119. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

120. Should this Court conclude there was a protectable trade secret, it was jointly developed by Jane Talkington, Ph.D.

121. Thus, Jane Talkington, Ph.D. should be an owner of that trade secret or trade secrets as well.

122. This Court should declare Jane Talkington, Ph.D. as a joint owner of any trade secrets stemming from her research collaboration with Dr. Helton, including those developed while in Illinois.

**Request for Relief**

Plaintiff, Jane Talkington, requests that the Court declare and that a judgment be entered:

A. Declaring Plaintiff has not infringed any copyright interests held by Defendant;

B. Declaring Plaintiff is a joint author and owns an undivided, equal interest in any copyright-protectable materials she created during her research collaboration with Defendant;

C. Declaring there is no trade secret in the joint research efforts undertaken by Plaintiff and Defendant and Plaintiff has not misappropriated any trade secret owned by Defendant;

D. Declaring, in the alternative to C, Plaintiff is also an owner of any trade secret developed during the joint research efforts of Plaintiff and Defendant and, as a result, Plaintiff has not misappropriated what she already owns;

E. Plaintiff be awarded her reasonable attorneys' fees against Defendant under 17 U.S.C. § 505;

F. Plaintiff be granted such other further and general relief as may be just.

**Plaintiff demands a trial by jury on all counts so triable.**

Dated: August 1, 2025

Respectfully submitted,

JANE TALKINGTON, by

s/ Jonathan L.A. Phillips
Jonathan L.A. Phillips (IL6302752)
**Phillips & Bathke, P.C.**
300 Northeast Perry
Peoria, Illinois 61603
jlap@pb-iplaw.com
(309) 323-9476

Giselle Ayala (NY5724505)
**Phillips & Bathke, P.C.**
535 5th Avenue
Floor 4
New York, New York 10017
gam@pb-iplaw.com
(646) 470-2858
*Pending admission*