E-FILED
Monday, 12 January, 2026  10:11:23 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| Jane Talkington, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:25-cv-1318-JEH-RLH |
| | ) | |
| Sharla Helton, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| Sharla Helton, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Jane Talkington, | ) | |
| | ) | |
| Counterclaim-Defendant | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| Megan McCue, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED**
**DECLARATORY JUDGMENT COMPLAINT AND JURY DEMAND,**
**COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT**

Defendant Sharla Helton ("Defendant" or "Dr. Helton"), by and through undersigned counsel, files this Answer to Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(a) and the Court's Order entered October 29, 2025 [Dkt. No. 19], denying Defendant's motion to dismiss. Dr. Helton continues to object to and contest this Court's exercise

1

of personal jurisdiction over them (and, to the extent applicable, venue in this District), as previously raised under Rules 12(b)(2) and 12(b)(3). Dr. Helton files this Answer subject to, and without waiving, those objections, and Defendant expressly preserves them for all purposes, including any renewed request for jurisdictional/venue relief to the extent permitted by the Federal Rules and for any appellate review. Nothing in this Answer, or Dr. Helton's participation in these proceedings following the Court's Order, shall be construed as consent to personal jurisdiction, a waiver of any jurisdictional objection, or an admission of any allegation not expressly admitted herein. In addition to this Answer, Dr. Helton submits the following affirmative defenses, counterclaims, and third-party complaint.

## **INTRODUCTION**

1. Plaintiff brings this action to protect herself against a threat of copyright, trade secret, right of publicity, and other litigation, demands to destroy her intellectual property, as well as to confirm her ownership in her own intellectual property. Defendant, essentially, seeks to interfere with Plaintiff's research, publishing, and advocacy concerning botulism. Defendant has threatened Plaintiff, accusing her of infringing on Defendant's copyrights, misappropriating Defendant's trade secrets, violating Defendant's right of publicity and consumer protection laws. Defendant went so far as to claim statutory damages for infringement of a work that did not yet exist. The Court should enter judgment that Plaintiff infringed no copyright, misappropriated no trade secret, and, further, that Plaintiff owns the intellectual property rights in her research efforts.

**ANSWER**: Paragraph 1 consists of Plaintiff's characterization of her lawsuit and legal conclusions, to which no response is required. To the extent a response is deemed required, Dr. Helton denies Plaintiff's allegations that Dr. Helton has "threatened" Plaintiff improperly or sought to interfere with Plaintiff's legitimate research and publishing. Dr. Helton affirmatively states that

any actions she has taken to enforce her rights were in good faith to protect her own intellectual property and economic interests. Dr. Helton denies that Plaintiff owns the intellectual property at issue or that Plaintiff is entitled to the relief requested in Paragraph 1.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because it involves substantial claims arising under the federal Copyright Act and federal Defend Trade Secrets Act.

**ANSWER**: Dr. Helton admits that Plaintiff purports to invoke federal question jurisdiction under the cited statutes (15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338) for claims under the Copyright Act and Defend Trade Secrets Act.

3. This Court has personal jurisdiction over the Defendant. As explained below, Defendant's threats are premised, at least in part, on an ongoing research and collaboration effort with Plaintiff located in Illinois. Defendant has, thus, transacted the very sort of business she claims concerns the intellectual property rights in question, and has contacts here in Illinois. Defendant has purposefully availed herself of the privilege of conducting the relevant activities here in Illinois. Additionally, Defendant has claimed ownership of intellectual property owned by Plaintiff here in Illinois and threatened litigation over events transpiring in central Illinois.

**ANSWER**: Dr. Helton admits that she is an Oklahoma resident and that Plaintiff has alleged an "ongoing research collaboration" involving Illinois, but Dr. Helton expressly denies that she purposefully directed any activities toward Illinois sufficient to confer personal jurisdiction. Dr. Helton maintains that she has only limited contacts with Illinois and did not undertake any suit-related conduct in Illinois. Indeed, Dr. Helton previously moved to dismiss for lack of personal jurisdiction and improper venue. Notwithstanding those denials and defenses, Dr.

Helton will answer on the merits as required according to the Court's Order [Dkt. No. 19], finding that personal jurisdiction exists. Dr. Helton expressly preserves her objection to personal jurisdiction previously asserted, and nothing in this Answer shall be deemed a waiver of that objection or consent to personal jurisdiction. As to any further factual allegations made by Plaintiff in Paragraph 3, Dr. Helton denies the same.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 for the same reasons.

**ANSWER**: Dr. Helton maintains that she has only limited contacts with Illinois and did not undertake any suit-related conduct in Illinois. Likewise, Dr. Helton expressly denies that venue is proper in this District, as none of the substantial events giving rise to Plaintiff's claims occurred in Illinois. Dr. Helton admits that this Court has entered an Order [Dkt. No. 19] finding that venue is proper in the Central District of Illinois. Dr. Helton expressly preserves her objection to venue previously asserted, and nothing in this Answer shall be deemed a waiver of that objection or consent to venue in this jurisdiction. As to any other factual allegations made by Plaintiff in Paragraph 4, Dr. Helton denies the same.

## PARTIES

5. Plaintiff, Jane Talkington, Ph.D., is an individual residing in Peoria, Illinois at the time the initial complaint was filed.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information sufficient to form a belief as to the truth of the residence allegation in Paragraph 5 and therefore denies the same.

6. Defendant, Sharla Helton, M.D., is an individual residing in Oklahoma.

**ANSWER**:  Dr. Helton admits the allegation in Paragraph 6 that she is an individual residing in the State of Oklahoma.

## STATEMENT OF FACTS
### Dr. Helton's Background

7. Sharla Helton is a medical doctor who practiced in the Oklahoma City area.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 7 that she is a medical doctor who practiced in the Oklahoma City area.

8. Dr. Helton was an obstetrician and gynecologist that eventually co-founded and was the medical director of Lakeside Hospital.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 8 that she was an obstetrician and gynecologist and co-founded Lakeside Women's Hospital, where she served as Medical Director.

9. In 2006, Dr. Helton received Botox cosmetic injections. And, around that same time, she, unfortunately, contracted botulism.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 9 that in 2006, she received BOTOX® cosmetic injections and around that time contracted botulism.

10. As a result of the botulism, Dr. Helton experienced profound weakness and fatigue. Initially bed-ridden she later could only walk 100 feet before being overcome with muscle fatigue.

**ANSWER**: Dr. Helton admits she experienced physical symptoms due to botulism after receiving BOTOX® cosmetic injections, including weakness and fatigue, but denies any remaining allegations or implications contained in Paragraph 10.

11. Dr. Helton further alleged that the Botox injections also lead to toxic peripheral neuropathy, which caused both pain and numbness in her extremities.

**ANSWER**: Dr. Helton admits that the BOTOX® cosmetic injections caused specific medical issues, including neuropathy, but denies any remaining allegations or implications contained in Paragraph 11.

5

12. In the end, these issues caused Dr. Helton to have to give up her medical career.

**ANSWER**: Dr. Helton admits that she had to cease active clinical practice due to her botulism and associated medical issues, but denies the remaining allegations in Paragraph 12 to the extent they imply she relinquished her medical license or professional currency in the field of medicine.

13. Ultimately, Dr. Helton sued Allergan, Inc., the maker of Botox.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 13 that she sued Allergan, Inc., the manufacturer of BOTOX®, to seek redress for her injuries.

14. After an April 2010 trial, a jury awarded her $15,000,000.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 14 that in April 2010, a jury awarded her approximately $15,000,000 in damages.

15. Allergan appealed.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 15 that Allergan appealed the verdict.

16. Appeals upheld the verdict and the judgment stood.

**ANSWER**: Presuming that "Appeals" is intended to refer to the Oklahoma Court of Civil Appeals, Dr. Helton admits the procedural history and outcomes of the litigation against Allergan, Inc., as paraphrased in Paragraphs 13 through 16, but denies any remaining implications or characterizations inconsistent with court records.

17. There was a significant amount of publicity, including attorney marketing material, about Dr. Helton's case and the factual bases for it.

**ANSWER**: Dr. Helton admits that the litigation referenced in Paragraph 17 received media attention, but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations and implications, and therefore denies the same.

### Research Collaboration

18. In 2015, Dr. Helton provided Jane Talkington with hundreds of research publications that she represented to have used to build her legal case against Allergan.

**ANSWER**: Dr. Helton admits the allegation in Paragraph 18 that in 2015 she provided Plaintiff with an extensive collection of research publications (on the order of thousands of articles) that Dr. Helton researched, analyzed, and collected as part of the materials used in her legal case against Allergan, but denies any remaining allegations and implications in Paragraph 18.

19. At the time, Jane Talkington was a graduate student at Oklahoma State University.

**ANSWER**: Dr. Helton admits the allegations in Paragraph 19 that at that time, Plaintiff was a graduate student at Oklahoma State University.

20. Jane Talkington had successfully merged twelve research fields into a single dissertation using a historical methodology called Process Tracing.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies the same.

21. Upon information and belief, this is why Dr. Helton sought Jane Talkington's Services.

**ANSWER**: To the extent Paragraph 21 suggests a motivation, Dr. Helton admits that she agreed to engage Plaintiff for assistance but denies any implication that Dr. Helton's reason for engaging Plaintiff was Plaintiff's purported dissertation methodology; instead, Dr. Helton's interest was in administrative and clerical assistance to organize the materials that were provided to Plaintiff as detailed in Paragraph 18, and for the charitable reasons outlined in Dr. Helton's counterclaims, *infra*.

22. Dr. Helton had a project that involved three literature fields: biological warfare, public health, and medicine.

**ANSWER**: Dr. Helton admits that she possesses a research library containing literature regarding various fields, including, but not limited to, biological warfare, public health, and medicine, but denies any remaining allegations or implications in Paragraph 22.

23. Dr. Helton secured Jane Talkington's part-time assistance to conduct further research on Botox and botulism.

**ANSWER**: Dr. Helton denies the allegations in Paragraph 23.

24. Jane Talkington was paid by the hour by Dr. Helton.

**ANSWER**: Dr. Helton admits that she compensated Plaintiff on an hourly basis for administrative and clerical assistance.

25. Jane Talkington was an independent contractor, not an employee of Dr. Helton.

**ANSWER**: Dr. Helton admits that Plaintiff was retained as an independent contractor for administrative and clerical assistance and was not treated as a W-2 employee for tax purposes. Dr. Helton denies any remaining allegations or implications in Paragraph 25.

26. Dr. Helton did not withhold taxes on the pay she provided Jane Talkington.

**ANSWER**: Dr. Helton admits that she did not withhold taxes or provide typical employment benefits, consistent with Plaintiff's status as an independent contractor providing administrative and clerical services.

27. Jane Talkington worked on her personal laptop, not one provided by Dr. Helton, in an office not provided by Dr. Helton.

**ANSWER**: Dr. Helton admits that she did not provide a laptop computer or an office to Plaintiff, given their status as an independent contractor providing administrative and clerical

services, but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 27.

28. Jane Talkington was not asked to and never signed a non-disclosure or confidentiality agreement concerning the research or her activities.

**ANSWER**: Dr. Helton admits she did not execute a written non-disclosure agreement with Plaintiff, but denies the remaining allegations of Paragraph 28 to the extent that they do not accurately reflect the administrative and clerical nature of the activities performed.

29. Jane Talkington was not asked to and never signed any document transferring intellectual property rights of any kind to Dr. Helton.

**ANSWER**: Dr. Helton admits that she did not execute a written assignment agreement with Plaintiff regarding the transfer of any intellectual property rights to Dr. Helton, but denies any remaining allegations or implications in Paragraph 29 to the extent that they do not accurately reflect the administrative and clerical nature of the activities performed by Plaintiff and therefore the existence or generation of intellectual property by Plaintiff during her time working for Dr. Helton.

30. Under this independent contractor research arrangement, Jane Talkington and Dr. Helton searched out more articles concerning Botox, botulism, or both. Research covered topics such as migraine, cerebral palsy, pregnancy, lethal dose studies, biological warfare studies, and similar publicly available studies and articles.

**ANSWER**: Dr. Helton admits that further literature about topics such as those listed in Paragraph 30 was found during the time Plaintiff was engaged as an independent contractor, but denies any remaining allegations or implications contained in Paragraph 30.

31. While over 1,000 research articles were compiled during this collaborative research effort, these were all academic articles accessible through libraries and library databases.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 31.

32. During this time, Jane Talkington, at times, tagged and placed keywords on certain journal articles and publications.

**ANSWER**: Dr. Helton admits that during this time she directed Plaintiff to tag and place keywords on particular journal articles and publications as part of Plaintiff's administrative and clerical duties, but denies any remaining allegations or implications contained in Paragraph 32.

33. This initial phase of collaboration occurred between 2015 and 2018.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 33 to the extent that they do not accurately reflect the timeline of the administrative and clerical services performed by Plaintiff.

34. At all times, Dr. Helton explained the research compilation was not just hers, but hers and Jane Talkington's.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 34.

35. There was no formal or informal agreement as to ownership beyond that.

**ANSWER**: Dr. Helton admits that there was no written agreement as to ownership in Dr. Helton's intellectual property, but denies any remaining allegations or implications contained in Paragraph 35 to the extent that they imply Plaintiff created or was given any ownership in Dr. Helton's intellectual property.

36. Jane Talkington, through multiple conversations with Dr. Helton, developed a strategy on which botulism-related topics to publish on first, identifying names of potential journals and co-authors.

**ANSWER**: Dr. Helton admits that she, at times, discussed the publication of information and personal narratives with Plaintiff as part of their administrative and clerical services, but denies the remaining allegations and any implication that this information was developed independently by Plaintiff, as contained in Paragraph 36.

37. The expectation was that each would publish in their own botulism-related area of interest using these shared resources with a general desire to raise awareness.

**ANSWER**: Dr. Helton denies that her research compilation was a "shared resource," denies that Plaintiff was ever expected to publish anything related to botulism, and denies any remaining allegations or implications contained in Paragraph 37.

38. In May 2016, Jane Talkington earned her Ph.D. She then enrolled in a program to earn an Interdisciplinary Toxicology certificate.

**ANSWER**: Dr. Helton admits that Plaintiff earned a Ph.D. in or around July 2016. Dr. Helton admits only that Plaintiff purportedly enrolled in a toxicology course, but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 38, and therefore denies the same.

39. Thereafter, Jane Talkington's access to the software used to store and organize this research, which was a tool provided by Jane Talkington, not Dr. Helton. So, both her and Dr. Helton downloaded a copy of the compilation at that time.

**ANSWER**: Dr. Helton admits that Plaintiff, as a university student, was provided resource management software under a student license, and that Plaintiff preferred to use this software over any other software that Dr. Helton may have provided. Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 39,

given that the first sentence of Paragraph 39 fails to state a coherent fact or claim regarding "access," and therefore denies the same.

40. No formal or informal, written or oral restrictions were placed on the use of the compilation.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 40.

41. No formal or informal, written or oral representations of ownership of the research were made.

**ANSWER**: Dr. Helton admits that no formal written agreement of ownership of her research compilation was executed during the time Plaintiff worked for her, but denies the remaining allegations and implications contained in Paragraph 41.

42. From 2018 to 2024, Jane Talkington continued her research efforts into botulism and collaboration with Dr. Helton through publicly available resources.

**ANSWER**: Dr. Helton denies the existence of any research collaboration with Plaintiff and any remaining allegations or implications contained in Paragraph 42.

43. During this stage of research collaboration, Jane Talkington was doing most of the research.

**ANSWER**: Dr. Helton denies the existence of a research collaboration with Plaintiff and any remaining allegations or implications contained in Paragraph 43.

44. During this stage of the research collaboration, Dr. Helton was not paying Jane Talkington.

**ANSWER**: Dr. Helton admits that she ceased payments to Plaintiff in or around 2018, because Plaintiff's employment was terminated and they were no longer performing administrative or clerical work for Dr. Helton, but denies any remaining allegations or implications contained in

12

Paragraph 44 to the extent that they imply a "research collaboration" existed between Dr. Helton and Plaintiff.

45. In fact, during this time, Jane Talkington became a known botulism academic in her own right. Indeed, Jane Talkington, Ph.D., was selected as a keynote speaker at a symposium on the topic in Dartmouth, Massachusetts.

**ANSWER**: Dr. Helton admits only that Plaintiff became a self-proclaimed botulism academic without any apparent academic credentials supporting the same, but lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 45, and therefore denies the same.

46. Her research began focusing on early 1900's foodborne botulism, an area of particular interest to Jane Talkington, Ph.D.

**ANSWER**: Dr. Helton admits that Plaintiff purports to have independently researched early 1900's foodborne botulism, but lacks sufficient knowledge or information to form a belief as to the truth of any remaining allegations or implications set forth in Paragraph 46, and therefore denies the same.

### Dr. Helton's Direction of Peoria, Illinois Activities

47. This collaboration continued during 2022 through present. During this time, Jane Talkington, Ph.D., taught at Bradley University in Peoria, Illinois.

**ANSWER**: Dr. Helton denies that a collaboration existed, at any time, between the Plaintiff and Dr. Helton. Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations or implications set forth in Paragraph 47.

48. Jane Talkington also worked at the Turner School of Entrepreneurship and Innovation at Bradley University.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 48.

49. Dr. Helton was well aware she was engaged in a research collaboration with an academic at Bradley University.

**ANSWER**: Dr. Helton denies the existence of a research collaboration with Plaintiff and any remaining allegations or implications contained in Paragraph 49.

50. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, at least 88 emails were exchanged between Dr. Helton and Jane Talkington, Ph.D, all focused on the research collaboration between the two.

**ANSWER**: Dr. Helton admits that Plaintiff sent her copious emails during this time, but denies that emails were "exchanged" to the extent that it implies Dr. Helton read or responded to such emails from Plaintiff. Dr. Helton denies any remaining allegations or implications contained in Paragraph 50.

51. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, Dr. Helton was provided with at least 26 academic publications by Jane Talkington, Ph.D. in furtherance of this research collaboration.

**ANSWER**: Dr. Helton denies the allegations or implications contained in Paragraph 44 to the extent that they imply a "research collaboration" existed between Dr. Helton and Plaintiff, and to the extent that they imply Dr. Helton requested that Plaintiff provide ongoing unpaid administrative and clerical work to Dr. Helton.

52. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, Dr. Helton provided Jane Talkington, Ph.D. with at least three academic publications in furtherance of this research publication.

14

**ANSWER**: Dr. Helton denies the allegations or implications contained in Paragraph 52 to the extent that they imply a " research collaboration" existed between Dr. Helton and Plaintiff and to the extent that they imply Dr. Helton requested that Plaintiff provide ongoing unpaid administrative and clerical services to Dr. Helton.

53. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, PhD. included a 2022 grant proposal submitted to a Peoria, Illinois hospital.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 53, particularly the existence of a research collaboration with Plaintiff and any knowledge of, or participation in, a grant proposal submitted to an Illinois hospital.

54. The grant proposal was for a Botulism Research Repository and involved Dr. Helton reviewing the grant proposal that would facilitate further research within the research collaboration between the two.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 54, particularly the existence of a research collaboration with Plaintiff and the review of any grant proposal.

55. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Jane Talkington, Ph.D. interviewing botulism victims in Peoria.

**ANSWER**: Dr. Helton denies the allegations contained in Paragraph 55, particularly the existence of a research collaboration with Plaintiff and any involvement in Plaintiff's unilateral and unrequested interview efforts. Dr. Helton admits only that she was aware Plaintiff was

interviewing botulism victims in Peoria in connection with a class Plaintiff was purportedly teaching.

56. In particular, as it relates to the above paragraph, Dr. Helton requested that Jane Talkington, Ph.D. meet with a local Peoria woman who suffered from botulism with Dr. Helton requesting that Jane Talkington, Ph.D. secure the woman's medical records for Dr. Helton's review.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 56, particularly the existence of a research collaboration with Plaintiff. Dr. Helton has never directed, requested, or otherwise suggested that Plaintiff, who holds no scientific or medical credentials, meet with any botulism victims or obtain any medical records of any such botulism victims.

57. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton requesting to meet with a Peoria, Illinois intellectual property consultant concerning intellectual property and business opportunities arising from the research collaboration.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 57, particularly the existence of a research collaboration with Plaintiff. Indeed, Dr. Helton has never requested to meet with any intellectual property consultant, in Peoria, Illinois, or elsewhere, nor has Dr. Helton made any expressions to Plaintiff that would suggest that they share any ownership in any of Dr. Helton's intellectual property.

58. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton requesting Jane Talkington, Ph.D. issue Freedom of Information Act requests to the Center for Disease Control on Dr. Helton's behalf.

16

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 58, particularly the existence of a research collaboration with Plaintiff. If Dr. Helton ever requested that Plaintiff submit a FOIA request to the CDC on her behalf, it was upon Plaintiff's unilateral first offer to do so.

59. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton reviewing early drafts of Jane Talkington, Ph.D.'s historical botulism book.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 59, particularly the existence of a research collaboration with Plaintiff. Dr. Helton admits reviewing drafts of Plaintiff's historical botulism book as a personal favor to Plaintiff upon her request.

60. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton requesting Jane Talkington, Ph.D. secure research articles for her.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 60, particularly the existence of a research collaboration with Plaintiff. If Dr. Helton received any such articles from Plaintiff, they were first proffered by Plaintiff through their unilateral initiative, and thereafter, Dr. Helton may have indicated an interest in reviewing the article.

61. Dr. Helton even guest lectured in April 2023, on botulism during one of Jane Talkington Ph.D.'s courses, on Bradley University's campus.

**ANSWER**: Dr. Helton admits providing a virtual guest lecture, via Zoom from Oklahoma City, for approximately thirty (30) minutes at Talkington's request in April of 2024, but denies the remaining allegations and implications contained in Paragraph 61. Indeed, Dr. Helton has never been physically present in Peoria, Illinois, let alone Bradley University's campus.

17

62. As recently as 2024, Dr. Helton and Jane Talkington, had discussed purchasing a license for certain software to continue this interstate collaborative research effort.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 62, particularly the existence of a research collaboration with Plaintiff. Dr. Helton denies explicitly that the parties discussed purchasing software. Rather, Plaintiff unilaterally contacted Dr. Helton to solicit the software as a Christmas gift for Plaintiff. Dr. Helton did not purchase the software, nor did she respond to Plaintiff's request for this Christmas present.

63. As recently as June 2024, Dr. Helton suggested the formation of a limited liability company with herself, Jane Talkington, Ph.D., and a third party to prepare a book for publication. Ultimately, Dr. Helton decided to proceed on her own.

**ANSWER**: Dr. Helton admits that in the summer of 2024, after urging by Plaintiff, she participated in a phone discussion with Plaintiff and a third party regarding a potential publication project concerning topics associated with long-term botulism, including information and research Dr. Helton held as intellectual property and as a trade secret, and the possible formation of an LLC for such purposes. Dr. Helton denies any remaining allegations, implications, and characterizations in Paragraph 63. Specifically, Dr. Helton denies that she unilaterally decided to proceed on her own; rather, Plaintiff contacted Dr. Helton approximately one week after such LLC discussion to expressly decline any involvement therein.

64. Around that same time, Jane Talkington and Dr. Helton discussed a strategy as to the timing of respective book releases on the subject matter, with the research and publication collaboration becoming a two-pronged approach to raise public awareness on botulism, the subject matter of the research collaboration, and potential business opportunities.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 64. Dr. Helton explicitly denies that the parties discussed any strategies regarding the timing of book releases, nor was there any "two-pronged" research collaborative approach or discussion of joint business opportunities, as Plaintiff lacks the requisite academic or medical credentials for any such joint business opportunity.

65. In July 2024, Jane Talkington provided Dr. Helton with a preview of the first several chapters of Talkington's historical botulism book.

**ANSWER**: Dr. Helton admits that Plaintiff provided, unsolicited, her with various drafts from Plaintiff's historical botulism book on multiple occasions beginning in approximately 2018.

66. By December 2024, Dr. Helton declined to provide further feedback or review of Jane Talkington's potential book.

**ANSWER**: Dr. Helton denies that she declined to provide feedback or review of Plaintiff's historical botulism book; in fact, Dr. Helton provided feedback to Plaintiff in December 2024, explicitly telling Plaintiff that they were not to use any part of Dr.Helton's story in such a book. Upon information and belief, the potential book was Plaintiff's independent project, authored with the assistance of graduate students and presumably written by a generative AI chatbot. Dr. Helton was not credited in the work, received no profits from it, and explicitly refused Plaintiff any rights in and to her intellectual property or personal story.

67. Ultimately, Jane Talkington published Recognizing Botulism and established a historical botulism museum in a late 1800's home on historic Moss Avenue in Peoria, Illinois.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations or implications contained in Paragraph 67 and therefore can neither admit nor deny.

68. Dr. Helton repeatedly expressed awareness of Jane Talkington's efforts, including during her Illinois-based collaboration efforts.

**ANSWER**: Dr. Helton admits that Plaintiff unilaterally, and without request, informed her of certain activities Plaintiff was undertaking, specifically regarding Plaintiff's own book and teaching duties at Bradley University. Dr. Helton denies the remaining allegations in Paragraph 68, specifically the characterization of these activities as "collaboration efforts." Indeed, Dr. Helton was not involved in Plaintiff's decision-making processes, and all such efforts were Plaintiff's unilateral actions unrelated to Dr. Helton.

69. Dr. Helton also was aware and supportive of Jane Talkington, Ph.D.'s meeting with a Chicago Tribune reporter about the historical foodborne botulism outbreak in Peoria, Illinois.

**ANSWER**: Dr. Helton admits only that Plaintiff unilaterally, and without request, informed her of a meeting with a reporter after Plaintiff had already arranged it. Dr. Helton denies the remaining allegations and implications in Paragraph 69.

70. The reporter came to Bradley University, in Peoria, Illinois, to interview Jane Talkington, Ph.D. in 2023.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 70 and therefore denies the same.

71. Dr. Helton requested and encouraged Jane Talkington, Ph.D. to contact the Chicago Tribune reporter to inquire whether he would consider writing an investigative reporting piece on botulism from Botox, especially given the number of counterfeit Botox cases reported to the Centers for Disease Control in 2023.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 71. Dr. Helton specifically denies having requested or encouraged Plaintiff to contact a reporter

20

regarding botulism, BOTOX®, or counterfeit cases. Dr. Helton has no knowledge of the reporter in question or any discussions that were undertaken. Any inquiry made by Plaintiff on this subject was done unilaterally for their own self-promotion and without Dr. Helton's request, involvement, or direction.

72. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton requesting Jane Talkington, Ph.D. monitor social media websites and secure information and screenshots for Dr. Helton's use in a documentary.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 72, particularly the existence of a research collaboration with Plaintiff. Dr. Helton avers that Plaintiff's use of social media, and any information gathered or actions she took on social media, were undertaken solely for her own self-promotion and not at Dr. Helton's request, involvement, or direction.

73. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton requesting and encouraging Jane Talkington, Ph.D. to share counterfeit Botox news reports and the declining of the aforementioned FOIA request by the CDC with the Chicago Tribune reporter.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 73, particularly the existence of a research collaboration with Plaintiff. Dr. Helton specifically denies requesting or encouraging Plaintiff to share news reports or FOIA information with a reporter. Dr. Helton was not involved in any efforts with a reporter, and any communication Plaintiff had with

the media regarding these topics was a unilateral decision made solely for her own self-promotion, without Dr. Helton's request, involvement, or direction.

74. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Jane Talkington, Ph.D. looking into and providing Dr. Helton with a list of academic publishers for Dr. Helton to publish her potential Book.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 74, particularly the existence of a research collaboration with Plaintiff. Dr. Helton specifically denies having requested or received a list of academic publishers from Plaintiff.

75. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton contacting Jane Talkington, Ph.D. to request she contact the group Public Citizen to discuss their petition to the Food and Drug Administration regarding labeling for Botox.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 75, particularly the existence of a research collaboration with Plaintiff. Dr. Helton specifically denies requesting that Plaintiff contact Public Citizen.

76. During this time, while Dr. Helton knew she was working with an academic in Peoria, Illinois, the research collaboration between Dr. Helton and Jane Talkington, Ph.D. included Dr. Helton coordinating business opportunities in the form of generating of articles for the two to coordinate on and write on and coordinating the order of the proposed articles.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 76, particularly the existence of a research collaboration with Plaintiff. Dr. Helton specifically denies

coordinating with Plaintiff to write or the ordering of any articles, given that Plaintiff lacks the academic and medical credentials to credibly collaborate with Dr. Helton on these topics.

77. In sum, Jane Talkington, Ph.D. and Sharla Helton, M.D. had a productive decade and a half of research, publishing, and awareness collaboration, including efforts and collaboration here, in Illinois.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 77, particularly the existence of any collaboration or research efforts in Illinois or elsewhere. Dr. Helton specifically denies that the parties engaged in a "productive collaboration" of any kind, let alone one spanning a decade and a half.

78. Between 2022 and the filing of the suit, Dr. Helton repeatedly requested Jane Talkington, Ph.D., in Peoria, Illinois, undertake activities in furtherance of the research collaboration and to generate business opportunities, including Illinois and Peoria, Illinois-specific efforts outlined above.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 78, particularly the existence of a research collaboration with Plaintiff. Dr. Helton never requested that Plaintiff undertake activities to further a "research collaboration" or generate business opportunities in Illinois or elsewhere.

79. There were no efforts, by either, to divvy up intellectual property rights, maintain any trade secrets (insofar as any could exist), or otherwise transfer any rights that might exist in research collaboration efforts: all from publicly available sources.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 79, particularly the existence of a research collaboration with Plaintiff.

23

**Megan McCue**

80. At some point, Megan McCue was injured from a botulinum toxin injection as well in July 2024.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 80 and therefore denies the same.

81. In fall 2024, Jane Talkington, PhD. and Ms. McCue met by phone in 2024, having met "virtually" through a Facebook group that Jane Talkington, Ph.D. was active in.

**ANSWER**: Dr. Helton admits that, upon information and belief, Plaintiff and McCue met in 2024, but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 81 and therefore denies the same.

82. Dr. Helton blessed and encouraged Jane Talkington, Ph.D.'s contributions to that Facebook group and as part of their collaboration, Jane Talkington, Ph.D. apprised Dr. Helton of novel botulism symptoms reported in the group.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 82, particularly the existence of a research collaboration with Plaintiff.

83. Megan McCue published and released a book, Me Tox Pretty: A Story of Iatrogenic Botulism and the Ugly Side of Cosmetic Injections in December 2024. It told her story about contracting botulism after a Botox injection.

**ANSWER**: Dr. Helton admits that McCue released a publication in or around December 2024 but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 83 and therefore denies the same.

84. From Jane Talkington, Ph.D's impression, Megan McCue had already conducted a vast amount of research into iatrogenic botulism before Talkington met her.

**ANSWER**: Dr. Helton denies knowledge of Plaintiff's subjective impressions. Upon information and belief, Dr. Helton denies the validity of Plaintiff's characterization that McCue conducted "vast research" into iatrogenic botulism and any remaining allegations or implications contained in Paragraph 84.

85. Moreover, Ms. McCue had access to resources through the aforementioned Facebook group and was a speech language pathologist familiar with neurology.

**ANSWER**: Dr. Helton admits only that, upon information and belief, McCue had access to the Facebook group for a period of time before being blocked and removed from said group following accusations that she misappropriated information and plagiarized group content for use in her book. Dr. Helton denies any remaining allegations or implications contained in Paragraph 85.

86. In January 2025, Ms. McCue asked Jane Talkington, Ph.D. to put her in touch with Dr. Helton.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the specific communications between McCue and Plaintiff regarding this request, and therefore denies the allegations in Paragraph 86.

87. Ms. McCue interviewed, among others, Jane Talkington, Ph.D. and Dr. Helton, for her book Notox: The Shocking Truth About Cosmetic Injections, released in January 2025.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 87. Dr. Helton states that Plaintiff contacted her under false pretenses, stating that McCue was ill and in need of guidance and support regarding botulism recovery. Dr. Helton agreed to speak with McCue solely to provide medical support, based on Plaintiff's deceptive misrepresentation. Dr. Helton never consented to an interview, nor did she provide information for publication.

88. Upon information and belief, the only portions of this book referencing Dr. Helton are from publicly available information.

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 88. Dr. Helton specifically denies that she sanctioned, authorized, or validated the references to herself in said book (*Notox*). Rather, Dr. Helton explicitly informed McCue prior to publication that she did not have permission to include Dr. Helton's story in her book, yet Ms. McCue proceeded to publish with such information contained therein.

89. Then, Megan McCue published another book, Iatrogenic Botulism 101: A Guide for Doctors, Nurses & Other Healthcare Providers in April 2025.

**ANSWER**: Dr. Helton admits that McCue appears to have released a publication titled Iatrogenic Botulism 101 in or around April 2025, but lacks sufficient knowledge or information to form a belief as to the truth of any remaining allegations or implications contained in Paragraph 89 and therefore denies the same.

90. While Jane Talkington, Ph.D. was blessed with a dedication for this book, it was published without her input or advance knowledge.

**ANSWER**: Dr. Helton lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 90 and therefore denies the same.

### Dr. Helton's Escalation

91. Prior to 2025, to the best of Jane Talkington Ph.D.'s knowledge, Dr. Helton has not published any articles in peer-reviewed academic journals or published any books or manuscripts.

**ANSWER**: Dr. Helton admits that she did not publish any articles, books, or manuscripts prior to 2025, but denies any remaining allegations or implications contained in Paragraph 91.

92. Apparently, in 2025, Dr. Helton completed a book or manuscript.

26

**ANSWER**: Dr. Helton admits that she had a draft written manuscript in 2025, but denies any remaining allegations or implications contained in Paragraph 92.

93. Dr. Helton applied for and secured a copyright registration, TXU 2-488-289 for that manuscript.

**ANSWER**: Dr. Helton admits that she secured a copyright registration, TXU 2-488-289, for a manuscript, but denies any remaining allegations or implications contained in Paragraph 93.

94. The effective date of that registration is May 13, 2025.

**ANSWER**: Dr. Helton admits that the effective date of copyright registration TXU 2-488-289 is May 13, 2025, but denies any further implications.

95. Less than one month later, Dr. Helton's attorneys sent a letter to Jane Talkington, Ph.D. [Doc. No. 1-1].

**ANSWER**: Dr. Helton admits that her counsel sent a letter to Plaintiff on or about June 11, 2025.

96. In that letter, they refer to the registered manuscript as the Copyrighted Work. This Amended Complaint will do the same.

**ANSWER**: Dr. Helton admits that the June 11, 2025, letter refers to her registered manuscript as the "Copyrighted Work."

97. In that letter, they claim that Jane Talkington Ph.D. infringed Dr. Helton's copyright directly or contributorily, in the 2025 Copyrighted Work.

**ANSWER**: Dr. Helton admits that the June 11, 2025, letter to Plaintiff provided notice to Plaintiff of her infringement of Dr. Helton's copyrighted material(s) and misappropriation of Dr. Helton's trade secret(s).

98. The letter threatens statutory damages of up to $150,000 per infringement.

**ANSWER**: Dr. Helton admits that the letter notified Plaintiff that Dr. Helton may be entitled to statutory damages of up to $150,000.00 per willful copyright infringement under 17 U.S.C. § 504(c), but denies any remaining allegations or implications contained in Paragraph 98.

99. The letter claims trade secret protections in a research compilation built, at least in part, by Jane Talkington, Ph.D. over the years.

**ANSWER**: Dr. Helton admits that the letter asserts trade secret protection over her research compilation. Dr. Helton denies any allegation or implication that the compilation was, in any part, "built, at least in part by" Plaintiff.

100. The letter threatens claims under U.S. trade secret law, i.e. the federal Defend Trade Secrets Act, and boldly claims Jane Talkington, Ph.D. "stole" a research Compilation.

**ANSWER**: Dr. Helton admits that the letter asserts Plaintiff violated U.S. trade secret laws, in part, by unlawfully acquiring, maintaining, using, and disseminating Dr. Helton's trade secret research compilation, with reason to know it was improper to take it. Dr. Helton denies any remaining allegations or implications contained in Paragraph 100.

101. The letter threatens claims about right of publicity violations under Oklahoma law, despite Jane Talkington, Ph.D. being located in Illinois.

