**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| Jane Talkington, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:25-cv-1318-JEH-RLH |
| | ) | |
| Sharla Helton, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| Sharla Helton, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Jane Talkington, | ) | |
| | ) | |
| Counterclaim-Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Megan McCue, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**RESPONSE IN OPPOSITION TO JANE TALKINGTON'S MOTION TO STRIKE AND
DISMISS SHARLA HELTON'S AFFIRMATIVE DEFENSES AND
<u>COUNTERCLAIMS UNDER RULES 8(d), 9(b), 12(b)(6), 12(e), AND 12(f)</u>.**

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................................................. 1

II.    LEGAL STANDARD FOR MOTION TO DISMISS UNDER FED. R. CIV. P.
12(b)(6)............................................................................................................... 2

III.   ARGUMENT....................................................................................................... 2

  A.   Helton's Counterclaims do not violate Fed. R. Civ. P. 8................................ 2

  B.   Helton's Properly Pleaded Affirmative Defenses Should Not Be Stricken................5

  C.   Helton's Claims are Not Time-Barred......................................................7

    1. Talkington Fails to Establish Inquiry Notice for Helton in 2018. ........................... 7

    2. Equitable Estoppel and Fraudulent Concealment Properly Toll Any Limitations
       Period.......................................................................................... 8

    3. Talkington's Statute of Limitations Arguments Similarly Fail Across All Claims,
       including Counterclaims I, II, V, X, and XI.................................................. 10

  D.   Each Counterclaim provides adequate definitional clarity of the Trade Secret and
       Research Compilation, providing fair notice to Talkington, and should not be
       dismissed and/or struck. ......................................................................11

  E.   Helton's Lanham Act Claims Are Properly Pleaded. ................................................12

    1. Counterclaim III for False Designation of Origin is well pleaded despite *Dastar*. 12

    2. Counterclaim IV for False Advertising is well pleaded.......................................... 15

  F.   Helton's Remaining Counterclaims do not fail to state a claim upon which relief
       may be granted. ......................................................................................16

    1. Counterclaim I. ............................................................................... 16

    2. Counterclaim VI.............................................................................. 16

    3. Counterclaims VII and VIII. ................................................................. 18

    4. Counterclaim IX.............................................................................. 19

    5. Counterclaim XII.............................................................................. 21

    6. Counterclaim XIII. ........................................................................... 22

    7. Counterclaim XIV............................................................................. 23

    8. Counterclaim XV .............................................................................. 24

IV.    CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................... 2, 10

*Bausch v. Stryker Corp.,*
  630 F.3d 546 (7th Cir. 2010) ................................................................................................ 6

*Behn v. Kiewit Infrastructure Co.,*
  No. 17 C 5241, 2018 WL 5776293 (N.D. Ill. 2018) ..................................................... 6

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................................................. 2

*Bennett v. Schmidt,*
  153 F.3d 516 (7th Cir. 1998) ............................................................................................... 3

*Berry v. Stevens,*
  31 P.2d 950 (Okla. 1934).................................................................................................... 18

*Bilek v. Federal Insurance Company,*
  8 F.4th 581 (7th Cir. 2021) ............................................................................................. 2, 3

*Boese v. Paramount Pictures Corp.,*
  952 F. Supp. 550 (N.D. Ill. 1996).................................................................................... 22

*Bogie v. Rosenberg,*
  705 F.3d 603 (7th Cir. 2013) ............................................................................................. 19

*Bryson v. News Am. Publications, Inc.,*
  672 N.E.2d 1207 (1996) ..................................................................................................... 21

*Carpenter v. Olin Corp.,*
  No. 3:23-CV-00759-NJR, 2024 WL 1285421 (S.D. Ill. Mar. 26, 2024) ................... 4

*Chapski v. Copley Press,*
  92 Ill. 2d 344, 442 N.E.2d 195 (1982)............................................................................ 21

*City of Chicago v. DoorDash, Inc.,*
  636 F. Supp. 3d 916 (N.D. Ill. 2022)................................................................................. 6

*Dace v. Chi. Pub. Sch.*,
   No. 19 C 6819, 2020 WL 1861671 (N.D. Ill. 2020) ...................................................... 6

*Dastar v. Twentieth Century Fox Film*,
   539 U.S. 23 (2003) ........................................................................................... 12, 13

*Davis v. Ruby Foods, Inc.*,
   269 F.3d 818 (7th Cir. 2001) ........................................................................... 3, 4

*DeJong v. Pembrook*,
   662 F.Supp.3d 896 (S.D. Ill. 2023) ..................................................................... 3, 4

*Doe v. Templeton*, No. 03 C,
   5076, 2004 WL 1882436 (N.D. Ill. Aug. 6, 2004) ................................................... 22

*Dorsey v. Ghosh*,
   No. 13-CV-05747, 2015 WL 3524911 (N.D. Ill. 2015) ............................................. 6

*Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*,
   871 F.2d 697 (7th Cir. 1989) ........................................................................... 13

*First Health Group v. BCE Emergis*,
   269 F.3d 800 (7th Cir. 2001) ........................................................................... 15

*Ford v. Psychopathic Records*,
   No. 12–cv–0603–MJR–DGW, 2013 WL 3353923 (S.D. Ill. 2013) ............................. 6

*Gabler v. Holder and Smith*,
   11 P.3d 1269 (Okla.Civ.App. 2000) ................................................................... 20

*Garst v. Lockheed-Martin*,
   328 F.3d 374 (7th Cir. 2003) ............................................................................. 3

*Gensler v. Strabala*,
   764 F.3d 735 (7th Cir. 2014) ........................................................................... 12, 13

*Green v. Rogers*,
   917 N.E.2d 450 (Ill. 2009) ............................................................................... 21

*Hart v. Bridges*,
   591 P.2d 1172 (1979) ......................................................................................... 9

*Heller Fin., Inc. v. Midwhey Powder Co.*,
   883 F.2d 1286 (7th Cir. 1989) ........................................................................... 6

*Hernandez v. Dart*,
  635 F. Supp. 2d 798 (N.D. Ill. 2009)...................................................................22

*Hollander v. Brown*,
  457 F.3d 688 (7th Cir. 2006) .........................................................................9

*Holmberg v. Armbrecht*,
  327 U.S. 392 (1946) ........................................................................................7

*Intermedics, Inc. v. Ventritex, Inc.*,
  775 F.Supp. 1258 (N.D.Cal.1991)..................................................................10

*Kadamovas v. Stevens*,
  706 F.3d 843 (7th Cir. 2013) .........................................................................3

*KISS Pharm v. Becker Professional Development*,
  18 C 7848, 2021 WL 3207822 (N.D. Ill. July 29, 2021)..................................5

*Kurczaba v. Pollock*,
  318 Ill.App.3d 686, 742 N.E.2d 425 (1st Dist.2000) ...................................22

*Lexmark.*,
  572 U.S. 118 (2014) ......................................................................................13

*Lozier v. Quincy Univ. Corp.*,
  No. 3:18-CV-3077, 2019 WL 409368 (C.D. Ill. Jan. 31, 2019)......................22

*Maremont v. Susan Fredman Design Group*,
  772 F.Supp.2d 967 (N.D. Ill. 2011).................................................................13

*McBride v. Bridges*,
  215 P.2d 830 (Okla. 1950)...............................................................................17

