E-FILED
Thursday, 22 October, 2026 11:24:10 AM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

JANE TALKINGTON,
Plaintiff,

v.

SHARLA HELTON,
Defendant.

-----------------------------------------------
SHARLA HELTON,
Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff,

v.

JANE TALKINGTON,
Counterclaim-Defendant.

AND

MEGAN McCUE,
Third-Party Defendant.

Case No. 1:25-cv-01318-JEH-RLH

**Order**

Now before the Court are Plaintiff/Counter-Defendant Jane Talkington's Motion to Strike and Dismiss Helton's Amended Affirmative Defenses and First Amended Counterclaims Under Rules 8(d), 9(b), and 12(b)(6) and (e) (D. 37) and Third-Party Defendant Megan McCue's Motion to Dismiss Third Party Claims Under Rule 12(b)(6) (D. 58).[1] For the reasons set forth *infra*, Talkington's Motion

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

to Strike and Dismiss is GRANTED IN PART AND DENIED IN PART, and McCue's Motion to Dismiss is DENIED.

**I**

On September 16, 2025, Plaintiff Jane Talkington, Ph.D. filed her First Amended Declaratory Judgment Complaint (D. 11) against Defendant Sharla Helton, M.D. seeking declaratory judgment of non-infringement of copyright, of joint authorship, and of non-misappropriation of trade secret (Count III), and a declaration of joint ownership of trade secret in the alternative to the third count. Broadly summarized, Plaintiff Talkington alleged Defendant Helton secured Talkington's part-time assistance to conduct research on Botox and botulism beyond that done by Helton, and under their independent contractor research arrangement, the two women collaborated between 2015 and 2018 and compiled over 1,000 research articles. Plaintiff Talkington alleged the expectation was that each woman would publish in her own botulism-related area of interest using their shared resources. The Plaintiff earned her Ph.D. in May 2016 and she alleged, thereafter, she became a known botulism academic in her own right. Talkington further alleged Third-Party Defendant Megan McCue met Talkington through a Facebook group in the fall of 2024, McCue asked her in January 2025 to put McCue in touch with Helton, McCue interviewed Talkington and Helton for her book, and McCue ultimately released a book in January 2025 that referenced Helton.

**II**

On March 2, 2026, Helton filed her First Amended Answer and Affirmative Defenses to First Amended Declaratory Judgment Complaint and Jury Demand, Counterclaims, and Third-Party Complaint (collectively First Amended Answer) (D. 35). She included 15 counterclaims: copyright declaratory judgment, injunction, and damages for copyright infringement; declaratory judgment of sole ownership of Trade Secret in the Research Compilation, injunctive relief, and

damages for trade secret misappropriation; false designation of origin; false advertising; misappropriation of trade secret under the Oklahoma Uniform Trade Secrets Act, Okla. Stat. Ann. tit. 78, § 86 *et seq*.; unjust enrichment under Oklahoma law; fraudulent misrepresentation under Oklahoma law; civil conspiracy under Oklahoma law; intentional interference with prospective economic advantage under Oklahoma law; breach of fiduciary duty under Oklahoma law; misappropriation of trade secret under the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1; defamation under Illinois law; false light invasion of privacy under Illinois law; violation of the right of publicity under the Illinois Right of Publicity Act, 765 Ill. Comp. Stat. 1075/1; and fraudulent concealment under Illinois law (collectively Amended Counterclaims). Helton included the following third-party claims against McCue: false designation of origin under the Lanham Act; false advertising under the Lanham Act; false advertising under Chapter 1 of Part 3 of Division 7 of the California Business and Professions Code (CBPC); unfair competition under the CBPC; fraudulent misrepresentation under California law; civil conspiracy under California law; and illegal recording of a confidential communication under Chapter 1.5 of Title 15 of Part 1 of the California Penal Code (collectively Third-Party Claims).

Specifically, Helton alleges[2] in her First Amended Answer that she and Talkington met in or around 1983 as undergraduate students at Oklahoma State University, where Talkington chose Helton as her sorority "big sister," establishing an early dynamic in which Helton was both a friend and a mentor to Talkington. After Talkington left Oklahoma State University in or around 1984, she and Helton became reacquainted in or around 1999 when Talkington appeared

[2] At the motion to dismiss stage, a court "accept[s] the well-pleaded facts in the complaint as true and draw[s] reasonable inferences in the plaintiff's favor." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 448 (7th Cir. 2023).

at Helton's Oklahoma City, Oklahoma medical office unannounced and pregnant with her second child. Helton provided free obstetric care in two instances and waived her physician fees in the third instance in the births of three of Talkington's children.

Helton contracted iatrogenic botulism, a rare, distinct, and potentially life-threatening illness caused by the injection of botulinum toxin for cosmetic or therapeutic purposes, in 2006 after receiving BOTOX® injections. She experienced many symptoms which necessitated self-directed diagnostic efforts by Helton and her husband, a Board-Certified anesthesiologist. Helton and her husband researched, gathered, and analyzed thousands of documents on a broad range of neurological diseases and potential treatment options to confirm her diagnosis of botulism and efforts at survival. Helton filed a products liability lawsuit against Allergan, Inc., the maker of BOTOX®, in 2008. As part of moving that case forward, Helton conducted research into information that had not been previously collected, analyzed, organized, or characterized in any manner.

Before 2014, Helton and her husband hired two full-time administrative and clerical secretaries to assist in managing the volume of information in Helton's collection and in her research and analysis thereof. At all relevant times, Helton took reasonable measures to keep the collection of information, research, and her analysis actually secret and unavailable to third parties. At all relevant times, Talkington was fully aware that Helton's proprietary research and concurrent analyses were born of Helton's specific product liability litigation and her personal survival efforts. At all relevant times, Talkington explicitly understood that this research and its analysis comprised a rare and unique asset containing restricted and/or confidential materials that were otherwise inaccessible to the general public or academic community.

Helton, with her personal experience and medical expertise, in collaboration with her husband, had created a confidential and proprietary collection of physical and electronic research documents, and she researched, reviewed, prepared, and collected her thoughts and analyses together into a body of work collectively referred to as the "Trade Secret" with electronic versions of the physical documents, as well as original electronic records, eventually being stored in an ENDNOTE™ library (Research Compilation). For example, the Trade Secret and Research Compilation contains secret governmental testing data and conclusions, confidential internal documents produced by the maker of BOTOX® during Helton's 2010 litigation and jury trial, and materials that were only discovered and ultimately obtainable through in-person searches at the National Library of Medicine in Bethesda, Maryland. The Trade Secret and Research Compilation also includes Helton's research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions derived from her independent scientific and medical analysis of the materials. Those things do not exist in the public domain and have never been publicly disseminated by Helton.

Helton's Trade Secret and Research Compilation served as an essential forensic and research instrument enabling Helton to secure a $15 million jury verdict in 2010 against the maker of BOTOX® that was ultimately upheld on appeal. Before 2010, Helton's Trade Secret existed in physical binders and digital folders on her and her husband's personal computers, but it had not yet been organized within a unified citation software program such as the Research Compilation. In or around 2010, Helton began writing a manuscript (Botulism Manuscript) utilizing the Trade Secret to create a complex manuscript that intertwined her personal survivor memoir with rigorous scientific analysis of the pathophysiology of botulism. An application for copyright registration of the

Botulism Manuscript was made and eventually registered on May 13, 2025 as Registration No. TXU 002-488-289.

Despite having been largely absent during the most critical and painful years of Helton's illness with botulism, survival, and litigation with the maker of BOTOX® (between approximately 2006 and 2014), Talkington re-initiated contact with Helton only after news of her successful appeal of the jury verdict was reported, and, upon information and belief, Talkington was unaware of Helton's research into botulism and the creation of the Trade Secret before Talkington's reinstatement of contact with Helton.

Between 2010 and early 2015, upon information and belief, Talkington was in a doctoral program at Oklahoma State University and communicated sporadically and unilaterally with Helton regarding further proceedings in her lawsuit against the maker of BOTOX®. In or around late 2014, while Talkington was in her eighth year as a doctoral student, Talkington once again reached out to Helton seeking a financial lifeline. In or around that time, Helton's personal secretary was assisting with the management of the Trade Secret and conversion of at least a portion of it into the Research Compilation. Recognizing the academic and economic value and usefulness of the Trade Secret and eventual Research Compilation, Helton believed that further digitizing the entire compilation and thereafter further organizing this information would be beneficial to her future research efforts, allow for the preparation of the Botulism Manuscript, and increase the Trade Secret's overall usefulness and economic value. By that time, Helton had written at least 950 pages of her Botulism Manuscript, and her Trade Secret comprised well over 3,000 discrete documents.

Solely to assist Talkington in sustaining herself and her children, Helton loaned Talkington $25,000, gifted her $2,000 in Target gift cards, and offered and paid Talkington $30 an hour for hourly work to edit Helton's daughter's college

application essays and create a curriculum vitae therefor. After that hourly work was completed and Talkington remained in need of financial assistance, Helton created a temporary, hourly role (again $30/hour) for Talkington to assist with the administrative and clerical transfer of Helton's Trade Secret information more fully into the Research Compilation into a digital format (Work Arrangement); Talkington recommended moving the Research Compilation to ENDNOTE™ because she had free access to it and had training on it as a graduate student. At all times relevant, Helton told Talkington that the Work Arrangement was temporary and not an academic or research collaboration among colleagues or peers; instead, the Work Arrangement's one sole goal shared by the two women was to enable Talkington to become more stable and provide some financial stability until she graduated with her Ph.D and secured a job. The Work Arrangement began in early 2015 and ended by late 2017. Upon information and belief, Talkington's undergraduate and graduate studies did not include coursework or training in human anatomy, physiology, biochemistry, clinical pathology, or medical diagnostics, and Talkington has never been involved in any scientific laboratory research.

Under the Work Arrangement, Talkington was necessarily limited to performing administrative and clerical tasks at the sole direction of Helton, given the former's educational background and scientific credentials. During the Work Arrangement, Talkington was paid to physically organize the materials in the Trade Secret and place them within the Research Compilation when she was physically present in Oklahoma City and thereafter enter PDF'd electronic documents into the ENDNOTE™ software, organize these materials within the online ENDNOTE™ software, code these documents with words or phrases provided by Helton, as well as other administrative and clerical tasks as directed by Helton. During the Work Arrangement, Helton would at times request and

specifically direct Talkington to retrieve and/or read articles she identified, in order to word-tag, highlight, and/or summarize particular information Helton indicated she wanted. Helton would at times request that Talkington trace and identify the origin of a publication, particularly the origin of "ghostwriters" of industry articles. Helton would at times request that Talkington read and review specific sections of Helton's writings so that Helton could acquire a layperson's perspective of her writings. Helton never requested Talkington to write more than a general three-sentence summary of articles in the Trade Secret to be placed in the Research Compilation. Helton never requested or authorized Talkington to independently research botulism-related topics Helton was researching and authoring analyses of, and Helton never gave Talkington any ownership in the Trade Secret and/or Research Compilation and never indicated to Talkington that the Trade Secret and/or Research Compilation were assets whose ownership was shared between the two women. At all relevant times, Helton repeatedly and uniformly communicated to Talkington that the Trade Secret and/or the Research Compilation were Helton's exclusive, confidential, and trade secret intellectual property and the Trade Secret and/or the Research Compilation were not Talkington's to share with third parties.