**ANSWER**: Dr. Helton admits that the letter addresses violations of her rights of publicity under applicable law, including Oklahoma law, to protect Dr. Helton's name, image, and likeness from unauthorized commercial use by Plaintiff. Dr. Helton denies any remaining allegations or implications contained in Paragraph 101.

102. Dr. Helton bases her threatened claims on events transpiring in Peoria, Illinois, i.e. appearing on a podcast from Peoria and being interviewed by WCBU, the Peoria, Illinois, Bradley University-located National Public Radio station.

**ANSWER**: Dr. Helton admits that the letter references the podcast and interview in question, specifically because Plaintiff utilized these platforms to disseminate demonstrable falsehoods regarding her relationship with Dr. Helton. Dr. Helton denies any remaining allegations or implications contained in Paragraph 102.

103. The letter demands that Jane Talkington, Ph.D. cease engaging in copyright infringement for the Copyrighted Work.

**ANSWER**: Dr. Helton admits that the letter demands that Plaintiff cease and desist from copying, displaying, distributing, or otherwise using the Copyrighted Work as well as any derivatives therefrom.

104. The letter demands that Jane Talkington, Ph.D. cease using a research compilation she developed and owns, at least in part.

**ANSWER**:  Dr. Helton admits that the letter demands that Plaintiff cease using the trade secret research compilation. Dr. Helton denies the allegation that Plaintiff "developed and owns" any part of said trade secret research compilation.

105. The letter demands the destruction of a research compilation that Jane Talkington, Ph.D. developed, at least in part.

**ANSWER**: Dr. Helton admits that the letter demands the destruction/return of the trade secret research compilation that Plaintiff unlawfully possessed. Dr. Helton denies that Plaintiff developed any part of the trade secret research compilation.

106. These two demands constitute Dr. Helton reaching into this District to prevent Jane Talkington, Ph.D. from using her own intellectual property to conduct business as an academic and even destroy research located in Peoria, Illinois.

**ANSWER**: Dr. Helton denies the allegations, implications, and conclusory legal conclusions contained in Paragraph 106. Dr. Helton denies that she is preventing Plaintiff from using "her own" intellectual property; instead, Dr. Helton sought to enforce her lawful ownership rights in the Copyrighted Work and the trade secret research compilation to prevent Plaintiff's egregious theft and misuse thereof. Dr. Helton denies the allegation and implication that she sought to "destroy research located in Peoria, Illinois."

107. The dispute centers not only on Peoria, Illinois- and Illinois-specific acts, the letter sought to prohibit activities in Peoria, Illinois, contested ownership of intellectual property developed and held in Peoria, Illinois, and, overall, centers around an ongoing research collaboration where Dr. Helton directed research and business development opportunities in Peoria, Illinois.

**ANSWER**: Dr. Helton denies the allegations, implications, and legal conclusions contained in Paragraph 107.

108. This dispute, as it relates to ownership of intellectual property rights, centers around intellectual property developed in Peoria, Illinois.

**ANSWER**: Dr. Helton denies the allegations, implications, and legal conclusions contained in Paragraph 108.

### Count I - Declaratory Judgment of Non-Infringement of Copyright

109. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

**ANSWER**: Dr. Helton incorporates by reference each and every Answer to Plaintiff's factual allegations contained in Paragraphs 1 through 108 as though fully set forth herein.

110. Jane Talkington, Ph.D. did not copy any of Dr. Helton's Copyrighted Work, which was, according to the application to register the manuscript, completed only in 2025.

**ANSWER**: Paragraph 110 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 110.

111. Jane Talkington, Ph.D. did not contribute to or induce Megan McCue to copy any of Dr. Helton's Copyrighted Work, which was only completed in 2025, in Ms. McCue's books that were released prior to the completion of the "Copyrighted Work."

**ANSWER**: Paragraph 111 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 111.

112. Insofar as Dr. Helton claims there was copyright infringement by sharing other's articles, Dr. Helton does not own copyrights in the same.

**ANSWER**: Paragraph 112 consists of a hypothetical factual conclusion, or a legal conclusion, to which no response is required. To the extent that a response is deemed required, Dr. Helton otherwise denies the allegations and implications contained in Paragraph 112.

113. Insofar as Dr. Helton claims there was copyright infringement based on information and data about botulism, facts are not subject to copyright Protection.

**ANSWER**: Paragraph 113 consists of a hypothetical factual conclusion, or a legal conclusion, to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 113.

114. Insofar as Dr. Helton claims there was some copyright protection for a compilation, then Jane Talkington, Ph.D. has equal copyright interests in such a Compilation.

**ANSWER**:  Paragraph 114 consists of a hypothetical factual conclusion, or a legal conclusion, to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 114.

115. In sum, Jane Talkington, Ph.D. did not infringe any copyrights held by Dr. Helton, if any.

**ANSWER**: Paragraph 115 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 115.

116. This Court should declare Jane Talkington, Ph.D. did not infringe any copyrights held by Dr. Helton, if any.

**ANSWER**: Paragraph 116 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 116.

### Count II - Declaratory Judgment of Joint Authorship

117. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

**ANSWER**: Dr. Helton incorporates by reference each and every Answer to the Plaintiff's factual allegations contained in Paragraphs 1 through 116 as though fully set forth herein.

118. Insofar as there is any copyright interest in the so-called "Research Compillation," then Jane Talkington, Ph.D. is a joint author and, therefore, owner of that copyright interest.

**ANSWER**:  Paragraph 118 consists of a hypothetical factual conclusion, or a legal conclusion, to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 118.

119. One cannot infringe something they own.

**ANSWER**: Paragraph 119 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 119.

120. By accusing Jane Talkington, Ph.D. of infringement, Dr. Helton necessarily asserts Jane Talkington, Ph.D. lacks an ownership interest in the "Research Compillation."

**ANSWER**: Paragraph 120 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 120.

121. This Court should declare Jane Talkington, Ph.D. is a joint author of the "Research Compillation."

**ANSWER**: Paragraph 121 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 121.

122. This Court should declare that Jane Talkington, Ph.D. has an equal, undivided copyright interest in the "Research Compillation." (*sic*)

**ANSWER**: Paragraph 122 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 122.

**Count III - Declaratory Judgment of Non-Misappropriation of Trade Secret**

123. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

**ANSWER**: Dr. Helton incorporates by reference each and every Answer to the Plaintiff's factual allegations contained in Paragraphs 1 through 122 as though fully set forth herein.

124. There is no trade secret involved here.

**ANSWER**: Paragraph 124 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 124.

125. Dr. Helton took no steps to protect any secrets of any kind.

**ANSWER**: Paragraph 125 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 125.

126. Articles themselves are not trade secrets.

**ANSWER**: Paragraph 126 asks for a conclusory legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 126.

127. Any efforts related to compiling and researching articles were not taken with any expectation of confidentiality.

**ANSWER**: Paragraph 127 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 127.

128. The opposite was true, efforts were acknowledged to be joint and shared.

**ANSWER**:  Dr. Helton denies the allegations and implications contained in Paragraph 128.

129. Dr. Helton undertook no efforts to maintain the secrecy of any research, research compilations, or otherwise.

34

**ANSWER**: Dr. Helton denies the allegations and implications contained in Paragraph 129.

130. Dr. Helton did not undertake reasonable efforts to maintain the secrecy of any research, research compilations, or otherwise.

**ANSWER**: Paragraph 130 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 130.

131. As such, there is no trade secret to misappropriate.

**ANSWER**: Paragraph 131 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 131.

132. As such, Jane Talkington, Ph.D. did not misappropriate any trade secret.

**ANSWER**: Paragraph 132 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 132.

133. This Court should declare that Jane Talkington, Ph.D. did not violate the federal Defend Trade Secrets Act or any state-law analog.

**ANSWER**: Paragraph 133 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 133.

### Count IV- Declaration of Joint Ownership of Trade Secret
### In the alternative to Count III

134. Jane Talkington, Ph.D., Plaintiff, reasserts and restates the foregoing paragraphs as if set forth here.

**ANSWER**: Dr. Helton incorporates by reference each and every Answer to the Plaintiff's factual allegations contained in Paragraphs 1 through 133 as though fully set forth herein.

135. Should this Court conclude there was a protectable trade secret, it was jointly developed by Jane Talkington, Ph.D.

**ANSWER**: Paragraph 135 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 135.

136. Thus, Jane Talkington, Ph.D. should be an owner of that trade secret or trade secrets as well.

**ANSWER**: Paragraph 136 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 136.

137. This Court should declare Jane Talkington, Ph.D. as a joint owner of any trade secrets stemming from her research collaboration with Dr. Helton, including those developed while in Illinois.

**ANSWER**: Paragraph 137 asks for a legal conclusion to which no response is required. To the extent that a response is deemed required, Dr. Helton denies the allegations and implications contained in Paragraph 137.

## REQUEST FOR RELIEF

Plaintiff, Jane Talkington, requests that the Court declare and that a judgment be entered:

A. Declaring Plaintiff has not infringed any copyright interests held by Defendant;

**ANSWER**:    Dr. Helton denies the allegations in Paragraph A and asserts that Plaintiff has infringed upon Dr. Helton's copyright interests.

B. Declaring Plaintiff is a joint author and owns an undivided, equal interest in any copyright-protectable materials she created during her research collaboration with Defendant;

**ANSWER**:    Dr. Helton denies the allegations in Paragraph B and asserts that Plaintiff is not a joint author and does not own any interest in the copyright-protectable materials.

C. Declaring there is no trade secret in the joint research efforts undertaken by Plaintiff and Defendant and Plaintiff has not misappropriated any trade secret owned by Defendant;

**ANSWER**:    Dr. Helton denies the allegations in Paragraph C and asserts that there are trade secrets in the joint research efforts and that Plaintiff has misappropriated Dr. Helton's trade secrets.

D. Declaring, in the alternative to C, Plaintiff is also an owner of any trade secret developed during the joint research efforts of Plaintiff and Defendant and, as a result, Plaintiff has not misappropriated what she already owns;

**ANSWER**:    Dr. Helton denies the allegations in Paragraph D and asserts that Plaintiff is not an owner of any trade secret developed during the joint research efforts.

E. Plaintiff be awarded her reasonable attorneys' fees against Defendant under 17 U.S.C. § 505;

**ANSWER**:    Dr. Helton denies that Plaintiff is entitled to any attorneys' fees under 17 U.S.C. § 505.

F. Plaintiff be granted such other further and general relief as may be just.

**ANSWER**:    Defendant denies that Plaintiff is entitled to any further or general relief.

## JURY TRIAL CLAIM

Dr. Helton hereby requests trial by jury on all claims so triable.

## DEFENDANT, DR. HELTON'S AFFIRMATIVE
## DEFENSES TO PLAINTIFF'S CLAIMS

Defendant, Dr. Helton, alleges the following as separate and affirmative defenses to Plaintiff's Complaint. By virtue of having listed the following defenses, Dr. Helton does not assume any legal or factual burden not otherwise assigned to it under the law:

Dr. Helton asserts the following affirmative defenses in Answer to Dr. Talkington's First Amended Complaint. [Dkt. No. 11] Each defense is stated in plain terms and supported by a short factual basis drawn from Dr. Helton's own allegations and understanding of events, *infra*. These affirmative defenses are pleaded in the alternative and do not concede that Plaintiff has stated any valid claim.

1.    **Failure to State a Claim**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, because they fail to state a valid claim upon which relief can be granted. Even accepting the First Amended Complaint's allegations as accurate for this purpose, Plaintiff has not pleaded facts sufficient to establish the necessary elements of her claims. By way of example, but not by way of limitation, Plaintiff has not shown a legal entitlement to co-authorship, ownership, or relief beyond what was already provided to her. Therefore, the Complaint, in whole or in part, does not set forth a viable cause of action.

2.    **Statute of Limitations**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, under the applicable statutes of limitations. To the extent Plaintiff's claims arise from events occurring many years ago during the Work Arrangement, discussed *infra*, those claims are untimely. As such, Plaintiff has waited an unreasonably long period before filing suit in 2025, and any causes of action accruing outside the limitations period cannot be maintained.

3.    **Statute of Frauds (No Enforceable Contract)**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, under the Statute of Frauds. Any alleged agreement between Dr. Helton and Plaintiff for joint authorship, profit-sharing, or long-term collaboration is unenforceable under the Statute of Frauds and related contract principles. The parties had no written contract memorializing any such arrangement. Any supposed oral promise to share intellectual property or future proceeds could not be performed within one year (given the multi-year scope of the parties' relationship) and is void for lack of a writing. Moreover, there was no meeting of the minds or binding contract; Dr. Helton's own understanding is that their arrangement was temporary assistance, not a long-term contractual collaboration.

4.    **Waiver/Release/Discharge**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, because Plaintiff has waived, released, and/or discharged its claims against Dr. Helton. Throughout the relationship, Plaintiff voluntarily provided administrative and clerical services to Dr. Helton with the understanding that it was Dr. Helton's research without demanding co-ownership or additional compensation. Dr. Helton repeatedly made clear that her personal story, botulism research, and Research Compilation were her work and that they were not to be used, shared, or published by Plaintiff without Dr. Helton's permission and consent. By acquiescing in that arrangement, accepting payment for her administrative and clerical services, and never previously claiming authorship or ownership over Dr. Helton's personal story, botulism research, and/or Research Compilation until now, Plaintiff knowingly relinquished any such claims and cannot reverse course after the fact.

5.    **Promissory and/or Equitable Estoppel**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, under the doctrines of promissory and/or equitable estoppel. For example, but not by way of limitation, Plaintiff is equitably estopped from

pursuing her claims by her own words and deeds, including by leading Dr. Helton to reasonably believe that Plaintiff had no ownership interest in her personal story, botulism research, and/or the Research Compilation. Plaintiff was employed in an administrative and clerical role and never indicated that there was any expectation of joint ownership or authorship credit in Dr. Helton's personal story, botulism research, and/or Research Compilation. Dr. Helton relied on this understanding in continuing to invest time and resources into her intellectual property. It would be unjust to allow Plaintiff to assert rights now, and thus her claims are barred by estoppel.

6.    **Consent**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, as any actions by Dr. Helton, about which Plaintiff complains, were taken with Plaintiff's knowledge and consent.

7.    **License**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, as Plaintiff granted Dr. Helton an implied license to use any copyrightable material or intellectual property that Plaintiff contributed.

8.    **Payment and Accord and Satisfaction**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, as Plaintiff's claims for compensation or unjust enrichment are barred because Dr. Helton has already paid and satisfied any obligations for Plaintiff's administrative and clerical work. To the extent Plaintiff expected any payment or benefit from the administrative and clerical tasks she performed on Dr. Helton's behalf, those expectations have been met or exceeded. Thus, any claim for additional payment or unjust enrichment that Plaintiff has or may bring has been discharged by accord and satisfaction, or is subject to an offset for amounts already paid.

9.      **Laches**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, as Plaintiff's claims are barred by laches due to her unreasonable delay in asserting her alleged rights and/or filing suit, thereby prejudicing Dr. Helton's rights.

10.     **Unclean Hands**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, by the doctrine of unclean hands because her own inequitable conduct is directly related to the subject of this suit. By Dr. Helton's account, Plaintiff has repeatedly breached the trust Dr. Helton placed in them as an administrative and clerical employee while pursuing a graduate-level degree. For example, but not by way of limitation, Plaintiff has (a) claimed to others that they were a colleague of Dr. Helton's and likewise a botulism expert conducting research, (b) contacted at least one botulism victim and attempted to collect medical records under false pretenses of working on Dr. Helton's behalf, and (c) published, without consent, portions of Dr. Helton's personal story and botulism research and in an inaccurate manner. Plaintiff has also engaged in academically dishonest behavior, such as plagiarizing a colleague's work and passing it off as her own, which calls into question her judgment and good faith in bringing this litigation, which, at its heart, involves Plaintiff's attempted usurpation of Dr. Helton's medical and research prominence and accolades. In light of this and other to be proven misconduct, Plaintiff does not come to this Court with clean hands. Equity will not reward a plaintiff who has acted fraudulently or inequitably in relation to the matters at issue. Because Plaintiff has acted in bad faith and violated the confidence Dr. Helton placed in her, any equitable relief (including declarations of rights or ownership in intellectual property) is barred.

11.     **Failure to Plead/Prove Special Damages**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, because it fails to plead and/or prove the requisite special damages required to plead such claims.

12.    **Standing.** The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, because Plaintiff lacks standing to bring such causes of action.

12.    **No Specific Intent**. The First Amended Complaint, and each cause of action therein, is barred, in whole or in part, because Plaintiff cannot show that Dr. Helton has the requisite intent necessary for the maintenance of such claims.

13.    **Adequacy of Remedy at Law**. The First Amended Complaint, and each cause of action therein asserting an equitable claim, is barred, in whole or in part, because Plaintiff has an adequate remedy at law. Any injury or damage allegedly suffered by Plaintiff would be adequately compensated in an action or claim at law for damages. Accordingly, Plaintiff is not entitled to any equitable relief.

14.    **Election of Remedies**. The First Amended Complaint, and each cause of action therein asserting an equitable claim, is barred, in whole or in part, under the doctrine of election of remedies.

15.    **Setoff and Recoupment**. Without conceding that Dr. Helton has caused any damage to Plaintiff, Dr. Helton is entitled to setoff and recoup, against any judgment that may be entered against her, all obligations of Plaintiff owing to Dr. Helton.

16.    **Reservation of Rights**. Dr. Helton reserves the right to amend, supplement, and/or assert additional affirmative defenses that may become applicable as discovery progresses and further factual development warrants. No statement in these affirmative defenses is an admission of any allegation not expressly admitted, and Dr. Helton continues to deny all liability. Each of the foregoing defenses is pleaded in the alternative and shall not be construed as an admission of any fact or of the validity of any claim. All defenses available under Fed. R. Civ. P. 8(c) or any other rule or law are hereby expressly reserved.

## DR. HELTON'S COUNTERCLAIMS
## AGAINST COUNTER-DEFENDANT TALKINGTON

1.     Pursuant to Fed. R. Civ. P. 13, Defendant and Counterclaim Plaintiff, Dr. Sharla

Helton, asserts counterclaims (the "Counterclaims") against Plaintiff and Counterclaim Defendant,

Jane Talkington ("Plaintiff," "Talkington," or "Counterclaim Defendant"), as follows:

### Nature and Basis of this Action

2.     This action arises under the Copyright Act, 17 U.S.C. § 101 et seq., the Defend

Trade Secrets Act, 18 U.S.C. § 1836 et seq.,  the Lanham Act, 15 U.S.C. § 1125 et seq., and

applicable Oklahoma and Illinois state law, and out of Plaintiff, Jane Talkington's, effort to

weaponize a declaratory-judgment complaint to seize, recast, and nullify Defendant, Sharla

Helton's, long-standing intellectual property rights. Talkington's First Amended Complaint [Dkt.

No. 21] is not a defensive filing brought in good faith to clarify legitimate legal uncertainty; it is

an affirmative attempt to rewrite history, appropriate proprietary research and authorship that she

does not own, and insulate her own misconduct by racing to the courthouse. Through a pattern of

misrepresentation, unauthorized use of confidential materials, and calculated interference with Dr.

Helton's protected works and economic interests, Talkington has caused concrete and continuing

harm for which Dr. Helton now seeks affirmative relief.

3.     Let it be clear, at its core, this action represents a profound betrayal of benevolence,

loyalty, and confidentiality rather than a dispute between so-called academic peers. The

relationship between the Parties was not a "collaboration" of equals, but a charitable lifeline

extended by Dr. Helton to a supposed friend in need. Talkington was not the architect of the trade

secret research compilation; she was a destitute and academically failing "friend" hired years after

the compilation was created to perform administrative and clerical tasks. Dr. Helton created a paid

role for Talkington solely to provide financial stability during Talkington's never-ending personal

43

crises. In return for Dr. Helton's benevolence, Talkington misappropriated the trade secret research compilation that she was paid to organize. Rather than being a trustworthy academic, Talkington stole Dr. Helton's life's work and has cloaked herself with Dr. Helton's reputation to fuel her own commercial ventures and reputational arrogance. Dr. Helton now asks this Court to confirm Talkington's breach of trust and loyalty, acknowledge Dr. Helton as the sole valid owner of the Copyrighted Work and the trade secret research compilation, and appropriately penalize Talkington for her underhanded and unlawful misuse of the trust Dr. Helton unknowingly misplaced in Talkington.

## Jurisdiction and Venue

4.      This Court has subject-matter jurisdiction over Dr. Helton's Counterclaims pursuant to 28 U.S.C. § 1331 and § 1332.

5.      This Court has supplemental jurisdiction over state-law counterclaims pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the claims asserted by Talkington.

6.      This Court has ordered that Venue is proper in this District under 28 U.S.C. § 1391. [Dkt. No. 19].

## Parties

7.      Counterclaim Plaintiff Dr. Sharla Helton ("Dr. Helton") is an individual residing in the State of Oklahoma.

8.      Upon information and belief, Counterclaim Defendant Jane Talkington ("Talkington" or "Plaintiff") is an individual currently, and at the time that the First Amended Complaint was filed, a resident of the State of Kansas.

## <u>FACTUAL NARRATIVE OF DR. HELTON'S COUNTERCLAIMS</u>

### Personal History between the Parties

9.      Dr. Helton and Talkington met in or around 1983 as undergraduate students at Oklahoma State University. They were in the same sorority, with Talkington being two years behind Dr. Helton. Talkington admired Dr. Helton and chose her as her sorority "big sister," establishing an early dynamic in which Dr. Helton was both a friend and a mentor to Talkington.

10.      Upon information and belief, Talkington left Oklahoma State University in or around 1984 before graduating and moved to Virginia after marrying her first husband. Thereafter, Dr. Helton and Talkington spoke approximately one or two times as acquaintances.

11.      Talkington and Dr. Helton became reacquainted in or around 1999 when Talkington, unannounced, appeared at Dr. Helton's Oklahoma City, Oklahoma, medical office, pregnant by her third husband with her second child, without health insurance, and without the financial means to pay for the birth. Dr. Helton, a practicing obstetrician at the time, provided free obstetric care to Talkington and delivered her second child.

12.      In 2001, Talkington, once again lacking health insurance and the financial means to pay for the birth of a third child with her third husband, contacted Dr. Helton again, seeking free obstetric medical services for this third pregnancy. Dr. Helton agreed to Talkington's request and provided free obstetric care, delivering her third child free of charge.

13.      In or around 2007, Talkington, recently divorced and yet again without the financial means to pay for the birth of a fourth child by a new partner, returned to Dr. Helton seeking free obstetric medical services for this fourth pregnancy. Although Talkington had obtained insurance at this time, upon information and belief, Medicaid, Dr. Helton agreed to waive her physician fees as a personal kindness to Talkington.

14.     Throughout the time encompassing Talkington's second, third, and fourth pregnancies, Dr. Helton provided free obstetric medical services to Talkington.

**The Creation of Dr. Helton's Proprietary Research Library**

15.     In 2006, after receiving BOTOX® injections, Dr. Helton contracted iatrogenic botulism. Dr. Helton's symptoms, including nerve pain, muscle weakness, fatigue, difficulty breathing, and difficulty swallowing, necessitated self-directed diagnostic efforts by Dr. Helton and her husband, a Board-Certified anesthesiologist.

16.     Iatrogenic botulism is a rare, distinct, and potentially life-threatening illness caused by the injection of botulinum toxin (e.g., BOTOX®) for cosmetic or therapeutic purposes. Unlike foodborne botulism, which results from ingesting the preformed toxin, or wound botulism, iatrogenic botulism occurs when the injected neurotoxin spreads beyond the injection site, causing systemic symptoms. For the purposes of this Answer, Counterclaims, and Third-Party Claims, where the term "botulism" is used, it is to be understood that it refers to iatrogenic botulism unless specifically indicated otherwise.

17.     With the help of her anesthesiologist husband, Dr. Helton undertook extensive research to confirm her diagnosis of botulism and efforts at survival. In this effort, Dr. Helton and her husband researched, gathered, and analyzed thousands of documents on a broad range of neurological diseases and potential treatment options.

18.     Dr. Helton filed a products liability lawsuit against Allergan, Inc. ("Allergan"), the maker of BOTOX®, in 2008. As part of moving this product-liability case against the maker of BOTOX® forward, Dr. Helton conducted additional botulism research and analysis and organized her extensive collection of information on botulism.

19.     In the course of this research, Dr. Helton collected, analyzed, and characterized thousands of studies and materials, including studies produced by the maker of BOTOX®, historical military research (including wartime experiments and conclusions reached), and other classified documents. None of this information had previously been collected, analyzed, organized, and characterized in any manner.

20.     At all relevant times, Talkington was fully aware that Dr. Helton's proprietary research compilation and concurrent analysis were born of Dr. Helton's specific product liability litigation and her personal survival efforts. At all relevant times, Talkington explicitly understood that this collection and its analysis comprised a rare and unique asset containing restricted materials that were otherwise inaccessible to the general public or academic community.

21.     Before 2014, Dr. Helton and her husband hired two full-time administrative and clerical secretaries to assist in managing the volume of information in Dr. Helton's collection and in her analysis thereof.

22.     At all relevant times, Dr. Helton took reasonable measures to keep this collection of information and her analyses actually secret and unavailable to third parties, including the steps of, but not limited to, (a) directing and reinforcing to employees that the information was proprietary and confidential, and (b) restricting access to the information through utilization of secure passwords and maintaining physical security protocols for physical documents stored in her personal office.

23.     In all, Dr. Helton, with her personal experience and medical expertise, in collaboration with her anesthesiologist husband, had created a confidential and proprietary collection of physical and electronic research documents and she reviewed and prepared analyses herein collectively referred to herein as the "Trade Secret" with the electronic records stored in an

ENDNOTE$^{(TM)}$ library being referred to herein as the "Research Compilation"). Dr. Helton used this Trade Secret and Research Compilation, for example but not by way of limitation, to perform comparative analysis of symptomatology and outcomes across all physiological systems implicated in botulism.

24.    Dr. Helton's Trade Secret and Research Compilation proved its independent economic value as early as 2010, when it served as an essential forensic and research instrument enabling Dr. Helton to secure a fifteen million U.S. dollars ($15,000,000) jury verdict against the maker of BOTOX$^{®}$ that was ultimately upheld on appeal.

25.    In total, the Research Compilation is not merely a collection of publicly available articles, but a collection that also contains unique and publicly unavailable resources and documents, and Dr. Helton's analyses thereon that Dr. Helton created over multiple years of creative, extensive, and specialized investigation and research. Many of the references within the Trade Secret and Research Compilation were not simply findable or accessible through conventional public database searches,

26.    For example, but not by way of limitation, the Trade Secret and Research Compilation contains secret governmental testing data and conclusions, confidential internal documents produced by the maker of BOTOX$^{®}$ during Dr. Helton's 2010 litigation and jury trial, and materials that were only discovered and ultimately obtainable through in-person searches at the National Library of Medicine in Bethesda, Maryland.

27.    Notably, the Trade Secret and Research Compilation also includes Dr. Helton's research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions derived from her independent scientific and medical analysis of the materials.

28.    Dr. Helton's research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions do not exist in the public domain and have never been publicly disseminated by Dr. Helton.

29.    The immense personal and economic value of Dr. Helton's Trade Secret and Research Compilation lies not in any single reference or document therein, but in the original selection, organization, categorization, cross-referencing, and synthesis of these materials, together with Dr. Helton's research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions. Taken as a whole, the Trade Secret and Research Compilation comprises protected work product and intellectual property, independent of whether any isolated source document might theoretically exist elsewhere.

30.    Before 2010, Dr. Helton's Trade Secret and Research Compilation existed in physical binders and digital folders on her and her husband's personal computers. Still, it had not yet been organized within a unified citation software program (a.k.a. a "reference management software").

31.    In or around 2010, Dr. Helton began writing a manuscript (the "Botulism Manuscript") utilizing the Trade Secret and Research Compilation to create a complex manuscript that intertwined her personal survivor memoir with rigorous scientific analysis of the pathophysiology of botulism. An application for copyright registration of the Botulism Manuscript was made and eventually registered on May 13, 2025, as Registration No. TXU 002-488-289.

32.    Upon information and belief, Talkington became aware of Dr. Helton's successful verdict and substantial financial recovery from the maker of BOTOX® in or around 2014 through news accounts of the successful appeal of Dr. Helton's significant jury award against the maker of BOTOX®.

33.     Despite having been largely absent during the most critical and painful years of Dr. Helton's illness with botulism, survival, and litigation with the maker of BOTOX® (between approximately 2006 and 2014), Talkington re-initiated contact with Dr. Helton only after news of her successful appeal of the jury verdict was reported.

34.     Before Talkington's reinstatement of contact with Dr. Helton, upon information and belief, Talkington was unaware of Dr. Helton's research into botulism, the Trade Secret, and/or the Research Compilation.

### Dr. Helton's Repeated Benevolence Toward Talkington

35.     Between 2010 and early 2015, upon information and belief, Talkington was in a doctoral program at Oklahoma State University and communicated sporadically and unilaterally with Dr. Helton regarding further proceedings in her lawsuit against the maker of BOTOX®. During this period, Talkington once again married and, several years later, divorced.

36.     In or around late 2014, Talkington was in her eighth year as a doctoral student at Oklahoma State University and, upon information and belief, was facing imminent removal from Oklahoma State University for failing to complete her dissertation. At this time, Talkington once again reached out to Dr. Helton, seeking a financial lifeline, stating that she lacked the means to feed her children.

37.     In or around the same time, Dr. Helton's personal secretary was assisting with the management of the Trade Secret and Research Compilation. In particular, this personal secretary provided administrative and clerical assistance by organizing and tagging the documents within the Trade Secret and Research Compilation by subject matter.

38.     Recognizing the academic and economic value and usefulness of the Trade Secret and Research Compilation, Dr. Helton believed that digitizing the entire compilation (including

50

her research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions) and thereafter further organizing this information would be beneficial to Dr. Helton's future research efforts, allow for the preparation of the Botulism Manuscript, and increase the Trade Secret and Research Compilation's overall usefulness and economic value. By this time, Dr. Helton had written at least 950 pages of her Botulism Manuscript, and her Trade Secret and Research Compilation comprised well-over 3,000 discrete documents.

39.     Solely to assist Talkington in sustaining herself and her children, Dr. Helton loaned Talkington at least $25,000.00 (which was never repaid) and gifted her at least $2,000.00 worth of Target gift cards. (See Exhibit 1 attached hereto).

40.     Given Talkington's inability to financially provide for her family, Dr. Helton encouraged her to complete her doctoral program so she could graduate and find a paying academic position.

41.     At this time, Dr. Helton, concerned about Talkington's children's well-being, offered and paid Talkington thirty dollars an hour ($30/hr.) for hourly work to edit Dr. Helton's daughter's college application essays and create a curriculum vitae therefor.

42.     After this hourly editor work was completed, with Talkington still in dire need of financial assistance, Dr. Helton created a temporary, hourly role (continuing the $30/hr.) for Talkington to assist with the administrative and clerical transfer of Dr. Helton's Trade Secret and Research Compilation into a digital format (the "Work Arrangement"). Although Dr. Helton had been using the EASYBIB™ reference management software, Talkington recommended using the ENDNOTE™ reference management software because Talkington had free access to it and had training on how to use this software as a graduate student.

43.     This hourly administrative and clerical position, i.e., the Work Arrangement, was not a vacancy Dr. Helton sought to fill after a prior employee left; rather, Dr. Helton created this hourly administrative and clerical position solely as a favor to help Talkington regain some manner of financial footing, complete her education, and provide for her children

44.     At all times relevant, Dr. Helton told Talkington that the Work Arrangement was temporary and not an academic or research collaboration among colleagues or peers.

45.     The Work Arrangement had one sole goal shared by Dr. Helton and Talkington: enabling Talkington to financially provide for her children until she graduated with her PhD and secured a job.

46.     The Work Arrangement began in early 2015 and ended by late 2017.

47.     Upon information and belief, Talkington's undergraduate and graduate studies in marketing, business, and environmental science did not include coursework or training in human anatomy, physiology, biochemistry, clinical pathology, or medical diagnostics.

48.     Upon further information and belief, Talkington has never been involved in any scientific laboratory research, let alone microbiological or medical laboratory research, and before the Work Arrangement, Talkington lacked subject-matter competency to independently research, interpret, or evaluate the medical research, references, and data comprising the Trade Secret and/or the Research Compilation.

49.     Under the Work Arrangement, Talkington was necessarily limited to performing administrative and clerical tasks at the sole direction of Dr. Helton.

50.     In particular, but not by way of limitation, during the Work Arrangement, Talkington was paid hourly to: (a) physically organize the materials in the Trade Secret and Research Compilation when Talkington was physically present in Oklahoma City (the documents

comprising the Trade Secret and Research Compilation were physically located at Dr. Helton's home in Oklahoma City), and thereafter (b) enter the PDF'd documents into the ENDNOTE[TM] software, organize these materials within the online ENDNOTE[TM] software, code these documents with words or phrases provided by Talkington, as well as other administrative and clerical tasks as directed by Dr. Helton.

51.    During the Work Arrangement, Dr. Helton would at times request and specifically direct Talkington to retrieve and/or read articles she identified, in order to word-tag, highlight, and/or summarize particular information Dr. Helton indicated she wanted.

52.    During the Work Arrangement, Dr. Helton would, at times, request that Talkington trace and identify the origin of a publication, particularly the origin of "ghostwriters" of industry articles.

53.    During the Work Arrangement, Dr. Helton would, at times, request that Talkington read and review specific sections of Dr. Helton's writings so that Dr. Helton could acquire a layperson's perspective of her writings.

54.    At all relevant times, Dr. Helton never requested Talkington to write more than a general three-sentence summary of articles in the Research Compilation to be placed in ENDNOTE™.

55.    At all relevant times, Dr. Helton never requested or authorized Talkington to independently research botulism-related topics Dr. Helton was researching and authoring analyses of, as Talkington lacked the educational and scientific expertise to perform substantive, ethical scientific research, and any authorship by Talkington would not be seen as credible by either the scientific or medical community.

56.     At all relevant times, Dr. Helton never gave Talkington any ownership in the Trade Secret and/or Research Compilation.

57.     At all relevant times, Dr. Helton never indicated to Talkington that the Trade Secret and/or Research Compilation was an asset whose ownership was shared between Dr. Helton and Talkington.

58.     At all relevant times, Dr. Helton repeatedly and uniformly communicated to Talkington that the Trade Secret and/or the Research Compilation was Dr. Helton's exclusive, confidential, and trade secret intellectual property.

59.     At all relevant times, Dr. Helton repeatedly and uniformly communicated to Talkington that the Trade Secret and/or the Research Compilation was not Talkington's to share with third parties.

**Dr. Helton's Rejection of Talkington's "Collaboration" and "Post-Doc" Claims**

60.     At all relevant times, any independent research inquiries Talkington may have pursued were unilateral, unauthorized actions taken without Dr. Helton's direction, approval, or consent.

61.     At all relevant times, Dr. Helton was a private citizen conducting independent scientific and medical research.

62.     At all relevant times, Dr. Helton was not an accredited academic institution or industry member capable of sponsoring post-doctoral fellowships.

63.     Dr. Helton never offered Talkington a postdoctoral position.

64.     Dr. Helton never discussed a post-doctoral position with Talkington.

65.     At all relevant times, Dr. Helton never held herself out as a private research group, nor did she ever suggest that hiring Talkington for administrative and clerical duties constituted

the creation of a private research group or other organization for the purpose of offering Talkington a post-doctoral position.

66.     Dr. Helton never ratified, condoned, or impliedly gave permission for Talkington to characterize their working relationship with Dr. Helton as a "post-doc" or "fellow."

67.     Although Dr. Helton never admonished Talkington for self-aggrandizing her administrative and clerical work in recommendation letters or job applications, Dr. Helton never permitted—explicitly or implicitly—Talkington's fabrication of a "post-doc" title.

68.     Dr. Helton acquiesced solely to Talkington, labeling her administrative and clerical work as "contract work," to assist Talkington in securing paying academic employment.