*McReynolds v. Merrill Lynch & Co.*,
  694 F.3d 873 (7th Cir. 2012) ..........................................................................2

*Morgan v. Koch*,
  419 F.2d 993 (7th Cir. 1969) ..........................................................................7

*Morgan v. Kobrin Securities*,
  649 F. Supp. 1023 (N.D. Ill. 1986)..................................................................3

*Muzikowski v. Paramount Pictures Corp.*,
  No. 01 C 6721, 2003 WL 22872117 (N.D. Ill. Dec. 3, 2003)..........................21

*Neuros Co. v. KTurbo*,
   698 F.3d 514 (7th Cir. 2012) .................................................................... 15

*Oklahoma Dept. of Securities ex rel. Faught v. Blair*,
   231 P.3d 645 (Okla. 2010).................................................................... 16

*Parks v. Miller*,
   No. 18-CV-3244, 2020 WL 12813967 (C.D. Ill. 2020) ............................... 5

*Phoenix Entm't Partners v. Rumsey*,
   829 F.3d 817 (7th Cir. 2016) .................................................................... 12

*Presser v. Acacia Mental Health Clinic*,
   836 F.3d 770 (7th Cir. 2016) .................................................................... 11

*Randle v. City of Tulsa*,
   556 P.3d 612 (Okla. 2024)................................................................. 17, 18

*Singletary v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
   9 F.3d 1236 (7th Cir. 1993) ...................................................................... 9

*Slep-Tone Entertainment Corp. v. Sellis Enterprises*,
   87 F.Supp.3d 897 (N.D. Ill. 2015) .......................................................... 14

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*,
   380 F.3d 126 (2d Cir. 2004) .................................................................... 13

*Sokol Crystal Products, Inc. v. DSC Commun. Corp.*,
   15 F.3d 1427 (7th Cir. 1994) .................................................................... 10

*Stanard v. Nygren*,
   658 F.3d 792 (7th Cir. 2011) ................................................................ 3, 5

*Stayart v. Yahoo,*
   651 F.Supp.2d 873 (E.D. Wis. 2009) ................................................. 13, 14

*Sutton v. David Stanley Chevrolet*,
   475 P.3d 847 (Okla. 2010)................................................................. 18, 19

*Vigortone Ag Prods., Inc. v. PM Ag Prods., Inc.*,
   217 F. Supp. 2d 858 (N.D. Ill. 2001)......................................................... 9

*Walkowicz v. Am. Girl Brands, LLC*,
   20-CV-374-JDP, 2021 WL 510729 (W.D. Wis. Feb. 11, 2021) ................. 13

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*,
  556 F.2d 406 (9th Cir. 1977) ........................................................................................ 14

*Yeager v. Innovus Pharm.*,
  No. 18-cv-397, 2019 WL 447743 (N.D. Ill. Feb. 5, 2019) ......................................... 14

**Statutes**

15 U.S.C. § 1127 ............................................................................................................ 14
765 ILCS 1075/5 ....................................................................................................... 23, 24
805 ILCS 105/108.05(a) ................................................................................................ 24

**Rules**

Fed. R. Civ. P. 1 .............................................................................................................. 7
Fed. R. Civ. P. 8(a) ......................................................................................................... 3
Fed. R. Civ. P. 8(a)(2) ..................................................................................................... 3
Fed. R. Civ. P. 9(b) ...................................................................................................... 2, 3
Fed. R. Civ. P. 12(e) ....................................................................................................... 4
L.R. 7 ............................................................................................................................. 26

**Other Authorities**

5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1217 (1969) ................... 3
5C Wright & Miller, *Federal Practice and Procedure: Civil* § 1380 (3d ed.) ............... 6

Defendant/Counter-Plaintiff Dr. Sharla Helton ("Helton"), by and through her undersigned counsel, hereby submits this response (the "Response") to Plaintiff/Counter-Defendant Jane Talkington's ("Talkington") Motion to Strike and Dismiss [Dkt. 37] Helton's First Amended Answer, affirmative defenses, and Counterclaims [Dkt. 35].

At the outset, Helton objects to the Motion's vitriolic rhetoric. Talkington does not contend that Helton's factual narrative is false. Talkington's invective, therefore, adds nothing to the Motion's Fed. R. Civ. P. 8, 9(b), 12(b)(6), 12(e), or 12(f) analysis. Helton addresses the Motion on the merits and does not respond in kind.

## I.   INTRODUCTION

Talkington's Motion should be denied. Helton's First Amended Answer, affirmative defenses, and Counterclaims [Dkt. 35.] satisfy Rule 8 and provide ample notice of the defenses and claims. The Counterclaims plead a coherent chronology and facts that, if proven, entitle Helton to relief, including under controlling limitations principles that Talkington ignores or misstates. The Motion itself confirms notice: it labels the affirmative defenses "bare-bones recitations" while simultaneously attacking the supporting allegations as an "avalanche" under Rule 8. [Dkt. 37, pp. 2, 23-25.] Rule 8 does not require Helton to plead in a vacuum. Nor does it require Helton to strip out the chronology that makes the defenses and counterclaims intelligible.

This dispute arises from a nearly four-decade relationship built on trust and Helton's financial and personal support, followed, Helton alleges, by Talkington's profound betrayal. In a verified pleading, Helton alleges that Talkington used trusted access to misappropriate and monetize decades of Helton's botulism research and intellectual property, and later acted with Third-Party Defendant McCue to conceal and complete that plan. Those allegations are not "surplusage," [Dkt. 37, p. 24.]; they are the factual backbone of Helton's defenses, counterclaims,

and third-party claims. As explained below, Helton pleads plausible counterclaims and, where fraud is alleged, satisfies Rule 9(b) with dates, actors, and acts. [See, e.g., Dkt. 35, ¶¶ 119-122, 126-147, 381-384.] To the extent the Motion asks the Court to resolve competing factual inferences, it fails for the additional reason that factual disputes are not resolved on a Rule 12(b)(6) motion.

## II. LEGAL STANDARD FOR MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a pleading must allege sufficient factual matter to state a claim that is plausible on its face. Talkington moves to dismiss **with prejudice** Counterclaims I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV–that is, **all of Helton's Counterclaims**. Under *Twombly and Iqbal*, the pleading must allege facts that permit a reasonable inference of liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility is context-specific and requires sufficient detail to present "a story that holds together." *Bilek v. Federal Insurance Company*, 8 F.4th 581, 586 (7th Cir. 2021). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in Helton's favor. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

## III. ARGUMENT

### A. Helton's Counterclaims do not violate Fed. R. Civ. P. 8.

The Counterclaims do not violate Rule 8 simply because they are detailed. They are detailed because the alleged misconduct unfolded over years, involved multiple actors, and is pleaded as a coherent chronology rather than as disconnected conclusions. As articulated in *Morgan v. Kobrin Securities*, Seventh Circuit courts demonstrate significant tolerance for lengthy pleadings when justified by case complexity:

2

> Rule 8(a)(2) speaks of a short and plain statement of each claim, ***not a short and plain pleading***. Hence, in the context of a multiparty, multiclaim complaint each claim should be stated as succinctly and plainly as possible even though the entire pleading may prove to be long and complicated by virtue of the number of parties and claims.