At all relevant times, Helton was a private citizen conducting independent scientific and medical research and was not an accredited academic institution or industry member capable of sponsoring post-doctoral fellowships. She never discussed with and never offered to Talkington a postdoctoral position. Helton explicitly and repeatedly told Talkington that their arrangement was not a collaborative research relationship. Upon information and belief, since about 2015, Talkington has falsely held herself out to third parties as having performed a postdoc in botulism with Helton or a private research collaborative group. Talkington has told third parties, orally and in writing, that her administrative and

clerical work for Helton was a "post-doc" and/or performed as a "fellow." Unlike Talkington's statements to third parties, Talkington expressly characterized her administrative and clerical role to Helton as a "secretary with no overhead and no insurance cost!!" Upon information and belief, Talkington has told third parties, orally and in writing, that she was in a research collaboration with Helton. Talkington's frequent representations to the public that she completed a two-year postdoc under Helton, or at a private research collaborative group, were retrospective fabrications designed to inflate Talkington's professional credentials by leveraging Helton's medical, scientific, and personal reputation.

Helton unilaterally disclosed elements of her pre-existing publication roadmap or plans to Talkington in confidence, explicitly instructed Talkington that her publication plans were to remain strictly confidential until the writing was entirely written, professionally edited, and medically and scientifically defensible, and consistently dismissed Talkington's own independent suggestions for self-published materials as being incompatible with the research, writing, and scientific goals of Helton. On more than one occasion, Talkington commented to Helton about selling or sharing Helton's Research Compilation to third parties, and in response, Helton consistently and adamantly expressed to Talkington that her Research Compilation was not Talkington's to give or share. Talkington unequivocally acknowledged and understood that Helton solely owned the Research Compilation, the Botulism Manuscript, and any other botulism research, analyses, or writings made by Helton in the area of botulism.

Upon information and belief, Talkington received her Ph.D. in Environmental Sciences in the Summer of 2016. Following the completion of her Ph.D., Talkington increasingly took advantage of Helton's generosity by ignoring her gentle reminders that the Work Arrangement was only temporary and that Talkington needed to find permanent employment in her field. Talkington

repeatedly displayed a complete lack of understanding of the limited scope of the Work Arrangement, her own subject-matter competency, and the ethical requirements of scientific and medical research.

Talkington displayed a total lack of self-awareness regarding her suitability for work in scientific and/or medical research. Beginning in or around mid- to late-2017, Talkington became increasingly impulsive and resistant to the structure and nature of tasks Helton asked her to perform under the Work Arrangement. For example, in February 2017, during the Work Arrangement, Talkington unilaterally purchased the internet domain name iatrogenicbotulism.com without Helton's request or knowledge. Helton was made aware of this purchase and registration of the domain name in Talkington's own name after the fact. During that time, Talkington held herself out as a botulism expert or researcher to members of an actual research facility in Oklahoma City despite having no medical or scientific training.

At all relevant times during and after the Work Arrangement, Helton never authorized or requested that Talkington retrieve confidential patient medical records of botulism victims on her behalf. Roughly one year into the Work Arrangement, Helton would, at times, request that Talkington read and comment on specific selections of Helton's writings so that Helton could acquire a layperson's perspective of the writings. Talkington deviated and unilaterally decided to edit or write chapters for Helton that Helton never saw, requested, or used in any manner. Talkington submitted invoices billing Helton for hours spent locating additional botulism victims – a task Helton neither requested nor desired – while failing to complete the specific administrative and clerical assignments assigned to her. In or around the end of 2017, Helton informed Talkington that she would no longer pay her because Talkington was performing tasks that were never requested. The unrequested tasks were unhelpful to Helton as Talkington

lacked the medical or scientific credentials necessary to perform such tasks credibly.

At some point before her employment terminated, Talkington downloaded and retained a copy of the Research Compilation. Helton subsequently became aware that Talkington had done so, and Talkington characterized the download as a necessary backup, expressing that she had done so solely to safeguard the work for Helton's benefit against potential catastrophes. Helton trusted Talkington's characterization and assurances that the latter would not make use of, would maintain confidentiality of, and would protect the Research Compilation at all times from intentional or accidental disclosure to third parties.

After Helton terminated Talkington's employment under the Work Arrangement, in or around 2018, Talkington informed Helton that she would pursue research on botulism and write her own historical book about botulism (Historical Botulism Book). Talkington assured Helton that the Historical Botulism Book would not interfere with Helton's botulism research, analyses, or writings. Talkington subsequently publicly admitted that she had been working on the Historical Botulism Book as early as 2015. Upon information and belief, the materials Talkington used for her Historical Botulism Book were obtained and thereafter misappropriated from Helton's Trade Secret and/or Research Compilation. Helton never permitted or consented to Talkington's use of the Trade Secret and/or Research Compilation, either individually or collectively, to write or create Talkington's Historical Botulism Book. Helton did permit Talkington to use a few, limited historical references from the Research Compilation solely to enable Talkington to write on the topic of "historical botulism." Throughout Talkington's Post-Employment Period, Helton did not share with Talkington the content or status of her botulism research or Botulism Manuscript. During that time, Talkington sent Helton requests to review her

Historical Botulism Book, and Helton, a presumed friend of hers, briefly reviewed the book and offered minor suggestions and edits.

Talkington was strictly forbidden from interfering with or disclosing Helton's personal survivor story, botulism research, scientific analysis and theories, or other information in the Trade Secret and/or proprietary Research Compilation. Helton explicitly instructed Talkington that Helton was to be given no connection, credit, or association with Talkington's Historical Botulism Book. At all relevant times, Helton has explicitly and unambiguously communicated to Talkington that any financial support was a personal favor to Talkington, not payment for a professional research collaboration on botulism.

Upon information and belief, during Talkington's Post-Employment Period, Talkington represented herself to members and/or administrators of the Facebook support group entitled BOTOX Dysport Side Effect Support (FB Support Group) as a qualified medical and/or scientific researcher working in concert with Helton. On at least one occasion, Talkington represented to Helton's academic peers that she was responsible for the research that allegedly won Helton's lawsuit against the maker of BOTOX®. Upon information and belief, in Talkington's application letters to several universities throughout 2024, she falsified her own scientific education and clinical or research experience by stating that she had completed a postdoc in medical research.

In or around July 2024, Talkington provided Helton with the first of several chapters of her Historical Botulism Book and asked Helton to read them and provide edits, at which time Helton discovered Talkington included personal details of Helton's story in the preface of the Book without Helton's permission. Helton called Talkington to once again tell her she did not have permission to use any part of Helton's personal story in the Book or other writings. In December 2024, Talkington emailed Helton stating, "I left in SOME details about your

condition, but then moved on. I think it is like a car wreck on a highway. You give just enough tragedy that they pause, get hooked, then quickly move through the preface." Helton again demanded the removal of her personal history from the Book. On December 30, 2024, Talkington self-published the Historical Botulism Book: RECOGNIZING BOTULISM: NEW INSIGHTS FROM OLD NARRATIVES. The Book arose out of Helton's interest in compelling historical botulism victim stories. Helton asked Talkington to retrieve that information, paid Talkington to do so, and Talkington absconded with the idea and information to write the Book and held herself out as its originator.

On December 20, 2024, without Helton's permission, Talkington incorporated a non-profit entity in Illinois under the name Botulism Research Collaborative LLC. She listed Helton as a Board Member in its initial corporate disclosure filed with the Illinois Secretary of State though Helton never agreed to serve on the board, was never notified of her appointment to the board, and had no affiliation or other connection to the Botulism Research Collaborative LLC.

Upon information and belief, Third-Party Defendant Megan McCue joined the FB Support Group in or around September 2024, and she and Talkington became acquainted around that time. Within weeks of a live video broadcast to her followers in real-time, McCue claimed to be "completely healed" of her purported iatrogenic botulism after suffering from what Talkington described at one time to Helton as a mild case. Upon information and belief, not long after joining the FB Support Group, McCue aggressively advised and directed its members on medical and advocacy issues, portraying herself as an expert although she had allegedly contracted botulism just months ago. Upon information and belief, the group administrator(s) of the FB Support Group observed that both Talkington and McCue engaged in coordinated boundary-

violation patterns, attempting to position themselves as alternative authorities with the Group.

With regard to the iatrogenicbotulism.com domain, upon information and belief, Talkington has an oral and/or written agreement with, and/or transferred responsibility and maintenance of the domain to McCue for use in marketing her publications and disseminating botulism information. Upon information and belief, Talkington utilized McCue as a proxy to operationalize the domain given Helton's clear admonition that Talkington was not to publish Helton's personal story, botulism research, Trade Secret, and/or Research Compilation on the internet. McCue's use of the domain satisfied Talkington's and McCue's own need for professional recognition and potential financial compensation, awards, or plaudits.

Ultimately, after Talkington represented herself to McCue as a botulism researcher who worked alongside Helton, after McCue became increasingly active in the FB support group, after McCue shared with Talkington her interest in writing a book about BOTOX® side effects, and after Talkington provided research articles to McCue for use in her book, McCue's book confirmed Talkington's assistance in writing that book, dedicating it to Talkington and thanking her. McCue released a self-published memoir on or around December 15, 2024 entitled ME TOX PRETTY: A STORY OF IATROGENIC BOTULISM AND THE UGLY SIDE OF COSMETIC INJECTIONS. Talkington texted Helton a link to McCue's book, Helton asked whether McCue wanted to speak with her, and Talkington answered in the affirmative. Helton has long maintained a practice of speaking with survivors of botulism or their family members but also maintains a strict policy of personal privacy and does not grant interviews to authors, researchers, or media outlets about her personal story as a victim and survivor of botulism. Talkington knew these things about Helton. McCue reached out to Helton via text message on

January 6, 2025 asking to casually connect to discuss Helton's experience, and cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions, but McCue did not disclose her plans to write a book or refer to Helton as a resource for it in any text message to Helton.