69.     At all relevant times, Dr. Helton explicitly and repeatedly told Talkington that their arrangement was not a collaborative research relationship.

70.     Upon information and belief, since about 2015, Talkington has falsely held herself out to third parties as having performed a post-doc in botulism with Dr. Helton or a private research collaborative group.

71.     Upon information and belief, Talkington has told third parties, orally and in writing, that her administrative and clerical work for Dr. Helton was a "post-doc" and/or performed as a "fellow."

72.     Unlike Talkington's statements to third parties, Talkington expressly and accurately characterized her administrative and clerical role to Dr. Helton as a "secretary with no overhead and no insurance cost!!" (See Exhibit 2 attached hereto)

73.     Talkington's characterization of herself as a "secretary" to Dr. Helton expressly acknowledges the administrative, clerical, and subordinate nature of the tasks she performed during the Work Arrangement for Dr. Helton's benefit.

74.     Upon information and belief, Talkington has told third parties, orally and in writing, that she was in a research collaboration with Dr. Helton.

75.     At all relevant times, Dr. Helton never discussed a publication strategy with Talkington; instead, Dr. Helton unilaterally disclosed elements of her pre-existing publication roadmap or plans to Talkington in confidence.

76.     Dr. Helton also explicitly instructed Talkington that her publication plans were to remain strictly confidential until the writing was entirely written, professionally edited, and medically and scientifically defensible.

77.     At all relevant times, Dr. Helton consistently dismissed Talkington's own independent suggestions for self-published materials as being incompatible with the research, writing, and scientific goals of Dr. Helton.

78.     Talkington's frequent false representations to the public that she completed a two-year postdoc under Dr. Helton, or at a private research collaborative group, are retrospective fabrications designed to inflate Talkington's professional credentials by leveraging Dr. Helton's medical, scientific, and personal reputation.

**Talkington's Unauthorized Employment Conduct and Her Termination Therefor**

79.     Many times, during the Work Arrangement, Talkington told Dr. Helton that she enjoyed working for Dr. Helton more than her own PhD work and dissertation writing.

80.     Upon information and belief, Talkington received her PhD in Environmental Sciences in the Summer of 2016 after approximately 11 years as a doctoral student at Oklahoma State University.

81.    In her doctoral thesis, Talkington acknowledged Dr. Helton, thanking her as the "brilliant, amazing, and courageous person, who taught [Talkington] the **absolute necessity of accurate and ethical research**." (Emphasis added) (See Exhibit 3 attached hereto).

82.    Following the completion of her PhD, Talkington became increasingly hostile to the boundaries Dr. Helton placed on Talkington's tasks under the Work Arrangement.

83.    For example, but not by way of limitation, Talkington increasingly took advantage of Dr. Helton's generosity by ignoring her gentle reminders that the Work Arrangement was only temporary and that Talkington needed to find permanent employment in her field.

84.    Indeed, Talkington repeatedly displayed a complete lack of understanding of (a) the limited scope of the Work Arrangement, (b) her own subject-matter competency, and (c) the ethical requirements of scientific and medical research.

85.    Given Talkington's failure to secure full-time employment and her continued inability to adequately provide for her children, Talkington made additional financial demands on Dr. Helton between October and December, 2016. Talkington's demands culminated in her demanding that Dr. Helton purchase a house in Stillwater, Oklahoma, in exchange for her administrative and clerical work under the Work Arrangement. (See Exhibit 4 attached hereto).

86.    Dr. Helton declined to buy a home for Talkington at this time.

87.    Confusing her administrative and clerical work with substantive research, Talkington also told Dr. Helton that she would abandon her postdoctoral career and commit to working with Dr. Helton on her botulism research on a full-time basis.

88.    Dr. Helton declined Talkington's offer to work on a full-time basis and reminded Talkington once again that her employment was a part-time administrative and clerical position provided as a lifeline to help Talkington finish her PhD and feed and care for her children.

89.    In September 2017, Talkington, unprompted by Dr. Helton, decided to enroll in a one-hour introductory toxicology course at Oklahoma State University (designated by the university as ITO6213 entitled "Toxicology: From Molecules to Ecosystems") instead of seeking employment in her applicable field of study after receiving her PhD.

90.    Talkington did not have the necessary prerequisite scientific knowledge or coursework to enroll in this toxicology course.

91.    Dr. Helton, upon Talkington's request, provided a letter to the university asking the professor to waive the necessary prerequisites so that Talkington could take the toxicology course.

92.    Upon information and belief, Talkington does not have a certificate in interdisciplinary toxicology or any similar professional education related to a medical or toxicology field.

93.    Upon information and belief, Talkington has enrolled in a single toxicology course at Oklahoma State University that was non-specific to botulism.

94.    Upon information and belief, Talkington possesses neither the medical education nor the scientific background necessary to substantively collaborate with Dr. Helton on any scientific or medical research or peer-reviewed publication.

95.    Talkington's pursuit of toxicology coursework rather than obtaining full-time employment in her field signaled to Dr. Helton a broader refusal to transition out of the part-time Work Arrangement.

96.    In addition to exploiting Dr. Helton's generosity and concern for Talkington's children's well-being, Talkington displayed a total lack of self-awareness regarding her suitability for work in scientific and/or medical research. Talkington appeared to Dr. Helton to be operating under the mistaken or delusional belief that Talkington could seamlessly transition from a part-

time administrative or clerical assistant position to a full-time scientific or medical researcher position, i.e., a substantive role for which Talkington was wholly unqualified.

97.     Beginning in or around mid- to late-2017, Talkington also became increasingly impulsive and resistant to the structure and nature of tasks Dr. Helton asked Talkington to perform under the Work Arrangement.

98.     For example, but not by way of limitation, Dr. Helton observed a troubling pattern in which Talkington repeatedly exceeded the scope of her administrative and clerical duties, engaged in unauthorized, unilateral activities, and prioritized them over her assigned tasks.

99.     Further, Talkington oftentimes invoiced Dr. Helton for such unauthorized, unilateral activities.

100.     For example, in February 2017, during the Work Arrangement, Talkington unilaterally purchased the internet domain name iatrogenicbotulism.com without Dr. Helton's request or knowledge. Talkington registered the domain in her own name, ostensibly to protect it for Dr. Helton. Dr. Helton has never utilized this domain nor asked Talkington to maintain it. Dr. Helton was made aware of this purchase and registration of the domain name in Talkington's own name after the fact. (See Exhibit 5 attached hereto)

101.     During this time, upon information and belief, Talkington misrepresented her medical and/or scientific qualifications to third parties.

102.     In particular, but not by way of limitation, Talkington held herself out as a botulism expert or researcher to members of an actual research facility in Oklahoma City despite having no medical or scientific training.

103.    In particular, Talkington falsified her role in her dissertation publication, holding herself out to be the "Research Director" of the "Botulism Education Center" from 2014-2016. (See Exhibit 6 attached hereto)

104.    Upon information and belief, Talkington at this time also falsely misrepresented herself as an expert botulism researcher, and also indicated that she was Dr. Helton's agent, while aggressively requesting confidential patient medical records from the administrator of a Chicago-based botulism victim support group.

105.    At all relevant times during and after the work Arrangement, Dr. Helton never authorized Talkington to speak with botulism victims on her behalf.

106.    At all relevant times during and after the Work Arrangement, Dr. Helton never authorized or requested that Talkington retrieve confidential patient medical records of botulism victims on her behalf.

107.    Roughly one year into the Work Arrangement, Dr. Helton would, at times, request that Talkington read and comment on specific selections of Dr. Helton's writings so that Dr. Helton could acquire a layperson's perspective of the writings.

108.    Talkington deviated from Dr. Helton's request for a layperson's perspective; instead, unilaterally deciding to edit or write chapters for Dr. Helton that Dr. Helton never saw, requested, or used in any manner.

109.    Talkington submitted invoices billing Dr. Helton for this unrequested work (i.e., the editing and writing of chapters).

110.    Despite Dr. Helton paying the invoices for this unrequested work, Talkington refused to produce the edited or written chapters when Dr. Helton asked to see them.

111.     Talkington also submitted invoices billing Dr. Helton for hours spent locating additional botulism victims—a task Dr. Helton neither requested nor desired—while failing to complete the specific administrative and clerical assignments assigned to her.

112.     In or around the end of 2017, Dr. Helton resolved to stop enabling Talkington's dependency on Dr. Helton's financial generosity and unauthorized work.

113.     Due to Talkington's ongoing failure to perform the administrative and clerical tasks assigned to her, as well as Talkington's unilateral and unauthorized activities unfairly billed to Dr. Helton, Talkington's administrative and clerical employment was terminated.

114.     Dr. Helton informed Talkington that she would no longer pay her because Talkington was performing tasks that were never requested. Talkington's unrequested tasks were unhelpful to Dr. Helton, as Talkington lacked the medical or scientific credentials necessary to perform such tasks.

115.     Upon the termination of Talkington's administrative and clerical work, Dr. Helton urged Talkington to find full-time employment within the field of her PhD.

116.     Dr. Helton did not hire someone to fill Talkington's position upon termination, as Talkington's work was never necessary; it was a charitable vehicle created solely to assist Talkington during her financial difficulties.

117.     At some point before her employment terminated, Talkington, without permission and under false pretenses, downloaded and retained a copy of the Research Compilation.

118.     Dr. Helton subsequently became aware that Talkington had downloaded and retained a copy of the Research Compilation.

119.    Talkington characterized the download as a necessary backup, expressing that she had done so solely to safeguard the work for Dr. Helton's benefit against potential catastrophes, such as computer failure or house fire.

120.    Unfortunately, Dr. Helton trusted Talkington's characterization and assurances of why she downloaded and retained a copy of the Research Compilation.

121.    Dr. Helton's financial and personal generosity to Talkington, and the loyalty and confidentiality obligations inherent in Talkington's work relationship, led Dr. Helton to believe that Talkington was honorable and would not disclose the Research Compilation to third parties.

122.    Dr. Helton relied, therefore, upon Talkington's false assurances that the downloaded and retained copy of the Research Compilation was for Dr. Helton's benefit and that Talkington would (a) not make use of, (b) maintain confidentiality, and (c) protect the Research Compilation at all times from intentional or accidental disclosure to third parties.

123.    In a December 2017 text to Dr. Helton, Talkington ironically foreshadowed her own unethical and disloyal conduct regarding the Research Compilation, quoting Alan Valentine: "Whenever science makes a discovery, the devil grabs it while angels are debating the best way to use it." (See Exhibit 7 attached hereto).

124.    Dr. Helton did not believe that the financial assistance, employment, and personal compassion she had shown Talkington over the years would be as baldly betrayed as the facts, as currently developed, now make plain: Talkington used her trusted and fiduciary position with Dr. Helton to steal, improperly make use of, and distribute the Research Compilation to third parties.

### "Historical Botulism Book" Restriction:
### Dr. Helton Placed Limits on Talkington's Use of Certain Botulism Resources

125.    On more than one occasion, Talkington commented to Dr. Helton about selling or sharing Dr. Helton's Research Compilation to third parties, such as a university.

126.    In response to each of these occasions, Dr. Helton consistently and adamantly expressed to Talkington that her Research Compilation was not Talkington's to give or share.

127.    At all times relevant, Talkington unequivocally acknowledged and understood that Dr. Helton solely owned the Research Compilation, the Botulism Manuscript, and any other botulism research, analyses, or writings made by Dr. Helton in the area of botulism.

128.    Shortly after Dr. Helton terminated Talkington's employment under the Work Arrangement, in or around 2018, Talkington informed Dr. Helton that she would pursue research on botulism and write her own historical book about botulism (the "Historical Botulism Book").

129.    Talkington assured Dr. Helton that the Historical Botulism Book would not interfere with Dr. Helton's botulism research, analyses, or writings, i.e., the subject matter of Dr. Helton's Botulism Manuscript.

130.    Despite Talkington's prior conduct and false belief that she was qualified to conduct scientific and medical research on botulism, Dr. Helton was still shocked by Talkington's arrogance and audacity in claiming she was qualified to write the Historical Botulism Book, given that Talkington possessed no independent scientific and medical expertise in the field of botulism.

131.    Talkington's entire understanding of botulism and related subtopics is derivative and superficial, acquired exclusively by observing and reviewing Dr. Helton's botulism research and by accessing Dr. Helton's Research Compilation, Botulism Manuscript, and botulism research, analyses, or writings.

132.    At this time, Talkington also admitted to Dr. Helton that she intended to utilize specific historical articles that she had gained access to through working with Dr. Helton and her access to the Research Compilation.

133.    One of the historical articles Talkington used for her Historical Botulism Book was an article Dr. Helton had previously given to Talkington as part of an assignment to create three-sentence lay-person summaries.

134.    Ironically, Talkington overcharged Dr. Helton for summarizing this article, and, incredibly, Talkington never delivered the summary to Dr. Helton despite Dr. Helton's requests therefor.

135.    Talkington subsequently publicly admitted that she had been working on the Historical Botulism Book as early as 2015. (See Exhibit 8 attached hereto).

136.    Talkington, upon beginning the Work Arrangement, nearly immediately, based on her own admission, began working on her Historical Botulism Book. Upon information and belief, contrary to her professed loyalty and promises of confidentiality to Dr. Helton, Talkington used her position of trust to create her Historical Botulism Book for her own benefit. Furthermore, Talkington accessed Dr. Helton's Trade Secret and/or Research Compilation to create her Historical Botulism Book.

137.    Upon information and belief, Talkington betrayed Dr. Helton's trust and breached her promises of loyalty and confidentiality and instead used her access to Dr. Helton's Trade Secret and/or Research Compilation to create the Historical Botulism Book.

138.    Upon information and belief, Talkington invoiced Dr. Helton for time spent researching and writing her Historical Botulism Book, rather than performing the tasks Dr. Helton actually assigned to Talkington.

139.    Upon information and belief, the materials Talkington used for her Historical Botulism Book were obtained and thereafter misappropriated from Dr. Helton's Trade Secret and/or Research Compilation.

140.    Upon information and belief, the materials Talkington misappropriated for her Historical Botulism Book are of a nature and type that Talkington would not have been aware of nor able to acquire access to without specific resort to Dr. Helton's Trade Secret and/or Research Compilation and guidance.

141.    Dr. Helton never permitted or consented to Talkington's use of the Trade Secret and/or Research Compilation, either individually or collectively, to write or create Talkington's Historical Botulism Book.

142.    Motivated by sympathy for Talkington's financial fragility and failure to launch a successful career in the field of her PhD on her own, in 2018, upon becoming aware of Talkington's intention and desire to use certain research materials in the Trade Secret and/or Research Compilation for the Historical Botulism Book, Dr. Helton permitted Talkington to use a few, limited historical references from the Research Compilation solely to enable Talkington to write on the topic of "historical botulism."

143.    Despite Dr. Helton's first finding out about Talkington's plans to use certain research materials of Dr. Helton's in the Historical Botulism Book in 2018, upon information and belief, Talkington had actually been using these materials, upon their own admission, for at least three (3) years before Dr. Helton became aware thereof. (See Exhibit 8)

144.    Upon information and belief, Talkington hid their prior use of these research materials from Dr. Helton for Talkington's own personal and financial benefit.

145.    Upon further assurances and agreement by Talkington, Dr. Helton established a strict boundary with Talkington, i.e., Talkington was strictly forbidden from interfering with or disclosing Dr. Helton's personal survivor story, botulism research, scientific analysis and theories, or other information in the Trade Secret and/or proprietary Research Compilation.

146.    Dr. Helton also explicitly instructed Talkington that Dr. Helton was to be given no connection, credit, or association with Talkington's Historical Botulism Book.

147.    In exchange for this concession by Dr. Helton, Talkington agreed to the strict boundary and indicated that she understood the limits imposed thereby and would at all times respect the trust she had been given and uphold her fiduciary obligations regarding the Trade Secret and/or Research Compilation.

148.    Despite personal concerns about Talkington's increasingly self-centered and unethical conduct, Dr. Helton continued to provide Talkington with individual and personal financial support upon request on an "as-needed" basis. This support was provided as a gesture of goodwill to a struggling friend with a history of professional setbacks and financial misdealings. Furthermore, Dr. Helton was concerned that if she did not provide such financial support, Talkington's children would be denied food and/or other necessary items.

149.    Any financial or personal support offered to Talkington by Dr. Helton throughout their relationship has always been a gratuitous act of benevolence, not as part of any research collaboration.

150.    At all relevant times, Dr. Helton has explicitly and unambiguously communicated to Talkington that any financial support was a personal favor to Talkington, not payment for a professional research collaboration on botulism.

151.    Pointedly, Talkington has never been qualified to participate in any scientific or medical research efforts on botulism.

**Talkington's Unilateral and Unsolicited Research / Activities**

152.    Upon information and belief, following her termination from Dr. Helton's employment, Talkington worked as an elderly caregiver in Stillwater, Oklahoma, because she was

66

unable to secure academic employment in her PhD field or in higher education. Upon information and belief, Talkington was also relying upon child support from her children's various biological fathers for financial support. (See Exhibit 9 attached hereto).

153.    Upon information and belief, Talkington departed from Stillwater, Oklahoma, and moved to Hays, Kansas, and maintained residence there from approximately April 2019 until January 2022. Thereafter, Talkington departed Kansas and moved to Peoria, Illinois, and maintained residence there from approximately February 2022 until June 2025. Thereafter, upon information and belief, Talkington departed Illinois and moved to Pittsburg, Kansas, and has maintained residence there since approximately June 2025.

154.    From the time the Work Arrangement between Dr. Helton and Talkington ended ("Talkington's Post-Employment Period"), communication between Dr. Helton and Talkington was generally limited to remote and/or asynchronous communications (e.g., email, text messaging, phone calls, or video calls).

155.    Throughout Talkington's Post-Employment Period, the nature of the Parties' relationship remained personal and charitable, although characterized by Talkington's continued self-centered reliance on Dr. Helton's financial charity and professional resources and expertise for self-promotion.

156.    Dr. Helton has provided personal, medical, and financial support to Talkington and her children at various times during Talkington's Post-Employment Period.

157.    For example, but not by way of limitation, Dr. Helton gave Talkington a car when Talkington complained that her children's use of the only car prevented her from traveling to her caregiving employment and reduced her chances of obtaining professional employment in the field of her PhD.

1:25-cv-01318-JEH-RLH    # 24    Filed: 01/12/26    Page 68 of 209

158.     As another example, but not by way of limitation, Talkington requested that Dr. Helton pay travel expenses for alleged "necessary" trips to find professional employment.

159.     As yet another example, but not by way of limitation, Dr. Helton provided Talkington with professional attire for her first professional job and allowed Talkington to list Dr. Helton as an "employer" for rental applications.

160.     As one more example, but not by way of limitation, Dr. Helton bought a house that Talkington and her brother were attempting to renovate and "flip." Talkington and her brother had become financially underwater on the property, were out of funds, and could not complete the flip. Dr. Helton bought the property from Talkington and her brother, expended significant resources to complete the renovation, and sold it for a small profit. As Talkington and her brother were financially destitute at the time, Dr. Helton gave Talkington half of the small profit received from selling or "flipping" the property.

161.     Dr. Helton's generosity and assistance to Talkington were because Dr. Helton believed Talkington to be honest, trustworthy, worthy of help and assistance, and because she was maintaining the secrecy and confidentiality of Dr. Helton's Trade Secret and/or Research Compilation. Unfortunately, and unbeknownst to Dr. Helton, Talkington was receiving this generosity and, at the same time, betraying Dr. Helton in ways then unknown.

162.     Throughout this Post-Employment Period, the communication between Talkington and Dr. Helton was characterized by Talkington's attempts to frame her one-sided financial dependency on Dr. Helton as a professional exchange.

163.     For example, but not by way of limitation, Talkington would oftentimes intersperse her requests for financial and/or personal support with unsolicited promises to "support" Dr. Helton, claiming that Talkington wished to repay Dr. Helton for her assistance.

164.    Dr. Helton largely ignored Talkington's promises of support as mere rhetoric, continuing to support Talkington because she was struggling and needed to feed and take care of her children.

165.    At all times relevant, Dr. Helton refused to engage with Talkington in any communication that would imply that Talkington was a collaborative or professional colleague in botulism research.

166.    Throughout Talkington's Post-Employment Period, Talkington consistently and persistently attempted to insert herself into Dr. Helton's professional and personal sphere, framing her involvement in Dr. Helton's life as a benefit to Dr. Helton.

167.    For example, Talkington, in an effort to insert herself into Dr. Helton's publication roadmap, continuously pressed the domain iatrogenicbotulism.com upon Dr. Helton as a necessary asset and vehicle to release Dr. Helton's research online, despite Dr. Helton never requesting that Talkington acquire or maintain any such domains for this purpose. Dr. Helton did not request the use or transfer of the domain, as she had no active plans for a website and viewed Talkington's actions as a continued attempt to insert herself into Dr. Helton's professional publishing activities and future botulism research. (See Exhibit 5)

168.    Dr. Helton largely ignored Talkington's overtures, recognizing them as pretexts for intrusion, requests for financial support, or self-aggrandizing characterizations of Talkington's alleged accomplishments and importance.

169.    Throughout Talkington's Post-Employment Period, Dr. Helton did not share with Talkington the content or status of her botulism research or Botulism Manuscript.

170.    Since 2010, Dr. Helton has maintained her own professional editing and publication representation, entirely separate from any of Talkington's activities and publications.

171.    Throughout Talkington's Post-Employment Period, Talkington sent Dr. Helton hundreds of unprompted, unsolicited emails and text messages that went largely unanswered.

172.    In particular, but not by way of limitation, Talkington often transmitted unsolicited and duplicative materials, such as standard Google Alert notifications, that Dr. Helton had received independently of Talkington.

173.    Dr. Helton had, unbeknownst to Talkington, been receiving these Google Alerts for years before Talkington's employment, and never requested nor expected to receive such information from Talkington.

174.    During Talkington's Post-Employment Period, Talkington repeatedly solicited Dr. Helton for elementary explanations of scientific concepts she lacked the training or education to understand, as well as personal, financial, and medical advice for herself and her children.

175.    For example, Talkington asked Dr. Helton why veins might bulge after BOTOX® injections and requested help converting basic units of measurement, such as microliters (uL), to other units. (See Exhibit 10 attached hereto). Upon information and belief, Talkington asked these types of questions of Dr. Helton, as she didn't have the scientific knowledge, education, training, or clinical experience to understand basic scientific and/or medical principles.

176.    Accordingly, Talkington's communications to Dr. Helton were not of the type that could be part of any coordinated research strategy as Talkington simply did not have the scientific or medical credentials to collaborate with Dr. Helton; rather, Talkington's communications were unilateral and taken by Talkington to maintain a toehold into Dr. Helton's personal and professional life as an attempt to adopt and/or coopt to herself at least a part of Dr. Helton's reputation and sphere of influence.

177.    If Dr. Helton responded to Talkington's communications, if at all, any such response was given solely as a personal courtesy to a presumed friend, not as a botulism research collaborator exchanging ideas with a peer. Talkington and Dr. Helton's communications were not part of any coordinated research strategy or collaboration but rather unilateral requests made by Talkington.

178.    In short, Talkington's communications to Dr. Helton during this period of time were so overwhelming as to be insidious and indicative of an individual incapable of succeeding in their own right, either financially or academically, and finding it necessary to maintain a connection with Dr. Helton for their own personal gain.

179.    Additionally, during Talkington's Post-Employment Period, Talkington sent Dr. Helton requests to review her Historical Botulism Book. Dr. Helton, as a presumed friend of Talkington, briefly reviewed the book and offered minor suggestions and edits.

180.    Also, during Talkington's Post-Employment Period, Talkington was never asked or requested to contribute to Dr. Helton's ongoing botulism research. Dr. Helton never requested, during Talkington's Post-Employment Period, that Talkington review her Botulism Manuscript or any other of Dr. Helton's writings. Dr. Helton never asked Talkington to suggest editors or publishers for her works, nor did Dr. Helton request Talkington to review her Botulism Manuscript. Further, Dr. Helton never requested that Talkington participate or make substantive contributions to Dr. Helton's botulism research. To the contrary, Dr. Helton retained two independent professional editors to assist with her own writings, including the Botulism Manuscript. At all times, Dr. Helton intentionally kept her work completely segregated from Talkington's unilateral and increasingly unusual activities.

181.    Pointedly, Dr. Helton has maintained an independent professional relationship with Public Citizen since approximately 2010, at least four (4) years prior to Talkington performing any administrative or clerical work for Dr. Helton. Dr. Helton has never requested Talkington contact, meet, or interview any botulism victims or any advocacy organization, including Public Citizen.

182.    Dr. Helton has never requested that Talkington seek out or obtain any medical records of botulism patients.

183.    With the exception of a single request for an inaccessible article, Dr. Helton has never requested Talkington's assistance or feedback on her botulism research during Talkington's Post-Employment Period. Notably, despite a specific and direct request from Dr. Helton, Talkington failed to obtain or act on it to locate this inaccessible article.

184.    In or around September 2022, Talkington emailed Dr. Helton an informal grant proposal to study long-term botulism and form a Botulism Research Repository.

185.    Talkington sought Dr. Helton's edits and insights on this Botulism Research Repository grant proposal.

186.    Dr. Helton never reviewed or edited Talkington's Botulism Research Repository grant proposal.

187.    Dr. Helton did not reply to Talkington's requests for review and/or editing of the Botulism Research Repository grant proposal, as she intended to maintain the Trade Secret and Research Compilation as her privately held intellectual property.

188.    As Talkington did not possess the necessary educational and professional knowledge or training to proceed with the Botulism Research Repository grant proposal plausibly, Dr. Helton had no interest in associating her reputation and medical expertise with Talkington's efforts at obtaining any such grant.

72

189.    Dr. Helton has no knowledge of her name or expertise being associated with any such grant proposal or issued grant for a Botulism Research Repository.

190.    Dr. Helton has never sent Talkington a letter of collaboration or support for such a grant proposal, nor did she verbally acquiesce to being named to any grant projects with Talkington, either formally or informally.

191.    Upon information and belief, any grant proposals or grants naming Dr. Helton in combination with Talkington are the result of a fraud perpetuated by Talkington.

192.    Upon information and belief, in or around April 2024, Talkington was employed by Bradley University in Peoria, Illinois, and taught a class on corporate malfeasance. Talkington requested that Dr. Helton guest-lecture to this class, given her product liability litigation. As a gesture of support, Dr. Helton agreed to lecture in one class and did so for approximately thirty (30) minutes over a Zoom video conference. The guest lecture, which was supposed to be one hour, was unusually short due to Talkington's technical difficulties with Zoom. (See Exhibit 11 attached hereto).

193.    Dr. Helton's guest lecture to this class, dealing with corporate malfeasance, was not part of a research collaboration, and Dr. Helton was not paid or compensated in any way for this guest lecture.

194.    Dr. Helton has never physically been to Bradley University's campus, nor to Peoria, Illinois.

195.    In or around July 2023, Dr. Helton informally asked Talkington, given her role as a university professor, about Talkington's knowledge of student-created intellectual property ownership. Dr. Helton's request was solely out of curiosity and on behalf of Dr. Helton's son, who

was an engineering student at the time. Dr. Helton never requested a meeting with an IP consultant in Peoria, Illinois, or any IP attorney.

196.    At no time did Dr. Helton request that Talkington contact the Chicago Tribune (or any news source or journalist), and did not know that Talkington had actually reached out to journalists until after the fact. Upon learning that Talkington was going to meet with a Chicago Tribune reporter, Dr. Helton offered nominal support, consistent with her generally supportive role in Talkington's life, and indicated to Talkington that the interview may be good publicity for Talkington's Historical Botulism Book.

197.    At no time did Dr. Helton request that Talkington disclose Dr. Helton's personal survivor story, the contents of the Trade Secret and/or Research Compilation, or Dr. Helton's ongoing medical and scientific botulism research to any news organization or journalist. Upon information and belief, any effort by Talkington to do so was made unilaterally and self-centeredly without Dr. Helton's permission.

## Talkington's False and Unyielding
## Representations of Expertise and Professional Status

198.    Upon information and belief, during Talkington's Post-Employment Period, starting in or around December 2018, Talkington unilaterally inserted herself into online botulism victim support groups, particularly a prominent Facebook support group entitled BOTOX Dysport Side Effect Support, found as of the date of this filing at the URL https://www.facebook.com/groups/224009391310103/ (hereinafter referred to as the "FB Support Group").

199.    Upon information and belief, Talkington, on at least one occasion, falsely represented herself to members and/or administrators of the FB Support Group as someone who had been personally affected by botulism.

200.    Upon information and belief, Talkington has never contracted botulism or suffered from any botulism-associated symptoms.

201.    Upon information and belief, Talkington, on at least one occasion, falsely represented herself to members and/or administrators of the FB Support Group as a qualified medical and/or scientific researcher working in concert with Dr. Helton. (See Exhibit 12 attached hereto).

202.    Despite having no contact with or association with Dr. Helton in her product liability lawsuit for BOTOX®, upon information and belief, Talkington, on at least one occasion, represented herself to the FB Support Group administrators as the alleged brains behind Dr. Helton's successful product liability lawsuit.

203.    Upon information and belief, on several occasions, Talkington shared proprietary, internal studies from the maker of BOTOX®, obtained during Dr. Helton's lawsuit and used during the trial, that were included within the Research Compilation, with group administrator(s) of the FB Support Group.

204.    Upon information and belief, Talkington informed the group administrator(s) of the FB Support Group that Dr. Helton had used the proprietary scientific studies of the maker of BOTOX® during the trial phase of the litigation with the maker of BOTOX®.

205.    Upon information and belief, on at least one occasion, Talkington represented to Dr. Helton's academic peers that she was responsible for the research that allegedly won Dr. Helton's lawsuit against the maker of BOTOX®.

206.    Upon information and belief, Talkington's false representations about her role in Dr. Helton's lawsuit against the maker of BOTOX® have led at least one academic peer of Dr.

Helton's to believe that Talkington was the primary or responsible researcher behind Dr. Helton's victory against the maker of BOTOX®.

207.    Dr. Helton has never requested that Talkington join any online support groups for survivors of botulism or participate in any social media regarding the same.

208.    Dr. Helton has never requested nor given Talkington her blessing to act as a liaison on her behalf to victims or survivors of botulism within these online support groups or social media sites.

209.    Dr. Helton herself is not a member of any online support groups, nor is she generally actively involved in them. Any involvement by Dr. Helton in online support groups is limited to direct, private communication with support group administrators and victims, domestically and internationally, independent of the online platforms themselves.

210.    As part of her charitable and compassionate nature, Dr. Helton has long maintained a practice of speaking with survivors of botulism or their family members, regardless of the survivor's online support group or social media affiliations.

211.    On occasion, Talkington would reach out to ask Dr. Helton to communicate with a botulism survivor or a family member of the survivor.

212.    For example, but not by way of limitation, Talkington requested that Dr. Helton review some material on botulism and pregnancy that the FB Support Group had collaboratively created. Charitably, Dr. Helton suggested that Talkington have the FB Support Group review additional articles on pregnancy loss and BOTOX® that Dr. Helton provided to Talkington.

213.    Upon information and belief, Talkington did not share the additional articles concerning pregnancy loss and BOTOX® that Dr. Helton provided with either the members or the group administrator(s) of the FB Support Group.

214.    Upon information and belief, Talkington, despite lacking the clinical training to evaluate the hierarchy of scientific evidence, extrapolated broad medical warnings from decontextualized, isolated studies, and thereafter dispensed medical advice that is not only scientifically unsound but potentially harmful to vulnerable botulism victims.

215.    Upon further information and belief, Talkington, on more than one occasion, provided unauthorized medical advice without possessing a medical education or a medical license.

216.    Upon information and belief, on at least one occasion, Talkington suggested a potential botulism victim lie to healthcare professionals about the source of their potential botulism exposure. Upon further information and belief, Talkington instructed the potential botulism victim to tell their healthcare professional that they had eaten home-canned green beans to obtain a botulism diagnosis. (See Exhibit 13 attached hereto).

217.    Upon information and belief, on at least one occasion, Talkington wrote and shared with the FB Support Group a document entitled "CONFIDENTIAL" about the maker of BOTOX® being a corrupt organization that needed to cease to exist. (See Exhibit 14 attached hereto).

218.    Upon further information and belief, as part of this CONFIDENTIAL document, Talkington explicitly and falsely represented and claimed that she was an activist research scientist who had rediscovered what untreated botulism looks like as the symptoms unfold.

219.    Upon information and belief, on at least one occasion, Talkington exhibited a delusional self-perception of professional status, representing herself to third parties as a medical or botulism research expert possessing knowledge superior to the established medical community.

220.    Upon information and belief, Talkington has received no accredited medical education and possesses no medical knowledge, informed by clinically treating patients, that

would confer upon her professional standing to diagnose, treat, or otherwise rule out other neurologic conditions in a patient who may have been exposed to botulism.

221.    Dr. Helton, a medically educated and board-licensed physician, was unaware of Talkington's unauthorized practice of medicine and/or Talkington's dispensation of medical advice.

222.    Dr. Helton would never sanction patients being instructed to deceive their medical providers when seeking treatment for botulism or any other medical concern.

223.    Upon information and belief, in or around July 2021, Talkington's pattern of repeated, alarming, and harassing communications directed at other members resulted in Talkington being admonished for such action by the group administrators of the FB Support Group.

**Talkington's Rejection of an Actual Collaboration in the Summer of 2024**

224.    Over the years of Talkington's Post-Employment Period, Dr. Helton and Talkington sporadically discussed general public-health concerns, typically prompted by news articles or media clips, such as the use of botulinum toxin during pregnancy, its promotion to adolescents, and long-term harm. While Talkington would frequently throw out whimsical possibilities for funding her writing or pitch impulsive, shortsighted publication ideas—such as self-publishing raw FDA documents on Amazon simply to create doubt–these interjections were informal and one-sided, often characterized as impulsive suggestions that Dr. Helton dismissed as scientifically unsound, unethical, or incompatible with her standards for dissemination of research. Dr. Helton treated these discussions as strictly social—conceptual what-ifs that were entirely divorced from the confidential subject matter of Dr. Helton's own Botulism Manuscript, her Research Compilation, and her specific research work, analyses, and findings therefrom. These

were not structured publication strategies but rather Talkington's impulsive musings, sharing her latest thought bubble. Dr. Helton engaged with these messages only socially, often ignoring them completely.

225.    Dr. Helton never agreed, implicitly or explicitly, that these sporadic conceptual discussions constituted a "project," "collaboration," or "joint work."

226.    Dr. Helton has discussed various public health concerns associated with botulism with many friends and colleagues, including a family health physician with whom Dr. Helton has been friends since approximately 2010. Since approximately 2020, this family health physician and Dr. Helton have been engaging in ongoing discussions regarding collaborative publications on botulinum toxin-associated public health topics. Talkington has not been a part of any discussions or projects between Dr. Helton and the family health physician prior to the summer of 2024.

227.    In or around April 2024, Dr. Helton introduced Talkington to this same family health physician, whom she thought might be helpful to Talkington in connection with a lecture series Talkington was teaching.

228.    Given Talkington's intense interest and previous unilateral offers to assist Dr. Helton by submitting further FOIA requests and/or gathering news articles regarding botulinum toxin effects, Dr. Helton thought Talkington might be a good fit to help gather materials for a potential publication with the family health physician.

229.    Dr. Helton agreed to allow Talkington to assist with data retrieval in a strictly administratively limited, clerical capacity. Dr. Helton provided Talkington with FDA reference numbers to retrieve the botulism incidence reports she wanted. Both Dr. Helton and Talkington expressly agreed that any contribution by Talkington in this endeavor would be minor yet

appropriately acknowledged in any peer-reviewed publications, as is customary for research assistance.

230.    Dr. Helton explained to Talkington that she did not have the scientific or medical background to make substantive contributions to the analysis, writing, or editorial decisions for any peer-reviewed publications arising from this pregnancy and botulinum toxin research. Any data retrieval performed by Talkington on this issue was limited to this specific potential peer-reviewed publication; Dr. Helton's request was not a general invitation to collaborate or an indication of any ongoing collaboration between Talkington and Dr. Helton.