649 F. Supp. 1023, 1026-27 (N.D. Ill. 1986) (quoting 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1217 (1969)) (emphasis added). Plainly, length alone does not violate Rule 8. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("Fat in a complaint can be ignored, confusion or ambiguity dealt with by means other than dismissal. It takes a lot worse than using 12 pages to set out a claim that could have been stated in 6 pages to justify a dismissal under Rule 8(a)."); *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013) ("The word 'short' in Rule 8(a)(2) is a relative term."); *DeJong v. Pembrook*, 662 F.Supp.3d 896, 916 (S.D. Ill. 2023) (citing *Stanard v. Nygren*, 658 F.3d 792, 797-98 (7th Cir. 2011)); *Davis v. Ruby Foods, Inc.,* 269 F.3d 818, 820 (7th Cir. 2001) ("…to dismiss a complaint merely because of the presence of superfluous matter. That would cast district judges in the role of editors, screening complaints for brevity and focus; they have better things to do with their time.") Thus, even if Helton has over-drafted, to justify Talkington's wholesale rejection of a pleading, undue length must be combined with other insufficiencies, like unintelligibility or incomprehensibility, which have not been sufficiently alleged here, as discussed *infra*.[1]

The Counterclaims' detail provides notice to Talkington and McCue and satisfies Rule 9(b) where required. A cohesive narrative presents "a story that holds together." *Bilek v. Federal Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021). The Counterclaims are also navigable: they use organized

---

[1] Talkington cites [Dkt. 37, p. 5.] *Garst v. Lockheed-Martin* to support dismissal under Rule 8(a)(2), yet a plain reading of this case squarely counsels against doing so. 328 F.3d 374, 378 (7th Cir. 2003) ("Some complaints are windy but understandable. Surplusage can and should be ignored. Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case. A district court is not 'authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter, a disposable husk around a core of proper pleading.'")

sections, plain phrasing, repeated reference points, and a chronology tied to dates, actors, and events. *Cf. Carpenter v. Olin Corp.*, No. 3:23-CV-00759-NJR, 2024 WL 1285421, at *5 (S.D. Ill. Mar. 26, 2024). [Dkt. 35, pp. 42-116.] If it takes effort to answer them, that is because the parties' relationship was long and the alleged misappropriations were many, not because the pleading is unclear.

The Motion's own paragraph-specific attacks further undercut any claim of vagueness. By targeting particular allegations as "scandalous" or "most egregiously and unnecessarily inflammatory," Talkington demonstrates that she understands exactly what is being alleged. That is fair notice, not confusion.[2] Under *Davis v. Ruby Foods*, even "superfluous matter" does not warrant dismissal if the pleading performs the essential function of giving notice. 269 F.3d 818, 820-21 (7th Cir. 2001) (explaining that the complaint "[i]ndeed, because of it prolixity, it gives the defendant **much more information** about the plaintiff's conception of his case than the civil rules require" but "nevertheless **performs the essential function** of a complaint under the civil rules, which is to put the defendant on notice") (emphasis added); *Pembrook*, 662 F.Supp.3d at 916 (holding dismissal under Rule 8 to be inappropriate where the complaint, while quite detailed and lengthy, "does not fall in the realm of unintelligibility and, as seen, successfully resists at least some of Defendants' arguments that it fails to state a claim"). To the extent the Motion invokes Rule 12(e), that invocation fares no better. A more definite statement is appropriate only when a pleading is so vague or ambiguous that a party cannot reasonably prepare a response. The Motion's own granular treatment of the allegations shows the opposite: Talkington can prepare a response and, pointedly, already has.

---

[2] It is puzzling that Talkington argues that the Counterclaims are litigation by "avalanche," yet they also arguably fail to provide enough facts. [Dkt. 37, pp. 3-6, 12, 25.] Talkington argues that the pleading is simultaneously too large and yet too small, but never just right under Rule 8.

4

Talkington's characterization of the Counterclaims as "a Rule 8-violative Novel" with "no point to be made" challenges length, not substance. [Dkt. 37, pp. 4-5.] The so-called "point" of Helton's pleading is the **necessary chronology of facts and misappropriations** that occurred over a significant period of time and which Talkington must answer for. Any "delay" or drain on judicial resources [Dkt. 37, pp. 5, 24] flows from Talkington's own Motion, not from the Counterclaims themselves. As Talkington concedes, length alone does not require dismissal (citing *Stanard*, 658 F.3d at 797; Dkt. 37, p. 5). As such, the Motion lacks merit.

Nor does using the word "strike" create a Rule 8 basis to strike anything. [Dkt. 37, p. 25 ("the counterclaims and affirmative defenses [should be] dismissed and stricken, with prejudice").] Talkington offers no supporting law or analysis for why Rule 8 provides a basis to strike any of Helton's pleading. Talkington does not even make the appropriate showing under Rule 12(f) to strike: that the Counterclaims contain redundant, immaterial, impertinent, or scandalous material. In any event, the Motion does not raise Rule 12(f). Perhaps Talkington chose not to move under Rule 12(f), as motions to strike are generally disfavored. *Parks v. Miller*, No. 18-CV-3244, 2020 WL 12813967, at *1 (C.D. Ill. 2020) ("Motions to strike are disfavored, and often waste a lot of time."); *KISS Pharm v. Becker Professional Development*, No. 18 C 7848, 2021 WL 3207822, at *1 (N.D. Ill. July 29, 2021).

**B.      Helton's Properly Pleaded Affirmative Defenses Should Not Be Stricken.**

The same overreach infects Talkington's request to strike Helton's affirmative defenses under a purported Rule 8 "fair notice" theory. [Dkt. 37, pp. 22-24.] Read in context of the Answer and incorporated Counterclaims, the defenses—consent, license, laches, lack of intent, and setoff—provide fair notice of their basis. The Motion attacks them in isolation, but Rule 8 does not require the Court to read them in isolation. The Motion is therefore a Rule 12(f) strike request

5

dressed as a Rule 8 notice-pleading dispute, and because the defenses raise factual and legal questions that should be tested through discovery, striking them now is inappropriate. *City of Chicago v. DoorDash, Inc.*, 636 F. Supp. 3d 916, 922 (N.D. Ill. 2022).

Talkington also proceeds from the wrong premise. In this Circuit, affirmative defenses are governed by fair notice, not complaint-level fact pleading. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286 (7th Cir. 1989); see also, 5C Wright & Miller, Fed. Prac. & Proc. § 1380 (3d ed.), n. 11 (noting that courts often decline to impose the heightened pleading requirements of *Twombly/Iqbal* on affirmative defenses, emphasizing the traditional "fair notice" standard.) Even where courts apply a plausibility gloss, they recognize the practical reality that affirmative defenses "rarely will be as detailed as a complaint (or a counterclaim); nor do they need to be in most cases to provide sufficient notice of the defense asserted." *Behn v. Kiewit Infrastructure Co.*, No. 17 C 5241, 2018 WL 5776293, at *1 (N.D. Ill. 2018) (citing *Dorsey v. Ghosh*, No. 13-CV-05747, 2015 WL 3524911, at *4 (N.D. Ill. 2015)).