On January 8, 2025, McCue and Helton spoke by phone for approximately one hour, during which they discussed several things including McCue's symptoms and options for recovery. At no point before or during that call did McCue indicate to Helton that the purpose of the call was to interview Helton about her biography, legal history, botulism research, Trade Secret, and/or the Research Compilation, and at no point before or after the call did Helton give her consent to McCue's use of any of those things. Around January 17, 2025, McCue first informed Helton via email that she was writing a book about botulism that included information about Helton and Helton's trial, and McCue included an excerpt from the book that pertained to Helton's personal story and requested the latter review it for accuracy. On January 19, 2025, McCue self-published a book entitled NOTOX: THE SHOCKING TRUTH ABOUT COSMETIC INJECTIONS (*Notox*). Helton, unaware of the publication, responded to McCue's January 17th email on January 20, 2025, informing McCue she did not consent to McCue's inclusion of her personal story in *Notox* and that the excerpt about her personal story was inaccurate. On January 20, 2025 McCue responded via email with understanding, but failed to inform Helton that she had already published *Notox* six days before. *Notox* includes explicit reference to Helton's Trade Secret and the Research Compilation. Upon information and belief, McCue's attribution of the extensive biographical and medical information of Helton in *Notox* to the January 8, 2025 interview with Helton was a purposeful attempt by McCue to avail herself and *Notox* with Helton's professional medical reputation and to make it appear as though Helton had sanctioned the *Notox* book.

Upon information and belief, Talkington and McCue, non-physicians, have dispensed unauthorized medical advice to numerous botulism victims, including instructing patients to lie to their treating physicians, and have cloaked themselves with Helton's medical reputation and acclaim.

**III**

The Court first considers Plaintiff/Counter-Defendant Talkington's Motion to Dismiss. Talkington argues Helton's Amended Counterclaims violate Federal Rule of Civil Procedure 8; the "core" Amended Counterclaims must be dismissed as time-barred; the unjust enrichment Counterclaim (Count VI) must be dismissed; the trade secrets Counterclaims (Counts II, V, XI) must be dismissed pursuant to Federal Rule of Civil Procedure 12(e); the Lanham Act Counterclaims (Counts I, II, III, IV), First Counterclaim (copyright declaratory judgment), Ninth Counterclaim (intentional interference with prospective economic advantage), Seventh Counterclaim (fraudulent misrepresentation) and Eighth Counterclaim (civil conspiracy), Thirteen Counterclaim (false light invasion of privacy), Fourteenth Counterclaim (violation of the right of publicity), Fifteenth Counterclaim (fraudulent concealment), and Twelfth Counterclaim (defamation) must all be dismissed pursuant to Federal Rule of Civil Procedure 9(b) and/or 12(b)(6); and the Affirmative Defenses must be stricken.[3]

**A**

Federal Rule of Civil Procedure 8 provides, in relevant part, that a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief", a party in responding to a pleading must "state in short and plain terms its defenses to each claim asserted against it", and, in general, "[e]ach

[3] The Court notes it is not entirely clear in all instances as to which Federal Rules of Civil Procedure or which subsections of those Rules are the authority pursuant to which Talkington seeks dismissal of Helton's claims. What the Court has identified is what it has gathered from Talkington's Brief (D. 37).

allegation must be simple, concise, and direct." FED. R. CIV. P. 8(a)(2), (b)(1)(A), (d)(1). Talkington calls Helton's Amended Counterclaims pleading a "Rule 8-violative Novel". Pl.'s Mot. to Dismiss (D. 37 at ECF p. 7). Talkington argues Helton should get to the point, "to the extent there is one[,]" instead of throwing item after item at the wall to see what might stick. *Id.* at ECF p. 8. Helton disputes the Amended Counterclaims violate Rule 8 simply because they are detailed.

The Court agrees with Helton and finds the Amended Counterclaims do not violate any section of Rule 8. The Amended Counterclaims are certainly, exceptionally, and notably long-winded, but if anything, "because of its prolixity, [Helton's Amended Counterclaims] give[] [Talkington] much more information about [Helton's] conception of [her] case than the civil rules require[.]" *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820 (7th Cir. 2001). Moreover, the Amended Counterclaims do not suffer from incomprehensibility or unintelligibility and so Talkington has sufficiently been put on notice of Helton's counterclaims. To dismiss the Amended Counterclaims at this time "would cast [this Court] in the role of editor[], screening complaints for brevity and focus; [this Court has] better things to do with [its] time." *Id.*

**B**

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of claims for "failure to state a claim upon which relief can be granted". A court may grant a Rule 12(b)(6) motion to dismiss only if a complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint sufficient on its face need not give "detailed factual allegations," but it must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Id.* at 555. The Court accepts all well-pleaded factual allegations in the complaint as true and draws all

reasonable inferences in favor of the plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

**1**

Here, Talkington argues that the central deficiency of Helton's Amended Counterclaims is that the conduct Helton complains of occurred between 2015 and 2017, and she knew about it by 2018. Thus, per Talkington, even the longest applicable statute of limitations does not reach back that far from the January 12, 2026 filing date of Helton's original Answer, Counterclaims, and Third-Party Complaint. Talkington specifically argues Helton's own allegations establish inquiry notice by 2018, fraudulent concealment does not rescue Helton's core claims, and the statute of limitations analysis applies across all time-barred claims.

The generally applicable rule of accrual in limitations law is that, "A cause of action accrues, and the limitations period begins to run, when a plaintiff has a complete and present cause of action." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014). To the extent Talkington argues for the application of "inquiry notice," i.e., knowledge that would have led a reasonable person to start investigating the possibility that her rights had been violated, Talkington is mistaken. Though Helton does not challenge its application and instead argues Talkington fails to establish inquiry notice, the Court notes that Talkington's cited cases and one of Helton's two cited cases were all in the context of securities fraud litigation. In *Chicago Building Design*, the Seventh Circuit explained that the Supreme Court clarified that "inquiry notice" is not a substitute for actual or constructive discovery and that it does not itself trigger the statute of limitations such that inquiry notice should not be used as the starting date for the statute of limitations. *Id*. (citing *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 651-53 (2010)). The *Merck* court stated succinctly, "[T]he limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff

would have discovered the facts constituting the violation . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." 559 U.S. at 653. Thus, this Court need not consider inquiry notice.

The discovery rule, however, applies in the context of claims such as copyright infringement and trade secret misappropriation, as here. *See Richardson v. Kharbouch*, No. 19 C 02321, 2020 WL 1445629, at *7 (N.D. Ill. Mar. 25, 2020) ("Under the discovery rule, a copyright claim accrues (and the limitations clock starts ticking) when the plaintiff learns or reasonably should have learned that the defendant was infringing a protected work.") (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 n.4 (2014)); *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd*, No. 1:17-cv-1973, 2019 WL 11025901, at *3 (N.D. Ill. Mar. 12, 2019) (observing the parties agreed the plaintiff's trade secret misappropriation claims under the Illinois Trade Secrets Act (ITSA) and Defend Trade Secrets Act (DTSA) were governed by the discovery rule). Talkington does not address Helton's factual allegations in the context of the discovery rule, and the Court will not do so either.

Talkington also argues that fraudulent concealment does not rescue Helton's claims because the allegation that Talkington characterized her download of the Research Compilation as a "necessary backup" is a simple denial of liability that does not toll the limitations period. Talkington argues further that if, as Helton alleges, Helton discovered the unauthorized use of the Research Compilation in 2018, she had access to the essential facts necessary to sue at that time. Per Helton, Talkington's "necessary backup" explanation in 2017 lulled Helton into believing the download served *Helton's* best interests, and so equitable estopped and fraudulent concealment properly toll any limitations period.

Equitable estoppel in the statute of limitations context comes into play "if the defendant takes active steps to prevent the plaintiff from suing in time, as by

promising not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1991). As for fraudulent concealment under Illinois law, it is a "subset" of equitable estoppel because it requires more than "conduct or representations by the [opposing party] that prevent the [party] from suing before the statute of limitations has run." *Singletary v. Cont'l Ill. Nat'l Bank and Tr. Co. of Chi.*, 9 F.3d 1236, 1241 (7th Cir. 1993). Under Oklahoma law, fraudulent concealment constitutes and exception to the statute of limitations when there is "some actual artifice or some affirmative act of concealment, or some misrepresentation which induces the other party to inaction, or to forgo inquiry". *Dinwiddie v. Suzuki Motor of Am., Inc.*, 111 F. Supp. 3d 1202, 1211 (W.D. Okla. 2015) (internal citations omitted).

Helton alleges in her Amended Counterclaims that she set strict boundaries to which Talkington agreed regarding Helton's Trade Secret and/or Research Compilation and that she trusted Talkington's characterization and assurances of why the latter downloaded and retained a copy (to serve as a backup) of the Research Compilation. She alleges further that Talkington had actually been using certain of Helton's research materials for at least three years before – in 2015 - Helton became aware in 2018 of Talkington's plans to use those materials in her Historical Botulism Book. Helton underscores that last allegation, made on information and belief, came from a February 3, 2025 article reporting that Talkington had "spent the last decade harvesting knowledge about botulism from the past", and that article rather than the 2018 events first put her on notice. Helton Am. Countercl. Ex. 8 (D. 35 at ECF p. 64; D. 35-8 at ECF pp. 1-7). Helton alleges generally that she had no knowledge that Talkington was offering to share, and was actually sharing, her botulism research, Trade Secret, and/or the Research

Compilation with third parties. Taking the alleged facts as true, together with the many other facts as to the parties' relationship over the years, Helton plausibly alleges that her claims are not time-barred because she was lulled into believing the "backup" served her interests. She plausibly alleges facts sufficient to toll any of the relevant limitations periods at least until the January 2025 release of McCue's *Notox*. As Helton insists, the arguments Talkington makes in support of a statute of limitations defense are not pleading-stage issues:

> As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record.

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

Per *Sidney Hillman*, the Court denies Talkington's Motion to Dismiss based upon a statute of limitations defense. Because the statute of limitations "analysis" Talkington presents has now been rejected, the Court need not address her last argument that the "analysis" also applies uniformly to Helton's copyright infringement, DTSA misappropriation, Oklahoma trade secret misappropriation, breach of fiduciary duty, and ITSA misappropriation claims.

**2**

Talkington next seeks dismissal pursuant to Rule 12(b)(6) of Helton's Oklahoma state law unjust enrichment counterclaim (Sixth Counterclaim). The elements of unjust enrichment are: 1) the unjust 2) retention of 3) a benefit received 4) at the expense of another. *Wells v. Johnson & Johnson*, 554 F. Supp. 3d 1207, 1215 (W.D. Okla. 2021) (citing *Okla. Dep't of Sec. ex rel. Faught v. Blair*, 231 P.3d 645, 658 (Okla. 2010)). To plead an unjust enrichment claim, "a party must plead

enrichment to another, coupled with a resulting injustice." *Id*. (internal citations omitted). Here, Talkington argues Helton's "invention" of a purported class of property rights, "Reputational Assets," fails to prop up her unjust enrichment claim and further muddies what is claimed to be a trade secret.