231.    In or around June 2024, Dr. Helton, Talkington, and the family health physician conducted a single video chat (ZOOM) meeting to discuss the logistics of a potential joint publication. During this meeting, the parties discussed the potential formation of a Limited Liability Company (LLC) to manage the project. This potential joint project had nothing to do with Dr. Helton's personal and ongoing botulism experiences, research, or work. There was no discussion of any other collaborations or the formation of any other LLCs associated with other research projects between Dr. Helton and Talkington at this time. Talkington had no ongoing research collaboration with the family health physician before or after this meeting.

232.    During this meeting, Talkington repeatedly requested that Dr. Helton pay for an ENDNOTE™ subscription to share the Research Compilation between the three of them.

233.    Dr. Helton refused Talkington's request to pay for an ENDNOTE™ subscription as Dr. Helton did not want the Research Compilation to be shared, preferring to keep her Research Compilation private from any future work with Talkington and/or the family health physician.

234.    Approximately one week after the meeting, Talkington contacted Dr. Helton to emphatically refuse the collaborative partnership. Talkington feigned concern that an equal

partnership would be unfair to Dr. Helton, explicitly acknowledging that Dr. Helton—along with the family health physician—possessed the medical training and public health expertise required for the project.

235.    In particular, Talkington admitted that Dr. Helton would be performing the vast majority of the critical thinking, writing, and substantive work, given her extensive scientific and medical education and clinical practice, whereas Talkington's role would be limited to clerical tasks and statistical inputs. Using this disparity as a pretext, Talkington demanded to be rehired as an hourly employee.

236.    Dr. Helton immediately rejected Talkington's demand to once again be hired as an hourly employee.

237.    Contrary to Talkington's allegations of an "ongoing research collaboration," this interaction, in particular, plainly confirms that Talkington viewed herself solely as a paid hourly laborer, not a peer academic collaborator with scientifically trained medical doctors like Helton and Sommers.

238.    Indeed, it confirmed Talkington's 2015 communication to Dr. Helton that she was acting in a secretarial role for Dr. Helton. (See Exhibit 2).

239.    The proposed collaboration with the family health physician was the only time Dr. Helton had ever offered Talkington an opportunity to collaborate, which Talkington expressly declined because she wanted to be treated as a laborer, not as an academic peer and collaborator– i.e., Talkington wanted to continue the secretarial role that she previously performed for Dr. Helton and unambiguously acknowledged in 2015.

**Talkington's Escalation, Career Desperation, and Intent to Selfishly Monetize Dr. Helton's Personal Story, Botulism Research, Trade Secret, and the Research Compilation**

240.    Upon information and belief, Talkington's contract with Fort Hays State University was scheduled to run through Spring 2022. The University took the extraordinary step of informing Talkington mid-year (December 2021) that her employment contract would not be renewed beyond January 2022. Upon information and belief, this termination was based, in whole or in part, on findings of Talkington's (a) academic and unethical actions and dealings, (b) plagiarism of another staff member's teaching content, and (c) sale of such plagiarized content as a self-published book on Amazon.com.

241.    Even after obtaining contract work at Bradley University, upon information and belief, Talkington submitted application letters to at least five universities throughout 2024 seeking employment.

242.    Upon information and belief, in these application letters, amongst other academic representations, Talkington falsified her own scientific education and clinical or research experience by stating that she had completed a postdoc in medical research.  (See Exhibit 15 attached hereto).

243.    Upon information and belief, in her attempts to secure academic employment, Talkington has falsely represented to academic peers and hiring institutions that she has served as a Principal Investigator (PI) on National Science Foundation (NSF) or other scientific or medical research grants.

244.    Upon information and belief, Talkington has never served as a PI on any federal or NSF grants.

245.    Upon information and belief, in one application letter to a University of Oklahoma professor, Talkington falsely asserted that Dr. Helton was her research partner and that starting in

2010, Talkington and Dr. Helton had created a unique research library spanning 120 years of biological war, public health, toxicology, and medicine.

246.    As outlined *supra*, Talkington and Dr. Helton had little to no communication between 2010 and late 2014, and Talkington had no knowledge that Dr. Helton's Research Compilation existed until roughly five (5) years later in 2015.

247.    In November 2024, Talkington texted Dr. Helton to announce that she was applying for a job at Wake Forest University.

248.    In this November 2024 correspondence, Talkington admitted her financial and academic desperation and intent to leverage Dr. Helton's life's work in the Trade Secret and/or Research Compilation to obtain a new position, stating she was at "rock bottom" and intended to write an audacious proposal about BOTOX$^{®}$ research to see what kind of bomb it would drop in the botulism academic world. (See Exhibit 16 attached hereto).

249.    In this same message to Dr. Helton, Talkington solicited Dr. Helton's endorsement for this unauthorized use of the Trade Secret materials and/or the Research Compilation, asking that Dr. Helton let her know if Talkington was crazy or if she saw a path for Talkington to bring Dr. Helton's BOTOX$^{®}$ research into academia.

250.    Talkington also told Dr. Helton that Wake Forest would be a great name to publish under. (See Exhibit 17 attached hereto)

251.    Dr. Helton did not respond to Talkington's message about Wake Forest and did not give Talkington permission to use the Trade Secret and/or Research Compilation, or even Dr. Helton's name, in applying to Wake Forest University.

252.    In a later November 2024 text message to Dr. Helton, Talkington further admitted that she did not possess a legitimate license for the research tool on which the Research

Compilation was based, begging Dr. Helton to purchase an ENDNOTE™ subscription as a Christmas present for Talkington. (See Exhibit 18 attached hereto)

253.    Dr. Helton did not respond to Talkington's message seeking this supposed gift, as she was tiring of Talkington's never-ending need for financial support. Furthermore, as Dr. Helton had not permitted Talkington to use the Research Compilation, an ENDNOTE™ subscription was unwarranted and unnecessary.

254.    In or around July 2024, Talkington provided Dr. Helton with the first several chapters of her Historical Botulism Book and requested that Dr. Helton read it and provide edits.

255.    As Dr. Helton discovered upon her cursory review, Talkington included personal details of Dr. Helton's story in the preface of the Historical Botulism Book.

256.    Dr. Helton immediately called Talkington to tell her that, once again, Talkington did not have permission to use any part of Dr. Helton's personal story in the Historical Botulism Book or other writings.

257.    In response, Talkington expressed to Dr. Helton that she understood and would not use Dr. Helton's personal story in the Historical Botulism Book or other writings. (See Exhibit 19 attached hereto).

258.    However, on December 15, 2024, Talkington sent an email to Dr. Helton containing a draft Preface to the Historical Botulism Book, which cited Dr. Helton's personal botulism survival story as the inspiration for the book.

259.    Contrary to her acknowledgement that she would not include Dr. Helton's personal botulism story in the Historical Botulism Book, Talkington's December 15, 2024, emailed draft included approximately ten sentences detailing Dr. Helton's specific medical experiences and botulism poisoning.

260.    Also, in this December 15, 2024, email, Talkington admitted to exploiting Dr. Helton's personal story as a selling point for her Historical Botulism Book, writing in particular that "I left in SOME details about your condition, but then moved on. I think it is like a car wreck on a highway. You give just enough tragedy that they pause, get hooked, then quickly move through the preface." (See Exhibit 20 attached hereto)

261.    Talkington's self-centered motive for using Dr. Helton's personal story, i.e., to "hook" readers, was, therefore, laid plain.

262.    Dr. Helton immediately contacted Talkington via phone call and once again demanded the removal of her personal history from the Historical Botulism Book.

263.    Upon information and belief, Talkington was aware that she did not have Dr. Helton's consent to use her personal botulism story and that utilizing this story violated the strict boundaries set by Dr. Helton.

264.    In this phone conversation, Talkington agreed to remove the material entirely from the Historical Botulism Book. However, Talkington's agreement was a falsehood as Talkington later chose to include Dr. Helton's private survivor story in the Historical Botulism Book for her own financial benefit.

265.    Upon information and belief, on December 30, 2024, Talkington, with the writing assistance of a student, self-published the Historical Botulism Book: *Recognizing Botulism: New Insights from Old Narratives* ("Recognizing Botulism").

266.    Talkington's self-published Historical Botulism Book, "Recognizing Botulism," purports to use historical narratives to aid the modern diagnosis of botulism, supposedly offering a rare understanding of complex symptomatology—a farcical claim for a layperson such as

Talkington, who lacks even the most basic scientific and medical education and clinical experience.

267.    The existence of the Historical Botulism Book, however, stems from Talkington's dereliction of work responsibilities.

268.    Dr. Helton originally assigned Talkington a specific clerical task during their Work Arrangement–i.e., to identify a few compelling sentences from a historical botulism account.

269.    Talkington failed to perform this task for Dr. Helton.

270.    Upon information and belief, Talkington, seeing an opportunity to further their own flailing career, seized upon the idea of identifying compelling stories from historical accounts of botulism.

271.    Upon information and belief, rather than perform the clerical task requested by Dr. Helton, Talkington prioritized her own commercial interests (including to bolster Talkington's fraudulent misrepresentation as a medical or scientific researcher or authority capable of speaking to botulism victims), and used Dr. Helton's resources, including financial payment, to fund Talkington's own delusion of professional equivalence.

272.    Accordingly, Talkington's purported Historical Botulism Book arose out of Dr. Helton's interest in compelling historical botulism victim stories. Dr. Helton asked Talkington to retrieve this information, paid Talkington to do so, and yet Talkington absconded with the idea and information to write the Historical Botulism Book and fraudulently misrepresented herself as the originator of the Historical Botulism Book.

**Talkington's Further Escalation: Unauthorized Distribution of Dr. Helton's Personal Story, Botulism Research, and the Research Compilation to Third Parties**

273.    Upon information and belief, Gretch Elizabeth ("Elizabeth") is one of several administrators of the FB Support Group with which Talkington has been involved at various times.

274.    Upon information and belief, Talkington intermittently communicated with Elizabeth from around 2019 through January 2025.

275.    Upon information and belief, the communications between Talkington and Elizabeth centered on botulism victim advocacy, botulism research, and, eventually, potential publications and data collection projects.

276.    Upon information and belief, as part of these communications, Talkington communicated personal details regarding Dr. Helton's medical history and experiences to Elizabeth. (See Exhibit 21 attached hereto).

277.    Upon information and belief, and as further part of Talkington's communications with Elizabeth, Talkington portrayed herself as a research partner and confidante of Dr. Helton's.

278.    Upon information and belief, as early as 2019, Talkington, under the pseudonym "Skye Bravo," began representing herself to Elizabeth, amongst other group administrator(s) of the FB Support Group, as a custodian of Dr. Helton's Trade Secret and, mor particularly, the Research Compilation.

279.    Upon information and belief, Talkington explicitly offered to provide access to or copies of Dr. Helton's Trade Secret and, more particularly, the Research Compilation to at least one group administrator of the FB Support Group.

280.    Talkington's representations as a supposed custodian of the Research Compilation and subsequent offer of distribution of the same were made by Talkington unilaterally, without Dr. Helton's knowledge, permission, and in direct violation of Dr. Helton's exclusive ownership rights therein.

281.    Upon information and belief, Talkington's correspondence to the group administrator(s) of the FB Support Group was Talkington's attempt to legitimize her

misappropriated copy of Dr. Helton's Trade Secret and, more particularly, the Research Compilation while obscuring its true source, creator, and owner, Dr. Helton.

282.     Upon information and belief, despite lacking any medical education or training, Talkington has claimed to have identified patterns of symptoms found in botulism patients.

283.     The patterns of symptoms found in botulism patients, claimed to have been identified by Talkington, were the result of Dr. Helton's significant medical training, clinical expertise, research into the causes and treatment of botulism, and scientific analysis of the information collected as the Trade Secret and, more particularly, in the Research Compilation.

284.     Talkington's claimed credit for discovering the patterns of symptoms in botulism patients is a clear indication of Talkington's intent to position herself as a medical authority, claiming knowledge based solely on information misappropriated from Dr. Helton's botulism research, the Trade Secret, and the Research Compilation.

285.     Talkington is wholly unqualified to interpret such medical and scientific research information on botulism and is not a medically licensed physician capable of providing this research as clinical information or treatment recommendations to patients.

286.     Upon information and belief, in early 2024, Talkington told Elizabeth that she had presented with Dr. Helton on botulism. (See Exhibit 22 attached hereto)

287.     Dr. Helton and Talkington have never presented together, privately or publicly, on the topic of botulism or scientific or medical research.

288.     Upon information and belief, in September of 2024, Talkington solicited Elizabeth to allow a PhD student to survey botulism victims in the FB Support Group, touting that a publication on the survey and its analysis would follow in 2026.

289.    Upon information and belief, on October 3, 2024, Talkington sent Elizabeth a research summary titled "Botoxic," admitting that she was technically restricted from sharing it but proceeding to offer access to Elizabeth regardless. (See Exhibit 23 attached hereto).

290.    Upon information and belief, this research summary, "Botoxic," is based wholly on Dr. Helton's botulism research, Trade Secret, and information residing within the Research Compilation.

291.    Upon information and belief, just a few days later, on or around October 7, 2024, Talkington indicated to Elizabeth that she had the Research Compilation, and Elizabeth could have access to it, contribute to it, and share it with whomever–"like a potluck dinner." (See Exhibit 24 attached hereto). Dr. Helton had no knowledge that Talkington was making use of her botulism research, Trade Secret, and/or the Research Compilation in this manner.

292.    Dr. Helton also had no knowledge that Talkington was offering to share, and was actually sharing, her botulism research, Trade Secret, and/or the Research Compilation with third parties.

293.    Upon information and belief, on October 16, 2024, Elizabeth, another group administrator of the FB Support Group, and Talkington participated in a video call ("Tri-Party Call").

294.    Upon information and belief, the Tri-Party Call was prompted by Talkington's request to obtain member stories from the FB Support Group for a book.

295.    Upon information and belief, Talkington exhibited a pattern of boundary violations against members of the FB Support Group characterized by excessive, erratic, and intrusive message requests for members' medical histories. Talkington even distributed unauthorized consent forms and, at times, impersonated FB Support Group leadership.

296.    Upon information and belief, during the Tri-Party Call, Talkington indicated that she had a book, other than the Historical Botulism Book, on a broad range of botulism topics ready to self-publish.

297.    Upon information and belief, this "ready to publish" book discussed during the Tri-Party Call largely relied upon the work, research, writings, notes, and insight obtained from Dr. Helton's botulism research, Trade Secret, and/or the Research Compilation.

298.    At all relevant times, Talkington knew, and had been told repeatedly, that Dr. Helton's botulism research, Trade Secret, Research Compilation, and writings were carefully curated intellectual property that only Dr. Helton had the right to utilize, economically exploit, and distribute or publish to third parties.

299.    Upon information and belief, in the Tri-Party Call, Talkington also made false representations to rationalize her unauthorized, illegal sharing of Dr. Helton's botulism research, Trade Secret, and/or the Research Compilation.

300.    Upon information and belief, Talkington expressed during the Tri-Party Call that she was impatient with Dr. Helton's timeline for publishing her personal story and botulism research, arguing that Dr. Helton was taking too long to complete and release her Botulism Manuscript.

301.    Upon information and belief, Talkington claimed in the Tri-Party Call that the safest thing to do for future botulism patients was to release the botulism research in Dr. Helton's Botulism Manuscript, Trade Secret, and/or the Research Compilation.

302.    Upon information and belief, Talkington also indicated in the Tri-Party Call that Dr. Helton was in poor health, and Talkington felt it was her duty to release the botulism research in Dr. Helton's Botulism Manuscript, Trade Secret, and/or the Research Compilation.

303.    Upon information and belief, in this same Tri-Party Call, Talkington once again falsely took credit for performing the research and analysis that resulted in Dr. Helton's successful verdict against the maker of BOTOX®.

304.    At all relevant times, Dr. Helton has maintained full mental capacity and sound-decision making authority regarding the dissemination and publication of her botulism research, Trade Secret. and/or the Research Compilation, as well as any related works. Despite managing chronic conditions, her intellect and professional judgment remain sharp and unaffected, as Talkington is fully aware.

305.    Furthermore, Dr. Helton has established a formal succession plan with a highly qualified peer physician to handle her botulism research, Trade Secret, and/or Research Compilation if it becomes necessary, excluding Talkington from any role in the research's future and rendering any interference or actions by Talkington on Dr. Helton's behalf wholly unauthorized.

**Talkington's Fraudulent Non-Profit Activities, Including the Creation of a Fraudulent Illinois Non-Profit Entity and Falsely Associating it with Dr. Helton**

306.    On December 20, 2024, without Dr. Helton's knowledge or consent, Talkington incorporated a non-profit entity in Illinois under the name Botulism Research Collaborative LLC. (See Exhibit 25 attached hereto).

307.    Talkington listed Dr. Helton as a Board Member of this non-profit entity in its initial corporate disclosure filed with the Illinois Secretary of State. (*See* Exhibit 25)

308.    Upon information and belief, Talkington has told the FB Support Group members that she founded the Botulism Research Collaborative LLC to obtain citizen-funding for long-term botulism recovery research.

309.   Dr. Helton never agreed to serve on the board of the Botulism Research Collaborative LLC.

310.   Dr. Helton was never notified of her appointment to the board of the Botulism Research Collaborative LLC.

311.   Dr. Helton has no affiliation or other connection to the Botulism Research Collaborative LLC.

312.   Talkington's use of Dr. Helton's name on the incorporation documents of the Botulism Research Collaborative LLC was a material misrepresentation designed to lend false legitimacy to her non-profit venture.

313.   Upon information and belief, Talkington has and continues to solicit funds nationally, in the name of the Botulism Research Collaborative LLC.

314.   Talkington's unauthorized use of Dr. Helton's identity in this Illinois state non-profit incorporation filing not only misappropriated Dr. Helton's professional reputation but also potentially exposed Dr. Helton to fiduciary liabilities for an organization she did not know existed.

315.   Upon information and belief, Talkington created this entity and fraudulently used Dr. Helton's name and medical credentials to establish an air of legitimacy for her self-published works under the imprimatur of the Botulism Research Collaborative LLC.

316.   Indeed, Talkington self-published her book "Recognizing Botulism" under her own imprint, Collaborative Medical Research Publishers.

317.   An existing non-profit entity, the Botulinum Research Center under the Institute of Advanced Sciences LLC, was founded in 2013 and exists to organize and conduct research, offer education through the Botulinum Journal, and host an annual Botulinum Research Symposium.

318.    Upon information and belief, this 2013-founded organization is not affiliated with Talkington's nonprofit organization of a similar name, i.e., the Botulism Research Collaborative LLC.

319.    Upon information and belief, Talkington's use of a publisher name confusingly similar to the Botulinum Research Center of the Institute of Advanced Sciences LLC was an attempt to deceive the public and the medical community.

320.    Upon information and belief, as Talkington's non-profit organization mimics the name of an established medical research institution and falsely lists Dr. Helton as a board member, it is clear that Talkington intended to fraudulently present the non-profit organization's work as a legitimate, multi-party scientific collaboration.

321.    Upon information and belief, Talkington's fraud was designed to cloak her self-published "Recognizing Botulism" book with the reputational privileges afforded Dr. Helton's stature as a botulism research expert and the organizational excellence of the Botulinum Research Center of the Institute of Advanced Sciences LLC.

322.    Upon information and belief, Talkington's "Recognizing Botulism" book is self-published and is available solely online on Amazon.com.

323.    Upon information and belief, Collaborative Medical Research Publishers is a fictitious name and does not exist as a separately incorporated organization in any U.S. state.

324.    Upon information and belief, Talkington has never published in a scientific or medical peer-reviewed journal or under the imprint of an established medical society or medical research organization.

325.    Shortly after Talkington fraudulently incorporated the Botulism Research Collaborative LLC, without mentioning its existence or that Dr. Helton was a named director, Talkington informed Dr. Helton that she would be a guest on the "Food Safety Talk" podcast.

326.    Upon information and belief, the "Food Safety Talk" podcast was released to the public on February 26, 2025.

327.    Despite Dr. Helton's multiple discussions and admonitions that Talkington not mischaracterize her work with Dr. Helton, on the Food Safety Talk podcast, Talkington once again falsely claimed to have completed a two-year postdoc on botulism. (See Exhibit 26 attached hereto). On the Food Safety Talk podcast, Talkington described her administrative and clerical work for Dr. Helton as a post-doc in boulism, saying that "I didn't think I would be able to do that long. I said I would try it for a year. And I really liked it. And I stayed on for two years." (See, *Id.*)

328.    On the Food Safety Talk podcast, Talkington yet again grossly misstated the charitable financial lifeline that Dr. Helton provided to Talkington in the form of hourly administrative and clerical work; a lifeline that Dr. Helton extended when Talkington was on the verge of failing out of her PhD program at Oklahoma State University and unable to take care of her children.

329.    Contrary to Talkington's statements on the Food Safety Talk podcast, Talkington did not "agree to try" a job offer for a two-year post-doc; instead, she solicited Dr. Helton in a state of financial ruin, unable to feed her children or complete her doctoral program.

330.    The "two years" Talkington claims she "stayed on" because she "liked it" were, in reality, the Work Arrangement–i.e., a period during which Dr. Helton created a task-based administrative and clerical role solely to prevent Talkington's educational collapse, financial ruin, and children from going hungry.

94

## Talkington's "Proxy Author" Scheme
### *or*
## Talkington's Search for a Proxy Author to Launder Misappropriated Trade Secrets

331.    Prior to recruiting McCue, Talkington attempted to solicit Elizabeth to serve as the titular author of a book (the "Ghost Book") Talkington had allegedly solely written and that was, upon information and belief, written based on Dr. Helton's botulism research, Trade Secret, and/or the Research Compilation, and, particularly, Dr. Helton's proprietary research and scientific analyses related to symptomatology of botulism.

332.    Upon information and belief, Talkington's strategy was to use Elizabeth's name on the cover of the Ghost Book to shield Talkington from direct claims of plagiarism, copyright infringement, and trade secret misappropriation by Dr. Helton, while still allowing Talkington to benefit financially from the publication of the Ghost Book.

333.    Upon information and belief, when Elizabeth declined this arrangement, Talkington shifted her strategy to identify an alternative participant willing to assume authorship and to publish the Ghost Book under that participant's name.

334.    Talkington eventually identified McCue—a willing partner aligned with Talkington and seemingly unconcerned with professional boundaries—to assume authorship and publish the Ghost Book under their name.

## Megan McCue, Talkington's Fraudulent Coconspirator

335.    Upon information and belief, McCue joined the FB Support Group in or around September 2024.

336.    Upon information and belief, McCue and Talkington became acquainted around the time McCue joined the FB Support Group.

337.    Upon information and belief, Talkington represented herself to McCue as a botulism researcher who had worked alongside Dr. Helton as her research partner since 2010.

338.    Upon information and belief, McCue became increasingly active in the FB Support Group shortly after joining.

339.    Upon information and belief, in or around the Fall of 2024, after being admitted to the FB Support Group, McCue shared with Talkington her interest in writing a book about BOTOX® side effects, as Talkington had presented herself to McCue as a botulism researcher who worked alongside Dr. Helton.

340.    Upon information and belief, on or around October 28, 2024, McCue went LIVE (i.e., broadcasted live video to their followers in real-time) on the FB Support Group's corresponding Instagram page.

341.    Upon information and belief, during this approximately one-hour-long LIVE broadcast, McCue claimed that the anxiety she allegedly suffered as a symptom of her self-reported iatrogenic botulism was so severe that she "would take having a stillborn again" and "would take losing [her] best friend again" rather than reliving such anxiety. (See Exhibit 27 attached hereto).

342.    Upon information and belief, within weeks of this LIVE broadcast, McCue claimed to be "completely healed" of her purported iatrogenic botulism after suffering from what Talkington described at one time to Dr. Helton as a mild case.

343.    Upon information and belief, on or around December 9, 2024, McCue had become active in the FB Support Group and told Elizabeth that she was writing a memoir about her experience with botulism symptoms.

344.    Upon information and belief, Talkington provided at least 20 research articles to McCue for use in a book about BOTOX® side effects. In particular, these 20 research articles were

generally inaccessible to the public, were part of Dr. Helton's botulism research, were Trade Secrets, and/or were within the Research Compilation.

345.    McCue confirmed Talkington's assistance in writing McCue's book, going so far as dedicating it to Talkington, writing, "Thank you for teaching me more about botulism than I ever wanted to know, and encouraging me to write. Without you, this book would not exist." (See Exhibit 28 attached hereto).

346.    Despite previously posturing that she had reserved the iatrogenicbotulism.com domain for Dr. Helton, Talkington, upon information and belief, has an oral and/or written agreement with, and/or transferred responsibility and maintenance of the iatrogenicbotulism.com domain, to McCue for use in marketing her publications and disseminating botulism information. Upon information and belief, Talkington utilized McCue as a proxy to operationalize this domain, given Dr. Helton's clear admonition that Talkington was not to publish Dr. Helton's personal story, botulism research, Trade Secret, and/or Research Compilation on the Internet. Registration of this domain name was, therefor, not taken for Dr. Helton's benefit or as part of any research collaboration with Dr. Helton; rather, the domain name was acquired, and is being used, to establish an alternative platform where Talkington could vicariously posture as a botulism authority, releasing Dr. Helton's misappropriated personal story, botulism research, Trade Secret, and/or the Research Compilation, in whole or in part, under a Talkington's alleged moral imperative to warn potential botulism victims. Conveniently, McCue's use of this domain name also satisfied Talkington's and McCue's own need for professional recognition and potential financial compensation, awards, or plaudits.

347.    Upon information and belief, on or around December 10, 2024, Talkington was admonished for harassing members of the FB Support Group to provide their botulism victim or survivor stories to Talkington.

348.    Upon information and belief, McCue released a self-published memoir on or around December 15, 2024, entitled *Me Tox Pretty: A Story of Iatrogenic Botulism and The Ugly Side of Cosmetic Injections* ("Me Tox Pretty"). Upon further information and belief, on or around January 10, 2025, McCue informed Elizabeth that she was also writing yet another book on botulism.

349.    Upon information and belief, not long after joining the FB Support Group, McCue aggressively advised and directed its members on medical and advocacy issues, portraying herself as an expert, though she had allegedly contracted botulism just months ago.

350.    On January 13, 2025, the group administrator(s) removed McCue from the FB Support Group for her aggressive and improper behavior toward members of the FB Support Group.

351.    Upon information and belief, the group administrator(s) observed that both Plaintiff and McCue engaged in coordinated boundary-violation patterns, attempting to position themselves as alternative authorities within the FB Support Group.

352.    Upon information and belief, Talkington and McCue's FB Support Group boundary violations included aggressive solicitation of members' stories, dissemination of emotionally triggering content, and relentless promotion of McCue's books.

353.    Even after McCue's access was removed from the FB Support Group, upon information and belief, McCue and Talkington continued their coordinated efforts to aggressively solicit and communicate with members of the FB Support Group, using inauthentic or false

Facebook profiles to evade the ban on McCue's primary account. Upon information and belief, given Talkington's prior use of the "Skye Bravo" pseudonym in the FB Support Group, Talkington also uses inauthentic or false Facebook profiles to act within the FB Support Group.

354.    On January 2, 2025, Talkington came to Oklahoma City, Oklahoma, and requested to have dinner with Dr. Helton, which she accepted.

355.    At dinner, Talkington and Dr. Helton reminisced about personal matters, and Talkington showed Dr. Helton a piece of artwork depicting an oil painting of an older male. Talkington did not disclose to Dr. Helton that the oil painting was to be placed in a botulism museum that Talkington was planning to open in Peoria, Illinois, just four (4) months later.

356.    Dr. Helton had no knowledge of Talkington's botulism museum prior to its opening, nor has she had any involvement with it since.

357.    On January 3, 2025, the morning after the Parties had dinner together, Talkington texted Dr. Helton a link to McCue's recently self-published memoir "Me Tox Pretty", McCue's contact information, and stated that McCue had been injected with XEOMIN® (a BOTOX® alternative) in July 2024. Dr. Helton asked Talkington whether McCue wanted to speak with her, to which Talkington answered affirmatively, noting several topics that McCue wanted to discuss, including healing advice, fast-twitch and slow-twitch muscles, and reassurance that McCue's hair would regrow. (See Exhibit 29 attached hereto).

358.    McCue then reached out to Dr. Helton via text message on January 6, 2025, introducing herself as Talkington's friend and asking to casually connect to discuss Dr. Helton's experience. McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. McCue did not disclose her plans to write a book, nor

refer to Dr. Helton as a resource for it, in any text message to Dr. Helton. (See Exhibit 30 attached hereto).

359.    Based on Talkington's January 3, 2025, text message and McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment. (See Exhibit 30).

360.    Upon information and belief, McCue has never been clinically diagnosed with botulism.

361.    Dr. Helton maintains a strict policy of personal privacy and does not grant interviews to authors, researchers, or media outlets about her personal story as a victim and survivor of botulism.

362.    Dr. Helton has consistently declined inquiries from national best-selling authors seeking to tell her story, as she reserves her time and expertise for her own independent work and intellectual property.

363.    At all times and upon information and belief, Talkington knew that Dr. Helton explicitly rejected requests to publicly disseminate any part of her personal story, botulism research, Trade Secret, and/or the Research Compilation itself.

364.    At all times and upon information and belief, Talkington knew that Dr. Helton was deliberate about her plans to publicly disseminate any part of her personal story, botulism research, Trade Secret, and/or the Research Compilation.

365.    At all times and upon information and belief, Talkington knew that Dr. Helton spoke with botulism victims seeking support or information about their personal situations when there was a request or an introduction to do so.

366.    Indeed, Talkington had requested that Dr. Helton speak to botulism victims prior to January 3rd, 2025, for private, personal, support-focused discussions. Dr. Helton always tried to make time for these conversations with botulism victims and has spent (and continues to spend) significant time and energy speaking with them and providing comfort, hope, and support, in addition to educational information, to support victims' informed discussions with their healthcare providers.  On occasion, at the individual's request, Dr. Helton has also communicated directly with the victims' physicians to share scientific information that may assist in treatment planning and recovery.

367.    Dr. Helton's communications with botulism victims are conducted exclusively on a humanitarian basis, limited to providing private support regarding symptom management and healing.

368.    Dr. Helton does not seek out victims of botulism, nor does she advertise these charitable services or profit from any sort of botulism victim support discussions.

369.    On or around January 8, 2025, McCue and Dr. Helton spoke on the phone for roughly one hour.

370.    During the January 8, 2025, telephone call, McCue and Dr. Helton discussed McCue's symptoms, symptom management, options for recovery, and potential options for regrowing McCue's hair, as well as some general educational context regarding the experience of iatrogenic botulism for McCue's advocacy work

371.    While Dr. Helton may have referenced her own experience in general terms to provide context, at no point did the January 8, 2025, conversation include the specific details of Dr. Helton's biography, legal history, botulism research, Trade Secret, and/or the Research Compilation.

372.    At no point before or during the January 8, 2025, telephone call did McCue explicitly or implicitly indicate to Dr. Helton that the purpose of the call was to interview Dr. Helton about her biography, legal history, botulism research, Trade Secret, and/or the Research Compilation.

373.    The January 8, 2025, telephone call was utterly lacking in any substantive focus, inquiries, or discussion regarding Dr. Helton's personal history with botulism, her biography, the details of her legal battle with the maker of BOTOX®, her botulism research, the Trade Secret, and/or the Research Compilation.

374.    At no point before, during, or after the January 8, 2025, telephone call did McCue indicate that she was interviewing Dr. Helton or that any information or commentary Dr. Helton provided during the call was on the record and therefore available for dissemination.

375.    At no point before, during, or after the January 8, 2025, telephone call did Dr. Helton provide consent for any of their discussion to be recorded. Upon information and belief, McCue recorded this conversation.

376.    At no point before, during, or after the January 8, 2025, telephone call did Dr. Helton consent to her personal story, biography, legal battle, botulism research, or any part of the Trade Secret and/or Research Compilation being published or used in any manner by McCue.

377.    During the January 8, 2025, telephone call, McCue indicated only that she may write a follow-up memoir, focused on her personal experiences, or feature on a podcast. At no point before or during the January 8, 2025 telephone call did McCue inform or discuss with Dr. Helton that she intended to or was actually writing a book on botulism symptomology, research, or other medical or scientific aspects of botulism or that McCue intended to include Dr. Helton's personal story, including aspects of her botulism battle, personal biography, legal battle with the

102

maker of BOTOX®, botulism research, Trade Secret, and/or any part of the Research Compilation therein.

378.    Upon information and belief, McCue is not a professional reporter and is not employed to report or otherwise disseminate interviews with individuals.

379.    On or around January 17, 2025, shortly after the telephone call of January 8, 2025, McCue first informed Dr. Helton via email that she was writing a book about botulism "that includes information about [Dr. Helton] and [Dr. Helton's] trial." (See Exhibit 31 attached hereto).

380.    In her January 17, 2025, email, McCue included an excerpt from her forthcoming book that pertained to Dr. Helton's personal story and requested that Dr. Helton review it for accuracy.

381.    Upon information and belief, on January 19, 2025, just eleven (11) days after McCue and Dr. Helton's telephone call, and just two (2) days after first informing Dr. Helton of her intent to include her personal story in the book, McCue self-published a book entitled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*").

382.    Upon information and belief, McCue's self-published book *Notox* incorporates in whole or in part Talkington's Ghost Book.

383.    Dr. Helton, unaware that McCue had already published *Notox* the previous day, and without Dr. Helton's permission to use her personal story, responded to McCue's January 17th email on or around January 20, 2025.  In this response, Dr. Helton informed McCue that she did not consent to McCue's inclusion of her personal story in *Notox*. Dr. Helton also informed McCue that the excerpt about her personal story was inaccurate.  (See Exhibit 32 attached hereto)

384.    McCue responded to Dr. Helton's refusal on January 20, 2025, with understanding, but failed to inform Dr. Helton that she had already published *Notox* on January 19, 2025, despite

leading Dr. Helton to believe McCue was waiting for Dr. Helton's consent. (See Exhibit 33 attached hereto).

385.    Based on McCue's facilitative response of January 20, 2025, and Dr. Helton's unambiguous admonishment and withholding of consent, Dr. Helton reasonably believed that McCue would remove the unauthorized and erroneous content about Dr. Helton's personal story from her book.

386.    McCue also failed to obtain Dr. Helton's prior permission to cite Dr. Helton as a source of scientific and medical information in *Notox*.

387.    After Dr. Helton's correspondence with McCue regarding the publication of her personal story and McCue's response acknowledging Dr. Helton's non-consent, Dr. Helton has had limited communication with McCue. McCue has, however, attempted to correspond with Dr. Helton, sending, for example, but not by way of limitation, an email on January 22, 2025 asking Dr. Helton science questions to which Dr. Helton did not respond, a text message on February 3, 2025 requesting to chat again, and a request to ask Dr. Helton further personal botulism questions on March 6, 2025. Dr. Helton did not have any discussions with McCue after the January 8, 2025, phone call. Further, but not by way of limitation, McCue sent a text message on July 1, 2025, following Dr. Helton's Cease & Desist communication to Talkington on June 11, 2025, asking what was going on, to which Dr. Helton did not respond.

388.    Given this July 1, 2025, text message from McCue, it is apparent that McCue and Talkington were still working together as of at least July 2025.

389.    Upon information and belief and based on the timeline McCue has provided, McCue drafted, edited, and published *Notox* in less than twenty (20) days.

390.    Upon information and belief, McCue has represented to potential consumers and readers of *Notox* that she conducted three personal interviews with experts in the subject matter of botulism for the purpose of researching and writing *Notox*. Upon information and belief, one of these three experts is Dr. Helton, and the second is believed to be Talkington.

391.    Upon information and belief, McCue, on more than one occasion, falsely represented to potential consumers and readers of *Notox* that she had interviewed Dr. Helton for the purpose of researching and writing *Notox*.

392.    Upon information and belief, McCue has falsely represented to potential consumers and readers of *Notox* that Dr. Helton was a mentor to McCue who had helped her unentangle the complexities of the botulism toxin and the illness potentially ascribed to it, and was therefore important in writing *Notox*.

393.    Upon information and belief, McCue falsely represented that she had close and personal knowledge of Dr. Helton's personal story on a February 25, 2025, podcast called Swallow Your Pride, particularly "Episode 360–When Beauty Treatments Go Wrong: An SLP's Warning About Cosmetic Botox Injections."