Helton's affirmative defenses are not boilerplate. They are supported by the verified narrative, which clarifies their scope and basis in accordance with Rule 8. *See Ford v. Psychopathic Records*, No. 12–cv–0603–MJR–DGW, 2013 WL 3353923, at *7 (S.D. Ill. 2013); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). Striking these defenses now would engage the Court in unnecessary "judicial editing" rather than addressing the merits, which is inconsistent with the goal of securing a just and inexpensive determination of the action. *See Silberman v. Stewart*, No. 20 C 1745 2021, WL 1057719, at *2 (N.D. Ill. 2021) (quoting *Dace v. Chi. Pub. Sch.*, No. 19 C 6819, 2020 WL 1861671, at *2 (N.D. Ill. 2020)); Fed. R. Civ. P. 1 (reciting the goal of "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding.'")

6

For example, Helton's laches defense alleges that Talkington delayed asserting authorship or ownership claims from 2017 until 2025, thereby prejudicing Helton's rights. In the context of the incorporated factual timeline, which gives clear notice of the defense's basis. The remaining affirmative defenses that Talkington seeks to strike are similarly straightforward and provide the fair notice required to at least proceed to discovery.

## C.    Helton's Claims are Not Time-Barred

### 1.    Talkington Fails to Establish Inquiry Notice for Helton in 2018.

Talkington's assertion that "Helton had far more than vague suspicion by 2018" [Dkt. 37, p. 6.] overreads both 2017 and 2018. It asks the Court to infer notice from conduct that Helton alleges was explained, limited, and expressly bounded. Helton knew Talkington downloaded the Research Compilation in 2017, but "Talkington characterized [this] download as a necessary backup, expressing that she had done so solely to safeguard the work for Dr. Helton's benefit against potential catastrophes, such as computer failure or house fire." [Dkt. 35, ¶119.] On that representation, Helton had no reason in 2017 to suspect misappropriation or to file suit. Equitable estoppel and fraudulent concealment, therefore, toll any limitations period. Equitable principles toll the statute of limitations period when a defendant fraudulently conceals their misappropriation and infringement. *Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946); *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969).

Talkington's 2018 request likewise did not trigger an inquiry notice. "In 2018, upon becoming aware of Talkington's intention and desire to use certain research materials," Helton "permitted Talkington to use a few, limited historical references from the Research Compilation solely to enable Talkington to write on the topic of 'historical botulism.'" [Dkt. 35, ¶142.] Helton did not authorize the use of the full Research Compilation; only a limited set of historical

7

references was authorized. A limited, granted request for specific articles is not notice of "unfettered use and misappropriation" of the entire compilation, particularly where Talkington concealed her true intended use. Talkington is estopped from invoking limitations based on conduct she actively concealed and fraudulently described in 2018.

Talkington also misstates what Helton learned in 2018. Talkington claims that "[a]lso in 2018, Helton discovered that Talkington 'had actually been using these materials . . . for at least three (3) years before Helton became aware.'" [Dkt. 37, p. 6.] That excerpt, with an inserted ellipsis and edits, distorts Dkt. 35, ¶143. The full allegation is: "[d]espite Dr. Helton's first finding out about Talkington's plans to use certain research materials of Dr. Helton's in the Historical Botulism Book in 2018, **upon information and belief, Talkington had actually been using** these materials, upon her own admission, for at least three (3) years before Dr. Helton became aware thereof. (See Exhibit 8)." [Dkt. 35, ¶143.] Exhibit 8 is a Feb. 3, 2025, article reporting Talkington had "spent the last decade harvesting knowledge about botulism from the past to compile a new guide" (the "Recognizing Botulism book"). It was Exhibit 8, not the 2018 events, that first put Helton on notice that Talkington had been using the Research Compilation since 2015 (a "decade" before Exhibit 8's publication). The Motion's contrary reading effectively tries to impute inquiry notice in 2015, but the pleaded facts do not say that. [Dkt. 35, ¶¶122, 143, and 144 ("Upon information and belief, Talkington hid their prior use of these research materials from Dr. Helton for Talkington's own personal and financial benefit.").] In 2018, Helton knew only that Talkington had requested and Helton had allowed limited use of a few articles, not that Talkington had been using the Research Compilation for her own benefit since at least Feb. 3, 2015.

### 2. Equitable Estoppel and Fraudulent Concealment Properly Toll Any Limitations Period.

8

Equitable estoppel tolls the statute of limitations "during any period in which the defendant took certain active steps to prevent the plaintiff from suing." *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006). "The Illinois courts apply this doctrine most typically in situations where the defendant has lulled the plaintiff into delaying suit, either by promising not to plead a limitations defense or by concealing evidence that the plaintiff needed to determine the existence of her claim." *Id.* (internal quotations omitted). Fraudulent concealment is a subset of equitable estoppel that concerns the concealment of wrongdoing. *Singletary v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir. 1993). Oklahoma follows the same rule: "[o]ne cannot equitably lull an adversary into a false sense of security, thereby subjecting his claim to the bar of limitations and then be heard to plead that very delay as a defense to the action." *Hart v. Bridges*, 591 P.2d 1172, 1174 (1979).

Talkington's 2017 "necessary backup" explanation was an affirmative assurance that "lulled" Helton into believing the download served Helton's interests, i.e., the security of the Research Compilation. *Vigortone Ag Prods., Inc. v. PM Ag Prods., Inc.*, 217 F. Supp. 2d 858, 866 (N.D. Ill. 2001) ("the law does not require the victim of a fraud to dig beneath apparently adequate assurances. Plaintiffs have a duty to investigate when circumstances require further examination as a matter of prudence. However, a plaintiff's duty to investigate may be absolved when the defendant's deliberate misrepresentations lull the plaintiff into a false sense of security, or attempt to block further inquiry." (citations omitted)).

Talkington asserts that any concealment ended by 2018. [Dkt. 37, p. 7.] It did not. In 2018, Talkington requested a few references from the Research Compilation, and Helton agreed to that limited use for historical research. [Dkt. 35, ¶142.] Talkington's claim that "the 2018 boundary-setting itself is evidence that Helton did not fully trust the explanation," [Dkt. 37, p. 7.], reverses

9

the record. Talkington "agreed to the strict boundary and indicated that she understood the limits imposed thereby and would at all times respect the trust she had been given and uphold her fiduciary obligations regarding the Trade Secret and/or Research Compilation." [Dkt. 35, ¶147.] With boundaries set and no actual or constructive knowledge of wrongdoing, Helton had no reason in 2018 to suspect broader exploitation. Talkington's assent induced Helton's limited consent; it was fraudulent because Talkington had already breached her obligations and lied when agreeing to those conditions. See *Sokol Crystal Products, Inc. v. DSC Commun. Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994), favorably citing *Intermedics, Inc. v. Ventritex, Inc.*, 775 F.Supp. 1258, 1266 (N.D.Cal.1991) (observing that the court "cannot apply statute of limitations law in a way that pressures litigants to file suits based merely on suspicions and fears."). Collectively, these allegations support tolling of any limitations period that Talkington says began in 2018. At minimum, the Motion presents competing factual inferences about what Helton knew, when she knew it, and whether Talkington's statements lulled her into inaction. **Those are not pleading-stage issues**. See *Ashcroft*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").

### 3. Talkington's Statute of Limitations Arguments Similarly Fail Across All Claims, including Counterclaims I, II, V, X, and XI.