Helton alleges Talkington unjustly retained an economic benefit, for example, the unjust retention of the value of associating with Helton's professional stature, research, writings, and analysis that Talkington acquired, possessed and utilized, and/or continues to utilize. Helton further alleges her professional and personal reputation, as well as her knowledge, life story, valuable intellect and insight, professional stature, research writings, and analytical impressions – her Reputational Assets – are not found within with the Trade Secret or Research Compilation, and those Reputational Assets derive independent economic value from their particularity to Helton and from the time and effort invested into creating them and maintaining their high reputational value across multiple domains, including legal, medical, and community. She more specifically alleges that she serves as a *pro bono* expert witness for law firms representing victims of iatrogenic botulism, and she may face disqualification if, for example, Talkington and McCue's advice that patients lie to their doctors is somehow attributed to Helton. She argues that in commerce, Talkington has, for example, repeatedly publicly held herself out as an agent, post-doctoral fellow, research partner, or collaborative associate of Helton, asserted in applications that Helton was her research partner, and listed Helton as a board member on an Illinois state non-profit limited liability company incorporation filing. Helton alleges Talkington listed her as a board member of Talkington's Botulism Research Collaborative LLC[4] without Helton's knowledge or consent. That is an allegation from which a

[4] The Court notes that discrepancies as to what this LLC actually is appear within the documents before it. Exhibit 25 attached to the First Amended Answer indicates the corporate name as Botulism Research

plausible inference arises that Talkington did so to create a false impression of endorsement and Director-level oversight of fundraising and finances; from there, as Helton argues, she is exposed to reputational risk if the LLC acted unlawfully.

These are just a smattering of the allegations made in Helton's Amended Counterclaims which illustrate that she sufficiently alleges unjust enrichment under Oklahoma state law. Talkington's argument rejecting "Reputational Assets" as sufficient to bolster Helton's claim – "She is not claiming that she would have did worse at her job, stopped living, or let her reputation flounder because Talkington misappropriating [sic] the "Reputational Assets" – is a stretch, particularly at the motion to dismiss stage. Talkington Mot. to Dismiss (D. 37 at ECF p. 13).

**3**

**a**

Talkington argues Helton's Third Counterclaim pursuant to the Lanham Act fails because it is a reverse passing off claim foreclosed by *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23 (2003), and the false-endorsement theory the Counterclaim attempts to invoke is not adequately pleaded. In *Dastar*, the Supreme Court explained that "reverse passing off", occurs where the "producer misrepresents someone else's goods or services as his own." 539 U.S. at 27 n.1. Helton disputes her Third Counterclaim is a reverse passing off claim, arguing instead that it targets Talkington's false claims about the origin of Helton's services and her false claims of affiliation and endorsement. She relies

Collaborative, Inc., Talkington refers to her "nonprofit" as "Botulism Research Collaborative, Inc., and Talkington refers to her "non profit" as "botulism [sic] Research Collaborative LLC" (D. 35-25 at ECF pp. 2, 3, 4); the Illinois Secretary of State form indicates it is "Form NFP 102.10 Articles of Incorporation General Not For Profit Corporation Act", *id.*; and Talkington says "Helton repeatedly suggests there is a not-for-profit limited liability company. There is no such thing in Illinois." Talkington Mot. to Dismiss (D. 37 at ECF p. 23). It is unnecessary for the Court to delve into this issue in order to resolve the instant Motions to Dismiss.

upon *Gensler v. Strabala*, 764 F.3d 735 (7th Cir. 2014). 15 U.S.C. § 1125(a)(1)(A) states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

In *Dastar*, the defendant made a video set (Campaigns) by purchasing tapes of the original version of a separate television series, which was available in the public domain, and copied and then edited the series. 539 U.S. at 26. The defendant substituted a new opening sequence, credit page, and final closing for those of the original television series and inserted new chapter-title sequences and narrated chapter introductions, moved the "recap" in the television series to the beginning and retitled it as a "preview", and removed references to and images of the book over which the plaintiff had previously acquired the television rights to. *Id*. at 26-27. The defendant created new packaging for its Campaigns series and a new title. *Id*. at 27. The defendant, Dastar, manufactured and sold the Campaigns video set as its own product, stating the set was "Produced and Distributed by: Entertainment Distributing" which was owned by Dastar. *Id*. The plaintiff, Twentieth Century Fox, claimed Dastar's sale of Campaigns "without proper credit" to the television series constituted reverse passing off in violation of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)). *Id*. The Supreme Court explained that if "origin" in § 43(a) referred only to the manufacturer or producer of the physical "goods" that are made available to the public – there, the videotapes – Dastar was

the origin. *Id*. at 31. If, on the other hand, "origin" included the creator of the underlying work that Dastar copied, then someone else "(perhaps Fox)" was the origin of Dastar's product. *Id*. The Supreme Cout held:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods . . . To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do.

*Id*. at 37 (emphasis in original). The Supreme Court concluded that because Dastar was the "origin" of the products it sold as its own, the plaintiffs could not prevail on their Lanham Act claim. *Id*.

In *Gensler*, the defendant architect had left the plaintiff architectural firm and began his own firm. 764 F.3d at 736. The defendant stated on his own firm's website that he had designed five projects for which the plaintiff was the architect of record. *Id*. The plaintiff contended the defendant's statements, a form of "reverse passing off", violated § 43(a) of the Lanham Act. *Id*. The district court had read *Dastar* to limit § 43(a) to false designations of goods' origin, and because the plaintiff's claim concerned services rather than goods, the district court held that the plaintiff could not invoke the Lanham Act. *Id*. The Seventh Circuit, however, explained:

> Gensler contends that Strabala made a "false or misleading representation of fact" (his role in designing the five buildings) that is "likely to . . . deceive as to the . . . connection[ ] or association of such person [Strabala] with another person [Gensler]" and to deceive clients about the "origin" of the designs. Nothing in *Dastar* forecloses such a claim . . . The district court thought that Gensler should have relied on copyright law rather than the Lanham Act, but Strabala did

> not make or sell copies of any plans or drawings in which Gensler claims a copyright. A false claim of authorship, without the making of copies (or some other act covered by 17 U.S.C. § 106), is outside the scope of copyright law. Gensler's only plausible federal claim rests on § 43(a).

*Id*. at 737. The Seventh Circuit pointed out that the Supreme Court in *Dastar* "did not read 'services' out of the Lanham Act. Nor did it hold that a false claim of origin is the only way to violate § 43(a)." *Id*. at 736.

In her Third Counterclaim, Helton alleges that Talkington has used her name and reputation in connection with, among other things, the promotion and sale of the latter's academic and botulism research services and other commercial activities by, for example, repeatedly and publicly holding herself out as an agent, post-doctoral fellow, research partner, or collaborative associate of Helton and falsely asserting in applications for employment and to interested third-parties that Helton was her research partner. According to Talkington, the Third Counterclaim fails because, as *Dastar* made clear, claims about misattribution of research authorship belong to the domain of copyright law, not trademark law. But Helton's allegations are akin to those in *Gensler* as she alleges deception about the origin of her professional services. *Dastar* thus does not foreclose such a claim and Helton states a plausible federal claim under § 43(a).

Next, Talkington argues any attempt by Helton to recharacterize her reverse passing off claim as a false-endorsement claim still fails because Helton does not sell goods or services in competition with Talkington, the alleged conduct does not involve the kind of commercial use that false endorsement claims require, and Helton's claim pertains to the type of authorship-attribution *Dastar* held belongs to copyright law. First, Helton does not have to be engaged in direct competition with Talkington to bring a false-endorsement claim. *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, No. 16 CV 10969, 2017 WL 4310671, at *3 (N.D. Ill. Sep. 28, 2017)

(recognizing that the direct competitor rule was rejected in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014)). Second, and decisively, a party has "standing" to pursue a claim within the scope of § 43(a) of the Lanham Act "if [she] can properly plead and prove 'an injury to a commercial interest in sales or business reputation proximately caused by the [opposing party's] misrepresentation." *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 931 (N.D. Ill. 2016) (citing *Lexmark Int'l, Inc.*). Here, as Helton summarizes her allegations, she has a commercial value in her reputation as a successful victim-litigant against a BOTOX® manufacturer and as a physician-researcher in iatrogenic botulism, and Talkington admitted Helton's name and story were a "hook" to bring in readers. As set forth in Section II above, several of Helton's allegations state explicitly, or provide facts from which it can be reasonably inferred, that Talkington cloaked herself with Helton's name and reputation in the field of botulism research and botulism victim advocacy. Notably, Helton additionally alleges that she serves as a *pro bono* expert witness for law firms representing iatrogenic botulism, drawing on her specialized knowledge, etcetera, and Talkington's and McCue's creation of unauthorized, unvetted, and scientifically inaccurate botulism materials, while cloaking themselves and attempting to usurp Helton's reputation, acclaim, and authority threatens to destroy Helton's credibility in court. Certainly, these allegations are enough, even if *just* enough, to establish Lanham Act standing at the pleading stage.

**b**

Talkington additionally challenges Helton's Fourth Counterclaim brought pursuant to 15 U.S.C. § 1125(a)(1)(B), arguing Helton's inability to establish the first element of such a claim: the opposing party made a false statement of fact about its own or another's product in commercial advertising or promotion. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). Helton alleges

Talkington has made false or misleading statements in commercial advertising or promotion, including misrepresenting her qualifications, her relationship with Helton, and the origin and authorship of research and publications derived from Helton's personal story, botulism research, and Research Compilation.

As detailed in Section II above, Helton specifically alleges Talkington self-aggrandized her administrative and clerical work in recommendation letters or job applications; Talkington held herself out to third parties as having performed a postdoc in botulism with Helton and that she was in a research collaboration with Helton; Talkington's entire understanding of botulism is derivative and superficial as it was acquired exclusively by observing and reviewing Dr Helton's botulism research and by accessing her Trade Secret, Research Compilation, Botulism Manuscript, and botulism research, analyses, or writings; and one of the historical articles Talkington used for her Historical Botulism Book was an article Helton had previously given her. Talkington rejects employment applications, statements to interested third parties, a filing with the Illinois Secretary of State, and a self-published book as not "commercial advertising or promotion" for her services.