394.    On January 21, 2025, Talkington sent a text message to Dr. Helton with a link to an Amazon product page for *Notox*, stating that the book was receiving positive reviews. (See Exhibit 34 attached hereto).

395.    As of January 21, 2025, Dr. Helton did not have a copy of *Notox* and had no actual knowledge of its contents or subject matter. At the time of this text message from Talkington, Dr. Helton, erroneously yet reasonably, presumed that McCue had honored her January 20, 2025, request to remove her personal story. Having seen only the cover and the excerpt of her personal

story, which Dr. Helton believed McCue had removed from the book, Dr. Helton erroneously presumed that McCue's book was directed to McCue's own personal experiences.

396.    Upon information and belief, at least one of McCue's motivations for writing the *Notox* book was to accord to herself the reputation and notoriety of a respected botulism researcher.

397.    Upon information and belief, McCue has received at least some acclaim for being a botulism researcher.

398.    Upon further information and belief, McCue has been featured on several podcasts that explicitly state that she is a botulism researcher.

399.    Upon information and belief, being seen as a botulism researcher has brought McCue acclaim, including financial and reputational rewards.

400.    On or around February 21, 2025, Dr. Helton first obtained a copy of *Notox* and discovered that, contrary to her request, McCue had included the incorrect personal story of Dr. Helton that McCue had sent on January 17, 2025, and which Dr. Helton had explicitly objected to and withheld consent to be published on January 20, 2025.

### Dr. Helton's Final Correspondence with Talkington and their Concealment of their Continuing Fraud Perpetrated by Talkington and McCue

401.    On February 10, 2025, Talkington engaged in a text message exchange with Dr. Helton regarding third-party threats of litigation against McCue for plagiarism and libel by members of the FB Support Group. (See Exhibit 35 attached hereto).

402.    In response, Dr. Helton inquired whether McCue had discussed or written about other people without their consent, as she had done with Dr. Helton. (See, *Id.*) In the same exchange, Talkington, unprompted, informed Dr. Helton that McCue was being accused of falsely naming herself as the author of the *Notox* book when Talkington was the actual, unacknowledged author of McCue's *Notox*. (See, *Id.*)

106

403.    Upon information and belief, although Talkington denied writing McCue's *Notox*, Talkington likely wrote all or a substantial part of *Notox*, i.e., *Notox* incorporates some or all of the Ghost Book, *supra*, and/or Talkington provided or disclosed to McCue the incorrect personal story of Dr. Helton, some or all of Dr. Helton's botulism research, Trade Secret, and/or some or all of the Research Compilation.

404.    In the same text message exchange of February 10, 2025, Talkington asserted that McCue wrote *Notox* based on 14,000 words of publicly available documents. (See, *Id.*) Talkington admitted that McCue had interviewed her for *Notox*. (See, *Id.*)

405.    Talkington never disclosed to Dr. Helton that she was providing at least some of Dr. Helton's personal story, botulism research, and all or at least a part of the Trade Secret and/or Research Compilation to McCue for inclusion or incorporation into McCue's *Notox* book.

406.    In the same text message exchange of February 10, 2025, Dr. Helton expressed to Talkington her continued frustration and opposition to McCue's attempt to include Dr. Helton's personal story in her book. (See, *Id.*)  At this time, Dr. Helton was unaware that McCue had already proceeded with the publication of her book, which included personal details of Dr. Helton's experience and product liability litigation.

407.    Upon information and belief, at least as early as the time of this text message exchange on February 10, 2025, Talkington knew that McCue had published her *Notox* book with unauthorized content regarding Dr. Helton's personal story, botulism research, Trade Secret, Research Compilation, and/or the product liability legal proceedings.

408.    Upon information and belief, at least as early as the time of this text message exchange of February 10, 2025, Talkington knew that McCue had used false pretenses to set up and conduct the January 8, 2025 telephone call with Dr. Helton in an undisclosed effort to obtain

Dr. Helton's personal story, botulism research, Trade Secret, Research Compilation, and information about her legal proceedings with the maker of BOTOX® for inclusion in the *Notox* book.

409.    Upon information and belief, at least as early as the time of this text message exchange of February 10, 2025, Talkington failed to disclose to Dr. Helton that the *Notox* book contained extensive references to Dr. Helton, her personal medical history, botulism research, Trade Secret, Research Compilation, and/or legal proceedings with the maker of BOTOX®.

410.    Upon information and belief, Talkington and McCue agreed among themselves at least as early as the time of this text message exchange of February 10, 2025, not to disclose the fact that the *Notox* book contained extensive references to Dr. Helton, her personal medical history, botulism research, Trade Secret, Research Compilation, and/or legal proceedings with the maker of BOTOX®

411.    The February 10, 2025, text message exchange was the last communication between Dr. Helton and Talkington.

**Talkington's Ultimate Selfish Betrayal of Dr. Helton**

412.    On or around February 11, 2025, Dr. Helton communicated with Elizabeth. It was at this time that Dr. Helton became aware that McCue's book, *Notox*, included at least six (6) full pages explicitly detailing Dr. Helton's personal story, including her medical issues, diagnosis, botulism research, and lawsuit against the maker of BOTOX® ("*Notox* Information"). McCue published this *Notox* Information despite Dr. Helton's indication that it was inaccurate.

413.    In addition to being inaccurate, Dr. Helton directly told McCue that she did not consent to the inclusion of her personal story and intellectual property in McCue's *Notox* book.

108

414.    For example, but not by way of limitation, McCue's *Notox* book includes explicit reference to Dr. Helton's Trade Secret and Research Compilation, stating that Dr. Helton "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities." (See Exhibit 36 attached hereto).

415.    The *Notox* book explicitly states that Dr. Helton's "trial and verdict [against the maker of BOTOX®] received exactly zero seconds of airtime on any major news networks" and was "mostly met with crickets" by the media. (See Exhibit 37 attached hereto).

416.    In the February 10, 2025, text message exchange, Talkington told Dr. Helton that *Notox* was based solely on publicly available documents. Upon information and belief, this statement by Talkington was false, as Talkington had provided Dr. Helton's personal story, botulism research, Trade Secret, and at least a portion of the Research Compilation to McCue to use in writing *Notox*. (See Exhibit 38 attached hereto)

417.    Alternatively, and upon further information and belief, Talkington wrote all or at least a portion of the *Notox* book using her privileged access to Dr. Helton's personal story, botulism research, Trade Secret, and the Research Compilation.

418.    *Notox* purports to cite personal communications with Dr. Helton as a reference, along with one public article from *The Oklahoman* newspaper dated May 12, 2010, and titled "Oklahoma County jury finds Botox maker negligent, awards $15 million."

419.    Upon information and belief, McCue explicitly and falsely represents that she interviewed Dr. Helton in preparation for writing the *Notox* book.

420.   Upon information and belief, McCue also explicitly and falsely claims that everything in her book is open source and public information, easily accessible to anyone with an internet connection.

421.   On the contrary, for example, but not by way of limitation, the *Oklahoman* newspaper article does not provide any details regarding the botulism research Dr. Helton performed in preparation for the trial, nor did Dr. Helton discuss such information with McCue when they spoke on the telephone. (See Exhibit 39 attached hereto).

422.   Many of the personal details of Dr. Helton's story that are included in *Notox* are not publicly available and, at least in part, are inaccurate. Dr. Helton never shared the personal information published in *Notox* with McCue in any communication.

423.   Upon information and belief, Talkington provided McCue with extensive details regarding Dr. Helton's personal story, botulism research efforts, Trade Secret, and/or the Research Compilation without Dr. Helton's knowledge or consent.

424.   Upon information and belief, Talkington provided McCue with the materials necessary to write at least some aspects of the *Notox* book from Dr. Helton's Trade Secret and/or the Research Compilation, in particular. Upon information and belief, by giving some or all of Dr. Helton's Research Compilation to McCue, Talkington enabled McCue to bypass years of necessary research and expense to produce a manuscript in an implausibly short timeframe of twenty (20) days or less.

425.   Talkington's provision of some or all of Dr. Helton's Research Compilation to McCue conferred an economic benefit on McCue that Talkington had no authority to give.

426.   Upon information and belief, McCue knew that Talkington had no authority to provide some or all of Dr. Helton's Research Compilation to her.

427.    Upon information and belief, despite knowing that Talkington had no authority to provide some or all of Dr. Helton's Research Compilation, McCue accepted the same and used the Research Compilation without permission or authority.

428.    Upon information and belief, McCue and/or Talkington, alone or in combination, imported some or all of the Research Compilation, without Dr. Helton's knowledge or consent, into a generative artificial intelligence large language model for assistance in writing some or all of *Notox*.

429.    Upon information and belief, McCue and/or Talkington, alone or in combination, used the large language model in which some or all of the Research Compilation was imported to write, refine, reconfigure, analyze, and/or summarize Dr. Helton's personal story, botulism research, Trade Secret, and/or Research Compilation in order to write and self-publish *Notox* in twenty (20) days.

430.    Upon information and belief, McCue was approved to join the FB Support Group in September 2024, where she met Talkington. Upon further information and belief, McCue is a speech-language pathologist with no prior history of botulism research. Upon further information and belief and despite having no formal training or education in botulism, McCue self-published the *Notox* book in January 2025—four months after first meeting Talkington and approximately one (1) month after McCue allegedly began writing *Notox*.

431.    Upon information and belief, the speed of McCue's self-publication indicates that McCue did not independently research the material in *Notox*; rather, it is believed upon information and belief that McCue was provided at least some or all of Dr. Helton's Research personal story, botulism research, Trade Secret, and/or the Research Compilation by Talkington

111

and that at some or all of these materials were placed into a generative artificial intelligence large language model which was thereafter used to create *Notox*.

432.    Upon information and belief, Talkington, alone or in combination with McCue, orchestrated the January 8, 2025, phone call between McCue and Dr. Helton under a false pretense.

433.    Upon information and belief, McCue conspired with Talkington, while they resided in Illinois, to orchestrate the January 8, 2025, phone call between McCue and Dr. Helton in order to obtain Dr. Helton's intellectual property under false pretense(s).

434.    Upon information and belief, Talkington induced Dr. Helton to speak with McCue under the guise of a personal botulism victim support call to create a plausible source or explanation as to why (a) McCue was able to include Dr. Helton's private information in *Notox*, including at least some or all of the Research Compilation, and (b) McCue was able to write and self-publish *Notox* in less than twenty (20) days.

435.    Upon information and belief, Talkington fraudulently induced Dr. Helton to speak with McCue, upon McCue's instructions or indications, so that the personal information in *Notox* could plausibly be claimed to have been sourced from Dr. Helton.

436.    Upon information and belief, McCue's attribution of the extensive biographical and medical information of Dr. Helton in *Notox* to the January 8, 2025, interview with Dr. Helton was a purposeful attempt by McCue to avail herself and *Notox* with Dr. Helton's professional medical reputation and to make it appear as though Dr. Helton had sanctioned the *Notox* book.

437.    Upon information and belief, McCue is also involved with this Illinois Botulism Research Collaborative LLC, either as a formal employee, volunteer, or director thereof, and encourages and recruits other individuals to join this Illinois organization. For example, McCue

stated in a Facebook communication regarding the Botulism Research Collaborative LLC, "We're going to need board members, so join us!" (See Exhibit 40 attached hereto).

438.   Upon information and belief, McCue utilized, or intended to utilize, the Illinois Botulism Research Collaborative LLC to promote, market, advertise, legitimize, and/or sell *Notox*.

439.   Upon information and belief, Talkington, while in Illinois, acted as a collaborator and agent of McCue and promoted, marketed, advertised, and defended *Notox* online, in the press, including podcasts, and as part of the sham Illinois non-profit entity's purported work.

### Irreparable Harm to Dr. Helton's Professional Standing and Reputation and Talkington's Usurpation of Dr. Helton's Life's Work

440.   Upon information and belief, Talkington and McCue, non-physicians, have dispensed unauthorized medical advice to numerous vulnerable botulism victims, including instructing patients to lie to their treating physicians.

441.   Upon information and belief, by falsely presenting themselves as Dr. Helton's research partner, mentee, and/or expert botulism researchers, while dispensing such unauthorized and dangerous medical advice, Talkington and McCue have sought to cloak themselves with Dr. Helton's reputation and acclaim as a physician and botulism researcher for commercial purposes and financial gain.

442.   Upon information and belief, in cloaking themselves with Dr. Helton's medical reputation and acclaim, Talkington and McCue have created a direct nexus of potential liability or reputational harm for Dr. Helton. Upon further information and belief, Talkington and McCue's unauthorized association with Dr. Helton places Dr. Helton's medical license and professional standing generally and, more particularly, within the community of botulism victims, in jeopardy

113

as botulism victims and their families may reasonably believe that Dr. Helton's medical authority sanctions Talkington and McCue's inaccurate and dangerous instructions.

443.    Dr. Helton also serves as a *pro bono* expert witness for law firms representing victims of iatrogenic botulism, drawing on her specialized knowledge of personal, scientific, and medical matters to help others seek justice. Talkington and McCue's creation of unauthorized, unvetted, and scientifically inaccurate botulism materials, while cloaking themselves and attempting to usurp Dr. Helton's reputation, acclaim, and authority, threatens to destroy Dr. Helton's credibility in court.

444.    Dr. Helton may face disqualification as an expert witness if, for example, but not by way of limitation, Talkington and McCue's egregious advice that patients lie to their doctors is somehow attributed to Dr. Helton. The ultimate harm from Talkington and McCue's actions is not merely reputational damage to Dr. Helton, but the denial of justice to future victims who rely on Dr. Helton's unimpeachable *pro bono* expert testimony to win their cases.

445.    Talkington fraudulently listed Dr. Helton as a Board Member of the Botulism Research Collaborative LLC in formal filings with the Illinois Secretary of State without Dr. Helton's knowledge or consent. (See Exhibit 25).

446.    Upon information and belief, McCue is also involved with this Illinois Botulism Research Collaborative LLC, either as a formal employee, volunteer, or director thereof, and encourages and recruits other individuals to join this Illinois organization. Upon information and belief, McCue intended to utilize the Botulism Research Collaborative LLC to promote *Notox*, and her other books, articles, and commercial activities (including her speech language pathology services) further damaging Dr. Helton's professional reputation as an unwitting and unwilling

Board Member of the LLC, as an unwitting and unwilling endorser and/or contributor of *Notox*, and/or as an endorser of McCue's professional and botulism related activities.

447.    This unconsented-to and unknown appointment to the Botulism Research Collaborative LLC non-profit entity exposes Dr. Helton to potential fiduciary liabilities, tax obligations, and regulatory scrutiny for a non-profit entity she has no input into or control over. Dr. Helton is now forced to expend considerable resources to defend her reputation against any further misconduct or financial impropriety arising from Talkington's management of the Botulism Research Collaborative LLC.

448.    Upon information and belief, Talkington publicly claims to have completed a two-year post-doctoral fellowship under Dr. Helton, a position that has never existed. Talkington's fabrication of such a post-doctoral fellowship degrades Dr. Helton's academic reputation by implying she operates an unaccredited or substandard post-doctoral training program. By holding herself out as a Dr. Helton-mentored or trained botulism research expert, despite lacking even the most basic of scientific or medical training or competency, Talkington publicly misrepresents the quality and rigor of Dr. Helton's research standards and the types of individuals that Dr. Helton associates with as part of her academic and research pursuits.

449.    Upon information and belief, Talkington has offered to provide or otherwise grant access to Dr. Helton's Trade Secret and/or Research Compilation to third parties, despite admissions and/or frank acknowledgements that Talkington had no authority to provide these materials to third parties, in whole or in part.

450.    Dr. Helton's Trade Secret and Research Compilation is a distinct proprietary economic asset, compiled and curated by her, that assisted in securing a $15,000,000 product liability lawsuit verdict. Talkington's uncontrolled publication of some or all of Dr. Helton's Trade

Secret and/or Research Compilation threatens its status as a trade secret, thereby destroying its economic benefit to Dr. Helton. Talkington and McCue's actions, alone or in combination, have or will likely permanently diminish the Trade Secret and Research Compilation's proprietary nature and economic value, which Dr. Helton has expended significant resources and time to create.

451.    Upon information and belief, in providing Dr. Helton's Trade Secret, Research Compilation, as well as confidential botulism research and proprietary mental analyses and impressions to McCue for use in *Notox*, Talkington and McCue have effectively destroyed the first-to-market value of Dr. Helton's upcoming manuscript. Dr. Helton has spent over fifteen years curating, analyzing, and synthesizing a massive amount of information for a debut work that would establish her unique voice and authority in the field of botulism research and iatrogenic botulism. The unauthorized use and/or sharing of Dr. Helton's Trade Secret and/or Research Compilation, in whole or in part, and/or release the of a derivative work (e.g., *Notox*), which relies on Dr. Helton's core thesis and research, dilutes the novelty of Dr. Helton's future publication, confusing the marketplace and siphoning potential readership and sales before Dr. Helton's work even hits the shelves.

452.    Upon information and belief, Talkington's malicious decision to attach Dr. Helton's private Botulism Manuscript as Exhibit 3 to her public Response to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. [Dkt. No. 16.3] was done purposefully in order to strip Dr. Helton of the authorial privilege of unveiling her life's work on her own terms. Talkington's unnecessary public disclosure converts Dr. Helton's valuable intellectual property in her Botulism Manuscript into a public record, accessible to third parties through a simple PACER search and download. Upon information and belief, Talkington's action was intentional and done

with the intent to deprive Dr. Helton of the ability to negotiate publishing rights, control the timing

of her book's release, or monetize the exclusive nature of her story, causing concrete economic

damage distinct from the reputational harm detailed above. Further, upon information and belief,

Talkington attached Dr. Helton's Botulism Manuscript in whole to her First Amended Complaint

in order to embarrass Dr. Helton, as the Botulism Manuscript is still in draft form.

**COUNTERCLAIM CAUSES OF ACTION**
**FIRST COUNTERCLAIM FOR RELIEF**

**Copyright Declaratory Judgment, Injunction, and Damages**
**for Copyright Infringement–17 U.S.C. § 101**

453.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint

and Paragraphs 1 through 452 of her Factual Narrative hereof, with the same force and effect as if

fully set forth herein.

454.    This action arises under the Copyright Act, 17 U.S.C. § 101 et seq., seeking a

declaration of Dr. Helton's sole authorship and ownership of a copyrighted work, i.e., the Botulism

Manuscript, damages, and injunctive relief resulting from Talkington's infringement of that

copyright.

455.    The Botulism Manuscript constitutes "original works of authorship fixed in any

tangible medium of expression," as defined by 17 U.S.C. § 102(a).

456.    Dr. Helton independently created the Botulism Manuscript.

457.    Dr. Helton has a valid copyright in the Botulism Manuscript from the moment it

was fixed in a tangible medium of expression.

458.    The Botulism Manuscript has been registered with the U.S. Copyright Office, and

a certificate of registration, Registration No. TXU 2-488-289 was issued on May 13, 2025. A copy

of this registration certificate is attached hereto as Exhibit 41.

459.    The Botulism Manuscript encompasses, for example, but not by way of limitation, 950 pages of Dr. Helton's authorship and writings about her botulism research, her personal story of contracting botulism, her product litigation with the maker of BOTOX®, and her analysis and conclusions drawn from reviewing and analyzing materials found in whole or in part in the Research Compilation.

460.    Under Dr. Helton's sole authority and control, Talkington was hired as an independent contractor to perform administrative and clerical tasks related to Dr. Helton's extensive botulism research. As part of these administrative and clerical tasks, Talkington had access to the Botulism Manuscript.

461.    At all relevant times, Dr. Helton directly expressed and explained to Talkington that the Botulism Manuscript was Dr. Helton's exclusive intellectual property and that Dr. Helton was the sole author of the Botulism Manuscript.

462.    After accessing the Botulism Manuscript, Talkington has reproduced the Botulism Manuscript, in whole or in part, and has prepared and/or published at least one derivative work therefrom, which copied at least portions from Dr. Helton's copyrighted Botulism Manuscript.

463.    Talkington's actions have infringed Dr. Helton's exclusive rights under 17 U.S.C. § 106, including the rights to reproduce the copyrighted work and to prepare derivative works.

464.    Talkington's infringement was willful and for commercial advantage or private financial gain.

465.    As a direct and proximate result of Talkington's infringement, Talkington has suffered and continues to suffer significant monetary damages (including lost profits and/or statutory damages) and irreparable harm, for which there is no adequate remedy at law.

466. Dr. Helton is therefore entitled to a declaration of sole authorship of the Botulism Manuscript, an injunction prohibiting Talkington's future infringement of the Botulism Manuscript, and monetary damages for Talkington's past and ongoing infringement of Dr. Helton's exclusive rights in and to the Botulism Manuscript.

## SECOND COUNTERCLAIM FOR RELIEF

**Declaratory Judgment of Sole Ownership of Trade Secret in the Research Compilation, Injunctive Relief, and Damages for Trade Secret Misappropriation**

467. Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 466 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

468. This action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1839(3) et seq., seeking a declaration of Dr. Helton's sole ownership of a trade secret, i.e., the Research Compilation, damages, and injunctive relief resulting from Talkington's infringement of that trade secret.

469. Dr. Helton owns a "trade secret," as defined by 18 U.S.C. § 1839(3), comprising a confidential and proprietary physical and electronic research and analysis compilation (collectively referred to herein as the "Trade Secret").

470. At all relevant times, the Trade Secret existed in physical documents stored in Dr. Helton's personal office, in digital format on Dr. Helton's personal computer, and/or in research management software (ENDNOTE®) controlled by Dr. Helton. The electronic files maintained in the ENDNOTE® software have been defined herein as the "Research Compilation," supra.

471. Dr. Helton has taken reasonable measures to keep the Trade Secret actually secret, including, but not limited to, (a) directing Talkington that the Trade Secret was proprietary and confidential and could not be disclosed to third parties without consent or permission, (b)

119

restricting electronic access to the Trade Secret through utilization of secure passwords and maintaining physical security protocols for non-electronically stored physical documents.

472.    The existence of the Trade Secret was known only to a select few individuals, including Dr. Helton's spouse, personal secretary, and, eventually, Talkington.

473.    Dr. Helton's Trade Secret derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

474.    The Trade Secret is related to a product or service that is used in, or intended for use in, interstate or foreign commerce.

475.    At all relevant times, Dr. Helton made Talkington aware of the personal and economic importance and the secrecy of the Trade Secret.

476.    At all relevant times, Dr. Helton also made Talkington aware that Dr. Helton was the sole and exclusive owner of the Trade Secret.

477.    Talkington knew, or should have known, that the Trade Secret, and particularly the Research Compilation, was the proprietary and confidential intellectual property owned exclusively by Dr. Helton.

478.    Dr. Helton never told or intimated to Talkington that the Trade Secret was a shared asset or that Talkington could make use of the Trade Secret, in whole or in part, outside of the administrative and clerical duties being performed under the direction and for the sole benefit of Dr. Helton.

479.    Following the termination of the Working Arrangement between Talkington and Dr. Helton, Talkington, under false pretenses, downloaded, retained, and has made use of the Trade

Secret in whole or in part, including, in particular but not by way of limitation, the Research Compilation.

480.    Talkington shared, showed, or otherwise disclosed the Trade Secret, in whole or in part, with McCue.

481.    Talkington and McCue, working independently or in concert with another, used the Trade Secret, in whole or in part, to prepare a published work entitled *Notox: The Shocking Truth About Cosmetic Injections*, evidenced at least by statements in *Notox* relating to information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, including for example,  but not by way of limitation, stating that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

482.    Talkington misappropriated the trade secret without Dr. Helton's express or implied consent through improper means as defined by 18 U.S.C. § 1839(5), including, but not by way of limitation, exceeding authorized access to a computer system by exporting a copy of the Trade Secret under false pretenses, particularly the Research Compilation, retaining a copy of the Trade Secret after Talkington's employment was terminated, making use of the Trade Secret for Talkington's own reputational and academic benefit, and providing access to the Trade Secret to third-parties who had no right to access it, and these acts of misappropriation occurred after May 11, 2016.

483.    As a direct and proximate result of Talkington's misappropriation, Dr. Helton has suffered and will continue to suffer irreparable injury, harm, and damages, including reputational

damage, loss of competitive advantage as an expert witness in botulism victim litigation, monetary loss for the exclusive exploitation of the Trade Secret, and other harms as discussed, supra.

484.    Pursuant to 18 U.S.C. § 1836(b)(3), Dr. Helton is entitled to appropriate relief, including but not limited to a declaration that Dr. Helton is the sole owner of the Trade Secret, injunctive relief to prevent any actual or threatened future misappropriation of the Trade Secret, recovery of damages for actual loss caused by Talkington's misappropriation of the Trade Secret, damages for unjust enrichment caused by Talkington's misappropriation that are not addressed in the computation of actual damages, exemplary damages, and reasonable attorney's fees as Talkington's misappropriation of the Trade Secret is willful and malicious.

### THIRD COUNTERCLAIM FOR RELIEF

### FALSE DESIGNATION OF ORIGIN–15 U.S.C.A. § 1125(a)(1)(A)

485.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 484 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

486.    This action arises under the Lanham Act, 15 U.S.C. § 1125 et seq., seeking seizure of goods, injunctive relief, damages, and other appropriate relief including an order for corrective notice and/or advertising, resulting from Talkington's use of Dr. Helton's name and reputation in commerce to create a false designation of origin, false description, and false representation that Dr. Helton sponsors, approves, endorses, or is affiliated with Talkington's services and commercial and professional advocacy efforts

487.    Dr. Helton is a globally recognized physician and botulism researcher whose name, personal botulism story, and public image or reputation, used in researching botulism and

advocating for and counseling botulism patients, are distinctive and widely known among consumers.

488.    In commerce, Talkington has used Dr. Helton's name and reputation in connection with the advertisement, promotion, and sale of Talkington's academic and botulism research services, personal promotional and advancement efforts, professional botulism advocacy, and other commercial activities; for example, but not by way of limitation, Talkington has (a) repeatedly and publicly held herself out as an agent, post-doctoral fellow, research partner, or collaborative associate of Dr. Helton, (b) falsely asserted in applications for employment and to interested third-parties that Dr. Helton was Talkington's research partner, (c) without consent, using Dr. Helton's name and personal story in order to gain interest in and purchases of at least one of Talkington's self-published books, and (d) without Dr. Helton's knowledge and consent, on December 20, 2024 listing Dr. Helton as a board member on an Illinois state non-profit limited liability company incorporation filing (i.e., the Botulism Research Collaborative LLC).

489.    This use constitutes a false designation of origin, false description, and false representation that Dr. Helton sponsors, approves, endorses, or is affiliated with Talkington's services and commercial and professional advocacy efforts.

490.    Talkington's conduct creates a likelihood of confusion, deception, or mistake among consumers as to the origin, sponsorship, or approval of Talkington's goods, for example, but not by way of limitation, causing them to believe Dr. Helton has a professional and/or commercial connection to Talkington, when none actually exists. This false association is material, influencing consumer impressions and beliefs when commercially or otherwise interacting with Talkington and/or purchasing or contracting for Talkington's services, and has thereby occurred in and affected interstate commerce.

491.    As a direct and proximate result of Talkington's actions, Dr. Helton has been injured by damage to her reputation, unauthorized usurpation and commercial exploitation of her name, likeness, and personal story, and impairment of Dr. Helton's commercial and professional economic opportunities.

492.    Talkington's use of Dr. Helton's name, personal botulism story, and public image or reputation to create a false association was willful.

493.     Talkington's use of Dr. Helton's name, personal botulism story, and public image or reputation resulted in economic and reputational harm to Dr. Helton.

494.    Pursuant to 18 U.S.C. § 1125(a)(1)(A), Dr. Helton is entitled to appropriate relief, including but not limited to injunctive relief to prevent Talkington from any actual or threatened future false appropriation or affiliation with Dr. Helton's name, personal botulism story, and public image or reputation, equitable relief, including an order for Talkington to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that (a) Talkington is not an agent, post-doctoral fellow, research partner, or collaborative associate of Dr. Helton and (b) that Dr. Helton has no relationship with the Botulism Research Collaborative LLC, recovery of damages for actual loss caused by Talkington's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public image or reputation, damages for unjust enrichment caused by Talkington's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public image or reputation that are not addressed in the computation of actual damages, exemplary damages, and reasonable attorney's fees and costs as Talkington's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public image or reputation is willful and malicious. Further, Dr. Helton is entitled to the seizure and/or

destruction of any existing publications or materials that appropriate or falsely claim affiliation with Dr. Helton's name, personal botulism story, and public image or reputation.

## FOURTH COUNTERCLAIM FOR RELIEF

## FALSE ADVERTISING–15 U.S.C. § 1125(a)(1)(B)

495.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 494 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

496.    This action arises under the Lanham Act, 15 U.S.C. § 1125 et seq., seeking injunctive relief, damages and, other appropriate relief, including an order for corrective notice and/or advertising, resulting from Talkington's false or misleading statements in interstate commerce which have influenced purchasing decisions of Talkington's goods and services and have proximately caused, or are likely to cause, commercial injury to Dr. Helton's economic, reputational, and professional interest.

497.    Talkington has made false or misleading statements of fact in commercial advertising or promotion, including misrepresenting her qualifications, her relationship with Dr. Helton, and the origin and authorship of research and publications derived from Dr. Helton's personal story, botulism research, and Research Compilation.

498.    Talkington's false or misleading statements of fact have been disseminated in interstate commerce and are material to consumers' and the public's perception of Talkington's goods, services, and professional status.

499.    Talkington's false or misleading statements have, and are likely to continue, influenced purchasing decisions of Talkington's goods and services and have proximately caused,

or are likely to cause, commercial injury to Dr. Helton's economic, reputational, and professional interests.

500.    Pursuant to 18 U.S.C. § 1125(a)(1)(B), Dr. Helton has suffered, and is likely to continue suffering, damages and is entitled to appropriate relief, including but not limited to injunctive relief to prevent Talkington from any actual or future false or misleading statements of fact, equitable relief, including an order for Talkington to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that Talkington is not an agent, post-doctoral fellow, research partner, or collaborative associate of Dr. Helton, recovery of damages for actual loss caused by Talkington's false or misleading statements, damages for unjust enrichment caused by Talkington's false or misleading statements that are not addressed in the computation of actual damages, exemplary damages, and reasonable attorney's fees and costs as Talkington's false and misleading statements have been willful and malicious.

## FIFTH COUNTERCLAIM FOR RELIEF

### Computer Fraud and Abuse Act Violation–18 U.S.C.A. § 1030(a)

501.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 500 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

502.    This action arises under the Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030(a), seeking damages and other appropriate relief for Talkington's unauthorized access to a protected computer in interstate commerce, resulting in harm to Dr. Helton.

503.    The Research Compilation existed, at least in part, in digitized form within a resource management software system, i.e., ENDNOTE®.

504.    The Research Compilation comprises Dr. Helton's confidential and proprietary research and analysis that has been protected at all relevant times as a trade secret owned solely by Dr. Helton.

505.    The Research Compilation derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use. At least a portion of the economic value of the Research Compilation is due to the research necessary to form the corpus of the materials therein, the substantial labor required to compile the materials, and the generally inaccessible, confidential, or proprietary nature of a great number of the materials and Dr. Helton's analyses contained therein. Dr. Helton solely performed this research, compilation, and analysis of the corpus of the Research Compilation and/or directed Talkington's activities in performing administrative and clerical tasks on and within the Research Compilation. At all relevant times, Talkington's access to and within the Research Compilation was under the sole authority and control of Dr. Helton.

506.    At all relevant times, and as part of the above-mentioned authority and control, Dr. Helton instructed Talkington that the Research Compilation was not a joint asset to be accessed for purposes other than directed by Dr. Helton, and that Talkington's use or access to the Research Compilation was not to be used by and/or provided to third parties. At all relevant times, Talkington indicated that she understood that the Research Compilation was solely owned by Dr. Helton and that Talkington's authorization to access the Research Compilation was premised solely upon performing the administrative and clerical tasks assigned to Talkington by Dr. Helton, under Dr. Helton's supervision and control, and exclusively for Dr. Helton's benefit.

507.    Talkington intentionally accessed, exceeding her authorization, downloaded, and has maintained and, upon information and belief, used a copy of the Research Compilation without the authorization or consent of Dr. Helton. Such intentional access of the Research Compilation by Talkington was an intentional act of accessing a computer or online electronic software-as-a-service ("SaaS") via the Internet in order to obtain a copy of the Research Compilation stored on such computer or SaaS, which was stored electronically and not intended to be accessible to the general public.

508.    Talkington's access to the Research Compilation was done knowingly and with intent to defraud, and by means of such conduct furthered the intended fraud and obtained the Research Compilation, an item of independent economic value, to Dr. Helton's detriment.

509.    Pursuant to 18 U.S.C. § 1030(a)(2)(C) and § 1030(a)(4), Dr. Helton is entitled to appropriate relief, including monetary damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## SIXTH COUNTERCLAIM FOR RELIEF

### Oklahoma Misappropriation of Trade Secret–Okla. Stat. Ann. tit. 78, § 86

510.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 509 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

511.    This action arises separately, or in the alternative to Dr. Helton's claim for trade secret misappropriation under federal law, under the Oklahoma Uniform Trade Secrets Act, Okla. Stat. Ann. tit. 78, § 86 et seq., seeking damages and injunctive relief resulting from Talkington's infringement of Dr. Helton's trade secret.

512.    Dr. Helton owns a "trade secret" as defined by Okla. Stat. Ann. tit. 78, § 86(4) and identified herein as including a confidential and proprietary physical and electronic research and analysis compilation (collectively referred to herein as the "Trade Secret").

513.    At all relevant times, the Trade Secret comprised physical documents stored in Dr. Helton's personal office, in digital files on Dr. Helton's personal computer, and/or in research management software (i.e., ENDNOTE®) controlled by Dr. Helton. The electronic files maintained in the ENDNOTE® software have been defined herein as the "Research Compilation," *supra*.

514.    At all relevant times, Dr. Helton has taken reasonable measures to keep the Trade Secret actually secret and unavailable to third parties, including the steps of, but not limited to, (a) directing and reinforcing to Talkington that the Trade Secret was proprietary and confidential and could not be disclosed to third parties without Dr. Helton's express consent, and (b) restricting access to the Trade Secret through utilization of secure passwords and maintaining physical security protocols for the non-electronically stored physical documents.

515.    The existence and identity of the Trade Secret were known only to a select few individuals, including Dr. Helton's spouse and personal secretary, and, eventually, to Talkington.

516.    The Trade Secret derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

517.    The Trade Secret is related to products and/or services that Dr. Helton used, or intended to be used, in interstate or foreign commerce.

518.    At all relevant times, Dr. Helton made Talkington aware of the personal and economic importance and the secrecy of the Trade Secret.

519.    At all relevant times, Dr. Helton also made Talkington aware that Dr. Helton was the sole and exclusive owner of the Trade Secret.

520.    Talkington knew, or should have known, that the Trade Secret, and particularly the Research Compilation, was the proprietary and confidential intellectual property owned exclusively by Dr. Helton.

521.    Dr. Helton never told or intimated to Talkington that the Trade Secret was a shared asset or that Talkington could make use of the Trade Secret, in whole or in part, outside of the administrative and clerical duties being performed under the direction and for the sole benefit of Dr. Helton.

522.    Following the termination of the Work Arrangement between Talkington and Dr. Helton, Talkington under false pretenses downloaded, retained, and, upon information and belief, has made use of the Trade Secret in whole or in part, including, in particular, the Research Compilation.

523.    Talkington shared, showed, or otherwise disclosed the Trade Secret, in whole or in part, with McCue.

524.    Talkington and McCue, working independently or in concert with another, used the Trade Secret, in whole or in part, to prepare a published work entitled *Notox: The Shocking Truth About Cosmetic Injections*, evidenced at least by statements in *Notox* relating to information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, including for example, but not by way of limitation, stating that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

525.    Talkington's download, retention, and use of a copy of the Trade Secret, under false pretenses, constitutes misappropriation of a trade secret under Okla. Stat. Ann. tit. 78, § 86(2).