Each of Talkington's limitations arguments against Counterclaims I, II, V, X, and XI is "grounded in the 2017 misappropriation and 2018 discovery." [Dkt. 37, p. 8.] Those premises fail for the reasons above. The 2017 and 2018 events do not establish actual or inquiry notice as a matter of law, and Helton alleges deliberate misrepresentations, false assurances, and concealment sufficient to toll any limitations period at least until the 2025 release of the derivative work

10

"*Notox*." [Dkt. 35, ¶383.] Because those arguments turn on disputed facts and inferences, dismissal is unwarranted.

### D. Each Counterclaim provides adequate definitional clarity of the Trade Secret and Research Compilation, providing fair notice to Talkington, and should not be dismissed and/or struck.

Talkington's nomenclature objection is overstated. Her own First Amended Complaint seeks a declaration of "joint author[ship] of the 'Research Compilation'" and "joint owner[ship] of any trade secrets." [Dkt. 11, pp. 15-16.] That pleading choice confirms that Talkington understands precisely which categories of information are at issue. Rule 9(b) requires the "who, what, when, where, and how." *Presser v. Acacia Mental Health Clinic*, 836 F.3d 770, 776 (7th Cir. 2016). Helton pleads the "what" with particularity: the Trade Secret is the research and analysis collection she built over 15+ years, including unique primary sources, mental impressions and analyses, synthesis, and selections. [Dkt. 35, see generally ¶¶ 17-30, 38.] The "Research Compilation" is the digitized vehicle containing at least a large portion of the broader Trade Secret. [Dkt. 35, ¶¶ 23, 38.] Those definitions, with the chronology, identify the "who," "what," "when," "where," and "how" of Talkington's alleged fraudulent misappropriation for financial and professional gain and notoriety. Talkington's assertion that the terms "Trade Secret" and "Research Compilation," alone or in combination, create "muddy water" merely seeks to manufacture confusion. [Dkt. 37, p. 11.] Per the Counterclaims, the Research Compilation is a digital database that stores part of Helton's proprietary insights and synthesized intellectual property, collectively the Trade Secret. The Trade Secret also includes materials that were never digitized or included in the database, such as Helton's handwritten notes and other non-digital materials. [Dkt. 35, ¶¶ 22-23, 30, 50.]

11

Talkington's "vagueness" argument [Dkt. 37, pp. 4, 12.] is further undermined by her First Amended Complaint, which seeks a declaration of "joint author[ship] of the 'Research Compilation'" and "joint owner[ship] of any trade secrets." [Dkt. 11, pp. 15-16.] No Rule requires the hyper-granular definitions Talkington demands at the pleading stage. The Counterclaims provide more than fair notice of the alleged acts, including exporting and misappropriating the Research Compilation as part of a coordinated theft of Helton's overall Trade Secret. [See, e.g., Dkt. 35, ¶¶ 117, 403, 424-429, 431, 434, 450, 482-483.] Notwithstanding specious Venn diagrams,[3] Helton has clearly defined the proprietary Research Compilation as one component of the broader Trade Secret.

### E. Helton's Lanham Act Claims Are Properly Pleaded.

#### 1. Counterclaim III for False Designation of Origin is well pleaded despite *Dastar*.

Counterclaim III is not a barred reverse-passing-off claim. Rather, it targets Talkington's false claims about the origin of Helton's services and her false claims of affiliation and endorsement. Talkington argues otherwise under *Dastar* and *Rumsey*. [Dkt. 37, pp. 12-14.] *Dastar v. Twentieth Century Fox Film*, 539 U.S. 23 (2003); *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817 (7th Cir. 2016).

In *Gensler v. Strabala*, the Seventh Circuit held that *Dastar* "did not read 'services' out of the Lanham Act. Nor did it hold that a false claim of origin is the only way to violate § 43(a)." 764 F.3d 735, 736 (7th Cir. 2014). In particular, the court noted:

> Architects' success in winning clients depends on what they have accomplished; Gensler has a **strong interest in defending its reputation** for creativity and **preventing a false**

---

[3] An analogy may be more helpful: a journal of calculations can be part of an overall trade secret that also includes a collection of engineering equipment, flow diagrams, and chemical formulations. The journal is part of the overall trade secret in the same way as the Research Compilation is part of Helton's overall Trade Secret.

> **claim that someone else did the design work**. … Gensler contends that Strabala made a "false or misleading representation of fact" (his role in designing the five buildings) that is "likely to ... deceive as to the ... connection[ ] or association of such person [Strabala] with another person [Gensler]" and to deceive clients about the "origin" of the designs. Nothing in *Dastar* forecloses such a claim.

764 F.3d at 737 (emphasis added), *citing Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126 (2d Cir. 2004). Helton alleges Talkington held herself out as Helton's "research partner," "fellow," and the "brains behind her" research and litigation success. [Dkt. 35, ¶¶ 62, 71, 202, 245, 494.] Counterclaim III targets false claims about the origin of Helton's professional services, not authorship of a tangible good, so *Dastar* does not foreclose Helton's claim.

Counterclaim III also pleads false affiliation and endorsement. *Maremont v. Susan Fredman Design Group*, 772 F.Supp.2d 967, 971 (N.D. Ill. 2011) (quoting *Stayart v. Yahoo!*, 651 F.Supp.2d 873, 880-81 (E.D. Wis. 2009)). The Motion does not dispute that Talkington claimed credit for Helton's work; it argues the claim fails because Helton is not a competitor and because the alleged conduct is not commercial use, citing *Lexmark*. 572 U.S. 118 (2014). **Lexmark rejects any direct-competitor requirement**: 572 U.S. at 119, 136 ("It is thus a mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors."). *Walkowicz v. Am. Girl Brands, LLC,* applied that rule to false endorsement: "[Plaintiff] doesn't have to be engaged in direct competition with [Defendant] to bring a false-endorsement claim." No. 20-CV-374-JDP, 2021 WL 510729, at *4 (W.D. Wis. Feb. 11, 2021) (citing *Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989)). Helton also alleges that her Research Manuscript is likely to compete with Talkington's efforts. [Dkt. 35, ¶322.] *Lexmark* requires only injury to a commercial interest in reputation or sales proximately caused by the challenged conduct. Helton pleads that, too. Courts

13

recognize claims where a plaintiff has an existing intent to commercialize their identity. *Yeager v. Innovus Pharm.*, No. 18-cv-397, 2019 WL 447743, at *6 (N.D. Ill. Feb. 5, 2019); *Stayart*, 651 F.Supp.2d at 881. Helton pleads commercial value in her reputation as a successful victim-litigant against a BOTOX$^{(R)}$ manufacturer (Allergan) and as a physician-researcher in iatrogenic botulism, and Talkington admitted Helton's name and story were a "hook" to bring in readers. [Dkt. 35, ¶¶ 260-61, 264.] Helton also pleads steps to commercialize, including the Botulism Manuscript, copyright registration, publishing infrastructure, and a strategy to avoid broad public dissemination before the work is fully researched and supported by peer-reviewed citations. [Dkt. 35, ¶¶ 31, 38, 145, 170, 180, 260-264, 361-64, 376, 383, 406.]

Talkington used Helton's identity in commerce, including on Amazon and through nonprofit fundraising, while falsely implying an affiliation with Helton. *Slep-Tone Entertainment Corp. v. Sellis Enterprises*, 87 F.Supp.3d 897, 906 (N.D. Ill. 2015) (citing *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 427 (9th Cir. 1977)) ("the infringing acts need not have actually taken place in commerce—they need only have an adverse effect on commerce."). See also 15 U.S.C. § 1127 ("[A] mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.").