The Seventh Circuit has explained, "A classic advertising campaign is not the only form of marketing embraced by the statutory term 'commercial advertising or promotion.'" *Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 522 (7th Cir. 2012). Further, "promotion – a systematic communicative endeavor to persuade possible customers to buy the seller's product – takes a form other than publishing or broadcasting." *Id*. Indeed, Helton rightly argues that she pleads organized promotional activity rather than private communications given that she alleges: Talkington and McCue coordinated and the former allowed McCue to disseminate false information about Helton's affiliation with McCue's book across McCue's public platforms; Talkington appeared on public podcasts and falsely

claimed Helton's botulism credentials; Talkington used Helton's name as a "hook" to market her book; Talkington listed Helton as a board member in Illinois nonprofit filings; and Talkington solicited funds from the public on a national level. Just as Talkington repeatedly, flippantly rejects allegations pertaining to an Illinois Secretary of State filing throughout her brief, the Court rejects her challenge to all of the allegations just listed at this stage of the case. Helton states a claim for false advertising under the Lanham Act.

**4**

While Talkington requests the Court dismiss a subpart of Helton's First Counterclaim – the part seeking a declaration of Helton's sole authorship and ownership of the Botulism Manuscript – the Court will not grant such relief at the motion to dismiss stage. As Talkington herself describes the request for declaratory judgment, it is only a "subpart" of the First Counterclaim. Talkington Mot. to Dismiss (D. 37 at ECF p. 19). Moreover, as Helton argues in opposition, she alleges that Talkington has positioned herself publicly as a contributor and co-author of at least part of the Botulism Manuscript, and Talkington has vacillated between acknowledging Helton's authorship and requesting a declaration in her First Amended Complaint (D. 11) of joint authorship. Helton's allegations are sufficiently specific to survive a motion to dismiss, but neither party's pleadings are sufficiently definite to dismiss, as lacking an actual controversy, the First Counterclaim's declaratory judgment subpart.

**5**

Talkington challenges Helton's Ninth Counterclaim for intentional interference with prospective economic advantage under Oklahoma state law. To state a claim for intentional interference with a prospective economic advantage, a party must allege: the opposing party had knowledge of a valid business relationship (or an expected business relationship) and intentionally interfered

with that relationship with a desire to induce or cause a breach or termination of the relationship or expectancy which results in damage to the party. *McLaughlin v. Bd. of Regents of Univ. of Okla.*, 566 F. Supp. 3d 1204, 1218 (W.D. Okla. 2021) (citing *Loven v. Church Mut. Ins. Co.*, 452 P.3d 418, 424 (Okla. 2019)). Talkington says Helton fails to allege a valid or expected business relationship as she identifies no deterred publishers or purchasers of her Botulism Manuscript and includes no allegations of a valid expectation to sell the Trade Secret and Research Compilation.

Helton alleges that: since 2010 she has maintained her own professional editing and publication representation with agents and contacts within the publishing industry; Talkington admitted to exploiting Helton's personal story as a selling point for Talkington's own Historical Botulism Book; Helton has consistently declined inquiries from national best-selling authors seeking to tell her story; Helton consistently and adamantly expressed to Talkington that her Research Compilation was not Talkington's to give or share; and Talkington, alone or in collusion with McCue, interfered with and abridged Helton's opportunity to enter the market first with her published Botulism Manuscript, by working in concert with McCue, who rushed *Notox* to market. As Helton argues, one does not rush to preempt a work with no economic expectancy. The allegations and plausible inferences arising from them within the Amended Counterclaims more than sufficiently state a claim for intentional interference with prospective economic advantage under Oklahoma state law.

**6**

Talkington argues Helton's Seventh Counterclaim for fraudulent misrepresentation and Eighth Counterclaim for civil conspiracy, both under Oklahoma state law, fail because the exhibits attached to the Amended Counterclaims show there was no misrepresentation. The essential elements of

actionable fraudulent misrepresentation are: 1) the representations were material; 2) they were false; 3) they were known by the party making them to be false, or that such party made them recklessly, without any knowledge of their truth, and as a positive assertion; 4) they were made with the intention that they should be acted upon by the party to whom they were made; 5) that such party acted in reliance upon them; and 6) that he thereby suffered injury. *Buck v. Rhoades*, 598 F. Supp. 3d 1181, 1199 (N.D. Okla. 2022) (quoting *Davis v. Higgins*, 217 P. 193, 195 (Okla. 1923)). To state a claim for civil conspiracy, a party must allege: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the subject or course of action; 4) one or more unlawful overt acts; and 5) damages as the proximate result thereof. *Allen v. IM Sols., LLC*, 94 F. Supp. 3d 1216, 1223 (E.D. Okla. 2015).

Helton alleges Talkington text-messaged her providing McCue's phone number and requesting that Helton speak with McCue about symptoms McCue was having after allegedly contracting botulism due to a BOTOX® alternative injection. Helton alleges McCue texted messaged her, introducing herself as Talkington's friend and asking to casually "connect" to discuss Helton's experience and that McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions. Helton alleges further that McCue and Talkington undertook a misrepresentation of McCue's true condition and/or intentions as the reasons for McCue's telephone call two days after McCue text messaged Helton. Helton alleges before and during the January 8, 2025 telephone conversation between McCue and her, Talkington and McCue knew or had reason to believe that Helton would become guarded or terminate the call if McCue revealed her true intentions and reasons for speaking with Helton (her plans to write a book or refer to Helton has a resource for it).

Exhibit 29 attached to the Amended Counterclaims is a screenshot of text messages between Helton and Talkington where Talkington wrote, in relevant part, in response to Helton asking her if McCue wanted Helton to call her: "yes please. For [sic] 1) healing advice and 2) discuss the topics she is covering in her podcast guest talk 3) discuss fast twitch and slow twitch muscles 4) tell her her hair will grow back." Helton Am. Countercl. Ex. 29 (D. 35-29 at ECF p. 3). Exhibit 30 attached to the Amended Counterclaims is a screenshot of text messages between Helton and McCue where McCue wrote:

> Hi Sharla, this is Megan, Jane's friend. 12 units of Xeomin once. I would love to connect on the phone or via email sometime so that I could ask you some questions about your experience. I'm going on a podcast next week that will be broadcast to thousands of speech language pathologists. I'm trying to raise awareness in my field about iatrogenic botulism, as many of our patients are receiving Bont for medical reasons.

Helton Am. Countercl. Ex. 30 (D. 35-30 at ECF p. 2).

Exhibits 29 and 30 do not incontrovertibly contradict the allegations of the Amended Counterclaims and so they do not warrant dismissal of the Seventh or Eighth Counterclaims for failure to state a claim. *See* FED. R. CIV. P. 10(c) (stating in relevant part that "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (explaining "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). The more extensive summary of the allegations of the Amended Counterclaims set forth in Section II above reveals the Rule 9(b) standard for pleading fraud is satisfied, and the Court will not waste its nor the parties' time reciting them again in an already unavoidably long order. *See Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847,

854 (Okla. 2020) ("The gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party, and, if this result is accomplished, the means of its accomplishment are immaterial."). As Helton argues, Exhibits 29 and 30 document Talkington's alleged artifice. Further, the Court observes Talkington's challenge in this regard is a waste of the Court's time.

**7**

Talkington challenges Helton's Thirteenth Counterclaim for false light invasion of privacy under Illinois state law for failure to allege Talkington acted with actual malice in making statements highly offensive to a reasonable person. To state a claim for false light, a party must allege: 1) she was placed in a false light before the public as a result of the opposing party's actions; 2) the false light would be highly offensive to a reasonable person; and 3) the opposing party acted with actual malice. *Osumdairo v. Glandian*, 591 F. Supp. 3d 353, 357 (N.D. Ill. 2022) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 209 (Ill. 1992)).

Helton highlights the following Amended Counterclaims allegations: Talkington's pattern of repeated, alarming, and allegedly harassing communications directed at other members of the FB Support Group; Talkington was admonished for harassing members of the FB Support Group to provide their botulism victim or survivor stories to Talkington; Talkington engaged in offensive and/or shameful conduct within the botulism victim FB Support Group including dispensing unauthorized and false medical advice to vulnerable botulism victims; Talkington's false light portrayal of Helton as a member of the board of directors of the Illinois state non-profit entity is especially egregious as Talkington has been publicly soliciting donations from the public and other third parties, allegedly on behalf of the non-profit entity; Helton is a prominent botulism victim advocate, botulism supporter, licensed and board-registered physician, and well-known researcher within the botulism community; Helton was being associated with

Talkington's highly offensive harassing conduct and false medical advice; and Talkington has and continues to solicit funds in the name of the Botulism Research Collaborative LLC. Helton further alleges Talkington knew her portrayal to the public of Helton as an associate, mentor, endorser, and/or supporter of Talkington was false or that Talkington failed to reasonably ascertain the truthfulness of the portrayal of Helton. These allegations plausibly allege the "highly offensive to a reasonable person" element as that element is met "when the defendant knows that the plaintiff, as a reasonable [person], would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." *Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 990 (Ill. 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 625E, cmt. c (A.L.I. 1977)). The last highlighted allegation sufficiently alleges Talkington's actual malice. *See Pope v. Chronicle Publ'g Co.*, 95 F.3d 607, 616 (7th Cir. 1996) (citing *Kolegas*, 607 N.E.2d at 209-10) (stating "actual malice" is defined "in the familiar way as knowledge of falsehood or reckless disregard for whether the statements were true or false[]").

**8**

As for Helton's Fourteenth Counterclaim for violation of the right of publicity pursuant to the Illinois Right of Publicity Act (IRPA), 765 Ill. Comp. Stat. 1075/30(a), Talkington argues a Secretary of State filing is not a commercial purpose as required to state a claim. To state such a claim, a party must allege: 1) an appropriation of the party's identity; 2) without the party's written consent; and 3) for the opposing party's commercial purpose. *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022) (citing § 30(a) of the IRPA and *Blair v. Nev. Landing P'Ship*, 859 N.E.2d 1188, 1192 (Ill. App. Ct. 2006)). The IRPA defines "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products,

merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILL. COMP. STAT. 1075/5.

Helton alleges: Talkington has held her out as a member of the board of directors of the Illinois state non-profit entity and has been publicly soliciting donations from the public and other third parties on behalf of the non-profit entity; Talkington's use of Helton's name on the incorporation documents of the Botulism Research Collaborative LLC was designed to lend false legitimacy to Talkington's non-profit venture; Talkington has and continues to solicit funds in the name of the Botulism Research Collaborative LLC; and Talkington created the LLC and used Helton's name and medical credentials to establish an air of legitimacy for Talkington and McCue's self-published works under the imprimatur of the LLC. Those allegations are more than enough to plead the third element of an IRPA claim because they amount to allegations of holding out Helton's identity for purpose of fundraising as well as holding her out in connection with the sale of a product (Talkington's and McCue's self-published works) and for purposes of advertising or promoting said works. Talkington's myopic view of these allegations (and others) verges on frivolous in arguing a motion to dismiss.