526.    As a direct and proximate result of Talkington's trade secret misappropriation, Dr. Helton has suffered and will continue to suffer irreparable injury, including reputational damage, loss of competitive advantage, monetary loss for no longer being able to exclusively exploit the Research Compilation, and other harms as discussed, supra.

527.    Pursuant to Okla. Stat. Ann. tit. 78, §§ 87–89, Dr. Helton is entitled, therefore, to appropriate relief, including but not limited to injunctive relief to prevent any actual or threatened future use of the misappropriated Trade Secret, with particularity to the Research Compilation, recovery of damages for actual losses caused by Talkington's misappropriation and use of the Trade Secret in whole or in part, damages for unjust enrichment caused by Talkington's misappropriation and use of the Trade Secret that are not addressed in the computation of actual damages, exemplary and punitive damages, for reasonable attorney's fees as Talkington's misappropriation and use of the Trade Secret is willful and malicious, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

<u>**SEVENTH COUNTERCLAIM FOR RELIEF**</u>

**Unjust Enrichment–Oklahoma State Law Claim**

528.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 527 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

529.    This action arises under Oklahoma law, as announced, for example, but not by way of limitation, in *Orthman v. Premiere Pediatrics*, PLLC, 2024 OK CIV APP 7, par. 30, 545 P.3d

131

124, 136 (2024), seeking damages and injunctive relief for Talkington's unjust retention of an economic benefit, for example, but not by way of limitation, retention of Dr. Helton's Trade Secret including, in particular, the Research Compilation, that Talkington acquired, possessed and utilized, and/or continues to utilize, at the expense and detriment of Dr. Helton.

530.    At all relevant times, the Trade Secret comprised physical documents stored in Dr. Helton's personal office, in digital files on Dr. Helton's personal computer, and/or in research management software (i.e., ENDNOTE®) controlled by Dr. Helton. The electronic files maintained in the ENDNOTE® software have been defined herein as the "Research Compilation," *supra*.

531.    Dr. Helton's Trade Secret derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

532.    At least a portion of the economic value of the Trade Secret is due to the research necessary to form the corpus of the materials therein, the substantial labor required to compile the materials, and the generally inaccessible, confidential, or proprietary nature of a great number of the materials and Dr. Helton's analyses contained therein (hereinafter "Helton's Effort"). Helton's Efforts were solely performed by Dr. Helton and/or Dr. Helton directed Talkington's activities in performing administrative and clerical tasks on and within the Trade Secret and, in particular, but not by way of limitation, on or within the Research Compilation. At all relevant times, Talkington's access to and within the Trade Secret, and/or the Research Compilation in particular, was under the sole authority, direction, and control of Dr. Helton.

533.    At all relevant times, Dr. Helton made Talkington aware of the personal and economic importance and the secrecy of the Trade Secret. At all relevant times, Dr. Helton also made Talkington aware that Dr. Helton was the sole and exclusive owner of the Trade Secret.

Therefore, and, upon information and belief, Talkington knew, or should have known, that the Trade Secret, and particularly the Research Compilation, was the proprietary and confidential intellectual property owned exclusively by Dr. Helton. Dr. Helton never told or intimated to Talkington that the Trade Secret was a shared asset or that Talkington could make use of the Trade Secret, in whole or in part, outside of the administrative and clerical duties being performed under the direction and for the sole benefit of Dr. Helton.

534.    The existence and identity of the Trade Secret, including the Research Compilation, were known only to a select few individuals, including Dr. Helton's spouse, personal secretary, and, eventually, Talkington.

535.    Following the termination of the Work Arrangement between Talkington and Dr. Helton, Talkington under false pretenses downloaded, retained, and, upon information and belief, has made use of the Trade Secret in whole or in part, including, in particular, the Research Compilation. For example, but not by way of limitation, Talkington made use of the retained Trade Secret, in particular the Research Compilation, to position and proclaim herself as an expert in the field of botulism.

536.    Given the Trade Secret's independent economic value, Talkington's retention and use of the Trade Secret, in particular the Research Compilation, is unjust, and Talkington has economically and reputationally benefited from the Trade Secret's retention and use, including, but not by way of limitation, dissemination of the Trade Secret, in whole or in part, to third parties.

537.    Dr. Helton has suffered and continues to suffer harm and damages by Talkington's retention and use of the Trade Secret without compensation, given the sheer amount of work expended by Helton's Efforts in bringing the Research Compilation into being, which Talkington has usurped and/or avoided performing themselves.

538.   As a direct and proximate result of Talkington's retention of the benefits of the Trade Secret, in particular the Research Compilation, in whole or in part, without payment, Dr. Helton has suffered damages in an amount equal to the reasonable value of the benefit conferred, believed to be no less than $75,000, plus consequential losses arising from the unconsented use of the Trade Secret, in whole or in part, in an amount to be proven at trial.

539.   Equity and good conscience require that Talkington disgorge the unjust benefits received from the retention and use of the Trade Secret and make restitution to Dr. Helton in the amount of the reasonable value of the benefit conferred.

## EIGHTH COUNTERCLAIM FOR RELIEF

### Fraudulent Misrepresentation–Oklahoma State Law Claim

540.   Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 539 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

541.   This action arises under Oklahoma law, as announced, for example but not by way of limitation, in *Bowman v. Presley*, 2009 OK 48, ¶12, 212 P.3d 1210, 1218 (2009), seeking damages and other relief for Talkington's unjust retention of an economic benefit Talkington gained upon the known and intentional, or recklessly without knowledge of the truth of the representation, use of one or more fraudulent misrepresentations to positively assert a falsity, with the intention that it be acted upon, and upon which Dr. Helton relied to his her detriment.

542.   On January 3, 2025, Talkington text-messaged Dr. Helton, providing McCue's telephone number. As part of this text-message, Talkington represented to Dr. Helton that McCue had been injected with XEOMIN® (a BOTOX® alternative). Thereafter, Talkington requested

that Dr. Helton speak with McCue about symptoms she was having after allegedly contracting botulism due to the XEOMIN® injection.

543.    Despite Dr. Helton maintaining a strict policy of personal privacy and typically not granting interviews to authors, researchers, or media outlets, Dr. Helton has always been willing to speak with botulism victims who need help.

544.    Talkington's text message asking Dr. Helton to speak with McCue, as she was allegedly a botulism victim, given Dr. Helton's well-known strict policy of personal privacy, reasonably led Dr. Helton to believe that McCue was seeking support as a potential victim of botulism.

545.    McCue sent a text message to Dr. Helton on January 6, 2025, introducing herself as Talkington's friend and asking to casually 'connect' to discuss Dr. Helton's experience. McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. McCue did not disclose her plans to write a book or refer to Dr. Helton as a resource for it in any text message to Dr. Helton.

546.    Based on Talkington's January 3, 2025, text message and McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment.

547.    On or around January 8, 2025, Dr. Helton and McCue spoke on the telephone.

548.    During the January 8, 2025, telephone discussion, McCue did not indicate or intimate to Dr. Helton that the discussion was on the record or would otherwise be considered to be an interview.

135

549.    During the January 8, 2025, telephone discussion, Dr. Helton was not asked by McCue, nor did Dr. Helton give McCue consent to record, rebroadcast, or republish any statements made or information provided by Dr. Helton during the call.

550.    Upon information and belief, McCue recorded the January 8, 2025, telephone conversation.

551.    Upon information and belief, on or about January 19, 2025, McCue self-published a book titled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*") that included at least six (6) full pages explicitly detailing Dr. Helton's personal story. Surprisingly, McCue cites personal communications with Dr. Helton as a reference for this material detailed in *Notox*.

552.    Given her strict policy of personal privacy, Dr. Helton would never have consented to speak with McCue had she known that she was being interviewed or otherwise probed for personal information that McCue would use in writing *Notox* and explicitly citing Dr. Helton as the source thereof.

553.    Talkington was explicitly aware that Dr. Helton would not have consented to speaking with McCue for the purpose of being interviewed or otherwise cited or listed as a source in McCue's book.

554.    Upon information and belief, Talkington was aware or had reason to believe that McCue's desire to speak to Dr. Helton was for purposes of conducting an interview and thereby gaining information that McCue could include in *Notox*. Upon information and belief, McCue further desired to use Dr. Helton as a legitimate source for information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, evidence by statements including for example, but not by way of limitation, stating that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its

humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

555.    The inclusion of this information in *Notox* was valuable to McCue, as it legitimized *Notox* and McCue as reputable sources of information on botulism, trading on Dr. Helton's impeccable reputation, personal botulism victim story, and extensive botulism research and analyses.

556.    Upon information and belief, Talkington knew or should have known that her representation to Dr. Helton that McCue wanted to speak with Dr. Helton as a botulism victim and victim advocate was false at the time it was made, as Talkington was aware of McCue's true intent to interview Dr. Helton and use any information obtained thereby in *Notox* and/or characterize Dr. Helton as a trusted source.

557.    As such, Talkington misrepresented McCue's true intentions for talking with Dr. Helton in order to persuade Dr. Helton to participate in a call with McCue.

558.    Talkington intended, therefore, to induce Dr. Helton to rely on the false representation that McCue wanted to speak with Dr. Helton solely as a botulism victim and victim advocate.

559.    Dr. Helton, unaware of the falsity of Talkington's representation, reasonably relied on Talkington's statement and participated in the January 8, 2025, telephone conversation with McCue, believing it was for botulism victim support.

560.    As a direct and proximate result of Talkington's fraudulent misrepresentation, Dr. Helton has suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

561.    Dr. Helton is therefore entitled to an award of damages, to be proven at trial, and in an amount equal to the reasonable value of the benefit conferred, believed to be no less than $75,000.

## NINTH COUNTERCLAIM FOR RELIEF

### Civil Conspiracy–Oklahoma State Law Claim

562.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 561 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

563.    This action arises separately, or in the alternative to Dr. Helton's civil conspiracy claim under California state law, as set forth *infra*, under Oklahoma law, as announced, for example, but not by way of limitation, in *Brock v. Thompson*, 1997 OK 127, par. 39, 948 P.2d 279, 294, as corrected (1998), seeking damages and other relief for a civil conspiracy committed by McCue and Talkington while undertaking the misrepresentation of McCue's true condition and/or intentions as the reasons for McCue's telephone call of January 8, 2025, with Dr. Helton.

564.    As set forth in Paragraphs 540 through 561 of Counterclaim Plaintiff's Eighth Claim for Relief, *supra*, Talkington was well-aware of Dr. Helton's strict policy of personal privacy, and falsely and fraudulently misrepresented McCue's medical condition and intentions in the January 3, 2025, telephone call between Talkington and Dr. Helton in order to induce Dr. Helton to participate in the January 8, 2025, call with McCue.

565.    Before the January 8, 2025, call with Dr. Helton, McCue was aware of and approved Talkington's use of false pretenses to entice Dr. Helton to participate in the call with McCue.

566.    McCue sent a text message to Dr. Helton on January 6, 2025, introducing herself as Talkington's friend and asking to casually 'connect' to discuss Dr. Helton's experience. McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. McCue did not disclose her plans to write a book or refer to Dr. Helton as a resource for it in any text message to Dr. Helton.

567.    Based on Talkington's January 3, 2025, text message and McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment.

568.    Before and during the January 8, 2025, telephone conversation, Talkington and McCue knew or had reason to believe that Dr. Helton would become guarded or terminate the call if McCue revealed her true intentions and reasons for speaking with Dr. Helton.

569.    At all relevant times, Talkington and McCue maintained their jointly derived false narrative that Talkington had used to entice Dr. Helton into speaking with McCue.

570.    McCue did not indicate or intimate to Dr. Helton during their January 8, 2025, telephone call that the discussion was on the record or would otherwise be considered to be an interview.

571.    McCue recorded the January 8, 2025, call with Dr. Helton. Had Dr. Helton known that the January 8, 2025, call was being recorded, Dr. Helton would have either not participated in the call or immediately terminated the call upon learning that it was being recorded.

572.    Prior to the January 8, 2025, telephone conversation, Talkington and McCue acted in concert to deceive Dr. Helton through misrepresentation and false pretenses by collectively

agreeing, planning, conspiring, and cooperating to fraudulently misrepresent McCue's medical condition and intentions or purpose for wanting to speak with Dr. Helton.

573.    The coordinated actions of Talkington and McCue were part of a concerted effort to mislead Dr. Helton and to exploit her personal story, botulism research, Trade Secret, and the Research Compilation in whole or in part, as well as Dr. Helton's reputation in botulism research, for their own benefit. Upon information and belief, significant portions of *Notox* were written or co-authored by Talkington despite McCue being acknowledged on the book's cover as its sole author.

574.    As a direct and proximate result of Talkington and McCue's conspiracy, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy. Talkington's and McCue's actions constitute a civil conspiracy, as they combined to mislead Dr. Helton and unlawfully used her personal and research information, reputation, and Research Compilation without her consent.

575.    Dr. Helton is therefore entitled to an award of damages in an amount to be proven at trial, and no less than $75,000, punitive damages due to Talkington's and McCue's willful and malicious conduct, pre- and post-judgment interest as permitted by law, and for costs of this suit and such other and further relief as the Court deems just and proper.

<u>**TENTH COUNTERCLAIM FOR RELIEF**</u>

**Intentional Interference with Prospective Economic Advantage–**
**Oklahoma State Law Claim**

576.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 575 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

577.    This action arises under Oklahoma law, as announced, for example, but not by way of limitation, in *Boyle Servs., Inc. v. Dewberry Design Grp., Inc*., 2001 OK CIV APP 63, par. 6, 24 P.3d 878, 880 (2001), seeking damages and other relief for Talkington's intentional interference with Dr. Helton's prospective economic advantage.

578.    Dr. Helton owns a confidential and proprietary research and analysis compilation known as the Trade Secret, which comprises a Research Compilation, as discussed supra, both of which derive economic value from their confidentiality and the substantial efforts Dr. Helton expended in their creation.

579.    At all times, the Trade Secret existed in physical documents stored in Dr. Helton's personal office, in digital format on Dr. Helton's personal computer, and/or in research management software (ENDNOTE®) controlled by Dr. Helton. The information contained in the ENDNOTE® software is generally referred to as the Research Compilation and forms at least a part of the Trade Secret.

580.    The Trade Secret, including the Research Compilation, comprises and derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

581.    At least a portion of the economic value of the Trade Secret and/or the Research Compilation is due to the research necessary to form the corpus of the materials therein, the substantial labor required to compile the materials, and the generally inaccessible, confidential, or proprietary nature of a great number of the materials, as well as Dr. Helton's significant analyses and mental impression contained therein ("Helton's Effort").

582.    Dr. Helton's Effort was expended solely by herself and/or in directing Talkington's administrative and clerical tasks or activities on and within the Trade Secret and/or Research Compilation.

583.    At all relevant times, Talkington's access to and within the Trade Secret and/or Research Compilation was under the sole authority and control of Dr. Helton, and Dr. Helton took reasonable steps to maintain the confidentiality of these economically valuable materials.

584.    Dr. Helton informed Talkington on numerous occasions that she was preparing the "Botulism Manuscript," supra, comprising her botulism research, her personal story of contracting botulism, her products liability litigation, as well as her analysis and conclusions drawn from reviewing and analyzing materials found in whole or in part in the Trade Secret and, in particular but not by way of limitation, the Research Compilation.

585.    Dr. Helton informed Talkington on numerous occasions of her plans to develop the Botulism Manuscript into a published literary work and to sell the published literary work in the marketplace.

586.    Dr. Helton also informed Talkington on numerous occasions that the information contained within the Botulism Manuscript, being not generally known, difficult to ascertain, and of extreme interest to the public, gave Talkington an expectation of a prospective economic advantage.

587.    Dr. Helton also informed Talkington on numerous occasions that she intended to develop the Botulism Manuscript into a published literary work for sale in the marketplace, providing Dr. Helton with a prospective economic advantage.

588.     Without Dr. Helton's consent, Talkington informed McCue of Dr. Helton's intention to publish the Botulism Manuscript and its prospective economic advantage, prior to *Notox*'s publication by McCue.

589.     Following the termination of the working relationship between Talkington and Dr. Helton, Talkington downloaded, retained, and/or used copies of the Trade Secret, Research Compilation, and/or the Botulism Manuscript without Dr. Helton's consent.

590.     Talkington, alone or in collusion with McCue, has reproduced the Botulism Manuscript, Trade Secret, and/or Research Compilation, in whole or in part, and have prepared and/or published at least one derivative work therefrom, with such derivative work including and/or plagiarizing at least portions of Dr. Helton's copyrighted Botulism Manuscript, Trade Secret, and/or the Research Compilation.

591.     Talkington, alone or in collusion with McCue, has given, or offered to give, the Botulism Manuscript, Trade Secret, and/or Research Compilation, in whole or in part, to third parties who had no authority to receive it.

592.     Talkington shared, showed, or disclosed Dr. Helton's confidential intellectual property contained within the Trade Secret, Research Compilation, and/or the Botulism Manuscript, in whole or in part, with Megan McCue, at least as early as January 19, 2025, the date McCue self-published a book titled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*"). At the time Talkington shared, showed, or disclosed this information to McCue, Talkington knew, or had reason to believe, that McCue intended to use this information to prepare a published literary work and enter the marketplace before Dr. Helton.

593.     On or about January 19, 2025, McCue self-published *Notox*. Unbeknownst to Dr. Helton, *Notox* included at least six (6) full pages explicitly detailing Dr. Helton's personal story.

For example, but not by way of limitation, *Notox* included information about Dr. Helton's medical issues, diagnosis, and product liability lawsuit against the maker of BOTOX®.

594.    Despite citing "personal communication" with Dr. Helton as a source for Dr. Helton's confidential information in *Notox*, this information was derived in whole or in part from Dr. Helton's personal story, Botulism Manuscript, Trade Secret, and/or Research Compilation that Talkington provided to McCue.

595.    As a result of Talkington and McCue's conduct, these confidential and proprietary materials owned solely by Dr. Helton have been published, disseminated, or otherwise publicly disclosed by McCue prior to Dr. Helton's own published literary work.

596.    Talkington, alone or in collusion with McCue, has interfered with and abridged Dr. Helton's opportunity to enter the market first with her published literary work, the Botulism Manuscript, by working in concert with McCue, who used Dr. Helton's confidential and proprietary materials to publish the *Notox* book before Dr. Helton was able to publish her Botulism Manuscript.

597.    Talkington's, alone or in collusion with McCue, actions intentionally interfered with Dr. Helton's prospective economic advantage by enabling the premature publication of Dr. Helton's confidential and proprietary materials, in whole or in part, in *Notox*.

598.    As a direct and proximate result of Talkington's, alone or in collusion with McCue's, tortious interference, Dr. Helton has suffered damages, including but not limited to lost economic opportunity and expectancy.

599.    Dr. Helton is therefore entitled to an award of compensatory damages in an amount to be determined at trial, and no less than $75,000, for punitive damages due to Talkington and

McCue's willful and malicious conduct, for pre- and post-judgment interest as permitted by law, and for costs of suit and such other and further relief as the Court deems just and proper.

## ELEVENTH COUNTERCLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing–Oklahoma State Law Claim

600.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 599 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

601.    This action arises under Oklahoma law, as announced, for example, but not by way of limitation, in *First Nat'l Bank & Trust v. Kissee*, 1993 OK 96, par. 24, 859 P.2d 502, 509 (1993), seeking damages and other relief for Talkington's breach of their covenant of good faith and fair dealing with Dr. Helton. Talkington's breach and actions hereunder injured Dr. Helton's reasonable expectations and impaired Dr. Helton's rights or interests in the benefits flowing from their contractual relationship, i.e., the Work Arrangement, described supra.

602.    Under the sole authority and control of Dr. Helton and pursuant to a valid oral contract, Talkington was hired as an independent contractor to perform administrative and clerical tasks related to Dr. Helton's extensive botulism research (i.e., the Work Arrangement).

603.    As part of her administrative and clerical tasks, Talkington had access to Dr. Helton's personal story, the Botulism Manuscript, botulism research, and the Trade Secret, which comprised, at least in part, the Research Compilation.

604.    As part of Dr. Helton and Talkington's contractual engagement, there existed an implied covenant of good faith and fair dealing that each party would not undermine or act contrary to the interests and benefits of the other party under the contract.

145

605.    At all relevant times, Dr. Helton directly expressed and explained to Talkington that her personal story, botulism research and analyses, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation were Dr. Helton's exclusive confidential intellectual property and were not to be shared with third parties.

606.    Talkington engaged in a course of conduct contrary to the interests and benefits of Dr. Helton under the contract by, after accessing these confidential materials of Dr. Helton, in particular, but not by way of limitation, the Botulism Manuscript, reproducing the Botulism Manuscript, in whole or in part, and preparing and/or publishing at least one derivative work therefrom, which copied at least portions from Dr. Helton's Botulism Manuscript.

607.    Talkington engaged in a course of conduct contrary to the interests and benefits of Dr. Helton under the contract by, after accessing the Research Compilation in particular, but not by way of limitation, and without Dr. Helton's express or implied consent, downloading a copy of the Research Compilation under false pretenses, retaining a copy of the Research Compilation after Talkington's employment was terminated, making use of the Research Compilation for Talkington's own reputational and academic benefit, and providing access to the Research Compilation to third-parties who had no right to access it.

608.    Talkington has, therefore, breached their implied covenant of good faith and fair dealing under the contract by downloading under false pretenses, using, retaining, and sharing Dr. Helton's proprietary and confidential intellectual property, including but not by way of limitation the Botulism Manuscript and the Research Compilation, for Talkington's personal benefit.

609.    Talkington's actions in breaching the contract with Dr. Helton were directly contrary to Dr. Helton's interests, benefits, and exclusive rights under the contract, undermining

146

Dr. Helton's exclusive rights in, for example, but not by way of limitation, the Trade Secret and/or Botulism Manuscript, in whole or in part.

610.    As a direct and proximate result of Talkington's breach of the contract, Dr. Helton has suffered damages, including but not limited to loss of control over her intellectual property, reputational harm, and economic losses.

611.    Therefore, Dr. Helton is entitled to an amount of compensatory damages in an amount to be determined at trial, and no less than $75,000, for punitive damages due to Talkington's willful and malicious conduct, for pre- and post-judgment interest as permitted by law, and for costs of suit and such other and further relief as the Court deems just and proper.

## TWELFTH COUNTERCLAIM FOR RELIEF

### Breach of Fiduciary Duty-Oklahoma State Law Claim

612.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 611 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

613.    This action arises under Oklahoma law, as announced, for example, but not by way of limitation, in *Orthman v. Premiere Pediatrics*, PLLC, 2024 OK CIV APP 7, par. 34, 545 P.3d 124, 136 (2024), seeking damages and other relief for Talkington's breach of her fiduciary duty owed to Dr. Helton pursuant to the Work Arrangement, supra, causing damages.

614.    Under the sole authority and control of Dr. Helton and pursuant to a valid oral contract, Talkington was hired as an independent contractor to perform administrative and clerical tasks related to Dr. Helton's extensive botulism research (i.e., the Work Arrangement).

615.     As part of the administrative and clerical tasks assigned by Dr. Helton, Talkington had access to Dr. Helton's personal story, botulism research, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation, in whole or in part, *supra*.

616.     Under the Work Arrangement, Talkington was entrusted with the secrecy and security of Dr. Helton's personal story, botulism research, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation, in whole or in part, all of which derived independent economic value from their confidentiality, inaccessibility, and exclusive control by Dr. Helton.

617.     Talkington had complete and unrestricted access to Dr. Helton's personal story, botulism research, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation, in whole or in part, and was entrusted to act as a custodian of Dr. Helton's valuable and confidential exclusive intellectual property rights therein.

618.     Under the Work Arrangement and pursuant to their oral contract, Talkington owed a fiduciary duty to Dr. Helton to act prudently and in Dr. Helton's best interests, placing Dr. Helton's interests above her own.

619.     At all relevant times, Dr. Helton directly expressed and explained to Talkington that her personal story, botulism research, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation, in whole or in part, were Dr. Helton's exclusive intellectual property and were not to be otherwise used and/or shared with third parties.

620.     Dr. Helton trusted and relied upon Talkington to guard her personal story, botulism research, the Botulism Manuscript, the Trade Secret, and/or the Research Compilation, in whole or in part, from unauthorized use and/or dissemination to third parties.

621.     Talkington breached her fiduciary duty owed to Dr. Helton by, after obtaining and/or otherwise accessing the Botulism Manuscript, reproducing the Botulism Manuscript, in

whole or in part, and preparing and/or publishing at least one derivative work therefrom, which copied at least portions from Dr. Helton's copyrighted Botulism Manuscript without Dr. Helton's consent. All of Talkington's actions in this regard were taken by Talkington for her own personal benefit.

622.    Talkington further breached her fiduciary duty owed to Dr. Helton by, after accessing the Research Compilation, and without Dr. Helton's express or implied consent, downloading a copy of the Research Compilation under false pretenses, retaining a copy of the Research Compilation after Talkington's employment was terminated, making use of the Research Compilation for Talkington's own reputational and academic benefit, and providing access to the Research Compilation to third parties who had no right to access it. All of Talkington's actions in this regard were taken by Talkington for her own personal benefit.

623.    All of Talkington's actions with respect to Dr. Helton's confidential intellectual property, including but not limited to the Botulism Manuscript and the Research Compilation, were contrary to Dr. Helton's interests, benefits, and exclusive rights therein.

624.    As a direct and proximate result of Talkington's breach, Dr. Helton suffered damages, including, but not limited to, loss of control over her intellectual property, reputational harm, and economic losses, plus consequential losses arising therefrom.

625.    Therefore, Dr. Helton is entitled to an amount of compensatory damages in an amount to be determined at trial, and believed to be no less than $75,000 plus consequential losses, punitive damages due to Talkington's willful and malicious conduct, for pre- and post-judgment interest as permitted by law, and for costs of suit and such other and further relief as the Court deems just and proper.

## THIRTEENTH COUNTERCLAIM FOR RELIEF

### Misappropriation of Trade Secret–765 Ill. Comp. Stat. Ann. 1065/2

626.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 625 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

627.    This action arises separately, or in the alternative to Dr. Helton's claim for trade secret misappropriation under federal and Oklahoma state law, under the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. Ann. 1065, seeking damages and injunctive relief resulting from Talkington's infringement of Dr. Helton's Trade Secret.

628.    Dr. Helton owns a trade secret as defined by 765 Ill. Comp. Stat. Ann. 1065/2(d), as a confidential and proprietary physical and electronic research and analysis compilation (collectively referred to herein as the "Trade Secret").

629.    At all relevant times, the Trade Secret comprised physical documents stored in Dr. Helton's personal office, in digital files on Dr. Helton's personal computer, and/or in research management software (i.e., ENDNOTE™) controlled by Dr. Helton. The electronic files maintained in the ENDNOTE™ software have been defined herein as the "Research Compilation," *supra*.

630.    Dr. Helton has taken reasonable measures to keep the Trade Secret actually secret and unavailable to third parties, including the steps of, but not limited to, (a) directing and reinforcing to Talkington that the Trade Secret was proprietary and confidential and could not be disclosed to third parties without Dr. Helton's express consent, and (b) restricting electronic access to the Trade Secret through utilization of secure passwords and maintaining physical security protocols for non-electronically stored physical documents.

631.    The existence of the Trade Secret was known only to a select few, including Dr. Helton's spouse, personal secretary, and, eventually, Talkington.

632.    The Trade Secret derives independent economic value from not being generally known or readily ascertainable, through proper means, by others who can obtain economic value from its disclosure or use.

633.    The Trade Secret is related to a product or service that is used in, or intended for use in, interstate or foreign commerce.

634.    At all relevant times, Dr. Helton made Talkington aware of the personal and economic importance and the secrecy of the Trade Secret.

635.    At all relevant times, Dr. Helton also made Talkington aware that Dr. Helton was the sole and exclusive owner of the Trade Secret.

636.    Talkington knew, or should have known, that the Trade Secret, and particularly the Research Compilation, was the proprietary and confidential intellectual property owned exclusively by Dr. Helton.

637.    Dr. Helton never told or intimated to Talkington that the Trade Secret was a shared asset or that Talkington could make use of the Trade Secret, in whole or in part, outside of the administrative and clerical duties being performed under the direction and for the sole benefit of Dr. Helton.

638.    Following the termination of the Working Arrangement between Talkington and Dr. Helton, Talkington, under false pretenses, downloaded, retained, and has made use of the Trade Secret in whole or in part, including, in particular but not by way of limitation, the Research Compilation.

639.    Talkington shared, showed, or otherwise disclosed the Trade Secret, in whole or in part, with McCue.

640.    Talkington and McCue, working independently or in concert with another, used the Trade Secret, in whole or in part, to prepare a published work entitled *Notox: The Shocking Truth About Cosmetic Injections*, evidenced at least by statements in *Notox* relating to information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, including for example,  but not by way of limitation, stating that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

641.    Talkington's download, retention, and use of a copy of the Trade Secret, under false pretenses, constitutes misappropriation of a trade secret under 765 Ill. Comp. Stat. Ann. 1065/2(b).

642.    As a direct and proximate result of Talkington's trade secret misappropriation, Dr. Helton has suffered and will continue to suffer irreparable injury, including reputational damage, loss of competitive advantage, monetary loss for no longer being able to exclusively exploit the Research Compilation, and other harms as discussed, supra.

643.    Pursuant to  765 Ill. Comp. Stat. Ann. 1065/2, Dr. Helton is entitled to appropriate relief, including but not limited to injunctive relief to prevent any actual or threatened future use or disclosure of the misappropriated Trade Secret, with particularity to the Research Compilation, recovery of damages for actual losses caused by Talkington's misappropriation and use of the Trade Secret, damages for unjust enrichment caused by Talkington's misappropriation and use that are not addressed in the computation of actual damages, exemplary and punitive damages, reasonable attorney's fees as Talkington's misappropriation and use of the Trade Secret is willful

and malicious, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

## FOURTEENTH COUNTERCLAIM FOR RELIEF

### Defamation–Illinois State Law Claim

644.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 643 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

645.    This action arises separately, under Illinois state law, as announced, for example, but not by way of limitation, in *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009), seeking damages and other relief for Talkington's false statements about Dr. Helton and the unprivileged publication of those statements to third parties. Talkington's false statements caused damage to Dr. Helton.

646.    Gretch Elizabeth ("Elizabeth") is one of multiple administrators of a prominent Facebook support group entitled BOTOX Dysport Side Effect Support, found at the URL https://www.facebook.com/groups/224009391310103/ (hereinafter referred to as the "FB Support Group").

647.    On October 16, 2024, Elizabeth, another group administrator of the FB Support Group, and Talkington participated in a video call ("Tri-Party Call").

648.    During the Tri-Party Call, Talkington expressed impatience with Dr. Helton's timeline for publishing her personal story and botulism research, arguing that Dr. Helton was taking too long to complete her manuscript and release it.

153

649.    Talkington claimed in the Tri-Party Call that the safest thing to do for future potential botulism victims was to release the botulism research in Dr. Helton's manuscript and/or the Research Compilation.

650.    Talkington also indicated in the Tri-Party Call that Dr. Helton was in poor health, and Talkington felt it was her duty to release the botulism research in Dr. Helton's manuscript and/or the Research Compilation.

651.    Talkington's statements were false, and Talkington knew or had reason to believe that the statements would create a false belief that Dr. Helton was in poor health and that Dr. Helton was prioritizing herself over the safety of the public.

652.    Talkington's false statements were damaging to Dr. Helton's reputation, particularly because Elizabeth and the FB Support Group are potential consumers of Dr. Helton's literary works, victim advocacy efforts, and other commercial enterprises.

653.    Talkington's statements constitute defamation *per se*. Alternatively, Talkington's statements constitute defamation *per quod*.

654.    As a direct and proximate result of Talkington's false statements, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

655.    Dr. Helton is therefore entitled to an award of damages in an amount to be determined at trial, and no less than $75,000, exemplary or punitive damages, as well as attorney's fees, as Talkington's were made in a wanton, willful, and malicious manner, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

## FIFTEENTH COUNTERCLAIM FOR RELIEF

### False Light Invasion of Privacy–Illinois State Law Claim

656.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 655 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

657.    This action arises under Illinois law, as announced, for example, but not by way of limitation, in *Kurczaba v. Pollock*, 318 Ill. App. 3d 686, 696, 742 N.E.2d 425, 434–35 (2000), seeking damages and other relief resulting from Talkington's malicious portrayal of Dr. Helton in a false light before the public, with Talkington's false light characterization of Dr. Helton being highly offensive to a reasonable person. Talkington's actions in portraying Dr. Helton in this false light were with reckless disregard for the truthfulness or falsity of the portrayal.

658.    Dr. Helton is a globally recognized physician and botulism researcher whose name, personal botulism story, and public image or reputation, used in researching botulism and in advocating for and counseling botulism patients, are distinctive and widely known within the medical community, among botulism victims and their families.

659.    In commerce, Talkington has used Dr. Helton's name and reputation in connection with the advertisement, promotion, and sale of Talkington's academic and botulism research services, personal promotional and advancement efforts, professional botulism advocacy, and other commercial activities; for example, but not by way of limitation, Talkington has (a) repeatedly and publicly held herself out as an agent, post-doctoral fellow, research partner, or collaborative research associate of Dr. Helton, (b) falsely asserted in applications for employment and to interested third-parties that Dr. Helton was Talkington's research partner, (c) without consent, used Dr. Helton's name and personal story in order to gain interest in and purchases of at

least one of Talkington's self-published books, and (d) without Dr. Helton's knowledge and consent, on December 20, 2024, appointing Dr. Helton as a board member on an Illinois state non-profit limited liability company incorporation filing (i.e., the Botulism Research Collaborative LLC).

660.    This course of conduct by Talkington portrayed Dr. Helton in a false light before the public as an associate, mentor, endorser, and/or supporter of Talkington, Talkington's economic and commercial pursuits, and Talkington's Illinois state non-profit entity.

661.    At all relevant times, Talkington knew such portrayal was false or failed to reasonably ascertain the truthfulness of the portrayal of Dr. Helton.

662.    Further, Talkington engaged in offensive, embarrassing, and/or shameful conduct within the botulism victim FB Support Group. Such conduct included harassing members of this FB Support Group to provide their medical and symptom stories, dispensing unauthorized and false medical advice to vulnerable botulism victims, and encouraging victims to lie to their treating physicians. These despicable actions of Talkington were undertaken while at the same time communicating to third parties that Dr. Helton was an associate, mentor, endorser, and/or supporter of Talkington, Talkington's economic and commercial pursuits, and Talkington's Illinois state non-profit entity.

663.    In particular, but not by way of limitation, Talkington's false light portrayal of Dr. Helton as a member of the board of directors of the Illinois state non-profit entity is especially egregious, as Talkington has been publicly soliciting donations from the public and other third parties, allegedly on behalf of the non-profit entity.

664.    Talkington's false light portrayal of Dr. Helton as an associate, mentor, endorser, and/or supporter of Talkington would be highly offensive to a reasonable person because Dr.

156

Helton, as a prominent botulism victim advocate, botulism victim supporter, licensed and board-registered physician, and well-known researcher within the botulism community, was being associated with Talkington's highly offensive harassing conduct and false medical advice.

665.    Dr. Helton's reputation as a physician and botulism researcher was damaged by Talkington's false portrayal of their relationship as an associate, mentor, endorser, board member, and/or supporter.

666.    Talkington acted maliciously in falsifying her statements and in portraying Dr. Helton as an associate, mentor, endorser, board member, and/or supporter thereof.

667.    As a direct and proximate result of Talkington's false light portrayal of Dr. Helton, Dr. Helton has suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

668.    Dr. Helton is therefore entitled to an award of damages in an amount to be determined at trial, and no less than $75,000, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

## SIXTEENTH COUNTERCLAIM FOR RELIEF

### Violation of the Right of Publicity–765 Ill. Comp. Stat. Ann. 1075/30

669.    Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 668 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

670.    This action arises under the Illinois Right of Publicity Act, 765 Ill. Comp. Stat. Ann. 1075, seeking damages and injunctive relief resulting from Talkington's use of Dr. Helton's identity for commercial purposes without obtaining Dr. Helton's prior consent.