Finally, the incorporation of "Botulism Research Collaborative LLC"[4] was not merely a regulatory matter. Talkington used Helton's identity to legitimize a botulism advocacy and research nonprofit and to pursue grants and donations she could not credibly obtain as an

---

[4] Helton notes that the First Amended Complaint [Dkt. 35] contains a clerical scrivener's error identifying the entity as the "Botulism Research Collaborative LLC" rather than the "Botulism Research Collaborative Inc." The entity's corporate status is correctly identified in Dkt. 35, Exhibit 25. Should the Court prefer this error be corrected, Helton shall immediately do so via an *errata* filing, by submitting a second amended answer and counterclaims, or via any other ordered means.

14

Entrepreneurship/Marketing/Sustainability academic without a biological or medical professional like Helton. That association created an air of legitimacy for soliciting donations, using Helton's identity "for purposes of trade" and to "hooking" readers, thereby increasing sales of Talkington's and McCue's books on Amazon. [Dkt. 35, ¶¶ 260-61, 264, 313-315.] These allegations plead the commercial use required for Counterclaim III.

### 2.    Counterclaim IV for False Advertising is well pleaded.

Talkington's Counterclaim IV argument mischaracterizes the pleaded conduct as private communications and ignores the Seventh Circuit's broader, industry-sensitive approach. [Dkt. 37, pp. 14-15.] Talkington characterizes the challenged statements as "person-to-person" communications, not promotion to anonymous recipients as required by the Seventh Circuit. *First Health Group v. BCE Emergis*, 269 F.3d 800, 803 (7th Cir. 2001). But Talkington ignores the Seventh Circuit's subsequent clarification that "there are industries in which promotion—a systematic communicative endeavor to persuade possible customers to buy the seller's product— takes a form other than publishing or broadcasting," and that commercial advertising or promotion need not be directed to the general public. *Neuros Co. v. KTurbo*, 698 F.3d 514, 522-23 (7th Cir. 2012). Helton pleads organized promotional activity, not private communications. Talkington allegedly coordinated with McCue and allowed McCue to disseminate false information about Helton's affiliation with McCue's book across McCue's public platforms. [Dkt. 35, ¶¶ 358-59, 391-93, 446.] Talkington also allegedly appeared on public podcasts, falsely claimed Helton's botulism credentials, used Helton's name as a "hook" to market her book, listed Helton as a Board Member in Illinois nonprofit filings, and solicited funds from the public on a national level. This is not a private "conference table" negotiation. It is targeted promotion to specific consumers and

15

supporters (including botulism victims, BOTOX(R) users, and donors) designed to influence purchasing and funding decisions, which satisfies the pleading requirements for Counterclaim IV.

### F. Helton's Remaining Counterclaims do not fail to state a claim upon which relief may be granted.

#### 1. Counterclaim I.

Talkington seeks dismissal by asserting there is no actual controversy regarding ownership, and asserts that Helton's ownership of the Botulism Manuscript is undisputed. [Dkt. 37, p. 16.] Helton agrees that she is the **sole owner** of the Botulism Manuscript. Notwithstanding Talkington's apparent new admission first made in this Motion, Talkington has and continues to vacillate between acknowledging Helton's authorship and repositioning her own administrative and clerical role as a collaboration, **entitling her to co-authorship**. For example, Talkington requests a declaration of equal joint authorship and an ownership interest in "any copyright-protectable materials she created during her research collaboration with [Helton]." [Dkt. 11, p. 17.] Additionally, Talkington has told third parties that she is the "brains" behind Helton's botulism research, contradicting any current admission that Helton is the sole author. [Dkt. 35, ¶¶ 202, 205-206, 303.] Talkington has therefore positioned herself publicly as a contributor and co-author of at least part of the Botulism Manuscript, creating a real, justiciable, and ripe controversy regarding Helton's sole authorship of the Botulism Manuscript.

#### 2. Counterclaim VI.

Talkington's argument that Counterclaim VI fails because Helton "does not identify any loss" misreads Oklahoma law and the pleaded facts. Oklahoma requires only "(1) the unjust (2) retention of (3) a benefit received (4) at the expense of another." *Oklahoma Dept. of Securities ex rel. Faught v. Blair*, 231 P.3d 645, 658 (Okla. 2010). Helton pleads exactly that. A plaintiff's "expense" includes expenditures that add to another's property and those that save the defendant

"from expense or loss." *Randle v. City of Tulsa*, 556 P.3d 612, 620 (Okla. 2024) (citing *McBride v. Bridges*, 215 P.2d 830, 832 (Okla. 1950)).

Helton pleads a benefit that Talkington unjustly retained. Talkington did not merely "discuss a relationship [with Helton]," she allegedly cloaked herself with Helton's reputation to legitimize Talkington's research and commercial ventures. [Dkt. 35, ¶¶ 70-71, 74, 78, 202, 205, 306-314, 321.] Holding herself out as Helton's research partner or the "brains" behind Helton's successful litigation is the purposeful use of Helton's experience, reputation, and analytical work to enhance Talkington's botulism research, "raising awareness," and the sales of Talkington's books and services. Put differently, Helton alleges that Talkington captured credibility she had not earned and used it to save herself the time, effort, and professional standing that would otherwise have been required.

Helton also pleads the corresponding injustice. Talkington reduces the allegations to "all that is left is Talkington discussing her relationship [with Helton] and a Secretary of State filing." [Dkt. 37, p. 9, citing Dkt. 35, ¶526.] That framing depends on the false premise that Helton's lived experience, expert analytical work, and professional stature, i.e., her "Reputational Assets" [Dkt. 35, ¶521-23], are "nothing." [Dkt. 37, p. 9.] To the contrary, Helton's Reputational Assets were hard-earned through years of specialized research and professional practice, surviving multiple near-death health crises, thereby making her a singular authority who has experienced and researched iatrogenic botulism as a medical professional and prevailed against a BOTOX[(R)] manufacturer. [Dkt. 35, ¶¶ 23-33, 81, 235, 260-61, 527; *See also* Exhibit 31 (McCue stating she is a "fangirl" of Helton's).] Helton further alleges that her Botulism Manuscript, Research Compilation, and Trade Secret derive value from the exclusivity and integrity of those assets,

17

which Talkington exploited by flooding the market with a distorted version of Helton's narrative for Talkington's benefit.

Finally, Talkington's attempt to dismiss her nonprofit conduct as a "Secretary of State filing," [Dkt. 37, p. 9.] fails under Oklahoma law, which permits unjust enrichment where a contractual or quasi-contractual relationship exists or the defendant committed fraud, abused confidence, or acted unconscionably. *Randle*, 556 P.3d at 622. Helton alleges Talkington, trading on Helton's Reputational Assets, falsely represented to the State of Illinois and the public that Helton was a Board Member, creating a false impression of endorsement and Director-level oversight of fundraising and finances, thereby exposing Helton to reputational risk if the nonprofit acted unlawfully, all without Helton's knowledge.