**9**

Helton's Fifteenth Counterclaim for fraudulent concealment under Illinois state law must be dismissed for failure to state a claim. To state a claim for fraudulent concealment a party must allege that the opposing party concealed a material fact when she was under a duty to disclose that fact to the party. *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017). A duty to disclose may be based on a fiduciary relationship or a relationship of trust and confidence where "the defendant is in a position of influence and superiority over plaintiff." *Gunn v. Cont'l Cas. Co.*, 622 F. Supp. 3d 694, 707 (N.D. Ill. 2022) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996)).

Helton argues Talkington owed her a duty to inform her of her appointment to the Board, and Talkington also owed a continuing duty to manage the non-profit collectively with Helton. However, as Talkington argues, without a fiduciary relationship, there is no duty. Helton's argument suggests Talkington had a fiduciary duty to Helton by reason of the latter being a named board member of the LLC. But Helton cites no authority in support of her position; instead, Illinois courts repeatedly explain that "directors owe a fiduciary duty *to their corporations and to their shareholders*." *Munroe-Diamond v. Munroe*, 139 N.E.3d 630, 638 (Ill. App. Ct. 2019) (emphasis added) (collecting cases). As for Helton's argument that whether she and Talkington had a special relationship is a factual dispute that should not be addressed via a motion to dismiss, applicable authority precludes a factual dispute. Where a confidential relationship does not exist as a matter of law, "a duty to speak may arise from a relationship in which the defendant is placed in a position of influence and superiority over the plaintiff by reason of friendship, agency, or experience." *D'Attomo v. Baumbeck*, 36 N.E.3d 892, 913 (Ill. App. Ct. 2015) (internal citations omitted). As Talkington underscores, Helton dedicates much of her Amended Counterclaims to pleading precisely the opposite of a duty flowing *from* Talkington *to* Helton; Helton claims *she* was Talkington's benefactor throughout the years. Helton cannot state a claim for fraudulent concealment. In light of the defect in this counterclaim, any attempt by Helton to amend it would be futile, and so her Fifteenth Counterclaim is dismissed with prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and Nw. Ind.*, 786 F.3d 510, 519-20 (7th Cir. 2015) ("Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss.") (emphasis in original).

With regard to Helton's Twelfth Counterclaim for defamation under Illinois state law, Talkington argues the sole allegedly defamatory statements that Helton was "taking too long" due to "poor health" and that it was "safest" for victims for Talkington to release the research are not actionable. To state a claim for defamation, a party must present facts that the opposing party made a false statement about the party, the opposing party made an unprivileged publication of that statement to a third party, and that the publication caused damages. *Seith v. Chi. Sun-Times, Inc.*, 861 N.E.2d 1117, 1126 (Ill. App. Ct. 2007). "[I]f a plaintiff alleges that a statement is defamatory *per se*, he need not plead or prove actual damages to his reputation; statements that are defamatory *per se* 'are thought to be so obviously and materially harmful to the plaintiff that injury to [her] reputation may be presumed.'" *Id*. (quoting *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996)). Talkington argues of the five categories Illinois recognizes as statements that are defamatory *per se*, only two might apply: imputing infection with a loathsome communicable disease; and those that prejudice a party or impute lack of ability in the party's trade, profession, or business. *Id*. She also argues that the innocent construction rule renders the alleged defamatory statements non-defamatory. Under the innocent construction rule, a statement must be reasonably viewed, considered in context with other words in the statement, and the implications therefrom must be given their natural and obvious meaning. *Id*. at 1127 (citing *Chapski v. Copley Press*, 442 N.E.2d 195, 198 (Ill. 1982)).

In her Amended Counterclaims, Helton alleges that during a phone call with another group administrator of the FB Support Group, Talkington expressed impatience with Helton's timeline for publishing her personal story and botulism research, arguing that Helton was taking too long to complete her manuscript and release it. She further alleges that Talkington indicated in that phone call that Helton was in poor health, and Talkington felt it was her duty to release the

botulism research in Helton's Botulism Manuscript, Trade Secret, and/or the Research Compilation. Talkington indicated in the call that the safest thing to do for future potential botulism victims was to release the botulism research in Helton's manuscript and/or the Research Compilation.

Per Helton, such statements plausibly impute professional incapacity and prejudice against her professional reputation, they also support the inference that she was prioritizing personal gain over public safety, and, in context, they have no innocent construction and attack her professional integrity. As with other claims in this case, it is premature to dismiss Helton's defamation claim. Talkington insists that there can only be an innocent construction given to her statements of impatience, taking too long, and poor health, but facts may appear from *both sides* during discovery which shed further light on the context in which the alleged statements were made. Helton states a claim for defamation.

**C**

Talkington seeks dismissal with prejudice of Helton's trade secrets claims (Second, Fifth, and Eleventh Counterclaims) pursuant to Rule 12(e). Federal Rule of Civil Procedure 12(e) states in relevant part:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response . . . If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

FED. R. CIV. P. 12(e). Talkington says the vagueness of the alleged trade secrets alone warrants dismissal under Rule 8 or a more definite statement under Rule 12(e). Talkington charges that Helton has made things worse in her Amended Counterclaims because, as before, she uses "and/or" with "Trade Secrets" and

"Research Compilation," and now includes "Reputational Assets" encompassing research writings and analyses which are not secret for some unknown or unstated reason. According to Talkington, Helton has made two attempts to clarify the scope of what is protectable, and she cannot do so. Helton counters that Talkington's own First Amended Complaint seeks a declaration of "joint author[ship] of the 'Research Compilation'" and "joint owner[ship] of any trade secrets[]" such that Talkington's nomenclature objection is overstated. Helton Resp. (D. 40 at ECF p. 18) (quoting 1st Am. Compl. (D. 11 at ECF pp. 15-16)). Illustrating how the Amended Counterclaims alleges the "who, what, when, where, and how" required for pleading fraud, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011), Helton argues Talkington merely seeks to manufacture confusion.

The Court need not dismiss Helton's trade secrets claims pursuant to Rule 8 nor order a more definite statement under Rule 12(e). To state a trade secret claim under with the DTSA or the ITSA, a party must allege: 1) existence of a trade secret; 2) that the opposing party misappropriated; and 3) used in the opposing party's business. *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. 2023). "At the pleading stage, trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Id.* at 614 (citing cases). Allegations that are adequate to allege the existence of a trade secret include the information and efforts, described in general terms, to maintain the trade secret's confidentiality. *Id.* At the pleading stage, "courts only dismiss a claim for lack of specificity on the pleadings in the most extreme cases." *Id.* (internal citation omitted).

This is not such an extreme case. First, it is of note that two of Talkington's cited cases were at the summary judgment stage and one was at the jury trial stage.

*See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (district judge had submitted to the jury eight possible trade secrets that the defendants might have appropriated); *Lear Siegler, Inc. v. Glass Plastics Corp.*, 1987 U.S. Dist. LEXIS 7357, at *1-2 (approving and ratifying Magistrate Judge's report recommending summary judgment be granted as to unfair competition claim based upon misappropriation of trade secrets); *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1093 (7th Cir. 2026) (district court had entered summary judgment against the plaintiff on its trade secrets claim because it failed to define its secrets with enough specificity). Second, the allegations of the Amended Counterclaims more than adequately identify the Trade Secret and Research Compilation at this stage of the case. Helton alleges she and her husband researched, gathered, and analyzed thousands of documents on a broad range of neurological diseases and potential treatment options; she collected, analyzed, and characterized thousands of studies and materials; she collected resources and documents into which she made specialized investigation and research; and she referenced resources and documents that were not simply findable or accessible through conventional public database searches. Helton further alleges the Trade Secret and Research Compilation contain materials that were only discovered and ultimately obtainable through in-person searches at the National Library of Medicine in Bethesda, Maryland. She also alleges her research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions do not exist in the public domain and have never been publicly disseminated by her, and Talkington explicitly understood that Helton's research and its analysis contained restricted and/or confidential materials that were otherwise inaccessible to the general public or academic community. She alleges the immense personal and economic value of her Trade Secret and the Research Compilation lies not in any single reference or document therein, but in the

original selection, organization, categorization, cross-referencing, and synthesis of the materials, together with her research summaries, annotations, notes, analytical frameworks, analyses, and interpretive conclusions. Helton Am. Countercl. (D. 35 at ECF p. 48 ¶29).

Paragraph 23 of the Amended Counterclaims states:

> In all, Helton, with her personal experience and medical expertise, in collaboration with her anesthesiologist husband, had created a confidential and proprietary collection of physical and electronic research documents and she researched, reviewed, prepared, and collected her thoughts and analyses together into a body of work collectively referred to herein as the "Trade Secret" with electronic versions of the physical documents, as well as original electronic records, eventually being stored in an ENDNOTE(™) library referred to herein as the "Research Compilation") [sic]. Helton used this Trade Secret and Research Compilation, for example but not by way of limitation, to perform comparative analysis of symptomatology and outcomes across all physiological systems implicated in botulism.

Helton Am. Countercl. (D. 35 at ECF pp. 46-47). Helton says she has clearly defined the proprietary Research Compilation as one component of the broader Trade Secret. Paragraph 23 says just that, albeit in more words.[5] Moreover, the allegations of Paragraph 23 together with the other allegations detailed, in part, above do more than point broadly to a collection of documents amounting to a "simple research bibliography," as Talkington puts it. Talkington Mot. to Dismiss (D. 37 at ECF p. 14). To expect more detail in Helton's Amended Counterclaims would be to impermissibly blur the distinction between pleadings and motions for

[5] Paragraph 30 of the Amended Counterclaims states: "Before 2010, Helton's Trade Secret existed in physical binders and digital folders on her and her husband's personal computers. Still, it had not yet been organized within a unified citation software program (a.k.a. a 'reference management software,' such as the Research Compilation)." Helton Am. Countercl. (D. 35 at ECF p. 48). This allegation also explains that the Research Compilation is just one component of the broader Trade Secret.

summary judgment. To the extent Talkington maintains the Amended Counterclaims fails to provide fair notice, she is choosing to remain ignorant.