671.    On December 20, 2024, without Dr. Helton's knowledge or consent, Talkington incorporated a non-profit entity in Illinois under the name Botulism Research Collaborative LLC.

672.    Talkington listed Dr. Helton as a Board Member of this non-profit entity in its initial corporate disclosure filed with the Illinois Secretary of State.

673.    Talkington has told the FB Support Group members that she founded the Botulism Research Collaborative LLC to secure citizen funding for long-term botulism recovery research.

674.    Dr. Helton never agreed to serve on the board of the Botulism Research Collaborative LLC.

675.    Dr. Helton was never notified of her appointment to the board of the Botulism Research Collaborative LLC.

676.    Dr. Helton has no affiliation or other connection to the Botulism Research Collaborative LLC.

677.    Talkington's use of Dr. Helton's name on the incorporation documents of the Botulism Research Collaborative LLC was a material misrepresentation designed to lend false legitimacy to Talkington's non-profit venture.

678.    Upon information and belief, Talkington has and continues to solicit funds in the name of the Botulism Research Collaborative LLC.

679.    Upon information and belief, Talkington created this entity and fraudulently used Dr. Helton's name and medical credentials to establish an air of legitimacy for Talkington and McCue's self-published works under the imprimatur of the Botulism Research Collaborative LLC.

680.    Talkington's fraudulent use of Dr. Helton's identity, therefore, constitutes a "commercial purpose" as defined by 765 Ill. Comp. Stat. Ann. 1075/5.

681.     Talkington's unauthorized use of Dr. Helton's identity in this Illinois state non-profit incorporation filing appropriated Dr. Helton's professional identity and reputation for a commercial purpose without Dr. Helton's consent under 765 Ill. Comp. Stat. Ann. 1075/30(a).

682.     Pursuant to  765 Ill. Comp. Stat. Ann. 1075/40 through 1075/60, Dr. Helton is entitled to appropriate relief, including but not limited to injunctive relief to prevent any actual or threatened future use of Dr. Helton's identity for commercial purposes, equitable relief, including an order for Talkington to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that Dr. Helton has no relationship with the Botulism Research Collaborative LLC, recovery, in an amount to be determined after trial, of damages for Dr. Helton's actual loss caused by Talkington's unauthorized use of Dr. Helton's identity for commercial gain, for monetary relief of any and all profits derived from Talkington's unauthorized use, for punitive damages and due to Talkington's willful and malicious conduct, exemplary damages, for reasonable attorney's fees as Talkington's misappropriation and use of the Research Compilation is willful and malicious, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

## SEVENTEENTH COUNTERCLAIM FOR RELIEF

### Fraudulent Concealment–Illinois State Law Claim

683.     Dr. Helton, Counterclaim Plaintiff, re-alleges her Answer to Plaintiff's Complaint and Paragraphs 1 through 684 of her Factual Narrative and Counterclaims hereof, with the same force and effect as if fully set forth herein.

684.     This action arises under Illinois law, as announced, for example, but not by way of limitation, in *Bauer v. Giannis*, 359 Ill.App.3d 897, 902–03, 296 Ill. Dec. 147, 834 N.E.2d 952 (2005), seeking damages and other relief resulting from Talkington's concealment of a material

fact under circumstances that created a duty to Dr. Helton to speak, whereby Talkington intended to induce a false belief in Dr. Helton, and Dr. Helton justifiably relied thereon, which caused damage to Dr. Helton as the information concealed by Talkington was such that the Dr. Helton would have acted differently had she been aware of it.

685.    On December 20, 2024, without Dr. Helton's knowledge or consent, Talkington incorporated a non-profit entity in Illinois under the name Botulism Research Collaborative LLC.

686.    Talkington listed Dr. Helton as a Board Member of this non-profit entity in its initial corporate disclosure filed with the Illinois Secretary of State.

687.    Upon information and belief, Talkington has told the FB Support Group members that she founded the Botulism Research Collaborative LLC to obtain citizen-funding for long-term botulism recovery research.

688.    Dr. Helton never agreed to serve on the board of the Botulism Research Collaborative LLC.

689.    Dr. Helton was never notified of her appointment to the board of the Botulism Research Collaborative LLC.

690.    Dr. Helton has no affiliation or other connection to the Botulism Research Collaborative LLC.

691.    Talkington's use of Dr. Helton's name on the incorporation documents of the Botulism Research Collaborative LLC was a material misrepresentation designed to lend false legitimacy to her non-profit venture.

692.    Upon information and belief, Talkington has and continues to solicit funds in the name of the Botulism Research Collaborative LLC.

693.    Upon information and belief, Talkington created this entity and fraudulently used Dr. Helton's name and medical credentials to establish an air of legitimacy for her self-published works under the imprimatur of the Botulism Research Collaborative LLC.

694.    Talkington's use of Dr. Helton's identity, therefore, constitutes a "commercial purpose" as defined by 765 Ill. Comp. Stat. Ann. 1075/5.

695.    Talkington's unauthorized use of Dr. Helton's identity in this Illinois state non-profit incorporation filing not only misappropriated Dr. Helton's professional reputation but also potentially exposed Dr. Helton to fiduciary liabilities for an organization she did not know existed and upon which Dr. Helton never agreed to serve as a member of the board of directors of the Botulism Research Collaborative LLC.

696.    Talkington had a duty, therefore, to inform Dr. Helton of her appointment as a member of the board of directors of the Botulism Research Collaborative LLC.

697.    Talkington knew, or reasonably expected, that Dr. Helton, if informed of the fraudulent appointment to the board of directors of the Botulism Research Collaborative LLC, would immediately reverse the appointment, which Dr. Helton has done contemporaneously with the filing of this counterclaim, and rebuke any purported association with Botulism Research Collaborative LLC.

698.    Further, had Dr. Helton known that Talkington had fraudulently appointed her as a director of the Botulism Research Collaborative LLC's board of directors without her knowledge or consent, Dr. Helton would have promptly notified all relevant Illinois law enforcement agencies of Talkington's fraudulent filing of a sworn document with the Illinois Secretary of State in conjunction with incorporating the entity, as Dr. Helton has now done contemporaneously with the filing of this counterclaim.

699.    Talkington had a duty to inform Dr. Helton of her appointment as a member of the board of directors of the Botulism Research Collaborative LLC

700.    As a direct and proximate result of Talkington's fraudulent concealment, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

701.    Dr. Helton is therefore entitled to an award of damages in an amount to be determined at trial, and no less than $75,000, equitable relief, including an order for Talkington to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that Dr. Helton has no relationship with the Botulism Research Collaborative LLC and that Talkington fraudulent named Dr. Helton as a member of the non-profit entity's board of directors without Dr. Helton's knowledge or consent, exemplary or punitive damages, as well as attorney's fees, as Talkington's were made in a wanton, willful, and malicious manner, for pre- and post-judgment interest as permitted by law, for the costs of this suit, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Helton, Counterclaim Plaintiff, prays for judgment and relief as follows:

A.    A declaratory judgment that Dr. Helton is the sole author of the Botulism Manuscript;

B.    A declaratory judgment that Dr. Helton is the sole owner of the Botulism Manuscript and that Talkington has no right, title, or interest in and to the same;

C.    A declaratory judgment that Dr. Helton is the sole owner of the Trade Secret and that Talkington has no right, title, or interest in and to the same;

162

D.      A permanent injunction prohibiting Talkington, and all those in active concert or participation with them, from any actual or threatened infringement of Dr. Helton's exclusive rights in the Trade Secret;

E.      A permanent injunction prohibiting Talkington, and all those in active concert or participation with them, from any actual or threatened copyright infringement of Dr. Helton's exclusive rights in the Botulism Manuscript;

F.      A permanent injunction prohibiting Talkington, and all those in active concert or participation with them, from any actual or threatened future false appropriation or affiliation with Dr. Helton's name, personal botulism story, and public image or reputation;

G.      A permanent injunction prohibiting Talkington, and all those in active concert or participation with them, from any actual or future false or misleading statements of fact about Dr. Helton and her botulism research, the Trade Secret, and/or the Research Compilation;

H.      A permanent injunction prohibiting Talkington, and all those in active concert or participation with them, from any actual or threatened future use of Dr. Helton's identity for any commercial purpose;

I.      An award to Dr. Helton of actual and compensatory damages in an amount to be determined at trial, and no less than $75,000 per offense, including but not limited to lost profits, emotional distress, reputational damage, invasion of privacy, irreparable harm, and damages for unjust enrichment caused by Talkington's unjust, inequitable, and illegal actions that are not addressed in the computation of actual damages;

J.      An award of statutory damages for Talkington's past and ongoing copyright infringement of Dr. Helton's copyright in the Botulism Manuscript;

K.      An award of statutory damages in addition to, or in the alternative to, an award of actual or compensatory damages, where applicable and already pleaded and/or requested;

L.      A judgment and order requiring Talkington to disgorge her profits and other ill-gotten gains resulting from Talkington's wrongful conduct;

M.      A judgment and order for Dr. Helton to be awarded punitive and exemplary damages because Talkington's deliberate and wanton infringing acts were committed willfully and maliciously;

N.      A judgment and order that Talkington issue corrective notices and/or advertising to correct the record and indicate to third-parties that Talkington is not an agent, post-doctoral fellow, research partner, or collaborative associate of Dr. Helton, that Dr. Helton has no relationship with the Botulism Research Collaborative LLC, and to correct any other misleading statement, imitation, or impression as the Court finds just and proper;

O.      A judgment and order for the seizure and/or destruction of any existing publications or materials that appropriate or falsely claim affiliation with Dr. Helton's name, personal botulism story, public image, and/or reputation;

P.      A judgment and order for Talkington to account to Dr. Helton for all sales and profits from the sale of any of Talkington's products or services as a result of the infringing use of Dr. Helton's copyright, Trade Secret, Research Compilation, and/or identity, or as a result of any misleading or false statement concerning Dr. Helton;

Q.      An award of reasonable royalties resulting from Talkington's unjust use of Dr. Helton's copyright, Trade Secret, Research Compilation, and/or identity for commercial purposes;

164

R.      An award of restitution for the amount of the reasonable value of the benefit conferred for Talkington's unjust retention and use of the Trade Secret;

S.      An award for reasonable attorney's fees and costs of this suit;

T.      An award for pre- and post-judgment interest for any monetary award the Court deems just and proper; and

U.      Such other and further legal and equitable relief as the Court deems just and proper.

## JURY TRIAL CLAIM

Dr. Helton hereby requests trial by jury on all claims so triable.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

## DR. HELTON'S THIRD-PARTY CLAIMS AGAINST
## THIRD-PARTY DEFENDANT MCCUE

1.     Pursuant to Fed. R. Civ. P. 14, Defendant and Third-Party Plaintiff, Dr. Sharla Helton, asserts Third-Party Claims (the "Third-Party Claims") against Third-Party Defendant, Megan McCue ("McCue," "Third-Party Defendant," or "Third-Party Defendant McCue") as follows:

### Nature and Basis of this Action

2.     This action arises under the Lanham Act, 15 U.S.C. § 1125 et seq., and applicable Oklahoma and California State Law, and out of Third-Party Defendant McCue's and Talkington's conspiracy to infringe upon Dr. Helton's intellectual property rights and leverage Dr. Helton's exemplary professional and personal reputation and identity for pecuniary gain. Through a pattern of misrepresentation, unauthorized use of confidential materials, and calculated interference with Dr. Helton's economic interests, Third-Party Defendant McCue has caused concrete and continuing harm for which Dr. Helton now seeks affirmative relief.

3.     This action represents not just the betrayal of a former friend, Talkington *supra*, but the deception of a stranger and the exploitation of Dr. Helton's selfless, charitable, and benevolent nature. Dr. Helton, while preferring privacy and maintaining a strict policy against the granting of interviews, had a charitable habit of freely giving her time and support to victims of botulism. Third-Party Defendant, having acquired Dr. Helton's confidential materials, needed a plausible reference to include the materials in a rushed literary work so that she could beat Dr. Helton to the market before Dr. Helton had completed her own manuscript. Thus, under the guise of a botulism victim and advocate needing support, Third-Party Defendant McCue stole time with Dr. Helton for a conversation that would later be cited as a source for the fraudulently-obtained confidential materials. Dr. Helton now asks this Court to confirm Third-Party Defendant McCue's deceitful

166

and fraudulent actions, restore Dr. Helton through monetary and equitable relief, and appropriately penalize Third-Party Defendant McCue for her exploitation of Dr. Helton's limitless charity.

### Parties

4.      Third-Party Plaintiff Dr. Sharla Helton ("Dr. Helton") is an individual residing in the State of Oklahoma.

5.      Upon information and belief, Third-Party Defendant Megan McCue ("McCue") is an individual currently residing in Fair Oaks, California.

### Jurisdiction and Venue

6.      This Court has subject-matter jurisdiction over Dr. Helton's Third-Party Claims pursuant to 28 U.S.C. § 1331 and § 1332.

7.      This Court has supplemental jurisdiction over state-law third-party claims pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the claims asserted by Talkington and Dr. Helton's Counterclaims thereto.

8.      This Court has ordered that Venue is proper in this District under 28 U.S.C. § 1391. [Dkt. No. 19]

9.      This Court has personal jurisdiction over Third-Party Defendant McCue because Third-Party Defendant McCue has directed her activities towards Illinois and purposefully availed herself of the privileges thereof, and Dr. Helton's injuries arise out of these same activities, for example:

   a.   Upon information and belief, at the time of Dr. Helton's injuries described herein, Third-Party Defendant McCue was a director of and intimately involved with the Illinois non-profit called Botulism Research Collaborative LLC. Upon further information and belief, Botulism Research Collaborative LLC is a sham non-profit

intended to legitimize, publish, advertise, promote, market, and sell Third-Party Defendant McCue's *Notox* book.

b.  Upon information and belief, Third-Party Defendant McCue engaged in a campaign of aggressively messaging and harassing members of the FB Support Group, including at least one member based in Illinois.

c.  Third-Party Defendant McCue has engaged in an ongoing conspiracy with Talkington while Talkington was a resident of Illinois.

d.  Third-Party Defendant McCue requested, asked, directed, or ordered Talkington, while Talkington was a resident of Illinois, to advertise, market, defend, endorse, and/or promote Third-Party Defendant McCue's *Notox* book in Illinois.

## FACTUAL NARRATIVE OF DR. HELTON'S THIRD-PARTY CLAIMS

### Megan McCue, Talkington's Fraudulent Coconspirator

10.    Upon information and belief, McCue joined the online botulism victim support group on Facebook entitled BOTOX Dysport Side Effect Support, found as of the date of this filing at the URL https://www.facebook.com/groups/224009391310103/ (hereinafter referred to as the "FB Support Group"), in or around September 2024.

11.    Upon information and belief, McCue and Jane Talkington ("Talkington") became acquainted around the time McCue joined the FB Support Group.

12.    Upon information and belief, Talkington represented herself to McCue as a botulism researcher who had worked alongside Dr. Helton as her research partner since 2010.

13.    Upon information and belief, McCue became increasingly active in the FB Support Group shortly after joining.

14.    Upon information and belief, in or around the Fall of 2024, after being admitted to the FB Support Group, McCue shared with Talkington her interest in writing a book about BOTOX® side effects, as Talkington had presented herself to McCue as a botulism researcher who worked alongside Dr. Helton.

15.    Upon information and belief, on or around October 28, 2024, McCue went LIVE (i.e., broadcasted live video to their followers in real-time) on the FB Support Group's corresponding Instagram page. (See Exhibit 27).

16.    Upon information and belief, during this approximately one-hour-long LIVE broadcast, McCue claimed that the anxiety she allegedly suffered as a symptom of her self-reported iatrogenic botulism was so severe that she "would take having a stillborn again" and "would take losing her best friend again" rather than reliving such anxiety. (See Exhibit 27).

17.    Upon information and belief, within weeks of this LIVE broadcast, McCue claimed to be "completely healed" of her purported iatrogenic botulism after suffering from what Talkington described at one time to Dr. Helton as a mild case.

18.    Upon information and belief, on or around December 9, 2024, McCue had become active in the FB Support Group and told Gretch Elizabeth ("Elizabeth"), a moderator of the FB Support Group, that she was writing a memoir about her experience with botulism symptoms.

19.    Upon information and belief, Talkington provided at least 20 research articles to McCue for use in a book about BOTOX® side effects. In particular, these 20 research articles were generally inaccessible to the public and were part of Dr. Helton's botulism research, Trade Secret, and/or within the Research Compilation.

20.    McCue confirmed Talkington's assistance in writing McCue's book, going so far as dedicating it to Talkington, writing, "Thank you for teaching me more about botulism than I

ever wanted to know, and encouraging me to write. Without you, this book would not exist." (See Exhibit 28).

21.     Despite previously posturing that she had reserved the iatrogenicbotulism.com domain for Dr. Helton, Talkington, upon information and belief, has an oral and/or written agreement with, and/or transferred responsibility and maintenance of the iatrogenicbotulism.com domain, to McCue for use in marketing her publications and disseminating botulism information. Upon information and belief, Talkington utilized McCue as a proxy to operationalize this domain, given Dr. Helton's clear admonition that Talkington was not to publish Dr. Helton's personal story, botulism research, Trade Secret, and/or Research Compilation on the Internet. Registration of this domain name was, therefor, not taken for Dr. Helton's benefit or as part of any research collaboration with Dr. Helton; rather, the domain name was acquired, and is being used, to establish an alternative platform where Talkington could vicariously posture as a botulism authority, releasing Dr. Helton's misappropriated personal story, botulism research, Trade Secret, and/or the Research Compilation, in whole or in part, under Talkington's alleged moral imperative to warn potential botulism victims. Conveniently, McCue's use of this domain name also satisfied Talkington's and McCue's own need for professional recognition and potential financial compensation, awards, or plaudits.

22.     Upon information and belief, on or around December 10, 2024, Talkington was admonished for harassing members of the FB Support Group to provide their botulism victim or survivor stories to Talkington.

23.     Upon information and belief, McCue released a self-published memoir on or around December 15, 2024, entitled *Me Tox Pretty: A Story of Iatrogenic Botulism and The Ugly Side of Cosmetic Injections* ("Me Tox Pretty"). Upon further information and belief, on or around

January 10, 2025, McCue informed Elizabeth that she was also writing yet another book on botulism.

24.    Upon information and belief, not long after joining the FB Support Group, McCue aggressively advised and directed its members on medical and advocacy issues, portraying herself as an expert, though she had allegedly contracted botulism just months ago.

25.    On January 13, 2025, the group administrator(s) removed McCue from the FB Support Group for her aggressive and improper behavior toward members of the FB Support Group.

26.    Upon information and belief, the group administrator(s) observed that both Plaintiff and McCue engaged in coordinated boundary-violation patterns, attempting to position themselves as alternative authorities within the FB Support Group.

27.    Upon information and belief, Talkington and McCue's FB Support Group boundary violations included aggressive solicitation of members' stories, dissemination of emotionally triggering content, and relentless promotion of McCue's books.

28.    Even after McCue's access was removed from the FB Support Group, upon information and belief, McCue and Talkington continued their coordinated efforts to aggressively solicit and communicate with members of the FB Support Group, using inauthentic or false Facebook profiles to evade the ban on McCue's primary account. Upon information and belief, given Talkington's prior use of the "Skye Bravo" pseudonym in the FB Support Group, Talkington also uses inauthentic or false Facebook profiles to act within the FB Support Group.

29.    On January 3, 2025, Talkington texted Dr. Helton a link to McCue's recently self-published memoir "Me Tox Pretty", McCue's contact information, and stated that McCue had been injected with XEOMIN® (a BOTOX® alternative) in July 2024. Dr. Helton asked Talkington

whether McCue wanted to speak with her, to which Talkington answered affirmatively, noting several topics that McCue wanted to discuss, including healing advice, fast-twitch and slow-twitch muscles, and reassurance that McCue's hair would regrow.

30.    McCue then reached out to Dr. Helton via text message on January 6, 2025, introducing herself as Talkington's friend and asking to casually connect to discuss Dr. Helton's experience. McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. McCue did not disclose her plans to write a book, nor refer to Dr. Helton as a resource for it, in any text message to Dr. Helton. (See Exhibit 30)

31.    Based on Talkington's January 3, 2025, text message and McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment. (See Exhibits 29 and 30).

32.    Upon information and belief, McCue has never been clinically diagnosed with botulism.

33.    Dr. Helton maintains a strict policy of personal privacy and does not grant interviews to authors, researchers, or media outlets about her personal story as a victim and survivor of botulism.

34.    Dr. Helton has consistently declined inquiries from national best-selling authors seeking to tell her story, as she reserves her time and expertise for her own independent work and intellectual property.

35.    Upon information and belief, Talkington told McCue that Dr. Helton explicitly rejected requests to publicly disseminate any part of her personal story, botulism research, Trade Secret, and/or the Research Compilation itself.

36.     Upon information and belief, Talkington told McCue that Dr. Helton was deliberate about her plans to publicly disseminate any part of her personal story, botulism research, Trade Secret, and/or the Research Compilation.

37.     Upon information and belief, Talkington told McCue that Dr. Helton spoke with victims of botulism seeking support or information about their personal situations when there was a request or an introduction to do so.

38.     Dr. Helton's communications with botulism victims are conducted exclusively on a humanitarian basis, limited to providing private support regarding symptom management and healing.

39.     Dr. Helton does not seek out victims of botulism, nor does she advertise these charitable services or profit from any sort of botulism victim support discussions.

40.     On or around January 8, 2025, McCue and Dr. Helton spoke on the phone for roughly one hour.

41.     During the January 8, 2025, telephone call, McCue and Dr. Helton discussed McCue's symptoms, symptom management, options for recovery, and potential options for regrowing McCue's hair, as well as some general educational context regarding the experience of iatrogenic botulism for McCue's advocacy work

42.     While Dr. Helton may have referenced her own experience in general terms to provide context, at no point did the January 8, 2025, conversation include the specific details of Dr. Helton's biography, legal history, botulism research, Trade Secret, and/or the Research Compilation.

43.     At no point before or during the January 8, 2025, telephone call did McCue explicitly or implicitly indicate to Dr. Helton that the purpose of the call was to interview Dr.

Helton about her biography, legal history, botulism research, Trade Secret, and/or the Research Compilation.

44.    The January 8, 2025, telephone call was utterly lacking in any substantive focus, inquiries, or discussion regarding Dr. Helton's personal history with botulism, her biography, the details of her legal battle with the maker of BOTOX®, her botulism research, the Trade Secret, and/or the Research Compilation.

45.    At no point before, during, or after the January 8, 2025, telephone call did McCue indicate that she was interviewing Dr. Helton or that any information or commentary Dr. Helton provided during the call was on the record and therefore available for dissemination.

46.    At no point before, during, or after the January 8, 2025, telephone call did Dr. Helton provide consent for any of the discussion with McCue to be recorded. Upon information and belief, McCue recorded this conversation.

47.    At no point before, during, or after the January 8, 2025, telephone call did Dr. Helton consent to her personal story, biography, legal battle, botulism research, or any part of the Trade Secret and/or Research Compilation being published or used in any manner by McCue.

48.    During the January 8, 2025, telephone call, McCue indicated only that she may write a follow-up memoir, focused on her personal experiences, or feature on a podcast. At no point before or during the January 8, 2025 telephone call did McCue inform or discuss with Dr. Helton that she intended to or was actually writing a book on botulism symptomology, research, or other medical or scientific aspects of botulism or that McCue intended to include Dr. Helton's personal story, including aspects of her botulism battle, personal biography, legal battle with the maker of BOTOX®, botulism research, Trade Secret, and/or any part of the Research Compilation therein.

49.    Upon information and belief, McCue is not a professional reporter and is not employed to report or otherwise disseminate interviews with individuals.

50.    On or around January 17, 2025, shortly after the telephone call of January 8, 2025, McCue first informed Dr. Helton via email that she was writing a book about botulism "that includes information about [Dr. Helton] and [Dr. Helton's] trial." (See Exhibit 31).

51.    In her January 17, 2025, email, McCue included an excerpt from her forthcoming book that pertained to Dr. Helton's personal story and requested that Dr. Helton review it for accuracy.

52.    Upon information and belief, on January 19, 2025, just eleven (11) days after McCue and Dr. Helton's telephone call, and just two (2) days after first informing Dr. Helton of her intent to include her personal story in the book, McCue self-published a book entitled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*").

53.    Dr. Helton, unaware that McCue had already published *Notox* the previous day, and without Dr. Helton's permission to use her personal story, responded to McCue's January 17th email on or around January 20, 2025.  In this response, Dr. Helton informed McCue that she did not consent to McCue's inclusion of her personal story in *Notox*. Dr. Helton also informed McCue that the excerpt about her personal story was inaccurate.  (See Exhibit 32)

54.    McCue responded to Dr. Helton's refusal on January 20, 2025, with understanding, but failed to inform Dr. Helton that she had already published *Notox* on January 19, 2025, despite leading Dr. Helton to believe McCue was waiting for Dr. Helton's consent. (See Exhibit 33)

55.    Based on McCue's facilitative response of January 20, 2025, and Dr. Helton's unambiguous admonishment and withholding of consent, Dr. Helton reasonably believed that

McCue would remove the unauthorized and erroneous content about Dr. Helton's personal story from her book.

56.    McCue also failed to obtain Dr. Helton's prior permission to cite Dr. Helton as a source of scientific and medical information in *Notox*.

57.    After Dr. Helton's correspondence with McCue regarding the publication of her personal story and McCue's response acknowledging Dr. Helton's non-consent, Dr. Helton has had limited communication with McCue. McCue has, however, attempted to correspond with Dr. Helton, sending, for example, but not by way of limitation, an email on January 22, 2025 asking Dr. Helton science questions to which Dr. Helton did not respond, a text message on February 3, 2025 requesting to chat again, and a request to ask Dr. Helton further personal botulism questions on March 6, 2025. Dr. Helton did not have any discussions with McCue after the January 8, 2025, phone call. Further, but not by way of limitation, McCue sent a text message on July 1, 2025, following Dr. Helton's Cease & Desist communication to Talkington on June 11, 2025, asking what was going on, to which Dr. Helton did not respond.

58.     Given this July 1, 2025, text message from McCue, it is apparent that McCue and Talkington were still working together as of at least July 2025. (See Exhibit _____ attached hereto).

59.    Upon information and belief and based on the timeline McCue has provided, McCue drafted, edited, and published *Notox* in less than twenty (20) days.

60.    Upon information and belief, McCue has represented to potential consumers and readers of *Notox* that she conducted three personal interviews with experts in the subject matter of botulism for the purpose of researching and writing *Notox*. Upon information and belief, one of these three experts is Dr. Helton, and the second is believed to be Talkington.

61.     Upon information and belief, McCue, on more than one occasion, falsely represented to potential consumers and readers of *Notox* that she had interviewed Dr. Helton for the purpose of researching and writing *Notox*.

62.     Upon information and belief, McCue has falsely represented to potential consumers and readers of *Notox* that Dr. Helton was a mentor to McCue who had helped her unentangle the complexities of the botulism toxin and illness potentially ascribed to it, and was, therefore, important in writing *Notox*.

63.     Upon information and belief, McCue falsely represented that she had close and personal knowledge of Dr. Helton's personal story on a February 25, 2025, podcast called Swallow Your Pride, particularly "Episode 360–When Beauty Treatments Go Wrong: An SLP's Warning About Cosmetic Botox Injections."

64.     On January 21, 2025, Talkington sent a text message to Dr. Helton with a photo of the cover of *Notox*, stating that the book was receiving positive reviews on Amazon. (See Exhibit 34).

65.     As of January 21, 2025, Dr. Helton did not have a copy of *Notox* and had no actual knowledge of its contents or subject matter. At the time of this text message from Talkington, Dr. Helton erroneously, yet reasonably, presumed that McCue had honored her January 20, 2025, request to remove her personal story. Having seen only the cover and the excerpt of her personal story, which Dr. Helton believed McCue had removed from the book, Dr. Helton erroneously presumed that McCue's book was directed to McCue's own personal experiences.

66.     Upon information and belief, at least one of McCue's motivations for writing the *Notox* book was to accord to herself the reputation and notoriety of a respected botulism researcher.

177

67.     Upon information and belief, McCue has received at least some acclaim for being a botulism researcher.

68.     Upon further information and belief, McCue has been featured on several podcasts that explicitly state that she is a botulism researcher.

69.     Upon information and belief, being seen as a botulism researcher has brought McCue acclaim, including financial and reputational rewards.

70.     On or around February 21, 2025, Dr. Helton first obtained a copy of *Notox* and discovered that, contrary to her request, McCue had included the incorrect personal story of Dr. Helton that McCue had sent on January 17, 2025, and which Dr. Helton had explicitly objected to and withheld consent to be published on January 20, 2025.

71.     On or around February 11, 2025, Dr. Helton became aware that McCue's book, *Notox*, included at least six (6) full pages explicitly detailing Dr. Helton's personal story, including her medical issues, diagnosis, botulism research, and lawsuit against the maker of BOTOX® ("*Notox* Information"). McCue published this *Notox* Information despite Dr. Helton's indication that it was inaccurate.

72.     In addition to being inaccurate, Dr. Helton directly told McCue that she did not consent to the inclusion of her personal story and intellectual property in McCue's Notox book.

73.     For example, but not by way of limitation, McCue's *Notox* book includes explicit reference to Dr. Helton's Trade Secret and Research Compilation, stating that Dr. Helton "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities." (See Exhibit 36).

74. The *Notox* book explicitly states that Dr. Helton's "trial and verdict [against the maker of BOTOX®] received exactly zero seconds of airtime on any major news networks" and was "mostly met with crickets" by the media. (See Exhibit 37).

75. In the February 10, 2025, text message exchange, Talkington told Dr. Helton that *Notox* was based solely on publicly available documents. Upon information and belief, this statement by Talkington was false, as Talkington had provided Dr. Helton's personal story, botulism research, Trade Secret, and at least a portion of the Research Compilation to McCue to use in writing *Notox*. (See Exhibit 38)

76. Alternatively, and upon further information and belief, Talkington wrote all or at least a portion of the Notox book using her privileged access to Dr. Helton's personal story, botulism research, Trade Secret, and the Research Compilation.

77. Notox purports to cite personal communications with Dr. Helton as a reference, along with one public article from *The Oklahoman* newspaper dated May 12, 2010, and titled "Oklahoma County jury finds Botox maker negligent, awards $15 million." (See Exhibit 39)

78. Upon information and belief, McCue explicitly and falsely represents that she interviewed Dr. Helton in preparation for writing the *Notox* book.

79. Upon information and belief, McCue also explicitly and falsely claims that everything in her book is open source and public information, easily accessible to anyone with an internet connection.

80. On the contrary, for example, but not by way of limitation, *The Oklahoman* newspaper article does not provide any details regarding the botulism research Dr. Helton performed in preparation for the trial, nor did Dr. Helton discuss such information with McCue when they spoke on the telephone. (See Exhibit 39).

81.     Many of the personal details of Dr. Helton's story that are included in *Notox* are not publicly available and, at least in part, are inaccurate. Dr. Helton never shared the personal information published in *Notox* with McCue in any communication.

82.     Upon information and belief, Talkington provided McCue with extensive details regarding Dr. Helton's personal story, botulism research efforts, Trade Secret, and/or the Research Compilation without Dr. Helton's knowledge or consent.

83.     Upon information and belief, Talkington provided McCue with the materials necessary to write at least some aspects of the *Notox* book from Dr. Helton's Trade Secret and/or the Research Compilation, in particular. Upon information and belief, by giving some or all of Dr. Helton's Research Compilation to McCue, Talkington enabled McCue to bypass years of necessary research and expense to produce a manuscript in an implausibly short timeframe of twenty (20) days or less.

84.     Talkington's provision of some or all of Dr. Helton's Research Compilation to McCue conferred an economic benefit on McCue that Talkington had no authority to give.

85.     Upon information and belief, McCue knew that Talkington had no authority to provide some or all of Dr. Helton's Research Compilation to her.

86.     Upon information and belief, despite knowing that Talkington had no authority to provide some or all of Dr. Helton's Research Compilation, McCue accepted the same and used the Research Compilation without permission or authority.

87.     Upon information and belief, McCue and/or Talkington, alone or in combination, imported some or all of the Research Compilation, without Dr. Helton's knowledge or consent, into a generative artificial intelligence large language model for assistance in writing some or all of *Notox*.

88.    Upon information and belief, McCue and/or Talkington, alone or in combination, used the large language model in which some or all of the Research Compilation was imported to write, refine, reconfigure, analyze, and/or summarize Dr. Helton's personal story, botulism research, Trade Secret, and/or Research Compilation in order to write and self-publish *Notox* in twenty (20) days.

89.    Upon further information and belief, McCue is a speech-language pathologist with no prior history of botulism research. Upon further information and belief and despite having no formal training or education in botulism, McCue self-published the *Notox* book in January 2025— four months after first meeting Talkington and approximately one (1) month after McCue allegedly began writing *Notox*.

90.    Upon information and belief, the speed of McCue's self-publication indicates that McCue did not independently research the material in *Notox*; rather, it is believed upon information and belief that McCue was provided at least some or all of Dr. Helton's Research personal story, botulism research, Trade Secret, and/or the Research Compilation by Talkington and that at some or all of these materials were placed into a generative artificial intelligence large language model which was thereafter used to create *Notox*.

91.    Upon information and belief, Talkington, alone or in combination with McCue, orchestrated the January 8, 2025, phone call between McCue and Dr. Helton under a false pretense.

92.    Upon information and belief, McCue conspired with Talkington, while they resided in Illinois, to orchestrate the January 8, 2025, phone call between McCue and Dr. Helton in order to obtain Dr. Helton's intellectual property under false pretense(s).

93.    Upon information and belief, Talkington induced Dr. Helton to speak with McCue under the guise of a personal botulism victim support call to create a plausible source or

explanation as to why (a) McCue was able to include Dr. Helton's private information in *Notox*, including at least some or all of the Research Compilation, and (b) McCue was able to write and self-publish *Notox* in less than twenty (20) days.

94.    Upon information and belief, Talkington fraudulently induced Dr. Helton to speak with McCue, upon McCue's instructions or indications, so that the personal information in *Notox* could plausibly be claimed to have been sourced from Dr. Helton.

95.    Upon information and belief, McCue's attribution of the extensive biographical and medical information of Dr. Helton in *Notox* to the January 8, 2025, interview with Dr. Helton was a purposeful attempt by McCue to avail herself and *Notox* with Dr. Helton's professional medical reputation and to make it appear as though Dr. Helton had sanctioned the *Notox* book.

96.    Upon information and belief, McCue is also involved with the Illinois Botulism Research Collaborative LLC, a sham Illinois state non-profit entity started by Talkington, either as a formal employee, volunteer, or director thereof, and encourages and recruits other individuals to join this Illinois organization. For example, McCue stated in a Facebook communication regarding the Botulism Research Collaborative LLC, "We're going to need board members, so join us!" (See Exhibit 40).

97.    Upon information and belief, McCue utilized, or intended to utilize, the Illinois Botulism Research Collaborative LLC to promote, market, advertise, legitimize, and/or sell *Notox*.

98.    Upon information and belief, Talkington, while in Illinois, acted as a collaborator and agent of McCue and promoted, marketed, advertised, and defended *Notox* online, in the press, including podcasts, and as part of the supposed work of the sham Illinois non-profit entity.

**Irreparable Harm to Dr. Helton's Professional Standing and Reputation
and McCue and Talkington's Usurpation of Dr. Helton's Life's Work**

99.     Upon information and belief, Talkington and McCue, non-physicians, have dispensed unauthorized medical advice to numerous vulnerable botulism victims, including instructing patients to lie to their treating physicians.

100.     Upon information and belief, by falsely presenting themselves as Dr. Helton's research partner, mentee, and/or expert botulism researchers, while dispensing such unauthorized and dangerous medical advice, Talkington and McCue have sought to cloak themselves with Dr. Helton's reputation and acclaim as a physician and botulism researcher for commercial purposes and financial gain.