### 3.    Counterclaims VII and VIII.

Talkington's attack on Counterclaim VII ignores settled Oklahoma law: "[f]raudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false." *Sutton v. David Stanley Chevrolet*, 475 P.3d 847, 854 (Okla. 2010) (citing *Berry v. Stevens*, 31 P.2d 950, 955 (Okla. 1934)). The exhibits do not defeat the pleaded fraud; they document the artifice. Talkington argues that because exhibits show Helton knew McCue appeared on a podcast, there could be no misrepresentation. [Dkt. 37, pp. 17-18.] That does not follow. Helton alleges that Talkington never disclosed the interview's true purpose: to borrow Helton's credibility to create a veneer of legitimacy for *Notox*. [Dkt. 35, ¶¶ 358-386.] A disclosure that omits the central purpose is a half-truth "calculated to deceive," and is actionable per *Sutton*. Talkington's attempt to dismiss Counterclaim VII is all the more noteworthy given her alleged frequent recitation of the Jewish Proverb, "A half-truth is a whole lie."

18

Nor do the exhibits defeat the pleaded fraud. Rather, they **document Talkington's artifice**. Exhibit 29 to Dkt. 35, for example, reflects that Talkington initiated the exchange while withholding the whole truth.[5] And nothing in the exhibits shows Helton authorized the recording, broadcasting, or publication of her personal story. [Dkt. 35, ¶¶ 358-378.] Talkington's Rule 10(c) claim that "the exhibits control" over purportedly contradictory allegations [Dkt. 37, p. 17] fails for the additional reason that Rule 10(c) applies only when an exhibit "**incontrovertibly contradicts**" the allegations. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (emphasis added). These exhibits do not.

Talkington's challenge to Counterclaim VIII repeats the same exhibit-driven mistake. Helton pleads the "who, what, where, when, and how" of synchronized conduct. Talkington appears to suggest Helton must produce a memorialized agreement to defraud, but conspiracies are rarely reduced to writing, and the law does not require that at the pleading stage. The Counterclaim exhibits do not contradict the existence of a conspiracy; they corroborate the coordinated mechanics Helton alleges.[6]

### 4.    Counterclaim IX.

Talkington's attempt to dismiss Counterclaim IX, including her characterization of Helton's Botulism Manuscript as "hopes and dreams" [Dkt. 37, p. 17.], is contrary to the pleaded facts and to Talkington's own documented conduct. Helton alleges Talkington repeatedly urged

---

[5] Under Oklahoma law, "once a [person] voluntarily chooses to speak" they assume a duty to tell the whole truth and to make a full and fair disclosure. *Sutton*, 2020 OK 87 at ¶ 14 (*citing* 37 Am. Jr. 2d Fraud and Deceit § 203).

[6] Helton pleaded this coordinated effort with particularity, revealing a pattern of "coordinated silence," i.e., both Talkington and McCue conveniently excluded any mention of the *Notox* project until **after the interview was secured, yet immediately used** Helton's name and story as a cornerstone of the book's marketing and content. [Dkt. 35, ¶¶260, 412, 391-92, 418.] Talkington, through her 40-year relationship with Helton, was uniquely aware that Helton strictly rejected interviews. [*Id.*, ¶¶361-367.] Talkington provided the insider knowledge of Helton's boundaries, and McCue misused this information to wholly bypass them.

Helton to disclose and publish Helton's irreplaceable aggregation of 15 years of experience surviving botulism, landmark product liability litigation, and exhaustive scientific research, including Helton's dealings with Allergan and the CDC and her insights as a BOTOX® litigation insider. [Dkt. 35, ¶¶ 260, 301.] Talkington's new contention that the manuscript lacks a "reasonable probability" of future economic benefit ignores those allegations. [Dkt. 37, p. 17.] Oklahoma law does not require an existing contract at the pleading stage. Helton needs only to plead a "reasonable assurance" of prospective economic advantage. *Gabler v. Holder and Smith*, 11 P.3d 1269, 1279 (Okla.Civ.App. 2000). In a market where approximately 10 million Americans receive botulinum toxin injections annually,[7] an insider account of botulism safety and pathophysiology from a physician, survivor, and successful litigant plausibly carries that assurance.

Helton further alleges the manuscript is a 950-page, professionally vetted work that attracted multiple literary agents and producers. [Dkt. 35, ¶¶ 170, 180, 362.] Talkington and McCue's recognition of that value is reflected in their admitted urgency to "release" it and their coordinated effort to rush derivative works, including Notox, to market first. [Dkt. 35, ¶¶ 122, 125, 248, 291, 498, 587.] One does not rush to preempt a work with no economic expectancy. Counterclaim IX pleads a specific probable expectancy supported by substantial investment and should stand.

---

[7] American Society of Plastic Surgeons, 2024 Procedural Statistic Release, www.plasticsurgery.org/documents/news/statistics/2024/plastic-surgery-statistics-report-2024.pdf, at 12 (table showing that 9,883,711 "Neuromodular injection (Botox®, Dysport®, Xeomin®, Jeuveau®, Daxxify®)" procedures were performed in 2024).

### 5.     Counterclaim XII.

Under Illinois law, health-related statements that impute a lack of ability to perform professional duties or otherwise prejudice a person in her profession are defamatory *per se*. *Green v. Rogers*, 917 N.E.2d 450, 492 (Ill. 2009). Talkington claims "[Helton] is not in the business of being an author" [Dkt. 37, p. 21], but Helton alleges she has drafted more than 950 pages of a Botulism Manuscript intended for sale. [Dkt. 35, ¶¶ 38, 170, 459, 575-578.] Helton also alleges she aids botulism victims and serves as a *pro bono* expert witness for victims of iatrogenic botulism. [Dkt. 35, ¶¶ 365-367, 443-444.] As one court in the N.D. Ill. has recognized that volunteer efforts can constitute a "profession" for purposes of defamation *per se*. *Muzikowski v. Paramount Pictures Corp.*, No. 01 C 6721, 2003 WL 22872117, at *5 (N.D. Ill. Dec. 3, 2003). In that context, Talkington's statements that Helton was "taking too long" due to "poor health," that it was "safest" for future victims for Talkington to release the research, and that it was her "duty" to do so [Dkt. 35, ¶¶ 299-302.] plausibly impute professional incapacity and prejudice against Helton's professional reputation. They also support the inference that Helton was prioritizing personal gain over public safety. [Dkt. 35, ¶ 630.]

It is true that the Court must consider innocent construction. But this rule does not require Courts to "strain to find an unnatural but possibly innocent meaning for words where the defamatory meaning is far more reasonable" or "espouse a naïveté unwarranted under the circumstances." *Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1217 (1996) (citation omitted). Statements are "considered in context, with the words and the implications therefrom given their natural and obvious meaning…" *Chapski v. Copley Press*, 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199 (1982). In context, these statements have no innocent construction and attack

Helton's professional integrity. Talkington's attempt to recast them as mere commentary on pace or health [Dkt. 37, p. 21.] raises factual disputes that do not support dismissal at this stage.