**D**

Lastly, Talkington argues Helton's affirmative defenses fail to provide fair notice because several are bare recitations of legal standards with no supporting facts, are nonsensical, or unnecessary surplusage slowing the case. Talkington obliquely argues Helton's affirmative defenses must be dismissed for failure to comply with Federal Rule of Civil Procedure Rule 8. Helton counters that her affirmative defenses are not boilerplate as they are supported by the verified narrative of her Counterclaims which clarifies the defenses' scope and basis in accordance with Rule 8. She also argues the motion to strike is a Federal Rule of Civil Procedure 12(f) motion to strike request dressed as a Rule 8 notice-pleading dispute. The Court need not focus on which rule applies, as "the general rule" is that "motions to strike are disfavored . . . because motions to strike potentially serve only to delay." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Moreover, courts do not generally grant motions to strike unless the defect in the pleading causes prejudice to the party bringing the motion. *Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1028 (N.D. Ill. 2007).

Talkington feigns a lack of clarity as to which facts, "among hundreds of pages," are relevant to which defense. Talkington Mot. to Dismiss (D. 37 at ECF p. 27). She does not, however, go so far as to allege prejudice as a result of the alleged lack of clarity, and the Court does not find that any prejudice would befall Talkington if all of the affirmative defenses remain in this case at this time. A discovery schedule has not yet been set in this case, though once discovery commences, Helton may very well abandon some of her affirmative defenses or be better able to articulate the contours of certain affirmative defenses for purposes

of additional discovery. The Court denies Talkington's motion to strike Helton's affirmative defenses.

**IV**

Next, the Court considers Third-Party Defendant McCue's Motion to Dismiss Third Party Claims Under Rule 12(b)(6).[6]

**A**

**1**

McCue argues that Helton's First Third-Party Claim for false designation of origin under § 43(a) of the Lanham Act because Helton alleges entirely literary use by McCue "constitutes a false designation of origin, false description, and false representation that Helton sponsors, approves, endorses, or is affiliated with Third-Party Defendant McCue's book." Helton 3d Party Claims (D. 35 at ECF p. 181 ¶116). Just as Talkington argued, McCue argues *Dastar* forecloses Helton's claim because she makes no plausible allegation that potential purchasers of McCue's book will likely be confused into believing that Helton is the origin of the book, and telling her "personal story" in a book is not actionable as a false designation of origin. Helton counters that her First Third-Party Claim is a false endorsement and false association claim, which *Dastar* does not reach.

The Seventh Circuit has summarized § 43(a) of the Lanham Act as follows: "§ 1125(a)(1)(A)[] provides a civil remedy if false or misleading factual

[6] The Court rejects McCue's first argument that Helton does not incorporate any allegations from her Amended Counterclaims into her Third-Party Claims. Helton initially states in her Third-Party Claims: "Helton, Third-Party Plaintiff, re-alleges her Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative thereof, and Paragraphs 1 through 108 of her Factual Narrative hereof, with the same force and effect as if fully set forth herein." Helton 3d Party Compl. (D. 35 at ECF p. 180 ¶109). Each subsequent third-party claim contains the following introductory paragraph: "Helton, Third-Party Plaintiff, Answer to Plaintiff's Complaint, her Counterclaims and Factual Narrative hereof, and Paragraphs 1 through 121 [130, 139, 148, 170, 184] of her Factual Narrative hereof, with the same force and effect as if fully set forth herein." *Id.* at ECF pp. 183 ¶122, 185 ¶131, 187 ¶140, 189 ¶149, 194 ¶171, 197 ¶185). The word "re-alleges" is obviously inadvertently missing from those introductory paragraphs, but the omission is not fatal as McCue otherwise attempts to argue. *See* FED. R. CIV. P. 10(c) (providing in relevant part that a "statement in a pleading may be adopted by reference elsewhere in the same pleading . . .").

representations are likely to confuse or deceive their audience about the plaintiff's 'affiliation, connection, or association' with the defendant 'or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities.'" *Martin v. Living Essentials, LLC*, 653 F. App'x 482, 484 (7th Cir. 2016) (unpublished opinion). The "or[s]" make the difference here. Helton alleges: McCue, unbeknownst to Helton, explicitly included at least six full pages in *Notox* detailing Helton's personal story; McCue cited in *Notox* personal communications with Helton as a reference; McCue's conduct caused consumers to believe Helton has a professional and/or commercial connection to Talkington when none actually exists; and the false association influenced consumer impressions and beliefs when commercially or otherwise interacting with McCue and/or purchasing or contracting for her services.

In other words, Helton alleges McCue's false or misleading factual representations are likely to confuse or deceive her audience about Helton's "affiliation, connection, or association" with McCue and that such representations are likely to confuse or deceive her audience "as to . . . sponsorship[] or approval" of the book. 15 U.S.C. § 1125(a)(1)(A). *Dastar*'s "origin of goods" analysis has no application here. Helton states a claim for false association and/or endorsement.[7] *See Minerva Sportswear Inc. v. First To Finish Kim and Mike Viano Sports, Inc.*, No. 19-2034, 2020 WL 12811576, at *5 (C.D. Ill. Mar. 9, 2020) (quoting *Wendy's Int'l, Inc.*, 183 F. Supp. 3d at 935) ("To make a claim for false association or endorsement under subsection (A), Plaintiff 'must show that the terms defendants used and the representations they made . . . likely caused consumers to believe that plaintiff endorsed defendants' products.'").

[7] To the extent Helton entitled her First Third-Party Claim "false designation of origin" and to some extent still relies on that language appearing in § 43(a), she has mistakenly done so given her further explanation as to the true contours of her First Third-Party Claim.

**2**

Next, McCue challenges Helton's Second Third-Party Claim for false advertising under § 43(a), 15 U.S.C. § 1125(a)(1)(B), of the Lanham Act because Helton's allegations in this regard are vague, and the specific allegations are upon "information and belief" and are therefore insufficient under Rule 9(b)'s standard for pleading fraud. McCue contests only the first element of Helton's false advertising claim: whether the defendant made a false statement of fact in a commercial advertisement. *Hot Wax, Inc.*, 191 F.3d at 819.

Helton argues McCue's challenge proceeds from her refusal to read Helton's pleading (including the facts set forth in Section II above) as a whole. The Court agrees. Helton alleges: McCue, on more than one occasion, falsely represented to potential customers and readers of *Notox* that she had interviewed Helton for the purpose of researching and writing *Notox*; Helton was a mentor to her who helped her untangle the complexities of the botulism toxin; around February 21, 2025, Helton first obtained a copy of *Notox* and discovered that McCue had included the incorrect personal story of Helton which Helton had explicitly objected to and withheld consent to be published; and McCue falsely represented on a February 25, 2025 podcast, SWALLOW YOUR PRIDE, "Episode 360 – *When Beauty Treatments Go Wrong: An SLP's Warning About Cosmetic Botox Injections*", that she had a close and personal knowledge of Helton's personal story.

Once again, "promotion – a systematic communicative endeavor to persuade possible customers to buy the seller's product – takes a form other than publishing or broadcasting." *Neuros Co., Ltd.*, 698 F.3d at 522. The foregoing allegations and plausible inferences arising therefrom sufficiently cover the first element of a Lanham Act false advertising claim. As for McCue's Rule 9(b) challenge, "A plaintiff satisfies the 'particularity' requirement of Rule 9(b) with allegations based 'upon information and belief' that the facts constituting fraud

are not accessible to the plaintiff and the plaintiff provides 'the grounds for his suspicion.'" *Bank of Am., N.A. v. Gould*, No. 11 C 7658, 2012 WL 3133609, at *5 (N.D. Ill. July 31, 2012) (quoting *Perelli Armstrong Tire Corp. Retiree Med Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011)). Here, Helton alleges: she conversed just once with McCue; as of January 21, 2025, Helton did not have a copy of *Notox* and had no actual knowledge of its contents or subject matter; the date, name of podcast, and episode number of that podcast on which McCue appeared; the timeline of less than 20 days in which McCue drafted, edited, and published *Notox*; and McCue cites personal communications with Helton as a reference for the detailed and previously unknown material in *Notox*. Helton satisfies the particularity requirement of Rule 9(b) because she has alleged both inaccessibility to the facts constituting fraud and the grounds for her suspicion.

**B**

McCue next argues Helton's Third Third-Party Claim for false advertising under the California Business and Professions Code, Cal. Bus. & Prof. Code § 17500[8], fails because Helton has failed to sufficiently plead standing. § 17500 prohibits advertising that is "untrue or *misleading*". *Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 462 P.3d 461, 475 (Cal. 2020) (emphasis in original) (citing BUS. & PROF. CODE § 17500). To state a claim under § 17500 based on false advertising or promotional practices, "it is necessary only to show that members of the public are likely to be deceived." *Id.* at 476 (internal citations omitted). Standing for FAL claims is restricted to a "person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter." CAL. BUS. & PROF. CODE §

[8] California courts refer to this as "California's false advertising law" or FAL. *See, e.g., Reilly v. Davids Nat. Toothpaste, Inc.*, 827 F. Supp. 3d 1326, 1337 (C.D. Cal. 2026) (referring to "California's False Advertising law", CAL. BUS. & PROF. CODE § 17500, as "FAL"); *and Williams-Sonoma, Inc. v. Last Brand, Inc.*, No. 5:25-cv-10118-EJD, 2026 WL 2970363, at *1 (N.D. Cal. Sep. 30, 2026) (referring to California's false advertising law, CAL. BUS. & PROF. CODE § 17500, as "FAL"). This Court will refer to it as FAL from time to time.

17535. Stated simply, "a plaintiff [ ] must demonstrate some form of economic injury." *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 885 (Cal. 2011). Specifically, McCue argues Helton does not allege she offers a competing book for sale – or any book, or that she lost business opportunities to McCue due to *Notox* sales.

Helton alleges her injury falls within the second and third categories of economic injury identified by the California Supreme Court: a plaintiff may have a present or future property interest diminished; or a plaintiff may be deprived of money or property to which she has a cognizable claim. *Id.* at 886; *see Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105 (9th Cir. 2013) (recognizing the California Supreme Cout in *Kwikset Corp.* set forth what is required to allege an economic injury under both the FAL and California's unfair competition law). Helton identifies the following allegations of her amended pleading: the commercial exploitation of her name, likeness, and personal story; impairment of her commercial and professional economic opportunities; McCue rushed *Notox* to market to beat Helton to the market before Helton had completed her own manuscript; and McCue used misappropriated materials to bypass years of necessary research and expense. She also highlights her allegations of the Trade Secret and Research Compilation as a distinct, proprietary economic asset compiled and curated by her in securing a $15,000,000 product liability lawsuit verdict, and its uncontrolled publication threatens its status as a trade secret, thereby destroying its economic benefit and will permanently diminish the Trade Secret and Research Compilation's proprietary nature and economic value. Helton's allegations fall neatly enough – at the motion to dismiss stage - within the second and third categories of economic injury. Helton thus states a claim under California's FAL.