101.     Upon information and belief, in cloaking themselves with Dr. Helton's medical reputation and acclaim, Talkington and McCue have created a direct nexus of potential liability or reputational harm for Dr. Helton. Upon further information and belief, Talkington and McCue's unauthorized association with Dr. Helton places Dr. Helton's medical license and professional standing generally and, more particularly, within the community of botulism victims, in jeopardy, as botulism victims and their families may reasonably believe that Dr. Helton's medical authority sanctions Talkington and McCue's inaccurate and dangerous instructions.

102.     Dr. Helton also serves as a *pro bono* expert witness for law firms representing victims of iatrogenic botulism, drawing on her specialized knowledge of personal, scientific, and medical matters to help others seek justice. Talkington and McCue's creation of unauthorized, unvetted, and scientifically inaccurate botulism materials, while cloaking themselves and attempting to usurp Dr. Helton's reputation, acclaim, and authority, threatens to destroy Dr. Helton's credibility in court.

103.    Dr. Helton may face disqualification as an expert witness if, for example, but not by way of limitation, Talkington and McCue's egregious advice that patients lie to their doctors is somehow attributed to Dr. Helton. The ultimate harm from Talkington and McCue's actions is not merely reputational damage to Dr. Helton, but the denial of justice to future victims who rely on Dr. Helton's unimpeachable *pro bono* expert testimony to win their cases.

104.    Talkington fraudulently listed Dr. Helton as a Board Member of the sham Illinois non-profit entity, the Botulism Research Collaborative LLC, in formal filings with the Illinois Secretary of State without Dr. Helton's knowledge or consent. (See Exhibit 25).

105.    Upon information and belief, McCue is also involved with this Illinois sham non-profit entity, i.e., the Botulism Research Collaborative LLC, either as a formal employee, volunteer, or director thereof, and encourages and recruits other individuals to join this organization. Upon information and belief, McCue intended to utilize the Botulism Research Collaborative LLC to promote *Notox*, and her other books, articles, and commercial activities (including her speech language pathology services) further damaging Dr. Helton's professional reputation as an unwitting and unwilling Board Member of the organization, as an unwitting and unwilling endorser and/or contributor of *Notox*, and/or as an endorser of McCue's professional and botulism related activities.

106.    This unconsented-to and unknown appointment to the Botulism Research Collaborative LLC non-profit entity exposes Dr. Helton to potential fiduciary liabilities, tax obligations, and regulatory scrutiny for a non-profit entity she has no input into or control over. Dr. Helton is now forced to expend considerable resources to defend her reputation against any further misconduct or financial impropriety committed by Talkington in managing the Botulism Research Collaborative LLC.

107.    Dr. Helton's Trade Secret and Research Compilation is a distinct proprietary economic asset, compiled and curated by her, that assisted in securing a $15,000,000 product liability lawsuit verdict. Talkington and McCue's, alone or in collaboration, uncontrolled publication of some or all of Dr. Helton's Trade Secret and/or Research Compilation threatens its status as a trade secret, thereby destroying its economic benefit to Dr. Helton. Talkington and McCue's actions, alone or in combination, have or will likely permanently diminish the Trade Secret and Research Compilation's proprietary nature and economic value, which Dr. Helton has expended significant resources and time to create.

108.    Upon information and belief, in providing Dr. Helton's Trade Secret, Research Compilation, as well as confidential botulism research and proprietary mental analyses and impressions to McCue for use in *Notox*, Talkington and McCue have effectively destroyed the first-to-market value of Dr. Helton's upcoming manuscript. Dr. Helton has spent over fifteen years curating, analyzing, and synthesizing a massive amount of information for a debut work that would establish her unique voice and authority in the field of botulism research and iatrogenic botulism. The unauthorized use and/or sharing of Dr. Helton's Trade Secret and/or Research Compilation, in whole or in part, and/or release the of a derivative work (e.g., *Notox*), which relies on Dr. Helton's core thesis and research, dilutes the novelty of Dr. Helton's future publication, confusing the marketplace and siphoning potential readership and sales before Dr. Helton's work even hits the shelves.

## THIRD PARTY CAUSES OF ACTION

## FIRST THIRD-PARTY CLAIM FOR RELIEF

## FALSE DESIGNATION OF ORIGIN–15 U.S.C.A. § 1125(a)(1)(A)

109.    Dr. Helton, Third-Party Plaintiff, re-alleges her Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 108 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

110.    This action arises under the Lanham Act, 15 U.S.C. § 1125 et seq., seeking seizure of goods, injunctive relief, damages, and other appropriate relief including an order for corrective notice and/or advertising, resulting from Third-Party Defendant McCue's use of Dr. Helton's name and reputation in commerce to create a false designation of origin, false description, and false representation that Dr. Helton sponsors, approves, endorses, or is affiliated with Third-Party Defendant McCue's goods and services.

111.    Dr. Helton is a globally recognized physician and botulism researcher whose name, personal botulism story, and public image or reputation, acquired after extensively researching botulism and in advocating for and counseling botulism patients, are distinctive and widely known among consumers, as well as among botulism victims and their families.

112.    Dr. Helton and Third-Party Defendant McCue have conversed only one time, on or around January 8, 2025, via telephone. During this discussion, Dr. Helton did not discuss or otherwise disclose any information about or relating to her personal botulism story, botulism research, her analyses and conclusions drawn therefrom, and the existence and contents of her Trade Secret and/or the Research Compilation. Dr. Helton did not discuss any matters relating to her personal story or personal research.

113.    During the January 8, 2025, telephone discussion, Third-Party Defendant McCue did not indicate or intimate to Dr. Helton that the discussion was on the record or would otherwise be considered to be an interview. Third-Party Defendant McCue is not a professional reporter and is not employed to report or otherwise disseminate interviews with individuals. Dr. Helton was not asked by Third-Party Defendant McCue, nor did Dr. Helton give Third-Party Defendant McCue consent to record, rebroadcast, or republish any statements made or information provided by Dr. Helton during the call.

114.    Following the January 8, 2025 conversation, in commerce, Third-Party Defendant McCue has used Dr. Helton's name and reputation in connection with the advertisement, promotion, and sale of Third-Party Defendant McCue's book titled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*"), by, unbeknownst to Dr. Helton, explicitly including at least six (6) full pages in *Notox* detailing Dr. Helton's personal story, including information about Dr. Helton's medical issues, diagnosis, and product liability lawsuit against the maker of BOTOX®.

115.    In *Notox*, Third-Party Defendant McCue cited personal communications with Dr. Helton as a reference for Dr. Helton's personal story and information. However, as explained supra, Dr. Helton never communicated any part of her personal story to Third-Party Defendant McCue and never authorized the use or publication of any part of her personal story or information for any purpose.

116.    Third-Party Defendant McCue's use of Dr. Helton's personal story and information constitutes a false designation of origin, false description, and false representation that Dr. Helton sponsors, approves, endorses, or is affiliated with Third-Party Defendant McCue's book.

117.    Third-Party Defendant McCue's conduct creates a likelihood of confusion, deception, or mistake among consumers as to the origin, sponsorship, or approval of Third-Party

Defendant McCue's goods, for example, but not by way of limitation, causing them to believe Dr. Helton has a professional and/or commercial connection to Talkington, when none actually exists. This false association is material, influencing consumer impressions and beliefs when commercially or otherwise interacting with Third-Party Defendant McCue and/or purchasing or contracting for Third-Party Defendant McCue's services, and has thereby occurred in and affected interstate commerce.

118.    As a direct and proximate result of Third-Party Defendant McCue's actions, Dr. Helton has been injured by damage to her reputation, unauthorized usurpation and commercial exploitation of her name, likeness, and personal story, and impairment of Dr. Helton's commercial and professional economic opportunities.

119.    Third-Party Defendant McCue's use of Dr. Helton's name, personal botulism story, and public image or reputation to create a false association therewith was malicious and willful.

120.    Third-Party Defendant McCue's use of Dr. Helton's name, personal botulism story, and public image or reputation resulted in economic and reputational harm to Dr. Helton.

121.    Pursuant to 18 U.S.C. § 1125(a)(1)(A), Dr. Helton is entitled to appropriate relief, including but not limited to injunctive relief to prevent Third-Party Defendant McCue from any actual or threatened future false appropriation or affiliation with Dr. Helton's name, personal botulism story, and public image or reputation, equitable relief, including an order for Third-Party Defendant McCue to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that Dr. Helton has not and does not sponsor, approve, endorse, or affiliate with Third-Party Defendant McCue or with Third-Party Defendant McCue's goods, in particular *Notox*, and services, recovery of damages for actual loss caused by Third-Party Defendant McCue's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public

image or reputation, damages for unjust enrichment caused by Third-Party Defendant McCue's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public image or reputation that are not addressed in the computation of actual damages, exemplary damages, and reasonable attorney's fees and costs as Third-Party Defendant McCue's appropriation and false affiliation with Dr. Helton's name, personal botulism story, and public image or reputation is willful and malicious. Further, Dr. Helton is entitled to the seizure and/or destruction of any existing publications or materials that appropriate or falsely claim affiliation with Dr. Helton's name, personal botulism story, and public image or reputation.

## SECOND THIRD-PARTY CLAIM FOR RELIEF

### FALSE ADVERTISING–15 U.S.C. § 1125(a)(1)(B)

122.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 121 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

123.    This action arises under the Lanham Act, 15 U.S.C. § 1125 et seq., seeking injunctive relief, damages and, other appropriate relief, including an order for corrective notice and/or advertising, resulting from Third-Party Defendant McCue's false or misleading statements in interstate commerce which have influenced purchasing decisions of Third-Party Defendant McCue's goods and services and have proximately caused, or are likely to cause, commercial injury to Dr. Helton's economic, reputational, and professional interest.

124.    Third-Party Defendant McCue has made false or misleading statements of fact in commercial advertising or promotion, including misrepresenting her qualifications, her relationship with Dr. Helton, and the origin and authorship of research and publications derived

from Dr. Helton's personal story, botulism research, Trade Secret, and the Research Compilation, in whole or in part.

125.    Particularly, upon information and belief, Third-Party Defendant McCue, on more than one occasion, falsely represented to potential consumers and readers of *Notox* that she had interviewed Dr. Helton for the purpose of researching and writing *Notox*.

126.    Upon information and belief, Third-Party Defendant McCue has falsely represented to potential consumers and readers of *Notox* that Dr. Helton was a mentor to Third-Party Defendant McCue, who had helped her unentangle the complexities of the botulism toxin and illness potentially ascribed to it.

127.    Upon information and belief, Third-Party Defendant McCue falsely represented that she had close and personal knowledge of Dr. Helton's personal story on a February 25, 2025, podcast called Swallow Your Pride, particularly "Episode 360–When Beauty Treatments Go Wrong: An SLP's Warning About Cosmetic Botox Injections."

128.    Third-Party Defendant McCue's false or misleading statements of fact have been disseminated in interstate commerce and are material to consumers' and the public's perception of Third-Party Defendant McCue's goods, services, and professional status.

129.    Third-Party Defendant McCue's false or misleading statements have, and are likely to continue, influenced purchasing decisions of Third-Party Defendant McCue's goods and services and have proximately caused, or are likely to cause, commercial injury to Dr. Helton's economic, reputational, and professional interests.

130.    Pursuant to 18 U.S.C. § 1125(a)(1)(B), Dr. Helton has suffered, and is likely to continue suffering, damages and is entitled to appropriate relief, including but not limited to injunctive relief to prevent Third-Party Defendant McCue from any actual or future false or

misleading statements of fact, equitable relief, including an order for Third-Party Defendant McCue to issue corrective notices and/or advertising, to correct the record and indicate to third-parties that Dr. Helton has not and does not sponsor, approve, endorse, or is affiliated with Third-Party Defendant McCue or with Third-Party Defendant McCue's goods, in particular *Notox*, and services, recovery of damages for actual loss caused by Third-Party Defendant McCue's false or misleading statements, damages for unjust enrichment caused by Third-Party Defendant McCue's false or misleading statements that are not addressed in the computation of actual damages, exemplary damages, and reasonable attorney's fees and costs as Third-Party Defendant McCue's false and misleading statements have been willful and malicious.

## THIRD THIRD-PARTY CLAIM FOR RELIEF

### False Advertising–Cal. Bus. and Prof. Code § 17500

131.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 130 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

132.    This action arises under Chapter 1 of Part 3 of Division 7 of the California Business and Professions Code, seeking damages and injunctive relief resulting from Third-Party Defendant McCue's false, misleading, and injurious representations in commerce, which are likely to influence consumer purchasing decisions as to Third-Party Defendant McCue's goods and services.

133.    Third-Party Defendant McCue has made false or misleading statements of fact in commercial advertising or promotion, including misrepresenting her qualifications, her relationship with Dr. Helton, and the origin and authorship of research and publications derived

from Dr. Helton's personal story, botulism research, Trade Secret, and the Research Compilation, in whole or in part.

134.    Particularly, upon information and belief, Third-Party Defendant McCue, on more than one occasion, falsely represented to potential consumers and readers of *Notox* that she had interviewed Dr. Helton for the purpose of researching and writing *Notox*.

135.    Upon information and belief, Third-Party Defendant McCue has falsely represented to potential consumers and readers of *Notox* that Dr. Helton was a mentor to Third-Party Defendant McCue, who had helped her unentangle the complexities of the botulism toxin and illness potentially ascribed to it.

136.    Upon information and belief, Third-Party Defendant McCue falsely represented that she had close and personal knowledge of Dr. Helton's personal story on a February 25, 2025, podcast called Swallow Your Pride, particularly "Episode 360–When Beauty Treatments Go Wrong: An SLP's Warning About Cosmetic Botox Injections."

137.    Third-Party Defendant McCue's false or misleading statements of fact have been disseminated in interstate commerce and are material to consumers' and the public's perception of Third-Party Defendant McCue's goods, services, and professional status.

138.    Third-Party Defendant McCue's false or misleading statements have influenced, and are likely to continue influencing, the purchasing decisions of Third-Party Defendant McCue's goods and services and have, therefore, proximately caused, or are likely to cause, commercial injury to Dr. Helton's economic, reputational, and professional interests.

139.    Pursuant to Cal. Bus. and Prof. Code § 17535, Dr. Helton has suffered, and is likely to continue suffering, damages and is entitled to appropriate relief, including but not limited to injunctive relief to prevent Third-Party Defendant McCue from any actual or future false or

misleading statements of fact and recovery of damages for actual loss caused by Third-Party Defendant McCue's false or misleading statements,.

## FOURTH THIRD-PARTY CLAIM FOR RELIEF

### Unfair Competition–Cal. Bus. and Prof. Code § 17200

140.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 139 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

141.    This action arises under Chapter 1 of Part 3 of Division 7 of the California Business and Professions Code, seeking damages and injunctive relief resulting from Third-Party Defendant McCue's unfair or fraudulent business actions and unfair, deceptive, untrue, or misleading advertising of Third-Party Defendant McCue's goods and services.

142.    As alleged in Dr. Helton's Second Third-Party Claim for Relief, supra, Third-Party Defendant McCue has made false or misleading statements of fact in commercial advertising or promotion, including misrepresenting her qualifications, her relationship with Dr. Helton, and the origin and authorship of research and publications derived from Dr. Helton's personal story, botulism research, Trade Secret, and the Research Compilation, in whole or in part.

143.    Third-Party Defendant McCue also engaged in unfair and fraudulent business actions by falsely and fraudulently inducing Dr. Helton to speak with her for the surreptitious purpose of utilizing Dr. Helton's name as a reference for her upcoming book titled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*"), leveraging Dr. Helton's identity and reputation for commercial gain.

144.    Third-Party Defendant McCue also knowingly, and without consent or authorization from Dr. Helton, obtained, viewed, and/or used Dr. Helton's Trade Secret, supra,

193

including the Research Compilation, in whole or in part, to create, write, and/or develop *Notox*, evidenced at least by statements in *Notox* relating to information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, including for example, but not by way of limitation, that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

145.   Dr. Helton has, for years, been preparing the Botulism Manuscript, which comprises her botulism research, her personal story of contracting botulism, her product litigation with the maker of BOTOX®, and her analysis and conclusions drawn from reviewing materials found in whole or in part in the Trade Secret and/or Research Compilation. Thus, Third-Party Defendant McCue is a direct competitor of Dr. Helton, albeit a poor facsimile of one lacking the appropriate scientific and medical background, in the same market of botulism literature, botulism patient advocacy, and botulism research.

146.   Third-Party Defendant McCue's false and misleading statements in commercial advertising, fraudulent misrepresentations to Dr. Helton, and unauthorized use of Dr. Helton's Trade Secret and/or Research Compilation, in whole or in part, to develop a competing book, botulism research, and botulism advocacy services, all constitute unfair competition by Third-Party Defendant McCue with Dr. Helton.

147.   Third-Party Defendant McCue's unfairly competitive acts have proximately caused, and are likely to further cause, commercial injury to Dr. Helton's economic, reputational, and professional interests.

148.   Pursuant to Cal. Bus. and Prof. Code § 17535, Dr. Helton has suffered, and is likely to continue suffering, damages and is entitled to appropriate relief, including but not limited to

194

injunctive relief to prevent Third-Party Defendant McCue from any actual or future false or misleading statements of fact and other unfairly competitive acts, as well as the recovery of damages for actual loss caused by Third-Party Defendant McCue's false or misleading statements of fact and unfairly competitive acts.

## FIFTH THIRD-PARTY CLAIM FOR RELIEF

### Fraudulent Misrepresentation–California State Law Claim

149.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 148 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

150.    This action arises under California law, as announced, for example, but not by way of limitation, in Graham v. Bank of Am., N.A., 226 Cal. App. 4th 594, 605–06, 172 Cal. Rptr. 3d 218, 228 (2014), seeking damages and other relief for Third-Party Defendant McCue's unjust retention of an economic benefit Third-Party Defendant McCue gained upon the known and intentional, or reckless, use of one or more fraudulent misrepresentations to positively assert a falsity, with the intention that it be acted upon, and upon which Dr. Helton relied to her detriment.

151.    On January 3, 2025, Talkington text-messaged Dr. Helton, providing the Third-Party Defendant's telephone number. As part of this text-message, Talkington represented to Dr. Helton that Third-Party Defendant McCue had been injected with XEOMIN® (a BOTOX® alternative). Thereafter, Talkington requested that Dr. Helton speak with Third-Party Defendant McCue about symptoms she was having after allegedly contracting botulism due to the XEOMIN® injection.

152.    Despite Dr. Helton maintaining a strict policy of personal privacy and typically not granting interviews to authors, researchers, or media outlets, Dr. Helton has always been willing

to speak with botulism victims who need help. In fact, Talkington had requested that Dr. Helton speak to botulism victims prior to January 3, 2025, for private, therapeutic-focused discussions.

153.    Talkington and Third-Party Defendant McCue were aware of Dr. Helton's strict policy of personal privacy and that Dr. Helton had consistently declined and/or rejected inquiries from others wishing to report on or write about her personal botulism story, botulism research, and her analyses and conclusions drawn therefrom, and the existence and contents of her Trade Secret, including, in whole or in part, the Research Compilation. Talkington and Third-Party Defendant McCue were also aware that Dr. Helton was deliberate about her writings and had her own plans for the distribution or dissemination of her personal botulism story, botulism research, her analyses and conclusions drawn therefrom, and the existence and contents of the Research Compilation.

154.    Talkington's text-message asking Dr. Helton, which was more likely than not sent at McCue's behest, to speak with Third-Party Defendant McCue as a botulism victim, given Dr. Helton's well-known strict policy of personal privacy, reasonably led Dr. Helton to believe that Third-Party Defendant McCue was seeking support as a potential victim of botulism.

155.    Third-Party Defendant McCue sent a text message to Dr. Helton on January 6, 2025, introducing herself as Talkington's friend and asking to casually connect to discuss Dr. Helton's experience. Third-Party Defendant McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. Third-Party Defendant McCue did not disclose any plans for writing a book, nor refer to Dr. Helton as a resource for said book, in any text message or communication to Dr. Helton.

156.    Based on Talkington's January 3, 2025, text message and Third-Party Defendant McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another

196

botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment.

157.    On or around January 8, 2025, Dr. Helton and Third-Party Defendant McCue spoke on the telephone. During this discussion, Dr. Helton did not disclose any information about or relating to her personal botulism story, botulism research, her analyses and conclusions drawn therefrom, or the existence and contents of the Trade Secret, including, in whole or in part, the Research Compilation.

158.    Third-Party Defendant McCue knew before the January 8, 2025, call with Dr. Helton that Talkington had used false pretenses in enticing Dr. Helton to participate in the call with Third-Party Defendant McCue.

159.    During the January 8, 2025, Third-Party Defendant McCue knew or had reason to believe that Dr. Helton would become guarded or terminate the call if Third-Party Defendant McCue revealed her true intentions in speaking with Dr. Helton.

160.    Third-Party Defendant McCue maintained the false narrative, presumably initiated by Talkington, which was used to entice Dr. Helton to speak with Third-Party Defendant McCue.

161.    Third-Party Defendant McCue did not indicate or intimate to Dr. Helton during their January 8, 2025, telephone call that the discussion was on the record or would otherwise be considered to be an interview.

162.    Third-Party Defendant McCue recorded the January 8, 2025, call with Dr. Helton. Had Dr. Helton known that the January 8, 2025, call was being recorded, Dr. Helton would have either not participated in the call or immediately terminated the call upon learning that it was being recorded.

197

163.    On or about January 19, 2025, Third-Party Defendant McCue self-published a book titled *Notox: The Shocking Truth About Cosmetic Injections* ("*Notox*"). Unbeknownst to Dr. Helton, *Notox* included at least six (6) full pages explicitly detailing Dr. Helton's personal story. For example, but not by way of limitation, *Notox* included information about Dr. Helton's medical issues, diagnosis, and product liability lawsuit against the maker of BOTOX®. The information Third-Party Defendant McCue included in *Notox* (a) contained inaccuracies, and (b) at least some of the information in *Notox* was not previously publicly known.

164.    Surprisingly, Third-Party Defendant McCue cites personal communications with Dr. Helton as a reference for this detailed and previously unknown material in *Notox*.

165.    Given her strict policy of personal privacy, Dr. Helton would never have consented to speak with Third-Party Defendant McCue had she known that she was being interviewed or otherwise probed for personal information that Third-Party Defendant McCue would use in writing *Notox* (noting Dr. Helton as the source thereof), evidenced at least by statements in *Notox* relating to information that was only available within the Trade Secret, including the Research Compilation, and in the Botulism Manuscript, including for example,  but not by way of limitation, that Dr. Helton had "learned everything she possibly could know about botulism and botulinum toxin, from its humble beginning as a potential bioweapon for the U.S. Military to its rampant off-label use in children with disabilities."

166.    As set forth supra, Third-Party Defendant McCue was explicitly aware that Dr. Helton would not have consented to speaking with Third-Party Defendant McCue for the purpose of being interviewed or otherwise cited or listed as a source in Third-Party Defendant McCue's book. The inclusion of this information in *Notox* was valuable to Third-Party Defendant McCue, as it legitimized *Notox* and Third-Party Defendant McCue as reputable sources of information on

botulism, trading on Dr. Helton's impeccable scientific and medical reputation, personal botulism victim story, and extensive botulism research and analyses.

167.    Upon information and belief, Third-Party Defendant McCue knew or should have known that her representation to Dr. Helton that she wanted to speak with Dr. Helton solely as a botulism victim was false at the time it was made. As such, Third-Party Defendant McCue misrepresented her true intentions for talking with Dr. Helton in order to persuade Dr. Helton to participate in a call with her.

168.    Third-Party Defendant McCue, therefore, intended to induce Dr. Helton to rely on the false representation proffered by Talkington that Third-Party Defendant McCue wanted to speak with Dr. Helton solely as a botulism victim. Dr. Helton, unaware of the falsity of Talkington's representation, reasonably relied on Third-Party Defendant McCue's representation and participated in the January 8, 2025, telephone conversation, believing it was for botulism victim support.

169.    As a direct and proximate result of Third-Party Defendant McCue's fraudulent misrepresentation, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

170.    Dr. Helton is therefore entitled to an award of damages in an amount to be determined at trial, and no less than $75,000, punitive and exemplary damages for Third-Party Defendant McCue's fraudulent and malicious conduct, pre- and post-judgment interest as permitted by law, and for such other and further relief as the Court deems just and proper.

## SIXTH THIRD-PARTY CLAIM FOR RELIEF

### Civil Conspiracy–California State Law Claim

171.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 170 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein. Talkington and Third-Party Defendant McCue each fraudulently misrepresented their true medical condition and/or intentions in speaking and attempting to associate themselves with Dr. Helton.

172.    This action arises separately, or in the alternative to Dr. Helton's civil conspiracy claim under Oklahoma state law, under California law, as announced, for example, but not by way of limitation, in City of Indus. v. City of Fillmore, 198 Cal. App. 4th 191, 212, 129 Cal. Rptr. 3d 433, 450 (2011), as modified (Aug. 24, 2011), seeking damages and other relief for a civil conspiracy committed by Third-Party Defendant McCue and Talkington while undertaking the misrepresentation of Third-Party Defendant McCue's true medical condition and/or intentions as the reasons for Third-Party Defendant McCue's telephone call of January 8, 2025, with Dr. Helton.

173.    As set forth in Paragraphs _ through _ of Counterclaim Plaintiff's Eighth Claim for Relief, Talkington and McCue were well-aware of Dr. Helton's strict policy of personal privacy, and Talkington, in concert with Third-Party Defendant McCue, falsely and fraudulently misrepresented Third-Party Defendant McCue's medical condition and intentions in the January 3, 2025, telephone call between Talkington and Dr. Helton in order to induce Dr. Helton to participate in the January 8, 2025, call with Third-Party Defendant McCue.

174.    Third-Party Defendant McCue sent a text message to Dr. Helton on January 6, 2025, introducing herself as Talkington's friend and asking to casually connect to discuss Dr. Helton's experience. Third-Party Defendant McCue cited a desire to raise awareness among

speech-language pathologists via a podcast as the sole reason for her questions. Third-Party Defendant McCue did not disclose any plans for writing a book, nor refer to Dr. Helton as a resource for said book, in any text message or communication to Dr. Helton.

175.   Based on Talkington's January 3, 2025, text message and Third-Party Defendant McCue's January 6, 2025, text message, Dr. Helton was led to believe that McCue was another botulism victim and victim-advocate seeking Dr. Helton's medical and educational perspective regarding symptoms and treatment.

176.   Third-Party Defendant McCue knew before the January 8, 2025, call with Dr. Helton that Talkington had used false pretenses in enticing Dr. Helton to participate in the call with Third-Party Defendant McCue. Third-Party Defendant McCue perpetuated Dr. Helton's false belief through the January 6, 2025, text message.

177.   During the January 8, 2025, telephone conversation, Third-Party Defendant McCue knew or had reason to believe that Dr. Helton would become guarded or terminate the call if Third-Party Defendant McCue revealed her true intentions for speaking with Dr. Helton.

178.   Third-Party Defendant McCue maintained the false pretense that Talkington had used to entice Dr. Helton into speaking with Third-Party Defendant McCue.

179.   Third-Party Defendant McCue did not indicate or intimate to Dr. Helton during their January 8, 2025, telephone call that the discussion was on the record or would otherwise be considered to be an interview.

180.   Third-Party Defendant McCue recorded her January 8, 2025, call with Dr. Helton. Had Dr. Helton known that the January 8, 2025, call was being recorded, Dr. Helton would have either not participated in the call or immediately terminated the call upon learning that it was being recorded.

201

181.    Prior to the January 8, 2025, telephone conversation, Talkington and Third-Party Defendant McCue acted in concert to deceive Dr. Helton by collectively agreeing, planning, conspiring, and cooperating to fraudulently misrepresent Third-Party Defendant McCue's physical condition and intentions to Dr. Helton for the purpose of inducing Dr. Helton to speak with Third-Party Defendant.

182.    The actions of Talkington and Third-Party Defendant McCue were part of a concerted effort to mislead Dr. Helton and to exploit her personal story, botulism research, Trade Secret, including the Research Compilation in whole or in part, as well as Dr. Helton's stellar international scientific and medical reputation in botulism research for their own benefit. Furthermore, significant portions of *Notox* were written or co-authored by Talkington despite Third-Party Defendant McCue being acknowledged on the book's cover as its sole author.

183.    As a direct and proximate result of Talkington and Third-Party Defendant McCue's conspiracy, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy. Talkington's and Third-Party Defendant McCue's actions constitute a civil conspiracy, as they combined to mislead Dr. Helton and unlawfully used her personal and research information, reputation, Trade Secret, and/or Research Compilation without her consent.

184.    Dr. Helton is therefore entitled to an award of damages in an amount to be determined at trial, and no less than $75,000, exemplary damages for Third-Party Defendant McCue's fraudulent and malicious conduct, pre- and post-judgment interest as permitted by law, and for such other and further relief as the Court deems just and proper.

## SEVENTH THIRD-PARTY CLAIM FOR RELIEF

### Illegal Recording of a Confidential Communication–Cal. Penal Code § 632

185.    Dr. Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 184 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein.

186.    This action arises under Chapter 1.5 of Title 15 of Part 1 of the California Penal Code, for which a private cause of action is provided for in § 637.2, seeking damages and injunctive relief resulting from Third-Party Defendant McCue's illegal recording of a confidential communication with Dr. Helton.

187.    On January 3, 2025, Talkington text-messaged Dr. Helton, providing Third-Party Defendant McCue's telephone number. As part of this text-message, Talkington represented to Dr. Helton that Third-Party Defendant McCue had been injected with XEOMIN® (a BOTOX® alternative). Thereafter, Talkington requested that Dr. Helton speak with Third-Party Defendant McCue about symptoms she was having after alleging contracting botulism due to the XEOMIN® injection.

188.    Given Dr. Helton's well-known strict policy of personal privacy and Talkington's text message asking Dr. Helton to speak with Third-Party Defendant McCue as a potential botulism victim, Dr. Helton reasonably believed that Third-Party Defendant McCue was seeking support as a potential botulism victim.

189.    On or around January 8, 2025, Dr. Helton and Third-Party Defendant McCue spoke on the telephone.

190.    As it was falsely intimated to Dr. Helton that the January 8, 2025, telephone discussion was for private, therapeutic purposes, Dr. Helton had a reasonable expectation that the telephone conversation was strictly confidential.

191.    During the January 8, 2025, telephone discussion, Third-Party Defendant McCue did not indicate or intimate to Dr. Helton that the discussion was on the record or would otherwise be considered to be an interview.

192.    During the January 8, 2025, telephone discussion, Dr. Helton was not asked by Third-Party Defendant McCue, nor did Dr. Helton give Third-Party Defendant McCue consent to record, rebroadcast, or republish any statements made or information provided by Dr. Helton during the call.

193.    Upon information and belief, Third-Party Defendant McCue recorded the January 8, 2025, telephone conversation.

194.    Third-Party Defendant McCue did not indicate or intimate to Dr. Helton during their January 8, 2025, telephone call that the discussion was on the record or would otherwise be considered to be an interview.

195.    Had Dr. Helton known that the January 8, 2025, call was being recorded, Dr. Helton would have either not participated in the call or immediately terminated the call upon learning that it was being recorded.

196.    As a direct and proximate result of Third-Party Defendant McCue's recording of the January 8, 2025, call, Dr. Helton suffered damages, including but not limited to emotional distress, reputational harm, and invasion of privacy.

197.    Pursuant to Cal. Penal Code § 637.2, Dr. Helton is therefore entitled to injunctive relief and an award of damages in an amount to be determined at trial, and no less than $75,000,

exemplary damages for Third-Party Defendant McCue's fraudulent and malicious conduct, pre-
and post-judgment interest as permitted by law, and for such other and further relief as the Court
deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Helton, Third-Party Plaintiff, prays for judgment and relief as follows:

A.      A permanent injunction prohibiting Third-Party Defendant McCue, and all those in
active concert or participation with them, from any actual or threatened future false
appropriation or affiliation with Dr. Helton's name, personal botulism story, and public image
or reputation;

B.      A permanent injunction prohibiting Third-Party Defendant McCue, and all those in
active concert or participation with them, from any actual or future false or misleading
statements of fact about Dr. Helton and her botulism research, the Trade Secret, and/or the
Research Compilation;

C.      A permanent injunction prohibiting Third-Party Defendant McCue, and all those in
active concert or participation with them, from any actual or threatened future use of Dr.
Helton's identity for any commercial purpose;

D.      An award to Dr. Helton of actual and compensatory damages in an amount to be
determined at trial, and no less than $75,000 per offense, including but not limited to lost
profits, emotional distress, reputational damage, invasion of privacy, irreparable harm, and
damages for unjust enrichment caused by Third-Party Defendant McCue's unjust, inequitable,
and illegal actions that are not addressed in the computation of actual damages;

E.      An award of statutory damages in addition to, or in the alternative to, an award of
actual or compensatory damages where applicable and already pleaded/suggested;

F.    A judgment and order requiring Third-Party Defendant McCue to disgorge her profits and other ill-gotten gains resulting from Third-Party Defendant McCue's wrongful conduct.;

G.    A judgment and order for Dr. Helton to be awarded punitive and exemplary damages because Third-Party Defendant McCue's deliberate and wanton fraudulent acts were committed willfully and maliciously;

H.    A judgment and order that Third-Party Defendant McCue issue corrective notices and/or advertising to correct the record and indicate to third-parties that Dr. Helton has not and does not sponsor, approve, endorse, or affiliate with Third-Party Defendant McCue or with Third-Party Defendant McCue's goods, in particular *Notox*, and services, and any other misleading statement, imitation, or impression as the Court finds just and proper;

I.    A judgment and order for the seizure and/or destruction of any existing publications or materials that appropriate or falsely claim affiliation with Dr. Helton's name, personal botulism story, and public image and/or reputation;

J.    A judgment and order for Third-Party Defendant McCue to account to Dr. Helton for all sales and profits from the sale of any of Third-Party Defendant McCue's products or services as a result of the illegal use of Dr. Helton's copyright, Trade Secret, and/or identity, or as a result of any misleading or false statement concerning Dr. Helton;

K.    An award of reasonable royalties resulting from Third-Party Defendant McCue's unjust use of Dr. Helton's copyright, Trade Secret, and/or identity for commercial purposes;

L.    An award for reasonable attorney's fees and costs of this suit;

M.    An award for pre and post-judgment interest for any monetary award the Court deems just and proper; and

N.     Such other and further legal and equitable relief as the Court deems just and proper.

### DR. HELTON'S DEMAND FOR JURY TRIAL

Dr. Helton demands a trial by jury on all issues so triable.

DATED: January 12, 2026                    Respectfully submitted

SHARLA HELTON, by and through

_____
Douglas J. Sorocco, IL 2381747; Okla Bar 17347
DUNLAP CODDING, PC
609 W. Sheridan Avenue
Oklahoma City, OK  73102
Tel: 405.607.8686; Fax: 405.607.8686
dsorocco@dunlapcodding.com

## **CERTIFICATE OF SERVICE**

I certify that on January 12, 2026, I transmitted the foregoing document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jonathan L.A. Phillips
Phillips & Bathke, PC
300 Northeast Perry
Peoria, IL 61603

Jonathan M. Francis
Phillips & Bathke, PC
53 West Jackson Blvd.
Suite 1126
Chicago, IL 60604

Giselle Ayala
Phillips & Bathke, PC
535 5th Avenue
Floor 4
New York, NY 10017

*/s/ Douglas J. Sorocco*
Douglas J. Sorocco (IL2381747)
Dunlap Codding, PC

208

**VERIFICATION**

STATE OF OKLAHOMA          )

COUNTY OF OKLAHOMA      )

Dr. Sharla Helton, being duly sworn, under penalty of perjury, deposes and says:

1.  I am over eighteen (18) years of age and mentally competent to testify in this matter, and from firsthand knowledge state:

2.  I have read the foregoing Answer and Affirmative Defenses to First Amended Declaratory Judgment Complaint and Jury Demand, Counterclaims, and Third Party Complaint in case number 2:25-cv-01318, Talkington v. Helton, et al. and can state that its factual contents are true and based upon my personal knowledge, except as to all matters alleged upon information and belief, which matters I believe to be true based on my review of pertinent documents and conversations with persons with knowledge.

Dr. Sharla Helton

Sworn before me this

12th day of January , 2026

Notary Public