### 6.  Counterclaim XIII.

Talkington's assertion that "[b]eing portrayed by someone . . . as their research partner or nonprofit board member is not 'highly offensive to a reasonable person'" fails to support dismissal of Counterclaim XIII at the pleading stage. Helton has pleaded facts sufficient to support that being falsely portrayed as a research partner of Talkington and a board member of her non-profit would be highly offensive to a reasonable person, including allegations of Talkington's documented harassment of botulism victims [Dkt. 35, ¶¶ 223, 347, 641.], dissemination of allegedly false medical advice without a medical license [Dkt. 35, ¶641.], public solicitations of donations to a nonprofit associated with Talkington's alleged online misconduct [Dkt. 35, ¶¶ 642, 657.], and other conduct that, taken together, creates the sort of reputational harm the law protects against. [Dkt. 35, ¶¶ 641-643, 657.] Whether such a portrayal is highly offensive to a reasonable person **is a question of fact, and dismissal is inappropriate at the pleading stage.** *See, e.g.*, *Lozier v. Quincy Univ. Corp.*, No. 3:18-CV-3077, 2019 WL 409368, at *11 (C.D. Ill. Jan. 31, 2019) (statements that plaintiff was a liar and the source of an investigation could be highly offensive to a reasonable person on a motion to dismiss); *Boese v. Paramount Pictures Corp.*, 952 F. Supp. 550, 557 (N.D. Ill. 1996) ("a trier of fact could decide that the charge that a person lied on the witness stand and in the discharge of his duties would be 'highly offensive to a reasonable person'); and *Doe v. Templeton*, No. 03 C 5076, 2004 WL 1882436, at *3 (N.D. Ill. Aug. 6, 2004) (disclosure of plaintiff's sexual orientation could be highly offensive).

Further, as set forth by the N.D. Ill., "malice" for a false light claim is defined as having "knowledge that the statements were false or with reckless disregard for whether the statements

were true or false." *Hernandez v. Dart*, 635 F. Supp. 2d 798, 811 (N.D. Ill. 2009) (citing *Kurczaba v. Pollock*, 318 Ill.App.3d 686, 742 N.E.2d 425, 434–35 (1st Dist.2000)). As pleaded, "Talkington knew such portrayal was false or failed to reasonably ascertain the truthfulness of the portrayal of Dr. Helton" [Dkt. 35, ¶640.] and thus "acted maliciously in falsifying her statements and in portraying Dr. Helton as an associate, mentor, endorser, board member, and/or supporter thereof." [Dkt. 35, ¶645.]

### 7.    Counterclaim XIV.

Talkington's challenge to Counterclaim XIV depends on selectively quoting only part of the Illinois Right of Publicity Act's definition of "commercial purpose." In particular, Talkington states that "commercial purposes" under the Illinois Right of Publicity Act is the "use of an individual's identity 'for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, or for purposes of trade." [Dkt. 37, p. 19.] (citing 765 ILCS 1075/5).

Actually, the Illinois Right of Publicity Act defines "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) **for the purpose of fundraising**." 765 Ill. Comp. Stat. Ann. 1075/5 (emphasis added). As pleaded, "Talkington has been publicly soliciting donations from the public and other third parties, allegedly on behalf of the non-profit entity" [Dkt. 35, ¶642.] and "has and continues to solicit funds in the name of the [non-profit entity]" [Dkt. 35, ¶657, *see also* Ex. 25, p. 2.] As the "use of Dr. Helton's name on the incorporation documents . . . was . . . designed to lend false legitimacy to Talkington's non-profit venture" [Dkt. 35, ¶656.], "Talkington's fraudulent use of Dr. Helton's identity, therefore, constitutes a 'commercial

23

purpose' as defined by 765 Ill. Comp. Stat. Ann. 1075/5." [Dkt. 35, ¶659.] Despite Talkington's attempt to read it out of the statute, fundraising is explicitly pleaded and forms the factual basis for this Counterclaim. Moreover, Helton has pleaded that "Talkington created this entity and fraudulently used Dr. Helton's name and medical credentials to establish an air of legitimacy for Talkington and McCue's **self-published works** under the imprimatur of the Botulism Research Collaborative LLC" [Dkt. 35, ¶658, emphasis added], further establishing that Talkington's activities were for a commercial purpose under 765 Ill. Comp. Stat. Ann. 1075/5.

### 8.    Counterclaim XV

Talkington next argues that there can be no fraudulent concealment because she owed Helton no fiduciary duty or special relationship when surreptitiously naming Helton to the board of a nonprofit without permission. [Dkt. 37, p. 20.] It is true that Illinois law typically requires such a duty or relationship. But Helton pleads one here. Once the nonprofit was incorporated and Talkington named Helton to its Board of Directors [Dkt. 35, ¶307.], the nonprofit was to be collectively managed by the members of the Board of Directors. *See* 805 Ill. Comp. Stat. Ann. 105/108.05(a) ("Each corporation shall have a board of directors, and except as provided in articles of incorporation, the affairs of the corporation shall be managed by or under the direction of the board of directors.") Thus, under Illinois law, a special relationship was established between Talkington and Helton as equal members of the Board. Not only did Talkington owe a duty to Helton to inform her of her appointment to the Board, but she also owed a continuing duty to manage the non-profit collectively with Helton. *Id*. Rather, Talkington engaged in unilateral action on behalf of the non-profit without consulting all Board members. [*See* Dkt. 35, ¶¶ 642, 657.] While Talkington may dispute the existence of this fiduciary or special relationship, that is a factual dispute that should not be addressed via a motion to dismiss.

## IV.        CONCLUSION

Talkington's Motion asks the Court to punish a level of detail that the Rules do not forbid, to resolve fact disputes that cannot be resolved on the pleadings, and to ignore reasonable inferences that must be drawn in Helton's favor at this stage. For all of the foregoing reasons, the Court should deny Talkington's Motion in its entirety and set a schedule for this case to proceed on the merits.

DATED: March 30, 2026                    Respectfully submitted

SHARLA HELTON, by and through

_____

Douglas J. Sorocco
IL 2381747; Okla Bar 17347
DUNLAP CODDING, PC
609 W. Sheridan Avenue
Oklahoma City, OK  73102
Tel: 405.607.8686; Fax: 405.607.8686
dsorocco@dunlapcodding.com

25

## <u>TYPE VOLUME CERTIFICATION</u>

This Response **does not** comply with the type volume limitation of 7,000 words.  L.R. 7.1(B)(4).  It contains 7612 words, as reported by Microsoft Word, exclusive of caption and signature blocks. Defendant previously moved unopposed for leave to exceed the type volume limitation. [Dkt. No. 39] Should that motion be granted, the word count is less than that requested in that motion, i.e., 7800 words. Should the motion not be granted, Defendant shall promptly file a replacement Response that complies with L.R. 7.1(B)(4) with less than 7,000 words.

This Response complies with the formatting requirements of Local Rule 5.1.  The body text is set in a 12-point font, and all footnotes are set in a font size no smaller than 12-point.  This document uses plain, roman style typeface (Times New Roman).  The document is double-spaced and maintains approximately one-inch margins on all sides.

*/s/ Douglas J. Sorocco*
Douglas J. Sorocco
Dunlap Codding, PC

**CERTIFICATE OF SERVICE**

I certify that on March 30, 2026, I transmitted the foregoing document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jonathan L.A. Phillips
Phillips & Bathke, PC
300 Northeast Perry
Peoria, IL 61603

Jonathan M. Francis
Phillips & Bathke, PC
53 West Jackson Blvd.
Suite 1126
Chicago, IL 60604

Giselle Ayala
Phillips & Bathke, PC
535 5th Avenue
Floor 4
New York, NY 10017

*/s/ Douglas J. Sorocco*
Douglas J. Sorocco (IL2381747)
Dunlap Codding, PC

27