**C**

The Court rejects McCue's challenge to Helton's Fourth Third-Party Claim for unfair competition under the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200[9], as the standing requirement for the UCL is the same as for the FAL. *See* CAL. BUS. & PROF. CODE § 17204 (action under UCL may be brought by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition[]"). Helton alleges the same facts in support of her standing for her UCL claim as she does for her FAL claim.

With regard to unfair competition, McCue argues that Helton does not explain how *Notox* could compete with Helton's unpublished manuscript, nor does Helton identify any services McCue offers or any that compete with Helton's services. "The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp.*, 246 P.3d at 883 (quoting CAL. BUS. & PROF. CODE § 17200). McCue says Helton simply concludes she has caused commercial injury to Helton's economic, reputational, and professional interests. Helton argues her claim survives on the "unlawful" and "fraudulent" prongs regardless of the competition question. "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 83 Cal. Rptr. 2d 548 (Cal. 1999) (internal citations omitted). Because Helton successfully pleads the violation of other laws, she states a claim under the UCL.

To the extent Helton alleges the following (among other things), she states a claim under the UCL based upon fraudulent business acts or practices: McCue

[9] California courts refer to this as California's "unfair competition law" or UCL. *See, e.g., Zhang v. Super. Ct.*, 304 P.3d 163, 166 (Cal. 2013) (referring to the Unfair Competition Law as "UCL"); *and Hinojos*, 718 F.3d at 1102 (using shorthand of "UCL" to refer to California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*). This Court will refer to it as UCL from time to time.

has misrepresented her qualifications, her relationship with Helton, and the origin and authorship of research and publications derived from Helton's personal story, botulism research, Trade Secret, and the Research Compilation in commercial advertising or promotion; McCue induced Helton to speak with her for the surreptitious purpose of utilizing Helton's name as a reference for *Notox*; and McCue obtained, viewed, and/or used Helton's Trade Secret to create, write, and/or develop *Notox*.

To the extent McCue faults Helton for failing to plausibly allege she lost "money or property" due to McCue's alleged conduct or that McCue received the "money or property" Helton allegedly lost, McCue's own cited case reveals no issue. In *Zhang v. Superior Court*, the California Supreme Court stated:

> The UCL does not *require* restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court *may* make such orders or judgments . . . as may be necessary to prevent the use or employment ... of any practice which constitutes unfair competition ... or as may be necessary to restore . . . money or property.

304 P.3d at 167-68 (emphasis in original) (internal citations omitted); *see Cel-Tech Commc'ns, Inc.*, 973 P.2d at 539 (explaining that under the UCL, prevailing plaintiffs are "generally limited to injunctive relief and restitution[]"); *see also Kwikset Corp.*, 246 P.3d at 895 (holding that ineligibility for restitution is not a basis for denying standing under § 17204). In any event, Helton also requests injunctive relief to prevent McCue from any actual or future false or misleading statements of fact and other unfairly competitive acts, which McCue fails to acknowledge.

**D**

McCue argues Helton's Fifth Third-Party Claim for fraudulent misrepresentation under California law is fatally defective because Helton has not alleged McCue represented to her "that an important fact was true" when, in

reality, McCue knew that her "representation was false." To state a claim for fraudulent misrepresentation a plaintiff must allege: 1) the defendant represented to the plaintiff that an important fact was true; 2) that representation was false; 3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; 4) the defendant intended that the plaintiff rely on the representation; 5) the plaintiff reasonably relied on the representation; 6) the plaintiff was harmed; and 7) the plaintiff's reliance on the defendants representation was a substantial factor in causing that harm to the plaintiff. *Thomas v. Regents of Univ. of Cal.*, 315 Cal. Rptr. 3d 623, 663 (Cal. Ct. App. 2023).

Helton alleges: Talkington and McCue were aware of Helton's strict policy of personal privacy and that she was deliberate about her writings and had her own plans for their dissemination; McCue cited a desire to raise awareness among speech-language pathologists via a podcast as the sole reason for her questions; McCue misrepresented her true intentions for talking with Helton in order to persuade Helton to participate in a call with her; and McCue intended to induce Helton to rely on the false representation proffered by Talkington that McCue wanted to speak with Helton solely as a botulism victim. Those allegations, taken together with a plethora of others as to the who, what, when, where, and how throughout the amended pleadings (and cited in Helton's Response (D. 64)) are allegations of then-present intent (not statements about future events deemed to be opinions), of misrepresentation of presently existing facts rather than Helton's knowledge of the truth, and of McCue's state of mind before the January 8, 2025 phone call between Helton and herself.

In challenging the Fifth Third-Party Claim as she does, McCue disregards the fact that on a motion to dismiss, a court is to accept all well-pleaded allegations *as true* and to draw all reasonable inferences *in favor of the plaintiff*. Obviously,

what Helton *actually* alleges is that summarized in her Response: the podcast statement is the false pretense that deceived Helton, not proof she saw through it; that McCue could reproduce, in a book published eleven days after the call, not only non-public details of Helton's personal story but advanced analyses and conclusions drawn from Helton's own research, is affirmative support for the fraud, not a contradiction of it; and Helton's admission that she did not disclose any information about her personal botulism story or botulism research on her call with McCue is a building block of Helton's claim, not a contradiction of it. Likewise, as Helton succinctly puts it, she pleads the circumstantial facts that support an inference of contemporaneous fraudulent intent: McCue self-published *Notox* approximately 11 days after the January 8, 2025 phone call and cited "personal communications with Helton" as a source after she and Talkington framed McCue as a "victim" to circumvent Helton's known no-interview policy. McCue's Rule 9(b) challenge falls on deaf ears at this point. Ultimately, McCue's challenge is really a dispute as to the merits of Helton's fraudulent misrepresentation claim. The motion to dismiss the Fifth Third-Party Claim is denied.

**E**

McCue argues Helton's Sixth Third-Party Claim for civil conspiracy under California law is defective because Helton admits by allegation and exhibits that she knew McCue would use the information they discussed in her public advocacy work and in a podcast, and Helton admits she did not disclose in the January 8, 2025 phone call any information about her own botulism story, the existence and contents of the Trade Secret, and the like. To state a claim for conspiracy under California law, a plaintiff must allege: 1) the formation and operation of the conspiracy; and 2) damage to the plaintiff from an act or acts in furtherance of the common design. *Tatung Co., Ltd. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1063 (C.D.

Cal. 2014) (citing California cases). Conspiracy is not a cause of action, and so a coconspirator incurs tort liability co-equal with the immediate tortfeasors. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994).

As just discussed above in Section IV.D, Helton states a claim for fraudulent misrepresentation under California law. Also, Helton *does* allege: that McCue and Talkington, together, undertook the misrepresentation of McCue's true medical condition and/or reasons for her January 8, 2025 phone call with Helton; both Talkington and McCue were well aware of Helton's strict policy of personal privacy and misrepresented McCue's medical condition and intentions in order to induce Helton to participate in the January 8th call; Talkington and McCue agreed among themselves at least as early as the text message exchange of February 10, 2025 between Talkington and Helton not to disclose the fact that *Notox* contained extensive references to Helton; and so on and so forth as set forth in the Third-Party Claims and several instances in this Order. The fraudulent misrepresentation tort is *not* absent from this case, allegations of Talkington and McCue's agreement as to a common plan are *present*, and the Court has already rejected McCue's assertion that Helton admits she knew how McCue would use her information. Helton's conspiracy tort remains in this case at this time.

**F**

And finally, McCue argues Helton's Seventh Third-Party Claim for illegal recording of a confidential communication under § 632 of the California Invasion of Privacy Act (CIPA) is precluded by the statute of limitations. The CIPA, CAL. PEN. CODE § 630 *et seq.*, has a one-year statute of limitations, and § 637.3 of the CIPA "refers to a singular act, specifically 'examination' or 'recordation,' as triggering a violation of the penal code provision." *Balanzar v. Fidelity Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1082 (S.D. Cal. 2023) (citing CAL. CIV. PROC. CODE § 340); CAL. PENAL CODE § 637.3. Helton alleges McCue recorded their January 8,

2025 telephone conversation without Helton's knowledge, and Helton filed her Third-Party Complaint more than one year later, on January 12, 2026. Helton argues that McCue's challenge cannot be resolved on a motion to dismiss. Specifically, Helton argues her allegations do not establish that her claim is untimely, and McCue's own cited authority applies the discovery rule to a secret-recording penalty claim.

The Court agrees with Helton, particularly where she alleges as to the January 8, 2025 phone call that: at no point before, during, or after the call did she provide consent for any of the discussion with McCue to be recorded; had Helton known the call was being recorded, she would have either not participated in the call or immediately terminated the call upon learning that it was being recorded; and "upon information and belief," McCue recorded the telephone conversation. Helton 3d Party Claims (D. 35 at ECF p. 198). Those allegations do not set forth "everything necessary to satisfy the [statute of limitations] affirmative defense." *Sidney Hillman Health Ctr. of Rochester*, 782 F.3d at 928 (internal citation omitted). Here, because "there is a conceivable set of facts, consistent with the [Third-Party Claims], that would defeat a statute-of-limitations defense," "questions of timeliness [will be] left for summary judgment (or ultimately trial), at which point [this Court] may determine compliance with the statute of limitations based on a more complete factual record." *Id*. Furthermore:

> By its nature, secret monitoring of private conversations is conduct not subject to contemporary reasonable discovery. To apply the unswallowed "portions" of the general rule [that a cause of action accrues when the wrongful act is done] to defeat suits for civil penalties under the [CIPA] would reward those most pernicious wrongdoers who successfully maintain the secrecy of their surreptitious acts.

*Montalti v. Catanzariti*, 236 Cal. Rptr. 231 (Cal. Ct. App. 1987). Simply put, Helton's Seventh Third Party Claim is not subject to dismissal at this stage based upon a statute of limitations defense.

**V**

For the reasons set forth *supra*, Plaintiff/Counter-Defendant Jane Talkington's Motion to Strike and Dismiss Helton's Amended Affirmative Defense and First Amended Counterclaims Under Rules 8(d), 9(b), and 12(b)(6) and (e) (D. 37) is GRANTED IN PART and DENIED IN PART. The Motion is granted as to Helton's Fifteenth Counterclaim for fraudulent concealment under Illinois law which is dismissed with prejudice, and the Motion is denied in all other respects. Third-Party Defendant Megan McCue's Motion to Dismiss Third Party Claims Under Rule 12(b)(6) (D. 58) is DENIED in its entirety.

Should a party file a motion to reconsider which this Court denies, it may enter an Order to Show Cause why the losing side(s) should not pay the attorney fees of the winning side(s) if the Court concludes that the motion did not raise new issues or arguments that could have been raised when filing the original motion.

This matter is referred to the Magistrate Judge for further proceedings.

*It is so ordered.*

Entered on October 22, 2026

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE